**No. 2021-2348**

# In the
# United States Court of Appeals
# for the Federal Circuit

———◆———

LKQ CORPORATION; KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,

*Appellants,*

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,

*Appellee.*

———————————————

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2020-00534.

## BRIEF OF APPELLANTS LKQ CORPORATION and KEYSTONE AUTOMOTIVE INDUSTRIES, INC.

BARRY F. IRWIN, P.C.
IFTEKHAR A. ZAIM
ANDREW C. HIMEBAUGH
IRWIN IP LLC
180 N. Wacker Dr., Suite 400
Chicago, IL 60606
(312) 667-6080
birwin@irwinip.com
izaim@irwinip.com
ahimebaugh@irwinip.com

MARK A. LEMLEY
DURIE TANGRI LLP
217 Liedesdorff St.
San Francisco, CA 94111
(415) 362-6666
mlemley@durietangri.com

MARK P. MCKENNA
LEX LUMINA PLLC
745 Fifth Ave., Suite 500
New York, NY 10151
(646) 898-2055
mark@lex-lumina.com

*Counsel for Appellants*
*LKQ Corporation and Keystone Automotive Industries, Inc.*

**CLAIM**

The ornamental design for a vehicle front fender, as shown and described.



FIG. 1

FIG. 2

FIG. 3

FIG. 4

**FORM 9. Certificate of Interest**                                   Form 9 (p. 1)
                                                                       July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 21-2348 |
| **Short Case Caption** | LKQ Corporation v. GM Global Technology Operations LLC |
| **Filing Party/Entity** | LKQ Corporation |

---

**Instructions:** Complete each section of the form.  In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.  **Please enter only one item per box; attach additional pages as needed and check the relevant box**.  Counsel must immediately file an amended Certificate of Interest if information changes.  Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 12/29/2021          Signature:   /s/Barry Irwin

                          Name:        Barry Irwin

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| LKQ Corporation | | None |
| Keystone Automotive Industries, Inc. | | LKQ Corporation |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable      ☐ Additional pages attached

| | | |
|---|---|---|
| Reid Huefner | Margaret Herrmann | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable      ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable      ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 1

INTRODUCTION .............................................................................. 2

STATEMENT OF THE ISSUES........................................................ 5

STATEMENT OF THE CASE............................................................ 7

SUMMARY OF THE ARGUMENT .................................................. 11

ARGUMENT .................................................................................... 14

    I.      STANDARD OF REVIEW ................................................ 14

    II.    THE BOARD ERRED IN FINDING THAT LIAN DOES NOT
         ANTICIPATE THE CLAIMED DESIGN......................................... 15

        A.    The Board's Definition of the Ordinary Observer Rests on
            Misapplication of the Law and Lacks Substantial Evidence... 15

            1.    The Board Defined the Ordinary Observer as a
                  Repairer, and Not as the Ordinary Consumer. .............. 15

            2.    The Board's Ordinary Observer Definition is
                  Inconsistent with the Supreme Court's Practice and
                  This Court's Precedents................................................. 18

        B.    The Board Erroneously Applied GM's Crowded
            Field Theory............................................................................ 24

            1.    Every difference identified by the Board as
                  defeating substantial similarity was also infected
                  by its "crowded field" approach. .................................. 24

            2.    Applying GM's "crowded field" theory to invalidity
                  yields absurd results..................................................... 26

            3.    Analyzing the claimed design and Lian in context of
                  the prior art demonstrates their substantial similarity. .. 31

C.  The Board Failed to Compare the Designs as a Whole. .......... 35

    1.  The Board applied the wrong test, focusing exclusively on GM's "checklist of small differences" because it improperly defined the ordinary observer and wrongly applied GM's crowded field theory. ............................. 35

    2.  GM's "checklist of differences" further led the Board astray because several of the alleged differences were not real. ......................................................................... 40

III.  THE BOARD ERRED BY REFUSING EVEN TO CONDUCT A FULL OBVIOUSNESS ANALYSIS ............................................49

A.  The Rosen Requirement to Identify a Single Reference That Is "Basically the Same" as the Claimed Design Is Not Consistent with KSR. .............................................................. 50

    1.  Other Circuits Have Applied a Test Consistent with KSR. .................................................................... 56

    2.  The Current Standard for Testing Obviousness Improperly Conflates Anticipation and Obviousness. .. 59

B.  Lian Must Be Sufficient as a Primary Reference, and Alone or In Combination with the Tucson Renders the Claimed Design Obvious. ...................................................................... 60

C.  The Board's Erroneous Refusal to Consider the Tucson Reference and the Ordinary Designer's Knowledge Was Prejudicial ................................................................................ 66

D.  The Board Erred in Refusing to Consider LKQ's Obviousness Grounds for Purportedly Insufficient Claim Construction. ..... 68

CONCLUSION ...................................................................................71

# TABLE OF AUTHORITIES

## CASES

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*,
　501 F.3d 1314 (Fed. Cir. 2007) ....................................................... 11, 20

*Automotive Body Parts Ass'n. v. Ford Global Techs., LLC*,
　930 F.3d 1314 (Fed. Cir. 2019) ............................................................22

*Becton, Dickinson & Co. v. Baxter Corp. Englewood*,
　998 F.3d 1337 (Fed. Cir. 2021) ............................................................66

*Belden Inc. v. Berk-Tek LLC*,
　805 F.3d 1064 (Fed. Cir. 2015) ............................................................14

*Campbell Soup Co. v. Gamon Plus, Inc.*,
　10 F.4th 1268 (Fed. Cir. 2021) (*Campbell II*) .....................................14

*Campbell Soup Co. v. Gamon Plus, Inc.*,
　939 F.3d 1335 (Fed. Cir. 2019) (*Campbell I*) .....................................14

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
　372 F.3d 471 (2d Cir. 2004) ................................................................29

*Crocs, Inc. v. Int'l Trade Comm'n.*,
　598 F.3d 1294 (Fed. Cir. 2010) ............................................. 12, 47, 48

*Durling v. Spectrum Furniture Co., Inc.*,
　101 F.3d 100 (Fed. Cir. 1996) ........................................ 50, 51, 56, 58

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
　543 F.3d 665 (Fed. Cir. 2008) ..................................................... passim

*Fields v. Schuyler*,
　472 F.2d 1304 (D.C. Cir. 1972) ..........................................................58

*Gorham Mfg. Co. v. White*,
　81 U.S. 511 (1871) ......................................................... 11, 18, 19, 35

*In re Borden,*
  90 F.3d 1570 (Fed. Cir. 1996) ...............................................................51

*In re Carter,*
  673 F.2d 1378 (CCPA 1982) ....................................................... 13, 63

*In re Cooper,*
  480 F.2d 900 (CCPA 1973) .................................................................64

*In re Harvey,*
  12 F.3d 1061 (Fed. Cir. 1993) ...............................................................51

*In re Laverne,*
  356 F.2d 1003 (CCPA 1966) ................................................................53

*In re Nalbandian,*
  661 F.2d 1214 (CCPA 1981) ....................................................... 53, 65

*In re Rosen,*
  673 F.2d 388 (CCPA 1982) ......................................................... 12, 50

*Int'l Seaway Trading Corp. v. Walgreens Corp.,*
  589 F.3d 1233 (Fed. Cir. 2009) ................................................... passim

*Keystone Retaining Wall Sys., Inc. v. Westrock, Inc.,*
  997 F.2d 1444 (Fed. Cir. 1993) .............................................................20

*KSR Int'l Co. v. Teleflex, Inc.,*
  550 U.S. 398 (2007) ..................................................................... passim

*Lanard Toys Ltd. v. Dolgencorp LLC,*
  958 F.3d 1337 (Fed. Cir. 2020) ................................................... 26, 27

*Litton Systems, Inc. v. Whirlpool Corp.,*
  728 F.2d 1423 (Fed. Cir. 1984) .............................................................22

*MRC Innovations, Inc. v. Hunter Mfg.,*
  747 F.3d 1326 (Fed. Cir. 2014) ....................................... 13, 51, 68, 69

*Peters v. Active Mfg. Co.*,
   129 U.S. 530 (1889) ................................................................. 28, 30

*Qualcomm Inc. v. Intel Corp.*,
   6 F.4th 1256 (Fed. Cir. 2021) ...................................................... 24, 62

*Sidewinder Marine, Inc. v. Starbuck Kustom Boats & Prods., Inc.*,
   597 F.2d 201 (10th Cir. 1979) ...................................................... 57, 58

*Sport Dimension, Inc. v. Coleman Co., Inc.*,
   820 F.3d 1316 (Fed. Cir. 2016) ..........................................................14

*Titan Tire Corp. v. Case New Holland, Inc.*,
   566 F.3d 1372 (Fed. Cir. 2009) .............................................. 51, 53, 54

*Tranchita v. Callahan*,
   511 F. Supp. 3d 850 (N.D. Ill. 2021).................................................29

*Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*,
   309 F. Supp. 2d 459 (S.D.N.Y. 2003) .......................................... 29, 30

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ........................................................................1

35 U.S.C. § 102 .................................................................................5, 27

35 U.S.C. § 103 ........................................................................... passim

35 U.S.C. § 171 ....................................................................................27

35 U.S.C. §§ 141-144...............................................................................1

35 U.S.C. §§ 311-315...............................................................................1

35 U.S.C. § 319 ......................................................................................1

**OTHER AUTHORITIES**

Courtney Taylor, *What are the Converse, Contrapositive, and Inverse?*,
    https://www.thoughtco.com/converse-contrapositive-and-inverse-3126458
    (last accessed Jan. 12, 2022)......................................................................... 29, 30

Nonobviousness—The Ultimate Condition of Patentability
    (John F. Witherspoon ed., 1980) ..........................................................................59

## STATEMENT OF RELATED CASES

There have been no other appeals in or from the Patent Trial and Appeal Board ("PTAB")'s decision in IPR2020-00534 (concerning U.S. Design Patent D797,625 ("the '625 Patent")) before this or any other appellate court. Counsel for Appellants is not aware of any other case pending in this or any other court or agency that will directly affect or be directly affected by the Court's decision on this appeal.

## JURISDICTIONAL STATEMENT

The PTAB had jurisdiction over IPR2020-00534 pursuant to 35 U.S.C. §§ 311-315. On August 4, 2021, the PTAB entered a final written decision ("Decision") in the proceeding. Appx0001-0060. Appellants timely filed their notice of appeal on October 7, 2021. Dkt. 3. Further, Appellants currently offer for sale a product that Appellants believe Appellee would deem to infringe the design patent challenged in IPR2020-00534, and Appellants reasonably believe that Appellee would commence legal proceedings against Appellants alleging infringement of that design patent. Thus, Appellants have standing to appeal the PTAB's decision in IPR2020-00534, and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141-144, 319.

## INTRODUCTION

The PTAB concluded that the design reflected in the primary prior art reference relied upon by LKQ, U.S. Pat. No. D773,340 ("Lian"), was neither substantially similar to nor basically the same as the claimed design. As a result, the Board concluded that it did not even need to consider whether the differences between Lian and the claimed design would be obvious to a designer of ordinary skill in the art. Given the striking similarity between the designs, as shown in the illustrations below, those conclusions could only be premised upon a misunderstanding of the law:

| '625 PATENT CLAIMED DESIGN | LIAN PRIOR ART |
|---|---|
|  | |
| Appx0063, FIG. 2 | Appx0450, FIG. 4 (cropped, annotated) |



| | |
|---|---|
| Appx0064, FIG. 3 | Appx0449, FIG. 1 (cropped, annotated) |
| Appx0064, FIG. 4 | Appx0451, FIG. 5 (cropped, annotated) |
| Appx0063, FIG. 1 | Appx0452, FIG. 6 (cropped, annotated) |

The Board did not evaluate the two designs as a whole from the perspective of the only observer to whom the design actually matters—the purchaser of the automobile incorporating that design. Instead, the Board erroneously defined the ordinary observer as the purchaser of a replacement part looking to restore a vehicle to its original design. The Board further erred by applying a nonsensical legal test for anticipation, under which a design is *more likely* to be found novel when there is *more* prior art. As a result, the Board treated trivial differences between the claimed

design and Lian as significant, giving undue weight to GM's "checklist of differences," rather than comparing the designs as a whole.

Those errors also infected the Board's obviousness analysis. In determining whether the design in Lian was "basically the same" as the claimed design, the Board once again compared the designs through the lens of GM's "checklist of differences" rather than considering the designs as a whole. Remarkably, having determined in the context of anticipation that the differences between the designs were small, the Board turned around and treated those very same differences as meaningful enough to avoid obviousness.

Because the Board found that no one reference was "basically the same" as the patented design, it never even looked at the secondary prior art reference relied upon by LKQ—one that teaches every purportedly meaningful difference between the prior art and the claimed design. That was error. The CCPA's bright-line requirement of a primary reference cannot survive *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007). The Supreme Court's test for obviousness does not require a single reference that discloses a design that is basically the same as the claimed design; indeed, there was no such primary reference in *KSR*. The requirement of a primary reference cannot be squared with *KSR*'s holistic approach. Nor does the Board's narrow focus reflect the reality of design practice. Designers routinely create new designs by combining aspects of different designs. Designers

would not only find designs to be obvious when they make minor modifications to an existing design.

## STATEMENT OF THE ISSUES

1. Whether, in determining if Lian anticipates the claimed design under 35 U.S.C. § 102:

    a. the Board erroneously defined the ordinary observer as the purchaser of a replacement part embodying the claimed design rather than the purchaser for whom the part was designed, *i.e.*, the purchaser of the vehicle first incorporating that part;

    b. the Board erroneously found that trivial differences between Lian and the claimed design were significant to an ordinary observer because there were numerous similar prior art designs despite finding that GM had not proven that vehicle fenders is a crowded field; and/or

    c. the board erroneously concluded that the overall visual impression of Lian was not substantially the same as the claimed design because of trivial differences it found would be noticed by the replacement purchaser.

2.  Whether, in finding that the claimed design was not obvious under 35 U.S.C. § 103:

   a. the Board erred in applying *Rosen* and demanding a single primary reference as a predicate to the obviousness analysis despite the Supreme Court's rejection of such bright-line rules in connection with the obviousness analysis in *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007);

   b. the Board erred in conflating the tests for anticipation and obviousness by treating a prior art reference as a qualifying primary reference only when the design disclosed in that prior art reference is "basically the same" as the claimed design;

   c. the Board erroneously found that the design in Lian was not basically the same as the claimed design in light of GM's checklist of differences, without regard to the overall visual similarities between the designs and despite the triviality of those differences; and/or

   d. the Board erred by requiring LKQ to provide an exhaustive verbal claim construction as a predicate to evaluating obviousness.

## STATEMENT OF THE CASE

LKQ argued in its Petition that GM's D797,625 Patent ("the '625 Patent") was invalid as anticipated or obvious in light of Lian alone or (to the extent an express teaching of a rounded wheel arch and termination of the fender above the rocker panel was necessary) in combination with the closely related 2010 Hyundai Tucson fender as disclosed in a prior art Hyundai promotional brochure ("Hyundai Tucson"). Appx0134-0218. Images of the claimed design, Lian, and the Hyundai Tucson are presented below:

| '625 PATENT CLAIMED DESIGN | LIAN PRIMARY REFERENCE | TUCSON SECONDARY REFERENCE |
|---|---|---|
|  Appx0063, FIG. 2 |  Appx0450, FIG. 4 (cropped, annotated) |  Appx0464 (cropped, rotated) |
|  Appx0064, FIG. 3 |  Appx0449, FIG. 1 (cropped, annotated) |  Appx0462 (cropped, flipped) |

| '625 PATENT CLAIMED DESIGN | LIAN PRIMARY REFERENCE | TUCSON SECONDARY REFERENCE |
|---|---|---|
|  Appx0064, FIG. 4 |  Appx0451, FIG. 5 (cropped, annotated) |  Appx0462 (cropped, flipped) |
|  Appx0063, FIG. 1 |  Appx0452, FIG. 6 (cropped, annotated) |  Appx0453 (cropped, flipped) |

Appx1134 (LKQ Reply at 30). LKQ's Petition was supported by the testimony of Mr. James M. Gandy, a former Design Patent Practice Specialist for Technology Center 2900 at the United States Patent and Trademark Office (USPTO), and Mr. Jason C. Hill, an expert automobile designer. Appx0294-0418.

GM submitted a Preliminary Response advancing most of the arguments and alleged distinctions it would later rely upon in its Patent Owner's Response. Appx0694-0742. GM argued that LKQ's claim construction was deficient, it inappropriately defined the ordinary observer, and it relied on an alleged crowded

field as a basis for focusing the ordinary observer analysis on trivial differences between the design and the prior art.  Appx0704-0729.

The Board, in its Institution Decision, Appx0778-0813, considered and rejected GM's arguments and determined that "comparison of the '625 design and Lian [was] consistent with LKQ's claim charts and analysis as supported by [LKQ's experts]."  Appx0800 (Institution Decision at 23).  The Board further considered and rejected each of the distinctions GM attempted to draw between Lian and the claimed design as to both anticipation and obviousness.  In its anticipation analysis, the Board found:

> the creases, bends, and folds in the panel, although arguably dissimilar when analyzed in minute detail, those features do not appear as particularly different when considering the designs as a whole.

Appx0805 (Institution Decision at 28).

In its Final Written Decision, the Board changed its position on nearly all of its prior determinations without even acknowledging its prior conclusions or explaining the changes.  The Board incorporated into its claim construction as "readily observable and relevant to the overall appearance of the claimed design" detailed verbal descriptions of the features that GM identified in its claim construction.  Appx0015-0016 (Decision at 15-16).  Because GM described the features of its design in order to distinguish it from Lian, the Board effectively construed the '625 Patent in terms of its differences versus Lian.  *See*

9

Appx0006-0007 (Decision at 6-7) ("GM asserts that there are five specific ornamental aspects of the design that **contribute to its uniqueness**") (emphasis added); Appx0016-0017.

In contrast to the Institution Decision, in which the Board acknowledged that LKQ's Petition "assessed in comparison to Lian, in detail and with analysis, many of the visually prominent elements that contribute to the overall appearance of the claimed design," Appx0799 (Institution Decision at 22), the Final Written Decision's analysis of the designs' similarities consisted almost entirely of the following:

> We recognize there are certain articulable and visible similarities in the overall appearance of the claimed design and Lian that would be apparent to an ordinary observer. As LKQ contends, both designs include a top protrusion and u-shaped notch. Pet. 13, 48. Below the u-shaped notch, Lian arguably shows a first and second crease extending forward from a door cut line as well as a concavity between the first and second creases. *Id.* at 14, 48–49. Also, the distal portion, *i.e.* [sic] the front left, of both designs has a slanted forward edge extending between the wheel arch and front elevation profile fairly close in appearance. *Id.* at 52–53.

Appx0030-0031 (Decision at 30-31). Having diminished the similarities between the designs, the Board then focused on GM's checklist of purported differences, all of which are trivial to the extent they even exist. Further, the Board cut short the obviousness inquiry without considering LKQ's obviousness combination, first because LKQ purportedly failed to discern the correct overall visual impression of

the claimed design, and then because it concluded that LKQ had not identified a primary reference.

## SUMMARY OF THE ARGUMENT

The Board erred by incorrectly defining the ordinary observer for purposes of anticipation as a purchaser of a replacement part seeking to repair an existing vehicle.  The Board should have defined the ordinary observer as the purchaser of a new vehicle because that is the person to whom the claimed design actually was directed and marketed.  *See, e.g.*, *Gorham Mfg. Co. v. White*, 81 U.S. 511 (1871); *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314 (Fed. Cir. 2007).

Second, the Board erred by crediting GM's specious "crowded field" theory despite having nominally rejected that theory as lacking legal and factual foundation.  Each of the Board's anticipation determinations was based on its assumption that the ordinary observer would "notice" trivial differences because of the supposed "crowded field."  However, applying GM's "crowded field" theory to anticipation yields absurd results and is contrary to law.  *See, e.g.*, *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 678 (Fed. Cir. 2008) (*en banc*).

Finally, the Board erred by focusing on GM's checklist of differences rather than comparing the claimed design and the design disclosed in Lian as a whole.  This alone merits reversal.  *See, e.g.*, *Crocs, Inc. v. Int'l Trade Comm'n*., 598 F.3d 1294,

1302-1303 (Fed. Cir. 2010) (reversing an ITC determination of design patent noninfringement for failure to consider the designs as a whole).  In evaluating the similarity of the designs, the Board wrongly relied on the testimony of GM's declarant, who admitted he never compared the designs as a whole and instead focused on the differences.  Appx1110-1111 (Reply at 6-7) (citing Appx1411-1413 (Deposition of Thomas V. Peters ("Peters") at 63-65); Appx1500-1501 (Peters at 152-53)).

With respect to obviousness, the Board first erred in applying the CCPA's *Rosen* test for design patent obviousness.  *See In re Rosen*, 673 F.2d 388 (CCPA 1982).  *Rosen's* requirement of a "primary reference" that is "basically the same" as the claimed design as a predicate for obviousness is the type of rigid and mandatory approach that the Supreme Court rejected in favor of a more expansive and flexible approach to obviousness.  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007).  This *Rosen* step only misdirects the obviousness inquiry away from the real issue: whether the claimed design would have been obvious to a person of ordinary skill in the art.  It also blurs the distinction between anticipation and obviousness in a manner contrary to law.

Second, the Board erred in finding that Lian did not disclose a design that is "basically the same" as the claimed design.  The Board's comparison of the designs erroneously focused upon trivial differences instead of comparing overall visual

12

appearances.  The Board's rejection of Lian as a primary reference was inconsistent with this Court's precedents, which have found less similar designs to be "basically the same."  *See, e.g.*, *In re Carter*, 673 F.2d 1378, 1380 (CCPA 1982).

Finally, the Board erred in cutting the obviousness inquiry short in two distinct respects.  First, because it erroneously rejected Lian as a primary reference, the Board refused to consider the combination of Lian and the 2015 Tucson.  Second, the Board erroneously determined that it could deny Appellant's obviousness ground without even analyzing obviousness because LKQ purportedly did not offer a sufficient claim construction.  Both conclusions are antithetical to the expansive and flexible approach to obviousness mandated by the Supreme Court in *KSR*, 550 U.S. at 415-21, and the Board's claim construction determination was further contrary to this Court's precedents, which do not require a detailed claim construction.  *See MRC Innovations, Inc. v. Hunter Mfg.*, 747 F.3d 1326, 1332 (Fed. Cir. 2014).

# ARGUMENT

## I. STANDARD OF REVIEW

In appeals from *Inter Partes* Review proceedings, the ultimate claim constructions of a design patent are reviewed *de novo*, and any underlying factual findings are reviewed for clear error. *Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316, 1321 (Fed. Cir. 2016). Further, this Court reviews the Board's legal conclusions *de novo* and its factual findings for substantial evidence. *Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1339 (Fed. Cir. 2019) (*Campbell I*).

Anticipation is a question of fact reviewed for substantial evidence. *Id.*; *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1237 (Fed. Cir. 2009). The ultimate determination of obviousness is reviewed *de novo*, and any underlying factual findings are reviewed for substantial evidence. *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir. 2021) (*Campbell II*). (citations omitted). However, like other legal questions, errors of law in applying the test for anticipation and/or obviousness are reviewed *de novo*. *See Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[This Court] review[s] the Board's compliance with the governing legal standards *de novo*").

## II.   THE BOARD ERRED IN FINDING THAT LIAN DOES NOT ANTICIPATE THE CLAIMED DESIGN.

### A.   *The Board's Definition of the Ordinary Observer Rests on Misapplication of the Law and Lacks Substantial Evidence.*

#### 1.   **The Board Defined the Ordinary Observer as a Repairer, and Not as the Ordinary Consumer.**

Because the design at issue is one for an automobile fender, the Board should have defined the ordinary observer as "the retail consumer of an automobile." Appx0182-0183 (Petition at 40-41).  That is the consumer for whom fenders are designed; fenders are not sold in the first instance as separate products.

GM never explained why the automobile purchaser for whom the part was originally designed is not the appropriate ordinary observer.  Instead, pointing to evidence submitted in other proceedings showing that *LKQ's* typical purchasers are repair shops, GM argued that the ordinary observer "includes commercial buyers who purchase replacement vehicle front fenders to repair a customer's vehicle, such as repair shop professionals."  Appx0704-0705 (GM Preliminary Response at 7-8). LKQ's customers are irrelevant; anticipation requires reference to the ordinary observer of *GM*'s claimed design.

The Board applied a standard even further removed from the ordinary observer than GM's: the perspective of someone inspecting a repaired vehicle with the prior art fender installed on one side and the claimed fender installed on the opposite side.  That perspective was evident in oral argument:

> JUDGE OBERMANN: But I think this is really important because, you know, you're sort of rocking the whole world that I had around these cases. ***Because I've always been thinking about this in terms of what's going to be acceptable to that post-buyer.*** You know, the person who's got the car. They're going to bring it into a shop. It's got to be acceptable to the person who owns that shop and has to get paid by the guy that brought it in. Right? And the guy that brought it in, ***if you get something that doesn't look like the other side of the car, if it's a different fender, you know*** -- You've got a couple things going on here. You've got, you know, what could be a potentially sophisticated purchase[sic] of a high end item. Looking to replace, you know, a fender, ***it's got to look like the other fender on the car or they're not going to accept it.*** Right?

Appx1764 (Hearing Transcript at 10) (emphasis added). And the Board's Final Written Decision embodied this legally erroneous approach, ignoring the new vehicle purchase context entirely and focusing even the vehicle owner's perspective exclusively on repair applications. The Board found:

> the interests and goals of both the vehicle owner and repair shop person are aligned, that is—***in the context of repair,*** to return the vehicle to its original appearance. Even if we chose between the two, the level of detail and analysis would not change sufficiently to affect the outcome of this Decision.

Appx0022 (Decision at 22) (emphasis added). Further, the Board found that "the ordinary observer readily recognized incongruity associated with a part that does not fit or match other parts of the vehicle it is attached to." Appx0023 (Decision at 23).

LKQ demonstrated throughout the proceeding, and it was undisputed, that a fender is designed to be integrated into and marketed as part of a complete

16

automobile. Indeed, there is no meaningful independent market for automobile parts other than for the repair of the original vehicle for which they were designed. Appx0182-0183 (Petition at 40-41) (citing Ex. 1004, ¶34 (Hill Dec)). Replacement parts are offered and sold as a downstream consequence of the prior sale of a vehicle having that part, and those parts are only sold if one of the vehicles for which it was designed is damaged and needs that part to be replaced. *Id.* It makes little sense to determine whether a design is anticipated by analyzing it in the context of a purchase that may never happen.

The Board's focus on the replacement part context was erroneous because, unlike new car purchasers, replacement part purchasers are not purchasing the design as such. They are simply matching the design they have already bought. That is also why it makes no sense to focus on automobile repair shops. Those shops seek to return a damaged car to its original design, and in that context a fender is a "must-fit" part that is required to be equivalent in form, fit, and function to the original part.[1] Defining the ordinary observer in the replacement context places undue emphasis on trivial differences that do not matter to the consumers for whom fenders are designed.

---

[1] Many states require insurance companies to return vehicles to their original form, fit, and function. *See* Appx0757-0758 (LKQ Letter to CBP, 2017-09-28) (citing Georgia, Florida, New York, Washington, Indiana, and Tennessee cases and statutes).

### 2. The Board's Ordinary Observer Definition is Inconsistent with the Supreme Court's Practice and This Court's Precedents.

Evaluating the designs from the perspective of someone repairing an existing vehicle is inconsistent with *Gorham Mfg. Co. v. White*, 81 U.S. 511 (1871), and contrary to this Court's precedents.

*Gorham* involved the design of silverware. Significantly, the Court viewed the ordinary observer as the prospective purchaser of a new *set* of silverware, not a person buying a replacement piece for an existing set. *Gorham Mfg.*, 81 U.S. at 530. As the images below demonstrate, the design of the allegedly infringing silverware in *Gorham* was different enough that pieces with that design could not have passed as replacement pieces for an existing set of the claimed design:



Appx1110 (LKQ Reply at 6) (citing *Gorham Mfg.*, 81 U.S. at 521) (selected differences annotated); *see also id.* at 530-31 (expressly rejecting that "identity of design … is the possibility of being struck from the same die" and finding the designs

"so much alike that in the market and with purchasers they would pass for the same thing").

Neither of the Board's cited cases, *Arminak* and *Keystone*, support the proposition that the ordinary observer should even include replacement part purchasers, much less that such a purchaser's perception should govern the inquiry. Rather, both cases counsel that the purchaser to whom the design is marketed as its primary customer should be deemed the "ordinary observer."

*Arminak* involved trigger sprayer shrouds that were sold to "purchaser[s] of trigger sprayer mechanisms for assembly and incorporation into the product that [was] sold to retail consumers." *Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1321 (Fed. Cir. 2007). This Court defined the ordinary observer as the purchaser of the sprayer shroud that was assembled into spray bottles, not retail consumers of the assembled bottles. *Id.* at 1323. Likewise, in *Keystone*, a case involving patented wall blocks, the Court focused on purchasers of the unassembled blocks, not purchasers of assembled walls. *Keystone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir. 1993). In both cases, the Court defined the ordinary observer as the person to whom the article was marketed in the first instance. The anticipation analysis does not change just because downstream purchasers might later need identical replacement parts for their spray bottles or retaining walls.

The key question is: who is the customer to whom the designer marketed and sold the article embodying the design?  In the case of fender designs, the answer is undisputed: fenders are designed to be marketed and sold to prospective purchasers of vehicles.  Appx0182-0183 (Petition at 40-41).  GM does not make and sell fenders to car assemblers; GM makes and sells cars that include its fenders.  Even GM's declarant testified that designers of vehicle fenders are focused on the purchasers of vehicles:

> Q.    All right. You say also in paragraph 10: Ultimately the designer's focus is driven by the customer.  …. What do you mean by that?
>
> A.    I think since you design a product that's going to be for sale, to me that's the difference between fine art and, say, a professional designer, *you're designing a product. Designing – you're designing a product that would be purchased.*
>
> Q.    So in that context, the customer, who are you referring to?
>
> A.    The customer would be the end user or *the one who would purchase the vehicle,* for example.
>
> Q.    Okay. So the designer's focus is driven by the end user of the vehicle?
>
> A.    *Purchaser* of the vehicle.

Appx1383-1384 (emphases added) (citing Appx0880 (Ex. 2004 ¶ 10)).  Indeed, when this Court found in a previous case involving auto parts that the design of an auto body part was important to consumers, and that such parts could embody different

designs, it identified the relevant consumers as those deciding which car to buy. *Automotive Body Parts Ass'n. v. Ford Global Techs., LLC*, 930 F.3d 1314, 1321 (Fed. Cir. 2019).

As a consequence of the Board's erroneous definition of the ordinary observer, it placed undue emphasis on trivial differences, ignoring this Court's repeated emphasis on overall visual appearances. In *Egyptian Goddess*, this Court cautioned against issuing detailed verbal claim constructions precisely because of the risk that doing so would lead the factfinder to place undue emphasis upon particular features of the design instead of its overall visual appearance. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 680 (Fed. Cir. 2008). And, in *International Seaway*, this Court held:

> The mandated overall comparison is a comparison taking into account ***significant differences*** between the two designs, ***not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another.*** Just as "minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement[,]" so too minor differences cannot prevent a finding of anticipation.

589 F.3d at 1243 (quoting *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed. Cir. 1984) (abrogated on other grounds)) (emphases added).

Further, defining the ordinary observer as the purchaser of a replacement part would illogically create two different standards for anticipation. For designs not routinely sold as repair parts, there can be no doubt that the ordinary observer would

be defined as the purchaser of the article to whom it was marketed in the first instance. However, for a design sold both as part of an original article and as a repair part for that article, according to the Board, the ordinary observer would be defined as a replacement purchaser seeking a design exactly matching that which they are replacing.[2] No case supports such a proposition.

The Board defined the ordinary observer in a manner contrary to law and contrary to the evidence in this case. This error infects all of the Board's findings as to anticipation. Those findings necessarily lack substantial evidence because the Board never considered substantial similarity from the perspective of a proper ordinary observer—the purchaser of a vehicle—but only from the perspective of a repair shop professional or automobile owner seeking to repair a vehicle with a part having the identical design as the part being repaired.

---

[2] As GM argued, repair parts intended to restore a vehicle to its original visual appearance must correspond to the part they are replacing. *See, e.g.*, Appx0832 *et seq.* (GM Response at 15); Appx0838 (GM Response at 21); Appx0841 ("The protrusion must closely match the perimeter of the hood, A-pillar, and door, and corresponding surface features of these components, respectively."); Appx0859 ("The design effect of the lower, rear portion would have been magnified to the ordinary observer because it must closely match the perimeter edge of the corresponding door in order to provide a consistent visual impression and mechanical fit with the door and other components of the vehicle.").

### B. The Board Erroneously Applied GM's Crowded Field Theory.

#### 1. Every difference identified by the Board as defeating substantial similarity was also infected by its "crowded field" approach.

GM argued that, because the field of fender design was allegedly crowded, as a matter of law, even trivial differences between Lian and the claimed design would be significant to the ordinary observer. *See* Appx0829-0831 (GM Response at 12-14). In its Final Written Decision, the Board purported to reject GM's crowded field theory on both legal and factual grounds. Appx0011-0013 (Decision at 11-13). Nevertheless, the Board found that the ordinary observer would be attuned to the trivial differences identified by GM because of the amount of prior art.[3] For example, as to the door cut line, the Board determined:

> Considering the evidence here, we find persuasive Mr. Peters' testimony that **when considered in light of prior art fender designs,** an ordinary observer would have considered differences, **even in nuanced elements** such the door cut lines, "and these nuanced differences would have had a substantial impact on the overall appearance of fender designs to the ordinary observer." Ex. 2004 ¶ 52.

Appx0035-0036 (Decision at 35-36) (emphases added).

---

[3] To the extent the Board was doing something other than incorporating GM's argument, such as concocting a new legal theory, it committed error, as LKQ was given neither notice of, nor opportunity to respond to such a theory. *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1263-64 (Fed. Cir. 2021).

Similarly, the Board found the at most minor differences in creases and sculpting to be meaningful because of the number of prior art fender designs:

> Considering the crease lines and horizontal visual details of the designs, we find persuasive GM's arguments and Mr. Peters' testimony that an ordinary observer would not find the fender body sculpting substantially similar between Lian and the claimed design. PO Resp. 32–37 (citing Ex. 2004 ¶¶ 81–89). Moreover, it is reasonably clear that an ordinary observer ***would be aware of other prior art fender designs and would notice specific details in the sculpting.*** See, e.g., Ex. 2008, 20:6–15 (LKQ's declarant, Mr. Hill, agreeing that the sculpting on the fender would "be meaningful to an ordinary observer.").

Appx0039 (Decision at 39) (emphasis added).

And as to the wheel arch and lower rear terminus, the Board determined:

> Because an ordinary observer would consider at least the wheel arch and terminus differences ***as a relevant part of the overall appearance of the claimed design in the context of Lian and other known prior art fenders***, and because these elements are not minor in that they affect the overall visual impression of the fender, we are persuaded that an ordinary observer would not be so easily deceived into purchasing Lian's fender thinking it to be the claimed fender. *See Egyptian Goddess*, 543 F.3d at 677 ("Where the frame of reference consists of numerous similar prior art designs, those designs can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer.").

Appx0033-0034 (Decision at 33-34) (emphasis added).

The Board thus concluded that the ordinary observer should be attuned to even trivial differences because of this improper "crowded field" theory despite having found that the theory lacked legal and factual support.

### 2.    Applying GM's "crowded field" theory to invalidity yields absurd results.

The Board's conclusion that unspecified prior art would cause its ordinary observer to recognize trivial differences and thus consider them substantial is erroneous as a matter of law.  This Court in *Egyptian Goddess* stated expressly that the use of prior art to provide context for evaluation of similarity was appropriate ***only*** as part of the ordinary observer test for infringement; it is ***not*** a test for validity. *Egyptian Goddess*, 543 F.3d at 678-79 ("We emphasize that although the approach we adopt will frequently involve comparisons between the claimed design and the prior art, it is not a test for determining validity, but is designed solely as a test of infringement.").

Applying an approach that renders anticipation more difficult to prove as the prior art becomes more robust is nonsensical.  The point of analyzing the prior art in the context of infringement is to protect against substantial similarity being found based solely upon features common in the prior art. *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1344 (Fed. Cir. 2020).  That is a risk for design patents because an accused design does not have to be identical to the claimed design to be infringing.  A design is infringing whenever it is "substantially the same" as the

26

claimed design from the perspective of an ordinary observer. *Id.* at 1341. Design patents cast a shadow.

To the extent evaluation of similarity in light of prior art leads courts to find noninfringement based on minor differences, that is because there is more reason to worry that the design patent's shadow will engulf the prior art when there is a lot of prior art. Thus, the more crowded the field, the narrower the scope of the design patent. *See Egyptian Goddess*, 543 F.3d at 675-76 (explaining genesis and effects of "crowded field"). If it were otherwise, patentees could enforce their patents against designs that are more different from the patented design than the patented design was from the prior art.

In the context of anticipation, however, applying the crowded field in such a way would yield absurd results. It would mean that the very same piece of prior art would anticipate a given design at an earlier date but would cease to anticipate that same design at a later date merely because other designs were contributed to the field in the intervening time. That is antithetical to the very concept of novelty; what was once not new cannot later ***become*** new.

The crowded field approach also moves design patent anticipation away from how the anticipation inquiry functions for utility patents. Pursuant to 35 U.S.C. § 171, design patent anticipation is governed by the same statutory language and requirements as apply to utility patents under 35 U.S.C. § 102. *Int'l Seaway*, 589

F.3d at 1238.  In the context of utility patents, the more robust the field of prior art, the **more** purported inventions would be found anticipated.  The crowded field approach as applied by the Board has the opposite effect:  the fewest designs are novel at the very inception of the field, and the number of novel designs *increases* as the field matures.

Finally, if an ordinary observer finds the prior art substantially the same as the patented design, it makes no difference if there are other very similar prior art references.  GM makes much of *International Seaway*'s statement that the same test must be applied to infringement and anticipation, Appx1591 (GM Surreply at 6), but that statement merely stands for the uncontroversial principle that anticipation, like infringement, must be considered from the standpoint of the ordinary observer.  *See Int'l Seaway*, 589 F.3d at 1239-40 (explaining that, pursuant to *Egyptian Goddess*, the ***ordinary observer test*** must be the sole test for anticipation).

While it is true that the Supreme Court has said that "[t]hat which infringes, if later, would anticipate, if earlier," *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889), that maxim does not require the tests to be identical in every respect. It merely posits that a simple conditional statement is true:

> **If** Widget would infringe a patent if later,
>
> **then** Widget would anticipate that patent if earlier.

In importing the crowded field approach into anticipation, the Board concluded that the ***inverse*** of this conditional statement must be true:

> **If** Widget would **not** infringe a patent if later [because of a crowded field],
>
> **then** Widget would **not** anticipate that patent if earlier.

However, basic logic provides that the inverse of a conditional statement is not the logical equivalent of the original statement. *See Tranchita v. Callahan*, 511 F. Supp. 3d 850, 874-75 (N.D. Ill. 2021) (citing *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 480 (2d Cir. 2004); Courtney Taylor, *What are the Converse, Contrapositive, and Inverse?*, https://www.thoughtco.com/converse-contrapositive-and-inverse-3126458 (last accessed Jan. 12, 2022) ("Taylor ThoughtCo Article")).

To provide a simple example, one could assume it is true that "if it rained last night, then the sidewalk is wet." Taylor ThoughtCo Article. "The inverse[,] 'If it did **not** rain last night, then the sidewalk is **not** wet[,]' is not necessarily true. The sidewalk could be wet for other reasons." *Id.* (emphasis added). In other words, the truth of the original conditional statement does not render the inverse true. *Id.* However, the contrapositive of a conditional statement is its logical equivalent and necessarily a true statement. *Id. Accord Xpedior Creditor Trust v. Credit Suisse First Boston (USA) Inc.*, 309 F. Supp. 2d 459, 462 n.1 (S.D.N.Y. 2003). Referring back to the simple example of the sidewalk, the contrapositive of "if it rained last

night, then the sidewalk is wet" would be "if the **sidewalk** is **not** wet, then it did **not rain** last night," and this, too, is a true statement.  Taylor ThoughtCo Article.

The contrapositive of the maxim set forth in *Peters* is as follows:

> **If** Widget would **not** anticipate a patent if earlier,
>
> **Then** Widget would **not** infringe that patent if later.

*See Xpedior Creditor Trust*, 309 F. Supp. 2d at 462 n.1 (illustrating the contrapositive); *Peters*, 129 U.S. at 537.  Thus, *Peters* did *not* require that anticipation must have an equivalent scope to infringement.  Rather *Peters* only requires that anticipation have *no less scope* than infringement.  The *Peters* maxim does not prohibit a design from anticipating a claimed design if earlier, even if that same design would not have infringed the claimed design if later.  This Court is not only free, but in fact bound by *en banc* precedent, to honor *Egyptian Goddess'* admonition that its comparison versus the prior art is "not a test for determining validity, but solely a test for infringement," *Egyptian Goddess*, 543 F.3d at 678-79.[4]

Applying the crowded field to invalidity reduces anticipation to an absurd legal mirage, receding as the prior art encroaches.  Yet, as shown above, the Board contorted the anticipation inquiry around this purported "crowded field" theory in its analysis.  The Board's application of this theory to anticipation in contravention

---

[4]    While we do not understand *International Seaway* to reject this holding in *Egyptian Goddess*, if it is understood to do so, it is *International Seaway* that must give way to the Court's *en banc* statement to the contrary.

of this Court's admonition in *Egyptian Goddess* reduced anticipation to a nullity and constituted legal error.

### 3. Analyzing the claimed design and Lian in context of the prior art demonstrates their substantial similarity.

The similarities between Lian and the claimed design were not features common in the prior art. This was apparent upon comparing the claimed design and Lian against GM's six 'featured' "crowded field" prior art references (Appx1294) and against all of GM's cited "crowded field" references (Appx1295-1296), as LKQ did. Each of these comparisons is set forth below. As LKQ demonstrated before the Board, as compared to the "crowded art,"

> Lian discloses a more identical (1) slanted cut; (2) headlamp aperture; (3) upper edge of the fender; (4) first crease; (5) second crease; (6) concavity line; (7) wheel arch flat; and (8) surface contour pattern than any of the "crowding" references, and (9) only one discloses a protrusion that is arguably as similar as Lian's. Further, none share the constellation of all of those similarities.

Appx1129-1130 (LKQ Reply at 25-26); Appx1312-1314 (Declaration of Jason C. Hill in Support of LKQ's Reply ("Hill Reply Declaration") ¶¶23-24).



Appx1294 (annotated).



Lian

US D797,625

US D713,298

US D764,362

US D785,521

US D739,306

US D722,282

US D784,857

US D613,645

US D611,387

US D704,103



Appx1295-1296 (annotated).

GM's own declarant admitted that no "crowding" reference disclosed an overall visual appearance that was more similar than Lian to the claimed design. Appx1128-1130 (LKQ Reply at 24-26), (citing Appx1488-1501 (Peters at 140-153) ("Q. …. [a]s you sit here today right now, you can't identify a single one of these references that you think is closer in overall visual appearance to the '625 and Lian? …. The Witness:  I can't in overall visual appearance.")).

### C.    *The Board Failed to Compare the Designs as a Whole.*

**1.    The Board applied the wrong test, focusing exclusively on GM's "checklist of small differences" because it improperly defined the ordinary observer and wrongly applied GM's crowded field theory.**

A design patent is anticipated if the design is substantially the same as the prior art in the eyes of an ordinary observer of that type or product.  *Int'l Seaway*, 589 F.3d at 1239–1240 (citing *Gorham*, 81 U.S. at 528).[5]  The Federal Circuit has cautioned when making these determinations that courts must analyze designs as a

---

[5] Deception is a part of *Gorham*'s infringement analysis, but it makes no sense to incorporate that concept into the anticipation analysis.  And deception has no place when the patented item is a fragment of the entire item being presented and sold to consumers, especially when the appearance of that fragment does not play a meaningful role in the purchase decision.  Because the Board applied an overly restrictive standard to the ordinary observer in the first instance, and should be reversed on that ground, this issue need not be resolved in the context of this appeal.  However, since it may be important upon remand, LKQ requests that the Court clarify the law in this regard.

whole, and that courts should not place too much emphasis on particular features. *Egyptian Goddess*, 543 F.3d at 679-80.

This Court's emphasis on the designs as a whole is appropriate because a prior art reference does not need to be identical to the claimed design for it to anticipate. Rather, as this Court instructed in *International Seaway*, the test for anticipation must take "into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of each other." 589 F.3d at 1243. This is consistent with *Gorham*, in which the Supreme Court found the defendant's silverware designs substantially the same as the claimed design notwithstanding numerous visible differences. *See* §II.A.2, *infra*.

The Board determined that Lian and the claimed design were not substantially the same even though the differences between those designs were trivial, particularly by comparison to the designs in *Gorham*. It did so because it believed its inappropriately defined ordinary observer would be especially attuned to trivial differences between the claimed design and Lian. The Board's misapplications of law caused it to apply an incorrect test for anticipation and caused the Board to lose sight of the designs' overall visual appearances and instead to sift through GM's checklist of differences, finding any discrepancy to distinguish the designs.

When Lian and the claimed design are analyzed as a whole, the two designs are highly similar and disclose substantially the same design from the perspective of a correctly defined ordinary observer. No evidence in the record supports a contrary conclusion. GM's declarant admitted that he *never addressed similarities in his report* and he never compared the designs as a whole; he only "focused on the differences." Appx1110 (LKQ Reply at 6) (citing Appx1411-1413 (Peters at 63-65)). Further, while GM's expert identified various differences that he thought would be observable to someone purchasing a replacement fender who was attuned to the differences because of the number of other fender designs, he never explained why the designs as a whole were not substantially similar to a vehicle purchaser. *See* Appx0906-0907 (Peters Declaration ¶55) (equating the expectations of consumers of replacement parts with "the ordinary observer, how they approach purchasing decisions, and the high level of detail that impacts their perception of the overall appearance of the part."). *See also* Appx0905-0906 (GM's declarant testifying that parts "must fit and match with adjacent components that the part interfaces with," which could only be an issue in the replacement context as a vehicle would not be designed with mismatched components.).

The overall similarity between Lian and the claimed design flows from the staggering number of specific design features that the two designs share, as

explained in detailed by LKQ's expert with reference to the annotated figures

illustrated below. Every one of the design similarities (a)-(v) was undisputed:

| '625 PATENT CLAIMED DESIGN | LIAN PRIOR ART |
|---|---|
| | |



Appx1305-1309 (Hill Reply Declaration ¶20). The designs are similar in nearly

every respect, and the similarities pervade any comparison. As just a few examples,

the designs have uncannily similar outer perimeters in all views (especially the front

and top views); they are highly similar in terms of the large features like the designs'
matching pattern of creases (O and Q) with a concavity (R) in between them and the
designs' near-identically shaped hood cut lines and headlamp apertures (C–F); and
they are even very similar at the level of minute details like the specific contour of
the front portion (G) and the contour of the area above the wheel arch (P). *Id.*

Even as to elements that exhibit some difference, like the curvature of Lian's
wheel arch, the differences are overwhelmed by surrounding similarities, such as the
designs' prominent wheel arch flats (J), having nearly identical widths, contours,
and inwards bevel angles. *Id.* As to the protrusion, LKQ's expert explained that the
designs exhibit numerous striking similarities, including the transition of the hood
cut line (C) into the protrusion; the angle at which the upper edge of the protrusion
intersects the trailing edge at the A-pillar; the length and angle of its trailing edge as
it crosses the A-pillar, the angle at which the trailing edge intersects the U-shaped
notch (B); and the similarity of the protrusions' overall contouring from all views.
*Id.* Further, the protrusions are virtually identical from a side view. *Id.*:



| '625 PATENT CLAIMED DESIGN | LIAN PRIOR ART |
|---|---|

FIG. 2

By focusing upon GM's checklist of trivial differences, the Board ignored the overwhelming weight of similarities between the two designs. From the perspective of a properly defined ordinary observer given such time and attention as a purchaser ordinarily gives, the designs are highly similar.

### 2. GM's "checklist of differences" further led the Board astray because several of the alleged differences were not real.

As discussed at length above, the Board's anticipation analysis evaluated substantial similarity from the wrong perspective, placed undue emphasis on trivial differences based upon the mere existence of other prior art, and failed to consider substantial similarity of the designs as a whole. Making matters worse, the Board also focused on illusory features that are not disclosed in the patented design, and features so minor they could not possibly affect the overall visual impression created by the design. In particular, the Board focused on: (1) an illusory or at most trivial difference in the designs' sculpting (2) a nonexistent "third" crease; and (3) a minute

difference in upper surfaces of Lian and the claimed design's respective protrusions. Appx0016-0017.

First, regarding the alleged difference in the designs' sculpting, the Board acknowledged that "[a]t first glance, the sculpting between the designs exhibits some similarity in location and arrangement." Appx0038-0039. However, the Board then distinguished the designs based on testimony that GM's declarant had himself acknowledged to be inaccurate, and by reference to a feature that the Board itself did not consider "prominent." Appx0039-0045. As to Lian's first and second crease, the Board "found persuasive Mr. Peters' testimony that 'Lian depicts substantially linear, angled lines,' and that an ordinary observer would have recognized these lines as elements integral to the overall appearance of Lian that differ from the design." Appx0043. Yet, Mr. Peters himself admitted that Lian's first and second creases were curved and arcuate; not linear or angular. Appx1112, Appx1122 (LKQ Reply at 8, 18) (quoting Appx1436-1437, Appx1440-1442, Appx1455-1456 (Peters at 88-89, 92-94, 107-108)).

Further, the Board "disagreed with GM that the concavity line can be considered prominent." Appx0045 (alterations and quotations omitted). Yet, the Board nonetheless concluded that "the concavity line, like the first and second creases, presents a nuanced difference in the claimed design that contributes to a visually disparate sculpting and overall appearance of the claimed design as

compared to Lian." Appx0045. Thus, even though it could neither articulate any particular difference between the concavity lines of the two designs nor any reason why the concavity line would be significant, the Board concluded that a "nuanced difference" distinguished the designs.

Second, the Board seems to have distinguished Lian from the claimed design on the ground that the claimed design allegedly had a "crease" at the location where the drawings reflect an inflection line. There is no crease in the claimed design at the location of the inflection line. As illustrated below, a crease causes a change in direction of those lines that intersect it. Appx0159 (Petition at 17) (citing Appx0379-0380 (Declaration of Jason C. Hill ¶50)). That effect is evident in the design's Second Crease, as the lines that intersect that crease (i.e., the door cut line and contour lines) change direction where they intersect the crease (annotated green). In contrast with that Second Crease, there is no change in direction of the door cut line of the fender where it intersects the inflection line, at the wheel arch flat line where it intersects the inflection line, or in the contour lines on either side of the inflection line (annotated orange):



Appx0063, FIG. 1 (detail) (annotated)

GM's expert admitted in cross-examination that there was no crease or surface change along that location. Appx1119-1120 (Reply at 15-16) (citing Appx1324-1327 (Hill Reply Declaration ¶¶41-44); Appx1468-1475 (Peters at 120-127). In reality, the inflection line is merely the apex of the fender's curvature, i.e., the top of a smooth curved surface. *Id.* And it was undisputed that the apex of the Lian fender's curvature occurs at the same location.[6] *See* Appx0192 (Petition at 50):

_____

[6] The Board criticized LKQ's demonstrative showing where the apex of the curve of Lian's fender was located, stating "in Lian '[t]here is simply no crease at the location annotated with a crease by the Petition.'" Appx0040 (Decision at 40) (quoting Ex. 2004 ¶77). However, LKQ never asserted that Lian has a crease at that location; LKQ stated that the apex of the curve of Lian's fender was at the same location as it is in the claimed design. Appx0192-0194 (Petition at 50-52).



| *'625 PATENT* *CLAIMED DESIGN* | *LIAN* *PRIOR ART* |
|---|---|
| Appx0063, FIG. 2 (annotated) | Appx0450, FIG. 4 (cropped, annotated) |

Oddly, even though the Board could not articulate whether the claimed design had an inflection line or a crease, it persisted in distinguishing the designs as though the feature were a crease:

> Whether termed an inflection line, or a crease, our consideration of this feature is consistent with Mr. Peters' testimony that Lian lacks such a feature. …. Mr. Peters explains persuasively that different from the claimed design, in Lian "[t]here is simply no crease at the location annotated with a crease by the Petition." Ex. 2004 ¶77.

Appx0040 (Decision at 40).

Third, the Board exaggerated the difference between the designs' protrusions. The Decision mischaracterized the fold-over in Lian's protrusion to suggest that it extended the length of the protrusion and increased in width to coincide with the full width of the A-pillar (as indicated by the right red bracket in the Board's cited

annotated image, below).   Appx0037-0038 (Decision at 37-38); Appx1323 (Hill

Reply Declaration ¶¶37):



As seen below, the intermittent fold-over in Lian's protrusion does not extend

from the front to the back or expand in width as found by the board, but rather fades

away partway up the protrusion indisputably creating the same visual effect as the

claimed design's fold-over from the perspective of the ordinary observer (causing

the viewers eyes to continue up the protrusion):



Appx0448-0452, Lian FIGS. 1, 4, 6 (cropped, annotated). *See also* Appx1323-1324

(Hill Reply Declaration ¶38):

> As a viewer's gaze tracks rearwards along the fender, it
> would be drawn upwards along Lian's A-pillar just as it
> would up the claimed design's embodiment's A-pillar …
> as the intermittent crease merely represents a foldover
> along a portion of the protrusion and terminates halfway
> down the protrusion. Further, it terminates at a height

> above the notch of Lian's fender, thus leading the viewer's
> gaze upwards and rearwards[.]

Further, the Board never determined whether or why an ordinary observer would find this extremely small portion of the designs enough to affect the substantial similarity of the designs as a whole. Rather, the Decision concluded only that some small difference existed, and that "play[ed] a role in the overall appearance of the designs." *Id.* Indeed, LKQ's expert testified that the designs' protrusions exhibited striking similarities, Appx1305-1309 (Hill Reply Declaration ¶20). The Board neither addressed LKQ's detailed comparison of the protrusions nor Mr. Hill's testimony.

Because it incorrectly defined the ordinary observer and then considered substantial similarity in light of a purported crowded field, the Board issued an overly-detailed verbal claim construction so disconnected from the drawings that it relied on features that the drawings did not disclose. In that respect, the Board's error was even more egregious than the ITC decision this Court reversed in *Crocs, Inc. v. Int'l Trade Comm'n*. 598 F.3d 1294, 1302-1303 (Fed. Cir. 2010). In that case, the ITC issued a determination of non-infringement after having developed and relied upon a detailed verbal claim construction that "led the administrative judge and the Commission away from consideration of the design as a whole." *Id.* The design patents and a subset of the allegedly infringing articles at issue in that case are replicated below:



*Id.* at 1304.

The Court found the Commission's error "apparent in [its] explicit reference to two details required by the written claim construction but not by the [design patent at issue's] drawings: (1) a strap of uniform width, and (2) holes evenly spaced around the sidewall of the upper." *Id.* at 1303. The Court held that:

> the Commission "placed undue emphasis on particular details of its written description of the patented design[,]" which "became a mistaken checklist for infringement. Without a view to the design as a whole, the commission used minor differences between the patented design and the accused products to prevent a finding of infringement. In other words, the concentration on small differences in isolation distracted from the overall impression of the claimed ornamental features.

*Id.* at 1303-1304. Similarly here, the Board's entire approach was skewed by an overly-detailed claim construction and emphasis on small differences based on GM's checklist of differences, which distracted from the overall impression of the claimed ornamental features.

## III.  THE BOARD ERRED BY REFUSING EVEN TO CONDUCT A FULL OBVIOUSNESS ANALYSIS

Even if Lian did not anticipate the '625 patent, it surely rendered the claimed design obvious to a designer of ordinary skill, especially in further view of the closely related design disclosed by the 2010 Hyundai Tucson publication.  Indeed, it was undisputed that the Hyundai Tucson discloses *every alleged difference* between Lian and the claimed design.  Even if it did not, all of the alleged differences constituted routine modifications that would have been obvious to a designer of ordinary skill in the art.  Yet, the Board cut the inquiry short, foreclosing obviousness before considering even a single prior art reference or what would be a routine change to an ordinary designer.  It did so on the basis that LKQ allegedly failed to correctly discern the elements of the claimed design.  Appx0050-0051 (Decision at 50-51).  That short-circuiting was legal error.  It was also factually incorrect, because LKQ's papers addressed in detail every aspect of the claimed design made of issue in the proceeding.

Then, in further addressing LKQ's obviousness grounds "[f]or purposes of completeness, and alternatively," the Board still refused to consider whether a DOSA would have found the claimed design obvious over the combination of Lian and the Tucson, or the general knowledge and skill of a designer.  The Board refused to even perform that analysis because it determined that Lian alone was not

"basically the same" under *In re Rosen*, 673 F.2d 388, 391 (CCPA 1982). Appx0058 (Decision at 58). But *Rosen* cannot survive *KSR*.

### A.   The Rosen Requirement to Identify a Single Reference That Is "Basically the Same" as the Claimed Design Is Not Consistent with KSR.

To determine whether a claimed design would have been obvious to a designer of ordinary skill in the art, this Court's predecessor developed a multi-part test: first, the trial court must find "a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design.'" *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (quoting *Rosen*, 673 F.2d at 391).

> This requires the trial court to: (1) discern the correct visual impression created by the patented design as a whole; and (2) determine whether there is a single reference that creates 'basically the same' visual impression. In comparing the patented design to a prior art reference, the trial court judge may determine almost instinctively whether the two designs create basically the same visual impression.

*Id.* Then, once the primary reference is identified:

> other references may be used to modify it to create a design that has the same overall visual appearance as the claimed design. … These secondary references may only be used to modify the primary reference if they are "so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other."

*Id.* (quoting *Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)) (citing *In re Harvey*, 12 F.3d 1061, 1063 (Fed. Cir. 1993)).

This restrictive, formulaic test, and particularly its requirement that the court identify a single prior art reference the design of which is "basically the same," is inconsistent with *KSR*. 550 U.S. at 407, 415-21. Even if the *Rosen* test were consistent with *KSR*, the Board erred in denying that Lian constituted an appropriate primary reference even under the current test.

For obviousness, it is not the ordinary observer but the designer of ordinary skill whose perspective matters. A design patent is unpatentable "if it would have been obvious to a designer of ordinary skill who designs articles of the type involved." *MRC Innovations, Inc. v. Hunter Mfg.*, 747 F.3d 1326, 1331 (Fed. Cir. 2014) (citing *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1380–81 (Fed. Cir. 2009)). "More specifically, the inquiry is whether one of ordinary skill ***would have combined teachings of the prior art*** to create the same overall visual appearances as the claimed design." *Durling*, 101 F.3d at 103 (citing *Borden*, 90 F.3d at 1574).

The C.C.P.A.'s artificial requirement that a design patent may only be deemed obvious to a designer of ordinary skill in the art if a challenger can first identify a "primary reference" that discloses a design that is "basically the same" as the claimed design misdirects the obviousness inquiry away from consideration of what

51

would have been obvious to designers. Such a rigid and mandatory formula is also inconsistent with the expansive and flexible approach required by the Supreme Court's decision in *KSR*, which governs all questions of patent obviousness under 35 U.S.C. § 103. *Rosen* and its progeny cannot survive *KSR*.

In *KSR*, the Supreme Court abrogated the Federal Circuit's rigid "teaching, suggestion, or motivation" test (TSM test). That test required, as a predicate for modifying one reference with another, that the prior art disclose "some teaching or suggestion to combine the prior art teachings." *KSR Int'l*, 550 U.S. at 407 (citing cases).

As the Supreme Court said, the fundamental problem was the "narrow conception of the obviousness inquiry reflected in [] application of the TSM test." *Id.* at 419 (emphasis added) ("What matters is the objective reach of the claim. If it extends to what is obvious, it is invalid under § 103.").

> We begin by rejecting the rigid approach of the Court of Appeals. Throughout this Court's engagement with the question of obviousness, our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its TSM test here. … [T]he principles laid down in *Graham* reaffirmed the 'functional approach' of *Hotchkiss*[.] To this end, *Graham* set forth a broad inquiry and invited courts, where appropriate, to look at any secondary considerations that would prove instructive."

*Id.* at 415 (citations omitted); s*ee also id.* at 427-28 ("In rejecting the District Court's rulings, the Court of Appeals analyzed the issue in a narrow, rigid manner inconsistent with §103 and our precedents.").

The Supreme Court's directive in *KSR* applies to design patents just as it applied to utility patents.  35 U.S.C. § 103 governs both:

> In *Laverne*, [the Court of Customs and Patent Appeals] recognized that the [Patent] statute does not specifically create a test for nonobviousness of a design which is different from that for inventions defined in 35 U.S.C. § 101.  That § 103 applies to designs follows from § 171, which states: 'The provisions of this title relating to patents for inventions shall apply to patents for designs."

*In re Nalbandian*, 661 F.2d 1214, 1216 (CCPA 1981) (citing *In re Laverne*, 356 F.2d 1003, 1006 (CCPA 1966)).  Thus, the Supreme Court's interpretation of the same language of 35 U.S.C. § 103 in *KSR*, rejecting the use of rigid formulas to limit the obviousness analysis, applies with equal force to design patent obviousness.

This Court has never held to the contrary.  *Titan Tire Corp. v. Case New Holland, Inc.*, the only case in which this Court addressed the issue, acknowledged that *KSR* likely governs design patent obviousness just as it governs utility patent obviousness.  566 F.3d at 1384-85 ("Design patents, like utility patents, must meet the nonobviousness requirement of 35 U.S.C. § 103, and it is not obvious that the Supreme Court necessarily intended to exclude design patents from the reach of *KSR*.").  However, *Titan Tire* did not need to resolve that question because "[w]ith

or without *KSR*," a preliminary injunction was improper in that case because the patentee was "unlikely to succeed on the merits of the validity issue." *Id.* at 1385.

*Rosen*'s requirement that a design patent challenger identify, as a ***predicate*** to the obviousness analysis, a "primary reference" that is "basically the same" as the claimed design represents an even more rigid bright-line barrier than the TSM test did. It forces the obviousness inquiry through a rigid and mandatory formula that only serves to distract from the fundamental question under 35 U.S.C. § 103: obviousness to a person of ordinary skill in the art.

This misalignment between the *Rosen* test and design practice is especially clear in the unique and specialized context of automobile design. As Mr. Hill, an accomplished automobile designer with experience as a senior designer at Mercedes-Benz and Porsche, testified:

> 37.    From a design process standpoint, the process used by a vehicle designer is one of inspiration combined with creative ideation in order to arrive at a visually pleasing result while respecting any engineering and manufacturing constraints. Generally, the process starts by understanding what the theme of the design may be, such as "expressive front end design" or "dynamic side sculpture design." From there, the designer would identify key elements that make up the theme such as "large hexagonal shaped grille opening." Once the primary theme is established, the designer tries various secondary themes for the supporting areas such as lights, intakes, etc.

Appx0370-0374 (Declaration of Jason C. Hill ¶37 *et seq*).[7]  This process necessarily draws elements from "many different sources" for an "incredible range of inspiration."  Ex. 1044 at 47.  *Accord* Appx0372-0373 (Mr. Hill explaining that designers "can and do look to many sources for inspiration for design," and that it is "common during the design process to keep images, both of automotive origin and other items, at the ready for a reminder of what the style of the final product could be.").  Indeed, Mr. Hill testified that "[d]esign can be, and often is, driven by marketing goals and brand positioning."  *Id.*

In this case, *Rosen*'s primary reference requirement led the Board to examine in minute detail part lines (such as the rear edge of the fender) that an auto designer would not consider important to the design.  *See* Appx1319 (Hill Reply Declaration ¶34) (explaining that vertically oriented part-lines such as the door cut line are "mainly functional parting lines that carry little visual significance and are intended to disappear rather than stand out in the design of the vehicle").  It also led the Board to ascribe outsized importance to features that DOSAs would have found routine to modify in the manner claimed, such as the wheel arch, door cut line, and lower rear

---

[7] More fundamentally, focusing on the design process would have shifted the focus away from the fender as a separate part.  As the record demonstrated, an individual auto body panel such as a fender "is not individually designed, and on its own only constitutes a fragment of the design of an entire automobile."  Appx1300-1301 (Hill Reply Declaration ¶8).

terminus.  *See* Appx1332-1333 (Hill Reply Declaration ¶53); Appx1335-1336 (Hill Reply Declaration ¶¶57-58).

The *Rosen* requirement reduces the ordinary designer to an automaton in contravention of the Supreme Court's directive in *KSR*.  An ordinary automobile designer is "a skilled design professional, with the creativity that would be expected of such a professional and the capability to envision solutions to at least routine problems encountered in the field of automotive design."  Appx1302 (Hill Reply Declaration ¶12).  But *Rosen* denies the designer any creativity to deviate from existing designs, declaring that nothing is obvious to designers of ordinary skill in the art except trivial modifications of designs that are already "basically the same."

The *Rosen* approach supplants the ordinary knowledge and creativity of the designer with an "almost instinctive[]" determination of "basic similarity" by the trial court judge.  *Durling*, 101 F.3d at 103.  As the Supreme Court has emphasized, obviousness must take into account the ordinary knowledge and creativity of the person of ordinary skill in the art.  "A person of ordinary skill is also a person of ordinary creativity, not an automaton."  *KSR*, 550 U.S. at 421.  There is absolutely no reason to treat designers differently in this respect.

### 1.    Other Circuits Have Applied a Test Consistent with KSR.

Prior to the creation of the Federal Circuit, other Circuits considering design patent obviousness properly focused their obviousness inquiries upon how a DOSA

would approach designs of the type at issue and did not require identification of a single primary reference. For example, in *Sidewinder Marine, Inc. v. Starbuck Kustom Boats & Prods., Inc.*, the Tenth Circuit found a design patent directed to a speedboat obvious in view of automobile prior art because an ordinary boat designer would have looked to automotive prior art. 597 F.2d 201, 209–211 (10th Cir. 1979).

| *SIDEWINDER MARINE DESIGN PATENT* | *CYCOLAC RESEARCH VEHICLE* |
|---|---|
|  | |

There are clear differences between the designs, such as the car naturally having a blunter bow than the speedboat, and no one reference is "basically the same" as the patented design. Nonetheless, the district court and the Tenth Circuit credited testimony that boat designers would be aware of developments in the field of automotive design, and the Tenth Circuit further considered the testimony of boat designer James Starbuck as to how a boat designer would view the prior art Cycolac

car design, cutting through the superficialities to perceive what the car design would have suggested to such a designer. *Id.* at 210 n. 13 ("(I)f you look at this car and the upper deck section … you could see instantly that that is a nifty boat design that affords all the features we've been talking about in these magazines."). The Tenth Circuit thus concluded the Cycolac exhibited "considerable similarity to the Sidewinder design." *Id.*

*Sidewinder Marine*, like *KSR*, placed the focus of the obviousness inquiry not on a judge's perception of the designs, but on the perception of a boat designer, as required by the statute. *See also Fields*, 472 F.2d at 1306 (noting the distinction between a lay person's perception and that of an ordinary designer and cautioning against the risk that the designer's perspective may be lost when applied by "an ordinary judge who lacks that skill."). However, *Rosen* and *Durling* do not permit such a flexible, detailed analysis of how a DOSA would have viewed the prior art and claimed design; instead, they foreclose the entire obviousness analysis if the trial court judge "almost instinctively" determines that no single reference is "basically the same" as the claimed design. *Durling*, 101 F.3d at 103.

Nothing in the statute dictates that a single reference must achieve some threshold degree of similarity before obviousness may even be assessed; it prohibits patents "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective

filing date of the claimed invention to a person having ordinary skill in the art….” 35 U.S.C. § 103.  Indeed, the overwhelming majority of section 103 cases involving utility patents combine references rather than focusing on a single primary reference.

Just as “common sense directs one to look with care at a patent application that claims as invention the combination of two known devices according to their established functions,” *KSR Int'l*, 550 U.S. at 418, common sense likewise dictates that one must look with care at a design patent that differs from one prior design only in ways disclosed by a single other prior art reference.  That is undisputedly the case here, yet the Board refused to even evaluate the legal question due to its primary reference requirement.  This further demonstrates that *Rosen* represents precisely the type of rigid, preventative rule that denies recourse to common sense, and that is incompatible with *KSR*.

### 2. The Current Standard for Testing Obviousness Improperly Conflates Anticipation and Obviousness.

Rosen's requirement that a primary reference be “basically the same” as the claimed design has another flaw: it gives the tests for design patent anticipation and obviousness the same scope.  Logically, obviousness must encompass more designs than anticipation.  Failing to do so would render section 103, the “ultimate condition of patentability,” *cf.* Nonobviousness—The Ultimate Condition of Patentability (John F. Witherspoon ed., 1980), entirely superfluous.

A single reference cannot anticipate a claimed design unless it is "substantially the same" from the perspective of the ordinary observer. *Int'l Seaway*, 589 F.3d at 1239. Under *Rosen*, the same reference cannot render a design obvious, and indeed cannot even be used in combination with other references, unless the court concludes ("almost instinctively") that the prior art design is "basically the same." Other than the difference in perspectives (ordinary observer vs. ordinary designer), it is entirely unclear what the difference is between those standards. Indeed, to the extent the ordinary observer is less discerning of differences than the ordinary designer, it is possible that the current legal standard makes it easier to prove that a single reference anticipates than that it renders the design obvious. "Substantial" similarity permits a fair bit of difference, as in *Gorham* and in copyright cases that use the same term. But even things that are substantially similar may not be "basically the same" design. An approach that collapses obviousness and anticipation cannot be a proper interpretation of the language of section 103 or of *KSR*.

### B. *Lian Must Be Sufficient as a Primary Reference, and Alone or In Combination with the Tucson Renders the Claimed Design Obvious.*

Not only did the Board err in requiring an artificial prerequisite before conducting the obviousness analysis, but it erred in concluding that Lian did not qualify as a primary reference. As explained above, the Decision acknowledged that the differences it identified between Lian and the claimed design were, at most,

"small." Yet, in its obviousness analysis, the Board determined that the designs were not "basically the same" because the ordinary designer would have noticed these trivial differences. However, small differences for anticipation must remain small differences for obviousness. The Decision never addresses this contradiction, merely determining in its obviousness analysis if the features comprising its checklist were different. Identifying whether there are differences and then setting forth a conclusory determination that the designs are therefore not basically the same is not the appropriate basic similarity analysis.

The Board disregarded the designs' overwhelming similarities, both visual and thematic, and instead hunted for any differences, regardless of their significance to a designer. For example, the Board focused extensively on the wheel arch and lower rear terminus, features that both sides' expert declarants agreed were routinely modified. Appx1123-1127. Further, LKQ demonstrated that the expression of both of those features in the '625 Patent was conventional to a DOSA, and that a DOSA would have had specific motivation to change them to match the '625 Patent's expression. *Id.*

Similarly, the Board concentrated on a difference in how the fenders were terminated at the bottom while ignoring the extensive record evidence establishing that an ordinary automobile designer would have found it obvious to modify Lian's lower rear terminus by cutting it at the rocker panel, as the claimed design does. *See*

*e.g.*, Appx0407, Appx0413-0417 (Declaration of Jason C. Hill ¶78, ¶¶86-89); Appx1123-1127 (Reply at 19-23); Appx1335-1336 (Hill Reply Declaration at ¶58). Relatedly, the Board created a new verbal claim construction that ignored that this was only a simple difference in one of three possible cut locations.[8]  Appx1311-1312 (Hill Reply Declaration ¶22); Appx0016 (Decision at 16) ("A consistent width lower rearward terminus shape defined between the wheel arch and door cut line.").  The Board then concluded that "Lian's terminus is also visibly different from the claimed design," having a "rearward protrusion forming a more sharply curved lower portion of the door cut line."  Appx0054 (Decision at 54).  When analyzed correctly, the triviality of that difference to an automobile designer becomes clear, and such a designer would have found the designs strikingly similar notwithstanding the difference in cut location.

Finally, the Board zeroed in on a minute difference on the top of the protrusion.  Meanwhile, the Board barely discussed the overwhelming similarities between the claimed design and Lian, illustrated above, which make the designs virtually identical in overall impression.  Specifically, the Board largely ignored the striking and complex pattern of creases, concavities, and inflections along the side of the fenders, their distinctive front elevation profiles, their entire upper outlines,

---

[8] Introducing and adopting a new claim construction (that no party had advocated) in its Decision deprived LKQ of notice or an opportunity to respond and constitutes legal error. *See Qualcomm Inc.*, 6 F.4th at 1263-64.

their headlamp aperture shapes, the distinctive manner in which the fenders fold over the first crease to meet the hood, and the fenders' almost identically-configured protrusions.  Appx1110-1115 (LKQ Reply at 6-11).

Considering the similarities spanning nearly the entire surface of the claimed design, Lian is far more similar to the claimed design than many of the references this Court and the C.C.P.A. have approved as primary references under *Rosen*, or even as obviousness references under the C.C.P.A.'s prior standard.  For example, as Mr. Hill explained in his Declaration in Support of LKQ's Reply, Lian is far more similar to the claimed design than the prior art in Carter was to the claimed design:



Appx1344, Appx1347 (Hill Reply Declaration ¶¶66, 70) (citing *Carter*, 673 F.2d at 1381) (annotated).

Likewise, the claimed design in *Cooper*, decided under the C.C.P.A.'s even more restrictive ordinary observer test for design patent obviousness, was held

obvious in view of a primary reference evincing far more substantial differences than

those between Lian and the claimed design:



| CLAIMED DESIGN | PRIOR ART |
|---|---|

Appx1345, Appx1347-1378 (Hill Reply Declaration ¶¶66, 71) (citing *In re Cooper*,

480 F.2d 900 (CCPA 1973) (annotated).  Notably, the claimed design there was

found obvious notwithstanding visible differences from the prior art in terms of the

shape of its roof and accompanying overhang, the number, placement, and visual

appearance of its 'ribs,' the presence of windows in one and lack of windows in the

other, the presence of a portico in one and absence in the other, and the inclusion of

a single-door versus a differently proportioned double-door.  *Id.*

And in *Nalbandian*, the C.C.P.A. held a claimed illuminable tweezer design obvious over a single prior art reference despite numerous aesthetic differences between that reference and the claimed design:



Appx1345-1347 (Hill Reply Declaration ¶¶66, 69) (citing *In re Nalbandian*, 661 F.2d 1214, 1215-18 (CCPA 1981) (differences annotated). The court found the differences in the finger grips and pincers to be *de minimis*, and the difference in the direction of the fluting obvious because the modification was well within the skill of an ordinary designer in the art. *Id.* at 1217-18.

In assessing the "basic similarity" between Lian and the claimed design, the Board glossed over the numerous similarities identified by LKQ, focusing instead on its checklist of alleged differences without any regard for whether they would have been obvious to a DOSA or impacted the overall visual similarity. Any reasonable application of the test for obviousness would have found Lian's strikingly similar fender design basically the same as the claimed design.

### C. The Board's Erroneous Refusal to Consider the Tucson Reference and the Ordinary Designer's Knowledge Was Prejudicial.

The Board's failure to consider the combination of Lian and the Tucson reference is particularly problematic given Mr. Hill's unrebutted testimony that, for every feature of Lian alleged to be different than the claimed design, the Tucson suggested a corresponding feature virtually identical to that claimed. Appx1337-1338 (Hill Reply Declaration ¶¶60-61). *See Becton, Dickinson & Co. v. Baxter Corp. Englewood*, 998 F.3d 1337, 1344 (Fed. Cir. 2021) (Board's factual determination contrary to uncontested expert testimony lacked substantial evidence). This is clear upon comparing the designs and focusing on the wheel arch, fender terminus above the rocker panel, protrusion/hood interface and door cut line. *See* Appx1339:

| '625 PATENT CLAIMED DESIGN | LIAN PRIMARY REFERENCE | TUCSON SECONDARY REFERENCE |
|---|---|---|
|  Appx0063, FIG. 2 |  Appx0450, FIG. 4 (cropped, annotated) |  Appx0464 (cropped, rotated) |
|  Appx0064, FIG. 3 |  Appx0449, FIG. 1 (cropped, annotated) |  Appx0462 (cropped, flipped) |
|  Appx0064, FIG. 4 |  Appx0451, FIG. 5 (cropped, annotated) |  Appx0462 (cropped, flipped) |
|  Appx0063, FIG. 1 |  Appx0452, FIG. 6 (cropped, annotated) |  Appx0453 (cropped, flipped) |

**D.    The Board Erred in Refusing to Consider LKQ's Obviousness Grounds for Purportedly Insufficient Claim Construction.**

The Board also denied LKQ's obviousness ground before analyzing a single prior art reference because of a purportedly incomplete verbal claim construction, which it believed was required under the first prong of the overly restrictive *Rosen* test.  If this Court recognizes that *Rosen* is no longer good law, this objection must likewise fail.

Even if *Rosen* remains good law, the Board erred by limiting its analysis to LKQ's verbal claim construction without regard to LKQ's subsequent analysis, much less its subsequent development of the record on Reply.  This Court has held that neither *High Point* nor *Durling* requires a verbal claim construction at all, much less an exhaustive one.  *MRC Innovations*, 747 F.3d at 1332.  Rather, all that is required is for the lower court to "describe the claimed design in words so that the parties and appellate courts can discern the trial court's reasoning in identifying a primary reference."  *Id.*  To the extent this requirement even applies to parties, the Board's limitation of the inquiry to LKQ's formal claim construction was improper and inconsistent with this Court's decision in *MRC Innovations*.  It is indisputable that LKQ's papers, considered as a whole, sufficiently described the design's features.

In *MRC Innovations*, the district court, in finding a design patent on a jersey for dogs invalid as obvious, "did not expressly undertake to translate the claimed design into a verbal description," and instead described the design in comparing it with the prior art. *Id.* That comparison addressed only eight elements of the claimed design: three "key similarities" ("an opening at the collar portion for the head, two openings at and sleeves stitched to the body of the jersey for limbs, and a body portion on which a football logo is applied"); two "additional similarities" (that they were "primarily made of a mesh and interlock fabric" and contained "at least some ornamental surge stitching"); and three differences (a V-neck collar versus a round neck; interlock panels on the sides rather than mesh; and additional ornamental surge stitching on the rear). *Id.* Yet, that description was enough to make "entirely clear from the district court's opinion what it considered to be the relevant design characteristics of the '488 patented design." *Id.*

Finally, even if the Board had stated the correct legal standard, it erred in applying that standard. The Decision identifies no specific feature that LKQ "failed to adequately take account of," and instead merely asserts as much in a conclusory manner. Appx0050-0051 (Decision at 50-51). However, it is indisputable that every single feature of the design raised by either party or the Board was addressed by at least one of LKQ's Petition or Reply.

LKQ's Petition presented a far more rigorous breakdown and analysis of the claimed design than that approved in *MRC Innovations*, especially considering its analysis of the designs' similarities and differences both as a whole and in terms of specific features. In fact, the Board acknowledged in its Institution Decision that LKQ's Petition had:

> assessed in comparison to Lian, in detail and with analysis, many of the visually prominent elements that contribute to the overall appearance of the claimed design, including *inter alia*, the top protrusion, u-shaped notch, wheel arch, first and second creases, inflection line and concavity line.

Appx0799 (Institution Decision at 22). Then, following GM's Response, LKQ's Reply addressed each of GM's six alleged differences in detail, Appx1114-1127 (LKQ Reply at 10-23), as well as over twenty specific similarities between the designs in minute detail. Appx1111-1114 (LKQ Reply at 7-10). Thus, it is clear that LKQ did "identify the correct visual impression of the patented design taken as a whole." Had the Board considered any of LKQ's analysis in its Petition, much less its Reply, it could not reasonably have concluded that LKQ "failed to identify the correct visual impression of the patented design taken as a whole." It is clear that the Board limited its assessment of LKQ's construction to the initial verbal claim construction set forth in the Petition. This misapplication of the *Durling* test constitutes legal error.

Further and regardless, if *Durling* requires an exhaustive verbal claim construction (or any claim construction) as a predicate to the obviousness inquiry, that would constitute an even more rigid and artificial limitation on the obviousness inquiry than that presented by the *Rosen* step.  For the same reasons as set forth above, such a restriction could not have survived the Supreme Court's decision in *KSR*.  550 U.S. at 419-422.

## CONCLUSION

The decision of the Board should be reversed, or alternatively remanded for new proceedings under a proper legal standard.

Respectfully submitted,

Dated: January 26, 2022

*/s/ Barry F. Irwin*
Barry F. Irwin
Iftekhar A. Zaim
Andrew C. Himebaugh
**IRWIN IP LLC**
180 N Wacker Dr., Suite 400
Chicago, Illinois  60606
(312) 667-6080
birwin@irwinip.com
izaim@irwinip.com
ahimebaugh@irwinip.com

Mark A. Lemley
**DURIE TANGRI LLP**
217 Liedesdorff Street
San Francisco, CA 94111
Tel: (415) 362-6666
mlemley@durietangri.com

Mark P. McKenna
**Lex Lumina, PLLC**
745 Fifth Avenue, Suite 500
New York, NY  10151
(646) 898-2055
mark@lex-lumina.com

*Attorneys for Appellants*
*LKQ Corporation and*
*Keystone Automotive Industries, Inc.*

# ADDENDUM

## TABLE OF CONTENTS TO ADDENDUM

Final Written Decision in IPR2020-00534 (filed 8/4/2021)......................Appx0001

U.S. Design Patent No. D797,625 .............................................................Appx0061

Trials@uspto.gov
571-272-7822

Paper No. 28
Entered: August 4, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

LKQ CORPORATION and
KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,
Petitioner

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,
Patent Owner.

———————

IPR2020-00534
Patent D797,625 S

———————

Before GRACE KARAFFA OBERMANN, SCOTT A. DANIELS, and
CHRISTOPHER G. PAULRAJ, *Administrative Patent Judges.*

DANIELS, *Administrative Patent Judge.*


JUDGMENT
Final Written Decision
Determining No Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-00534
Patent D797,625 S

## I. INTRODUCTION

### A. Background

LKQ Corporation and Keystone Automotive Industries, Inc., (collectively "LKQ") filed a Petition to institute an *inter partes* review of the claim for a "Vehicle Front Fender" in U.S. Patent No. D797,625 S (Ex. 1001, "the '625 patent"). Paper 2 ("Pet."). GM Global Technology Operations, Inc., ("GM") filed a Preliminary Response. Paper 9 ("Prelim. Resp."). On August 11, 2020, we entered a Decision instituting an *inter partes* review of the challenged claim in this proceeding. Paper 10 ("Inst. Dec.").

Following our Institution Decision, GM timely filed a Response. Paper 17 ("PO Resp."). LKQ filed a Reply. Paper 21 ("Pet. Reply"). GM subsequently filed a Sur-Reply. Paper 23 ("PO Sur-Reply"). We heard oral argument on April 27, 2021. A transcript of the argument has been entered into the record. Paper 27 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(b). This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a). Having reviewed the arguments of the parties and the supporting evidence, we find that Petitioner has not demonstrated by a preponderance of the evidence that the sole claim of the '625 patent is unpatentable.

### B. Additional Proceedings

The parties identify various other *inter partes* and post-grant review proceedings that Petitioner has filed challenging different patents owned by GM. The parties do not state that these other proceedings affect, or would be affected by, the outcome of this proceeding. Pet. 5–6; Paper 5, 2.

2

IPR2020-00534
Patent D797,625 S

### C. The '625 Patent and Claim

The '625 patent (Ex. 1001) is a design patent that issued September 19, 2017, and lists GM as the assignee.  Ex. 1001, codes (45), (73).  The title, "Vehicle Front Fender," refers to an outer surface of a vehicle front fender, which the figures of the patent illustrate in solid lines, but with certain portions shown in dashed lines, such as the inner surface, that would not be observable when the fender is attached to a vehicle.  *See* 37 C.F.R. § 1.152; *see also* MPEP 1503.02, subsection III ("Unclaimed subject matter may be shown in broken lines for the purpose of illustrating the environment in which the article embodying the design is used.  Unclaimed subject matter must be described as forming no part of the claimed design or of a specified embodiment thereof.").

The '625 design includes Figures 1–4, reproduced below, illustrating the claimed front fender as set forth below.[1]



FIG. 1

FIG. 2

---

[1] We refer to the claim, i.e., the vehicle front fender shown in Figures 1–4, also as "the '625 design."

IPR2020-00534
Patent D797,625 S



FIG. 3                    FIG. 4

Ex. 1001.  Figures 1–4 above depict, respectively, the following views of the

claimed vehicle front fender design:  a perspective view, a side view, a front

view, and a top view.  *Id.* at code (57).

*D. Claim Construction*

In an *inter partes* review based on a petition filed after November 13,

2018, the claims are construed

> using the same claim construction standard that would be used to
> construe the claim in a civil action under 35 U.S.C. [§] 282(b),
> including construing the claim in accordance with the ordinary
> and customary meaning of such claim as understood by one of
> ordinary skill in the art and the prosecution history pertaining to
> the patent.

37 C.F.R. § 42.100(b); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13

(Fed. Cir. 2005) (en banc) (setting forth claim construction standard in civil

actions).

With respect to design patents, it is well settled that a design is

represented better by an illustration than a description.  *Egyptian Goddess,*

*Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (en banc) (citing

IPR2020-00534
Patent D797,625 S

*Dobson v. Dornan*, 118 U.S. 10, 14 (1886)). Although preferably a design patent claim is not construed by providing a detailed verbal description, it may be "helpful to point out . . . various features of the claimed design as they relate to the . . . prior art." *Id.* at 679–80; *cf. High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1314–15 (Fed. Cir. 2013) (remanding to district court, in part, for a "verbal description of the claimed design to evoke a visual image consonant with that design").

### 1. LKQ's Proposed Claim Construction

LKQ relies on the Declarations of Jason M. Gandy (Ex. 1003) and Jason C. Hill (Ex. 1004; Ex. 1043) in support of its claim construction and arguments. GM relies on the Declaration of Thomas V. Peters (Ex. 2004).

LKQ contends that the claim of the '625 patent, as shown by the solid lines in the drawings, can be textually described as:

[a] vehicle fender comprising:

a top protrusion extending rearwardly and upwardly from an upper portion of the fender and having an intermittent u-shaped notch;

a first crease and a second crease extending forwards from a rear edge of the fender, a concavity line disposed between the first crease and the second crease, and an inflection line below the second crease; and

an angular front elevation profile.

Pet. 13–15 (emphasis omitted). LKQ provides the following annotated Figure 1 from the '625 patent, emphasizing certain claim elements.

IPR2020-00534
Patent D797,625 S



In annotated Figure 1, above, LKQ illustrates a front perspective view of the claimed vehicle fender pointing to a "first crease," a "concavity line," a "second crease," and an "inflection line."  *Id.* at 14.

### *2. GM's Proposed Claim Construction*

GM's position is that LKQ's construction is too general and simplistic.  *See* PO Resp. 1 (GM arguing that it "is not the presence or absence of common features, but the details in the claimed design that stand out").  GM describes the claimed design as "a coordinated set of features that contribute to a unique overall appearance."  *Id.* at 3.  Summarized below, GM asserts that there are five specific ornamental aspects of the design that contribute to its uniqueness.  *Id.* at 4–11.

#### *(a) "[f]irst, the claimed design includes distinct lateral and lower perimeter shapes"*

GM argues that the right hand lateral edge, i.e., "door cut line," and the circular edge of the wheel arch "complement each other—both have smooth, arcuate shapes that echo the smooth and consistent curvature of the

'first' and 'second' creases and other sculpting of the fender." *Id.* at 4.
Reproduced below is GM's annotated version of Figure 2 of the '625 design.



GM's annotated version of Figure 2 of the '625 design is shown above with
the door cut line and wheel arch highlighted in red. *Id.* at 5.

> *(b) "[s]econd, the claimed design includes a 'protrusion'
> having a particular three-dimensional shape"*

GM argues that the shape of the protrusion is unique, specifically
drawing our attention to the consistent width of the upper surface of the
protrusion, shown highlighted in green in Patent Owner's annotated Figure 1
reproduced below.

IPR2020-00534
Patent D797,625 S



GM's annotated version of Figure 1 of the '625 design is shown above with
the upper surface of the protrusion highlighted in green.  *Id.* at 6.  Patent
Owner argues that "[t]he upper surface (green) has a thickness and
consistent width that mirrors the inside surface of the 'u-shaped notch,'
furthering the cohesive overall appearance of the fender."  *Id.* at 5 (citing Ex.
2004 ¶¶ 39–40).

> *(c) "[t]hird, the claimed design includes lines and surfaces*
> *having smooth, arcing shapes that provide a distinctive*
> *sculpting"*

According to GM, the claimed design has first and second creases that
"gently curve between respective ends."  *Id.* at 7.  GM contends that the
"concavity line" is similarly curved and that "[t]hese lines cooperate with the
smooth, arching lines of the fender perimeter, and the contoured surfaces
between these lines, to provide an overall appearance of smooth, curving
shapes."  *Id.*  Figure 2 of the '625 patent as annotated by Patent Owner is
reproduced below.

IPR2020-00534
Patent D797,625 S



GM's annotated version of Figure 2 of the '625 design is shown above with the first and second creases, and concavity line, highlighted in red. *Id.* at 5. Patent Owner refers to the first crease as a "character line." *Id.* at 9. According to GM's declarant, Mr. Peters, "the curvature and relative positioning of the 'first crease' helps set a tone for the proportions and body shape of the fender." Ex. 2004 ¶ 44.

> *(d) "[f]ourth, the claimed design includes a horizontal crease near the lower portion of the fender that extends between the wheel arch and the lateral edge"*

GM argues that the horizontal crease located adjacent to the wheel arch "contributes to the overall sculpted appearance of the front fender, and adds a focal location extending to the right of the wheel arch." PO Resp. 10. We note LKQ refers to this feature as an "inflection line." Pet. 14. Patent Owner's annotated Figure 1 is reproduced below.

IPR2020-00534
Patent D797,625 S



GM's annotated version of Figure 1 of the '625 design is shown above with the horizontal crease highlighted in red.  PO Resp. 10.

> (e) "[f]ifth, the claimed design defines a wheel arch having a circular perimeter.  The perimeter has a smooth, continuous curvature that extends between the front corner and rear bottom corner of the fender"

GM contends also that the wheel arch contributes to the overall appearance of the claimed design because "the circular perimeter of the cutout echoes the smooth, arcing lines of the other perimeter edges, the protrusion, first and second creases, and other sculpting of the fender." *Id.* at 11.  Figure 2, as annotated by GM, is reproduced below.

IPR2020-00534
Patent D797,625 S



GM's annotated Figure 2, above, illustrates the perimeter of the wheel arch highlighted in red.  *Id.*

### 3. The Claim Construction Analysis

In addition to its claim construction the specific design elements discussed above, GM makes several arguments to support its overarching contention that, "in the field of vehicle fender design, nuanced features are significant to overall appearance."  *Id.* at 12 (citing Ex. 2004 ¶¶ 48–56).  GM argues that an ordinary observer would consider the overall appearance of the claimed design and that details are important "because (1) the art is crowded; (2) the fender at issue must interface with other aspects of a vehicle, which puts increased focus on incongruities; and (3) fender replacement part marketing materials tout the importance of details and parts being 'identical' in this field."  *Id.*  We address these three arguments in turn.

### (a) Whether Vehicle Fender Design is a Crowded Art

GM argues that vehicle fenders are in a crowded field.  *Id.* at 13.  GM argues that during prosecution of the application thatthat became the '625 patent, the Examiner cited and considered "dozens" of vehicle front fenders.

*Id.* GM cites several cases, including *In re Harvey*, 12 F.3d 1061, 1064 (Fed. Cir. 1993), where the Federal Circuit discusses crowded art. In *Harvey*, the Federal Circuit distinguished the facts from a prior case, *In re Hopkins*, explaining that the loud speaker designs at issue in *Hopkins* were in a field "much less crowded than that of ornamental vase design," which was the focus of *Harvey*. *Harvey*, 12 F.3d at 1064.

We appreciate that a recognition that the vehicle fender field is considered to be in a "crowded art" would be helpful for GM insofar as small or "nuanced" differences between the claimed design and the prior art will then become even more important. However, the "crowded art" concept is highly fact dependent. GM has presented evidence of other design patents for vehicle fenders. *See* PO Resp. 15; *see also* Ex. 1001, code (56) (listing dozens of references). GM's declarant, Mr. Peters, points out 24 design patents relating to vehicle fender design and, out of those, specifically addresses six "vehicle fender designs that reflect common design concepts like those recited in Petitioner's proposed construction for the '625 Patent." Ex. 2004 ¶ 50. Mr. Peters explains that, due to the necessity to interface with other vehicle components and body parts, commonalities between fender designs can "include arcuate wheel arches, protrusions that interface between the vehicle hood and A-pillar, door cut lines that interface with a door panel, and contoured surface sculpting that includes multiple creases." Ex. 2004 ¶ 51. Also, Mr. Peters references "an article from October 2017 estimating that over 1,700 different car models were on the road." *Id.* ¶ 53 (citing Ex. 2002, 2).

We are not persuaded that the field is crowded based merely on the evidence of the number of vehicle models that include front fenders. GM

IPR2020-00534
Patent D797,625 S

has not defined clearly the field of art that is allegedly crowded. For example, it is unclear whether the field of art should include all vehicles as recited in the title, or be limited to sedans, as opposed to trucks or sports cars which could arguably be significantly different in appearance. GM's analysis of six other fender designs, advanced to show that the field of fender design is crowded, is helpful to show certain commonalities among related fender designs, but it is not as persuasive that fender design is specifically a crowded art. Moreover, to the extent *In re Harvey* is applicable here, we find that vehicle fenders are more fairly akin to loud speakers, as compared to vases, which have been made for thousands of years. *See Un-Making Sense of Alleged Abkhaz-Adyghean Inscriptions on Ancient Greek Pottery*, Alexei Kassian, Copyright: Koninklijke Brill NV, Leiden, 2016 (last viewed Aug. 4, 2021 at https://www.researchgate.net/ publication/311802093_Un_Making_Sense_of_Alleged_Abkhaz Adyghean_Inscriptions_on_Ancient_Greek_Pottery) (explaining that "[a] large number of Ancient Greek vases, starting from the late 8th to the early 4th centuries BC, bear short inscriptions").

We acknowledge that there are many different front fender designs, and we find that this fact helps illustrate both commonalities and differences among the designs. *See, e.g.*, PO Resp. 13 (GM providing a collage of fender designs to illustrate common features). We are not persuaded, on the record before us, that GM has provided sufficient facts or evidence for the Board to determine that vehicle fender design is a relatively crowded art.

### (b) Interfacing with Other Vehicle Components and the Similar Appearance of Replacement Parts

GM argues that "the ordinary observer would have been especially attuned to interfacing aspects of the design because they directly impact the

match/fit with other parts of the vehicle." PO Resp. 15–16 (citing Ex. 2004 ¶ 54; *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 930 F.3d 1314, 1319 (Fed. Cir. 2019)). In this case, extending our claim construction inquiry beyond the metes and bounds of the claim to address "fit with other vehicle components" is not necessary. PO Resp. 15–16 (citing Ex. 2004 ¶ 54). For one thing, the claim in the '625 patent does not include any other body parts or vehicle components. Ex. 1001, code (57), Figs. 1–4; *see also OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997) ("A design patent only protects the novel, ornamental features of the patented design."). However, we do find persuasive GM's evidence that, when repairing a vehicle, consumer preference is to choose identical replacement parts, for the reason that identical parts best return the vehicle to its original appearance. Pet. 16 (citing Ex. 2003, 10, 14; Ex. 2004 ¶¶ 55–56; Ex. 2005, 3–4). This evidence helps support GM's position that "[t]he ordinary observer's overall impression would have been defined by a multitude of readily apparent features of the '625 Patent's design." PO Resp. 17.

### (c) How the Claim is Construed

We are persuaded by the parties' arguments and the evidence in this case that vehicle fender designs include unique ornamentation as shown in the drawings of the '625 patent. We are further persuaded that we should consider and describe, in more detail than the description LKQ proffers, the elements and ornamentation as part of the overall appearance of the claimed design. *See Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010) (The Federal Circuit questioning how "a court could effectively

IPR2020-00534
Patent D797,625 S

construe design claims, where necessary, in a way other than by describing
the features shown in the drawings.").

      Therefore, in addition to the commonalities between fenders described
by LKQ and its declarant, Mr. Hill, we find persuasive Mr. Peters' testimony
that "[t]he ordinary observer would have been attuned to nuanced
differences between fender designs," and "readily recognized differences
that distinguish vehicle fender designs."  Ex. 2004 ¶¶ 52–53.  Mr. Peters
testifies, for example, that "[t]he sculpture of vehicle front fenders
significantly impacts the character and visual impression of the fender in the
eyes of the ordinary observer."  Ex. 2004 ¶ 81.  Likewise, LKQ's declarant,
Mr. Hill, testified in his deposition that an ordinary designer would consider
various features, including sculpting, on vehicle fenders:

> Q. Right. What about the sculpting on the face of the fender,
> would you agree with me that those are features, the sculpting
> on the side of a vehicle including on a fender, that are going
> to be meaningful to an ordinary observer?
>
> . . . .
>
> A. Yes.

Ex. 2008, 20:6–15.

      In our Decision on Institution, we determined that no express verbal
description was necessary.  Inst. Dec. 5–6.  We explained that "the best
description of the ornamental features of the '625 design comes from the
drawings themselves."  *Id.* at 6.  Now, on the full record before us, we still
find that the best evaluation of the claimed design occurs by observing and
considering the overall appearance of the claimed design as shown explicitly
in Figures 1–4 of the drawings.  *See In re Jennings*, 182 F.2d 207, 208
(CCPA 1950) ("In considering patentability of a proposed design the

IPR2020-00534
Patent D797,625 S

appearance of the design must be viewed as a whole, as shown by the drawing, or drawings.").

However, based on the competing analyses by the parties and considering the relationship of the prior art to the claimed design, we find it helpful to describe verbally certain elements of the claim for purposes of our analysis in this Final Decision. *See Egyptian Goddess*, 543 F.3d at 680; *see also Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 104 (Fed. Cir. 1996) ("A proper interpretation of [the] claimed design focuses on the visual impression it creates.").

Considering the overall appearance of the '625 design, we determine that LKQ's proposed construction is incomplete. In addition to LKQ's construction, we find certain other elements of the claimed fender, some of which are described by GM, are readily observable and relevant to the overall appearance of the claimed design.

1) As best observed in Figures 1–4 of the '625 patent, on the right side, the claimed design illustrates a door cut line having a slight but consistent curvature extending from the u-shaped notch downwards to a lower terminus of the fender, and a circular wheel arch extending from the lower terminus to an angular forward edge of the distal portion. *See* PO Resp. 4–5 (citing Ex. 2004 ¶¶ 35–38).

2) A consistent width lower rearward terminus shape defined between the wheel arch and door cut line. *See* Ex. 1001, Figs. 1–2.

3) A protrusion where the upper surface of the protrusion (shown highlighted green in GM's annotated Figure 1, above) has a thickness and consistent width that mirrors the inside surface of the u-shaped notch. PO Resp. 7 (citing Ex. 2004 ¶¶ 41–42).

IPR2020-00534
Patent D797,625 S

4) A gently curving first and second crease extending forwards from the door cut line and defining a concavity line there between. The first and second crease and concavity lines providing a sculpted appearance to the fender body below the protrusion, as best shown in the perspective view of Figure 1. *Id.* at 10; Pet. 14–15 (citing Ex. 1004 ¶ 46).

5) As best seen in Figure 1 of the '625 patent, below the first and second creases, the claimed design illustrates an inflection line defined by opposing shade lines, the inflection line extending between the wheel arch and door cut line. PO Resp. 10, Ex. 1001, Fig. 1.

Considering Figures 1–4 and keeping these visually apparent characteristics of the claimed design in mind, we turn below to the anticipation and obviousness challenges that Petitioner has raised in this proceeding.

*E. Instituted Grounds*

LKQ contends that the challenged claim is unpatentable under 35 U.S.C. §§102, 103 based on U.S. Design Patent No. D773,340 S (Ex. 1006, "Lian"), which is assigned to BYD Company Ltd. and issued December 6, 2016. Pet. 18. LKQ also argues that the challenged claim is unpatentable under 35 U.S.C. §103 based on Lian combined with images of the 2010 Hyundai Tucson (Ex. 1007) as disclosed in a promotional brochure. *Id.*

IPR2020-00534
Patent D797,625 S

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| Claim 1 | 102 | Lian[2] |
| Claim 1 | 103 | Lian |
| Claim 1 | 103 | Lian and 2010 Hyundai Tucson[3] |

## II. ANALYSIS

### A. Principles of Law

#### 1. Anticipation

The "ordinary observer" test for anticipation of a design patent is the same as that used for infringement, except that for anticipation, the patented design is compared with the alleged anticipatory reference rather than an accused design. *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1238, 1240 (Fed. Cir. 2009). The ordinary observer test for design patent infringement was first enunciated by the Supreme Court in *Gorham Co. v. White*, 81 U.S. 511 (1871), as follows:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Id.* at 528. The ordinary observer test requires the fact finder to consider all of the ornamental features illustrated in the figures that are visible at any time in the "normal use" lifetime of the accused product, i.e., "from the completion of manufacture or assembly until the ultimate destruction, loss, or disappearance of the article." *Int'l Seaway*, 589 F.3d at 1241. In other

---

[2] Ex. 1006, U.S. Design Pat. No. D773,340 S (December 6, 2016).

[3] Ex. 1007, 2010 Hyundai Tucson Brochure, copyright 2009, http://www.auto-brochures.com/makes/Hyundai/Tucson/Hyundai_US Tucson_2010.pdf.

IPR2020-00534
Patent D797,625 S

words, the ordinary observer test requires consideration of the design as a whole. *See id.* at 1243; *Egyptian Goddess*, 543 F.3d at 677. In applying the ordinary observer test, we must "determine whether 'the deception that arises is a result of the similarities in the overall design, not of similarities in ornamental features in isolation.'" *See Richardson*, 597 F.3d at 1295.

Additionally, while the ordinary observer test requires consideration of the overall prior art and claimed designs,

> [t]he mandated overall comparison is a comparison taking into account significant differences between the two designs, not minor or trivial differences that necessarily exist between any two designs that are not exact copies of one another. Just as "minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement" . . . so too minor differences cannot prevent a finding of anticipation.

*Int'l Seaway*, 589 F.3d at 1243 (citation omitted) (quoting *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1444 (Fed. Cir. 1984)).

2.    *Obviousness*

"In addressing a claim of obviousness in a design patent, the ultimate inquiry . . . is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Apple, Inc. v. Samsung Elec. Co.*, 678 F.3d 1314, 1329 (Fed. Cir. 2012) (internal quotation and citations omitted); *see also High Point Design*, 730 F.3d at 1313 ("The use of an 'ordinary observer' standard to assess the potential obviousness of a design patent runs contrary to the precedent of this court and our predecessor court, under which the obviousness of a design patent must, instead, be assessed from the viewpoint of an ordinary designer.").

Often referred to as the *Durling* test, the obviousness analysis generally involves two steps: first, "one must find a single reference, a

IPR2020-00534
Patent D797,625 S

something in existence, the design characteristics of which are basically the same as the claimed design"; second, "[o]nce this primary reference is found, other references may be used to modify it to create a design that has the same overall visual appearance as the claimed design." *Durling*, 101 F.3d at 103 (internal quotation and citations omitted).

The first step has two parts; we must "(1) discern the correct visual impression created by the patented design as a whole; and (2) determine whether there is a single reference that creates 'basically the same' visual impression." *Id.* In the second step, the primary reference may be modified by secondary references "to create a design that has the same overall visual appearance as the claimed design." *Id.* However, the "secondary references may only be used to modify the primary reference if they are 'so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* (alteration in original) (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)).

Also, when evaluating prior art references for purposes of determining patentability of ornamental designs, the focus must be on actual appearances and specific design characteristics rather than design concepts. *Harvey*, 12 F.3d at 1064; *see also Apple*, 678 F.3d at 1332 ("Rather than looking to the 'general concept' of a tablet, the district court should have focused on the distinctive 'visual appearances' of the reference and the claimed design.").

### B. The Ordinary Observer

The parties dispute who is an ordinary observer. LKQ argues that "the ordinary observer should be the retail consumer of an automobile." Pet. 40 (citing Ex. 1003 ¶ 40; Ex. 1004 ¶ 34). GM argued in its Preliminary

IPR2020-00534
Patent D797,625 S

Response that "the ordinary observer includes commercial buyers who purchase replacement vehicle front fenders to repair a customer's vehicle, such as repair shop professionals."  Prelim. Resp. 7.  GM noted that LKQ has acknowledged in a related proceeding (IPR2020-00065) that "replacement automobile body parts[] are typically purchased on behalf of vehicle owners by repair shops."  *Id.* (quoting IPR2020-00065, Paper 2, 21) (emphasis omitted).

Before us is evidence that both automobile owners, as well as insurance and repair companies, desire to return vehicles to their original appearance.  GM points to a letter from LKQ's counsel to U.S. Customs and Border Protection stating that "[a]utomobile owners seek to repair their automobiles in a way that returns their automobile as closely as possible to its original appearance and condition."  Ex. 2003, 11.  This letter also states that "[i]nsurance companies are overwhelmingly the customers in aftermarket repair parts market transactions, acting on behalf of their driver clients."  *Id.*

The '625 design claims a "vehicle front fender," not a vehicle in total.  Ex. 1001, code (54).  Based on this, as well as the evidence from both parties, we determined in our Institution Decision

> that the ordinary observer includes a commercial buyer of replacement vehicle parts and a retail consumer of an automobile.  That is to say, as discussed in detail below, the evidence on the record before us demonstrates that the designs at issue have such distinct and similar characteristics that either ordinary observer (the retail consumer or the repair shop professional who would be aware of prior art designs) would confuse the prior art designs for the design claimed by the '625 patent.

IPR2020-00534
Patent D797,625 S

Inst. Dec. 12 (citation omitted).  LKQ clings to its argument that Federal Circuit case law supports just the vehicle owner as the ordinary observer. *See* Tr. 9:20–19:8 (LKQ's counsel arguing that "the proper ordinary observer in this context should be the vehicle -- the retail vehicle purchaser."); *see also* Pet. Reply 3 (citing *Pacific Coast Marine Windshields v. Malibu Boats*, 739 F.3d 694, 701–702 (Fed. Cir. 2014)).  Federal Circuit cases are consistent in that the determination of the ordinary observer is factually dependent.  *See Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d at 665 (The Federal Circuit explaining "that the ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs and who has the capability of making a reasonably discerning decision when observing the accused item's design whether the accused item is substantially the same as the item claimed in the design patent.").

On the facts and evidence in this proceeding, the interests and goals of both the vehicle owner and repair shop person are aligned, that is—in the context of repair, to return the vehicle to its original appearance.  Ex. 2003, 11; Ex. 2005, 3–4; Ex. 1043; Ex. 2004 ¶¶ 26, 54–56.  Even if we chose between the two, the level of detail and analysis would not change sufficiently to affect the outcome of this Decision.  Therefore, we do not alter our determination made at institution, that the ordinary observer includes both a vehicle owner and consumer and also a replacement parts buyer.

GM offers additional evidence as to the level of detail an ordinary observer would consider including a website selling a replacement fender for

the Chevrolet Equinox.  PO Resp. 16–17 (citing Ex. 2005).  The website states, for example, "[t]o replace your damaged parts, get these premium fenders by Replace.  They are identical to OE in fit, form, and function." Ex. 2005, 3–4.  In light of the evidence that both a vehicle owner and repair shop person would desire to return a vehicle in most cases to its original appearance, we find Mr. Peters' testimony persuasive that "the ordinary observer readily recognized incongruity associated with a part that does not fit or match other parts of the vehicle it is attached to."  Ex. 2004 ¶ 54.  We understand that this type of observation and consideration would require a certain level of examination when determining what replacement fender to purchase.  Thus, we find persuasive GM's and Mr. Peters' assertions that, when considering the overall appearance of a vehicle fender, "details are readily noticed by the ordinary observer."  PO Resp. 17 (citing Ex. 2004 ¶ 56).

### C. The Designer of Ordinary Skill in the Art

LKQ contends that:

> a designer of ordinary skill would be an individual who has at least an undergraduate degree in transportation or automotive design and work experience in the field of transportation design, or someone who has several years' work experience in the field of transportation or automotive design.

Pet. 38 (citing Ex. 1003 ¶ 42; Ex. 1004 ¶ 36).  GM argues that:

> [a] designer of ordinary skill in the art relevant to the '625 patent would have at least an undergraduate degree in automotive design, or other related industrial design field, with at least two years of relevant practical experience in designing automotive body parts.  An increase in experience could compensate for less education, and an increase in education could likewise compensate for less experience.

IPR2020-00534
Patent D797,625 S

Prelim. Resp. 9.  We do not discern a significant difference in these definitions proposed by the parties for an ordinary designer.  Both definitions allow for an undergraduate professional degree, or alternatively, a reasonable period of time and work experience in the field of transportation and automotive design field.  For purposes of this decision and on the complete record before us, we adopt LKQ's proposed definition of the ordinary designer.  Adopting GM's definition would not alter the outcome of this Decision.

   *D. Anticipation by Lian*

      *1. Lian (Ex. 1006)*

Lian includes seven drawings of a "Vehicle."  Ex. 1006, code (54). We reproduce Lian's Figures 1, 4, and 6 below.



**FIG. 1**

Figure 1 of Lian is a front elevation view of a vehicle.  Ex. 1006, 2.

IPR2020-00534
Patent D797,625 S



**FIG. 4**

Figure 4 of Lian is a left side elevation view of the vehicle.  *Id.* at 3.



**FIG. 6**

IPR2020-00534
Patent D797,625 S

Figure 6 of Lian is a front perspective view of the vehicle. *Id.* at 5. We selected these figures from among Lian's seven drawings because they show best Lian's left front fender for comparison with the claimed design.

### 2. LKQ's Arguments

Because we find it helpful, we reproduce below LKQ's chart from the Petition comparing cropped and annotated views of Lian's figures side-by-side with Figures 1–4 of the '625 design. Pet. 46–47.



| '625 PATENT | LIAN |
|---|---|
| Ex. 1001, FIG. 1 | Ex. 1006, FIG. 6 (cropped, annotated) |
| Ex. 1001, FIG. 2 | Ex. 1006, FIG. 4 (cropped, annotated) |

IPR2020-00534
Patent D797,625 S



LKQ provides on the left side of the claim chart, reproduced above, each of Figures 1–4 of the claimed front fender compared with a similar cropped view of the front fender from Lian on the right side of the claim chart.

LKQ provides additional claim charts showing certain similarities between specific portions of the '625 design and Lian. *Id.* at 48–54. For example, with respect to the "top protrusion," LKQ compares cropped portions of the '625 design and Lian, asserting that the similarities of the top protrusions are "an overall visual appearance that is substantially the same as the claimed design." *Id.* at 47 (citing Ex. 1003 ¶ 55; Ex. 1004 ¶ 60). We

IPR2020-00534
Patent D797,625 S

reproduce below LKQ's claim chart comparing the relevant portions of the
top protrusion



| '625 PATENT | LIAN |
|---|---|
| Ex. 1001, FIG. 2 (annotated) | Ex. 1006, FIG. 4 (cropped) |
| Ex. 1001, FIG. 4 | Ex. 1006, FIG. 5 (cropped, annotated) |

*Id.* at 48.  LKQ provides on the left side of the claim chart, above, cropped
and highlighted portions of Figures 2 and 4 of the claimed front left fender
compared with the same referential cropped and highlighted view of the
front left fender of Lian on the right side of the claim chart.  LKQ argues
that "both feature a top protrusion extending rearwardly and upwardly and
having an intermittent u-shaped notch." *Id.* (citing Ex. 1003 ¶ 55; Ex. 1004
¶ 60).

IPR2020-00534
Patent D797,625 S

Using another claim chart, below, LKQ also points out some differences, such as the "wheel arch" and "terminus" between the '625 design and Lian. *Id.* at 55.



| '625 PATENT | LIAN |
|---|---|
| Ex. 1001, FIG. 2 (cropped, annotated) | Ex. 1006, FIG. 4 (cropped, annotated) |

LKQ provides on the left side of the claim chart, above, cropped and highlighted portions of Figure 2 of the claimed front fender compared with the same referential cropped and highlighted view of the front fender of Lian shown on the right side of the claim chart. LKQ argues that the different curvature of the wheel arch and lower terminus of the fenders "are, at most, minor distinctions and neither diminishes the overall visual similarity between the designs." *Id.* at 56 (citing Ex. 1003 ¶ 62; Ex. 1004 ¶ 67). Mr. Gandy testifies, with respect to the wheel arch, that "[t]he minor difference in shape would not be apparent to an ordinary observer and would be overwhelmed by the many other common features, especially the similarities in the more prominent features and particularly in view of the virtual

IPR2020-00534
Patent D797,625 S

identicality [sic] in the width, proportion, and general appearance of the wheel arch flats of the two designs."  Ex. 1003 ¶ 63.

### 3. GM's Arguments

Consistent with its claim construction position, GM argues that when the overall appearance of the claimed design is considered, many elements of the claimed design are absent from Lian.  PO Resp. 21.  GM makes the following specific arguments:

 (a) The claimed door cut line is different from Lian (*Id.* at 21–24);

 (b) "Lian does not disclose a 'top protrusion' having the appearance of the claimed design." (PO Resp. 24–30);

(c) Lian lacks the inflection line on the lower portion of the fender between the wheel arch and door cut line.  (PO Resp. 30–32);

(d) Lian fails to disclose the same overall appearance provided by the sculpting shown in the claimed design. (PO Resp. 32–37);

(e) Lian's wheel arch lacks the consistent curvature of the claimed design.  (PO Resp. 37–41); and

(f) Lian has a different lower rearward terminus shape than the claimed design. (PO Resp. 41–44).

GM argues that all these elements are important to the overall appearance of the claimed fender, and are not, as LKQ asserts, "'a miniscule element' that is 'beneath an ordinary observer's notice,'" for example with respect to the lower rear terminus.  PO Resp. 43 (citing Pet. 57).

### 4. Analysis

#### (a) Similarities between the '625 patent and Lian

We recognize there are certain articulable and visible similarities in the overall appearance of the claimed design and Lian that would be

IPR2020-00534
Patent D797,625 S

apparent to an ordinary observer.  As LKQ contends, both designs include a
top protrusion and u-shaped notch.  Pet. 13, 48.  Below the u-shaped notch,
Lian arguably shows a first and second crease extending forward from a
door cut line as well as a concavity between the first and second creases.  *Id.*
at 14, 48–49.  Also, the distal portion, i.e. the front left, of both designs has a
slanted forward edge extending between the wheel arch and front elevation
profile fairly close in appearance.  *Id.* at 52–53.  These similarities are
readily observable by comparing the elevation views of Figure 2 of the
claimed design with Figure 4 of Lian, reproduced below.

| '625 patent Figure 2 | Lian's Figure 4 |
|---|---|
|  | |

Figure 2 of the '625 patent above left, in comparison to a cropped version of
Lian's Figure 4, on the right.

(b) *Differences between the '625 patent and Lian*

*Wheel Arch and Terminus*

We agree with LKQ that when considering the elevation views, the
wheel arch shape is different, and also the fender terminus, lower right, is

IPR2020-00534
Patent D797,625 S

visibly different. *Id.* at 55. We reproduce LKQ's annotated figures from the
'625 patent and Lian, below.



| '625 PATENT | LIAN |
|---|---|
| Ex. 1001, FIG. 2 (cropped, annotated) | Ex. 1006, FIG. 4 (cropped, annotated) |

LKQ's annotated and cropped Figure 2 of the '625 patent above left, in
comparison to an annotated and cropped Figure 4 of Lian, on the right.

We are not persuaded, however, that "these two differences are, at
most, minor distinctions" as LKQ and its declarants assert. *Id.* at 56 (citing
Ex. 1003 ¶ 62; Ex. 1004 ¶ 67). One of LKQ's declarants, Dr. Gandy,
testifies as to the wheel arch and terminus features that "[t]he minor
difference in shape would not be apparent to an ordinary observer and would
be overwhelmed by the many other common features, especially the
similarities in the more prominent features." Ex. 1003 ¶ 63. GM's
declarant, Mr. Peters, states the opposite, testifying that "Lian's wheel arch
accounts for a substantial portion of the fender perimeter and is a prominent
feature of the overall appearance of Lian's design." Ex. 2004 ¶ 93.

Considering the design as a whole, we are persuaded by Mr. Peters's testimony and GM's evidence that an ordinary observer would perceive, along with the similarities discussed above, that Lian's wheel arch is non-circular and that the terminus has a rearwardly extending segment different from the claimed design.  Considering our claim construction and the testimony of both parties' declarants, we find that an ordinary observer certainly would evaluate these visually significant features in defining the overall appearance of the claimed design, and find them to be missing in Lian.  *See* Section I.D.3.

Also bearing on our analysis, GM has produced evidence of other prior art references that disclose and claim various fender designs.  *See* PO Resp. 13–14 (citing Ex. 2004 ¶¶ 49–53).  Because an ordinary observer would consider at least the wheel arch and terminus differences as a relevant part of the overall appearance of the claimed design in the context of Lian and other known prior art fenders, and because these elements are not minor in that they affect the overall visual impression of the fender, we are persuaded that an ordinary observer would not be so easily deceived into purchasing Lian's fender thinking it to be the claimed fender.[4]  *See Egyptian Goddess*, 543 F.3d at 677 ("Where the frame of reference consists of numerous similar prior art designs, those designs can highlight the

---

[4] Although LKQ argues that *Egyptian Goddess* was designated as a test for infringement, not validity, the Federal Circuit has clarified "that the ordinary observer test must logically be the sole test for anticipation as well.  In doing so, we will prevent an inconsistency from developing between the infringement and anticipation analyses." *Int'l Seaway*, 589 F.3d at 1240.

IPR2020-00534
Patent D797,625 S

distinctions between the claimed design and the accused design as viewed by the ordinary observer.").

Moreover, the wheel arch and terminus are not the only differences between Lian and the claimed design. LKQ argues that "[n]one of Lian's door cut line, protrusion, inflection line, or pattern of creases and sculpture are meaningfully dissimilar from the claimed design." Pet. Reply. 11. For the reasons discussed below, we disagree.

Although in the next sections we analyze additional features of the claimed design and Lian, we never lose sight of the overall visual impressions of the claimed design and Lian, or the question of whether Lian creates the same overall visual impression as the claimed design. *Gorham Mfg. Co. v. White*, 81 U.S. 511, 530, 20 L. Ed. 731 (1871) ("though variances in the ornament are discoverable, the question remains, is the effect of the whole design substantially the same?").

*Door Cut Line*

Considering Figure 2 of the '625 patent in comparison to Figure 4 of Lian, it is apparent that the door cut lines are different. Even a cursory examination reveals that the claimed door cut line is a visually consistent curvature when observed in the elevation view, whereas Lian's door cut line presents a more angular transition at the second crease line. *Compare* Ex. 1001, Fig. 2, *with* Ex. 1006, Fig. 4. The door cut line differences may not be a hugely critical point of emphasis, but they can be a visually differentiable feature that draws an ordinary observer's attention. *See* Ex. 2008 8:13–9:21 (LKQ's declarant, Mr. Hill, agreeing that a door cut line could have visual significance to an ordinary observer).

IPR2020-00534
Patent D797,625 S

The importance of small design differences, such as the door cut line, may increase in importance when we consider the claimed design within the context of the prior art. *See Egyptian Goddess*, 543 F.3d at 676 (The Federal Circuit explaining that "when the claimed design is close to the prior art designs, small differences between the accused design and the claimed design are likely to be important to the eye of the hypothetical ordinary observer."). GM's compilation of other vehicle fender designs is reproduced below. PO Resp. 13.



Shown above are various elevation view figures from U.S. Pat. Nos. D766149, D704607, D763753, D686536, D692798, and D762151 as compiled by GM. The door cut lines illustrated in the prior art are generally slightly arcuate vertical lines, but even among the six designs shown above, there are visibly apparent differences in angularity and curvature when viewed objectively. Considering the evidence here, we find persuasive Mr.

IPR2020-00534
Patent D797,625 S

Peters' testimony that when considered in light of prior art fender designs, an ordinary observer would have considered differences, even in nuanced elements such the door cut lines, "and these nuanced differences would have had a substantial impact on the overall appearance of fender designs to the ordinary observer." Ex. 2004 ¶ 52.

*Protrusion*

Similarly, and keeping in mind the prior art discussed above, we are further persuaded that differences in the protrusions of the claimed design and Lian play a role in the overall appearance of the designs. While one might initially observe some relative similarity of the protrusions at issue here, specifically in the elevation views, these views alone do not provide a complete picture and sufficient comparison of the protrusions. The protrusions in this case are better seen in the perspective views Figures 1 and 4 of the '625 patent and Figures 5 and 6 of Lian, reproduced below.

| '625 patent Figure 1 | Lian's Figure 6 |
|---|---|
|  |  |

IPR2020-00534
Patent D797,625 S

Above left, Figure 1 of the '625 patent depicts a perspective view of the claimed fender design, in comparison to a cropped version of Lian's perspective view in Figure 6, on the right.

| '625 patent Figure 1 | Lian's Figure 6 |
|---|---|
|  FIG. 4 | |

Figure 4 showing a top plan view of the fender design of the '625 patent above left, in comparison to a cropped top plan view of Lian's Figure 6, on the right.

In its comparison, LKQ mainly offers that "both [designs] feature a top protrusion extending rearwardly and upwardly and having an intermittent u-shaped notch." Pet. 48 (citing Ex. 1003 ¶ 55; Ex. 1004 ¶ 60). GM's comparison, appropriately in our opinion, includes more detail. GM notes that the upper surface of the claimed design is generally consistent from front to back, but "Lian, on the other hand, depicts an upper surface that changes width and curvature along the length of this surface from its left to right edges." PO Resp. 26. We reproduce GM's annotated comparison of the protrusions below.

IPR2020-00534
Patent D797,625 S



GM's annotated Figure 1 of the '625 patent, above left, and annotated Figure 6 of Lian, above right.  We find that GM's declarant, Mr. Peters, provides the most persuasive testimony consistent with the elements an ordinary observer would consider in vehicle fender design.  Mr. Peters testifies that "Lian's protrusion has an upper surface that rotates and varies in width between left and right edges.  For example, the left edge that interfaces with a portion of the hood is substantially narrower than a right edge that interfaces with the A-pillar."  Ex. 2004 ¶ 70.

*Sculpting*

Sculpting, in the manner of the generally horizontal creases seen in both the '625 patent and Lian, certainly plays a role as part of the overall appearance of the fender as both parties address these elements in their claim construction and validity analyses.  *See, e.g.*, Pet. 48–52 (LKQ describing visual characteristics of first and second creases and inflection line); *see also* PO Resp. 30–37 (GM comparing horizontal creases of the '625 patent and Lian).  At first glance, the sculpting between the designs exhibits some similarity in location and arrangement.  On the other hand, in his deposition,

IPR2020-00534
Patent D797,625 S

Mr. Hill testified about the emphasis that a designer places on horizontal features of a fender:

> Q. Okay. And I think earlier you said that it's the horizontal features of the vehicle that are more often emphasized; is that right?
>
> A. Yes. Again, very broadly, but also extremely -- you know, we read left to right and the horizontal aspect, you know, the orientation of vehicles is generally long and in a horizontal manner as opposed to buildings which are more architecture and vertically oriented. So most of the elements are emphasized to -- or harmonized to emphasize an implied length in a horizontal manner.

Ex. 2008, 9:3–13.

Considering the crease lines and horizontal visual details of the designs, we find persuasive GM's arguments and Mr. Peters' testimony that an ordinary observer would not find the fender body sculpting substantially similar between Lian and the claimed design. PO Resp. 32–37 (citing Ex. 2004 ¶¶ 81–89). Moreover, it is reasonably clear that an ordinary observer would be aware of other prior art fender designs and would notice specific details in the sculpting. *See, e.g.*, Ex. 2008, 20:6–15 (LKQ's declarant, Mr. Hill, agreeing that the sculpting on the fender would "be meaningful to an ordinary observer.").

*Inflection Line*

LKQ argues that Lian exhibits the identical inflection line as the claimed design, utilizing the annotated figure for comparison below. Pet. 50–52.

IPR2020-00534
Patent D797,625 S



| '625 PATENT | LIAN |
|---|---|
| Ex. 1001, FIG. 2 (cropped, annotated) | Ex. 1006, FIG. 4 (cropped, annotated) |

LKQ's annotated Figure 2 from the '625 patent, above left, and Lian's annotated and cropped Figure 4, above right.  LKQ uses a horizontal yellow highlight line on Lian's design to indicate where it considers a similar inflection line on the claimed design.  GM takes issue with this comparison and argues that the claimed inflection line in the '625 design is in fact a crease as shown where "the shade lines in FIG. 1 signal a distinct and abrupt angle change of the fender above and below the crease."  PO Resp. 30 (citing Ex. 2004 ¶ 76).  Whether termed an inflection line, or a crease, our consideration of this feature is consistent with Mr. Peters' testimony that Lian lacks such a feature.  Mr. Peters compares LKQ's annotated Figure 4 of Lian with a similar cropped image *without* LKQ's yellow highlight line.  Mr. Peters explains persuasively that different from the claimed design, in Lian "[t]here is simply no crease at the location annotated with a crease by the Petition."  Ex. 2004 ¶ 77.

IPR2020-00534
Patent D797,625 S



Shown above is Figure 4 of Lian as annotated by LKQ, on the left, with a yellow highlight allegedly indicating an inflection line or crease, and on the right, a cropped annotated image from Figure 4 without the yellow highlight.

*First and Second Creases*

Also, while certainly nuanced, we are persuaded that there are visually ascertainable differences between the first and second creases, which are part of the sculpting of the two designs that would be apparent to an ordinary observer.  We reproduce the perspective views of Figure 1 of the '625 patent and Lian's Figure 6 below.

IPR2020-00534
Patent D797,625 S

| '625 patent Figure 1 | Lian's Figure 6 |
|:---:|:---:|
|  | |

Above, left, Figure 1 is a perspective view of the fender design of the '625 patent, in comparison to a cropped version of Lian's perspective view in Figure 6, on the right. We are persuaded by Mr. Peters' testimony and annotated Figure 2, reproduced below, that an ordinary observer would recognize in the claimed design that, as shown in blue, "the 'first crease' extends downwardly while the upper crease of the protrusion, and second and third creases extend upwardly." Ex. 2004 ¶ 88.



Mr. Peters' annotated elevation view, Figure 2 of the '625 patent, above, includes annotations highlighting the curvatures of the claimed creases. *Id.*

IPR2020-00534
Patent D797,625 S

Considering how the sculpting plays into the overall appearance of the fender, Mr. Peters testifies that compared to Lian, "[t]he '625 Patent's sculpting is characterized by smooth, curving lines." *Id.* ¶ 82. For comparison, we reproduce below Mr. Peters's annotated cropped portion of Lian's Figure 4. *Id.*



Lian depicts substantially linear, angled lines

Above is Mr. Peters' annotated and cropped portion of Lian's Figure 4 elevational view. *Id.* Considering Lian's creases, we find persuasive Mr. Peters' testimony that "Lian depicts substantially linear, angled lines," and that an ordinary observer would have recognized these lines as elements integral to the overall appearance of Lian that differ from the claimed design. *Id.*

*Concavity Line*

Both LKQ and GM contest the relevance and similarity of the concavity line that is positioned and essentially defined between the first and second creases. LKQ argues that both designs are similar in that relative to the first and second creases "the interplay between the resulting contours creates a curved concavity line." Pet. 48 (citing Ex. 1003 ¶ 56; Ex. 1004

IPR2020-00534
Patent D797,625 S

¶ 61).  We reproduce below LKQ's comparison of annotated Figure 2 of the
'625 patent and a cropped version of Figure 4 of Lian.



Above left, Figure 2 of the '625 patent depicts an annotated perspective view
of the claimed fender design alongside a cropped version of the perspective
view from Lian's Figure 6.

GM argues that the concavity lines are different.  PO Resp. 34.  GM's
declarant, Mr. Peters, testifies that "Lian altogether lacks a 'concavity line'
having the shape of the claimed design's concavity line."  Ex. 2004 ¶ 86.
GM argues of the second crease and concavity lines that "[t]he sculpting
depicted by these lines further contributes to the overall appearance of the
claimed design, providing distinctly shaped areas of relatively lighter and
darker surfaces."  PO Resp. 34 (citing Ex. 2004 ¶ 85).

There does not appear to be any dispute that both designs include a
concavity line defined between the first and second creases.  As discussed
above, without much persuasive support, both parties and their respective
declarants conclude that the concavity lines are either the same or different.

IPR2020-00534
Patent D797,625 S

Based on our review, it is not clear, in either the '625 patent or Lian, what the scope or significance of the concavity line is with respect to either the '625 patent or Lian. Observing the claimed design as a whole, we disagree with GM that the concavity line can be considered "prominen[t]." *Id.* at 35. However, overall, the creases and concavity line together play a part in the overall appearance of each design. Considering our analysis, *supra*, of the differences in the first and second creases of both designs, we find persuasive GM's position that the concavity line, like the first and second creases, presents a nuanced difference in the claimed design that contributes to a visually disparate sculpting and overall appearance of the claimed design as compared to Lian.

### 5. *Conclusion as to Anticipation by Lian*

Having reviewed the complete record, including both parties' evidence and arguments, and having considered the overall appearance of the claimed design as compared to that of Lian, we are not persuaded that LKQ has shown by a preponderance of the evidence that an ordinary observer would be deceived into "purchas[ing] one supposing it to be the other." *Gorham Co. v. White*, 81 U.S. 511, 528 (1871). LKQ has not established persuasively that the '625 patent design and the design of Lian are substantially the same under the ordinary observer analysis.

Accordingly, based on the final record before us, LKQ has not established by a preponderance of the evidence that Lian anticipates the claim of the '625 patent.

### E. *Obviousness by Lian, or Lian in view of 2010 Hyundai Tucson*

"In determining the patentability of a design, it is the overall appearance, the visual effect as a whole of the design, which must be taken

IPR2020-00534
Patent D797,625 S

into consideration." *See In re Rosen*, 673 F.2d 388, 390 (CCPA 1982).  The proper standard is whether the design would have been obvious to a designer of ordinary skill who designs articles of the type involved, which, in this case, are vehicle fenders.  *See In re Nalbandian*, 661 F.2d 1214, 1217 (CCPA 1981); Ex. 1001, Title, Fig. 1 (illustrating ornamental features on the outer surface of a vehicle fender).  For the reasons that follow, we determine that LKQ fails to carry its burden of identifying a primary, i.e., *Rosen*, reference.  *See Rosen*, 673 F.2d at 391.  As a consequence, LKQ fails also to establish that the challenged claim is unpatentable as obvious.

### 1. *LKQ's Arguments*

LKQ contends the ornamental design of the '625 patent would have been obvious to a designer of ordinary skill based on Lian alone, or based on Lian in view of 2010 Hyundai Tucson.  Pet. 58–76.  LKQ relies on a comparison of the combined ornamental features of Lian and 2010 Hyundai Tucson with the design of the '625 patent, as well as the Gandy and Hill declarations, to support its conclusion that the "Lian Patent is an appropriate primary reference for establishing obviousness of the '625 Patent because it constitutes 'a single reference, a something in existence, the design characteristics of which are ***basically the same*** as the claimed design.'"  *Id*. at 58 (citing *Durling*, 101 F.3d at 103).  *Id*.

LKQ asserts, as it did with respect to its claim construction and anticipation analysis, that a designer of ordinary skill in the art would have "recognized that the only possible differences between Lian and the claimed design relate to the specific shape of the wheel arch and the lower rearward terminus of the fender."  Pet. 62 (citing Ex. 1003 ¶ 71; Ex. 1004 ¶ 76).  LKQ argues that Lian is an appropriate primary reference because of all the

IPR2020-00534
Patent D797,625 S

similarities and further argues, as to the two differences, that '[t]he ordinary skill and creativity of a designer of ordinary skill in the art would have suggested the few minute alterations needed for the designer to arrive at the claimed design." Pet. 58 (citing Ex. 1003 ¶ 66; Ex. 1004 ¶ 71). More specifically, LKQ argues that an ordinary designer would have found the '625 patent and Lian to have "nearly identical protrusions, first and second creases, and concavity line." *Id.* at 61 (citing Ex. 1003 ¶ 68; Ex. 1004 ¶ 73).

　　*2. GM's Arguments*

　　GM argues that Petitioner failed to properly evaluate the "multiple, readily apparent differences between the claimed design and Lian that are significant to the overall appearance in the eyes of the ordinary observer/designer." PO Resp. 45. Because LKQ mainly addressed just two differences between the claimed design and Lian relating to the wheel arch and lower terminus, GM argues that even if these differences can be sufficiently addressed, "multiple, simultaneous changes related to the overall appearance of the design would be required to achieve the '625 Patent's design." *Id.* at 46 (citing Pet. 59; Ex. 2004 ¶ 101). According to GM, "the Petition summarily dismisses any differences as '*de minimis*,' without meaningful analysis of each one of the many required changes." *Id.* In other words, GM's main argument is that LKQ has failed to show that Lian is a proper primary, i.e., *Rosen*, reference. *Id.* GM also argues that LKQ has failed to provide a reasoned analysis as to why an ordinary designer would have modified the shape of Lian's wheel arch and the shape of Lian's lower terminus. *Id.* at 47. Further, GM argues that even if Lian were modified as proposed in the ground relying on Lian and 2010 Hyundai Tucson, LKQ

IPR2020-00534
Patent D797,625 S

fails to demonstrate the result would have an overall appearance "basically the same" as the claimed design.  *Id.* at 54.

### 3. Obviousness Analysis

As discussed previously, for design patents, the relevant obviousness inquiry is a two-step process.  First, we must identify a primary or *Rosen* reference, "a something in existence, the design characteristics of which are basically the same as the claimed design."  *MRC Innovations*, 747 F.3d at 1331 (quoting *Rosen*, 673 F.2d at 391).  The "basically the same" test requires initial consideration of the "visual impression created by the patented design as a whole."  *Id.*  The second step requires a determination of whether any secondary reference is "so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other."  *Id.* (alteration in original) (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)).

The Petition asserts that Lian qualifies as a primary or *Rosen* reference.  We address the two steps of the obviousness inquiry below.

### (a) The Visual Impression of the Patented Design as a Whole

We set forth in our claim construction the overall visual impression of the claimed design.  Section I.D.3.(c).  We determined that the appropriate visual impression of the claimed design occurs by observing and considering the overall appearance of the claimed design as shown explicitly in Figures 1–4 of the drawings.  *Id.*  Also, we found that LKQ's proposed claim construction offers a starting point, but does not go far enough, in describing the overall appearance of the claimed design.  According to LKQ, the claimed design can be described as follows:

IPR2020-00534
Patent D797,625 S

[a] vehicle fender comprising:

a top protrusion extending rearwardly and upwardly from an upper portion of the fender and having an intermittent u-shaped notch;

a first crease and a second crease extending forwards from a rear edge of the fender, a concavity line disposed between the first crease and the second crease, and an inflection line below the second crease; and

an angular front elevation profile.

Pet. 10–13; Section I.D.3.(c).  We reproduce below Figures 1 and 2 of the '625 patent.



Ex. 1001, Figs. 1–2.  Figure 1, above left, is a perspective view of the fender with ornamental features illustrated as solid lines and unclaimed features illustrated by broken lines.  Figure 2, above right, is an elevation view of the claimed fender.  Ex. 1001, Description.

IPR2020-00534
Patent D797,625 S

In addition, we determined based on GM's arguments that the appropriate visual impression considers other ornamental elements and features of the claimed fender design including:[5]

1) A consistently curved door cut line and a circular wheel arch. *See* PO Resp. 4–5 (citing Ex. 2004 ¶¶ 35–38).

2) A consistent width lower rearward terminus defined between the wheel arch and door cut line. *See* Ex. 1001, Figs. 1–2.

3) The top protrusion having an upper surface having a thickness and consistent width that mirrors the inside surface of the u-shaped notch. PO Resp. 7 (citing Ex. 2004 ¶¶ 41–42).

4) A gently curving first and second crease extending forward from the door cut line and defining a concavity line there between. *Id.* at 10; Pet. 14–15 (citing Ex. 1004 ¶ 46).

5) Below the first and second crease, an inflection line extending between the wheel arch and door cut line. PO Resp. 10, Ex. 1001, Fig. 1.

Section I.D.3.(c).

### (b) *The First Step of the Durling Test*

A preponderance of the evidence supports a conclusion that LKQ fails to take account adequately of the numerous elements of the patented design and, therefore, fails also to identify "the correct visual impression created by the patented design as a whole"—a required first step in identifying a *Rosen* reference. *Durling*, 101 F.3d at 103. That failure, standing alone, justifies

---

[5] These element descriptions are the same as that described in our claim construction analysis, Section I.D.3., which we summarize here for readability.

IPR2020-00534
Patent D797,625 S

our conclusion that LKQ fails also to prove by a preponderance of the evidence that the challenged claim of the '625 patent is unpatentable.

For purposes of completeness, and alternatively, we turn to the second part of the first step of the *Durling* test, which presents an independent basis for concluding that LKQ fails to carry its burden of proving that the challenged claim is unpatentable. We thus consider the overall appearance of the claimed design from the perspective of the ordinary designer in our analysis as to whether or not the overall appearance of Lian is "basically the same" as the claimed fender. *MRC Innovations*, 747 F.3d at 1331. For the following reasons, we are not persuaded that Lian is basically the same as the claimed design.

### (c) LKQ Fails to Identify a Single Reference that Creates Basically the Same Visual Impression as the Patented Design

We reproduce Petitioner's claim chart, which features Figures 1 and 2 of the claimed design in side-by-side comparison with Lian's Figures 4 and 6, below.

IPR2020-00534
Patent D797,625 S



LKQ provides on the left side of the claim chart reproduced above, each of Figures 1 and 2 of the claimed front fender compared with a similar cropped view of the front fender from Lian's Figures 4 and 6 on the right side of the claim chart.

Lian and the '625 patent do share certain vehicle fender elements such as an upper protrusion, a wheel arch, a door cut line, a front angled edge, and sculpting including at least first and second creases in both designs. *See* Section I.D.3.(c); *see also* Pet. 7–10 (citing Ex. 1044, 73). GM's declarant, Mr. Peters, agreed with LKQ's counsel during his deposition that certain shared features of the claimed design contribute to the overall appearance of the challenged design. Ex. 1044, 73–81. But determining whether a design is "basically the same" is not simply a matter of counting up the similarities and differences. The appropriate comparison focuses on the correct visual impression created by the designs. *See Durling*, 101 F.3d at 104. As we describe below, and keeping in mind the level and skill of an ordinary designer in vehicle fender design, a complete visual comparison of the overall appearance of both designs sufficiently shows that the two designs are quite different.

It is immediately apparent that the profiles of the wheel arches are not the same. *Compare* Ex. 1001, Fig. 2, *with* Ex. 1006, Fig. 4. Compared to the claimed consistently circular wheel arch, Lian depicts a more square profile matched by the square planar edge of the wheel arch extending from the front angled edge to the fender terminus, lower right. *Id.* LKQ's declarant Mr. Hill agreed that the wheel arch can be a significant feature:

> Q. Yeah. Do you believe that the difference in wheel arches between two fenders is something that a consumer or a designer would find -- could find significant?

> A. Depending on the degree of the extreme thematic element of a wheel arch, yes. It will always be important to a designer whether they settle for kind of a common solution or they're looking for a new solution. The consumer would also notice it if it was to such a degree that it presented something, you know, unique.

IPR2020-00534
Patent D797,625 S

Ex. 2008 16:17–17:5.

The fender terminus of Lian is also visibly different from the claimed design. *Compare* Ex. 1001, Fig. 2, *with* Ex. 1006, Fig. 4. Lian's terminus has a rearward protrusion forming a more sharply curved lower portion of the door cut line. *See*, *e.g.*, Ex. 1006, Fig. 4. Also, the door cut line of the claimed design is a mostly consistent curvature extending downward from the u-shaped notch smoothly to the terminus. Ex. 1001, Fig. 2. A reasonable observation of Lian's door cut line reveals a more angular, sharper bend at the second crease. We appreciate from the deposition testimony of Mr. Hill, that the door cut and terminus might not be considered highly significant by an ordinary designer. *See, e.g.*, Ex. 2008, 6:5–7:11, (Mr. Hill testifying about the door cut line, "from the standpoint that a designer is focused on it, they're concerned with it, but they're not overly concerned with it"). And, we balance this testimony along with Mr. Peters' testimony that "I note that the appearance of the door cut line would have had a substantial impact on the overall appearance of the design." Ex. 2004 ¶ 38. We determine that the door cut and terminus features, even if not overly significant, influence and differentiate the overall appearance of the claimed design and Lian.

We are also persuaded that the upper protrusions of Lian and the claimed design are visually different in meaningful ways. When observed in a comparison of elevation views, the upper protrusions of both designs may at first glance appear similar. *Compare* Ex. 1001, Fig. 2, *with* Ex. 1006, Fig. 4. However, considering all the views of the claimed design and Lian, specifically the perspective views, it is apparent that the surfaces of the

IPR2020-00534
Patent D797,625 S

protrusions are quite different.  We reproduce GM's annotated Figure 1 of
the claimed design and annotated cropped Figure 6 below.



GM's annotated cropped Figure 1 of the '625 patent, above left, as
compared to Lian's cropped annotated Figure 6, above right.  Considering
the ordinary designer's perspective, our review of the differences between
the designs is consistent with GM's argument referring to Lian's Figure 6
above, that in Lian, "[t]he crease becomes less prominent and disappears as
the top surface of the protrusion rotates into a more vertical orientation
where it meets the A-pillar."  PO Resp. 28 (citing Ex. 2004 ¶ 72).

GM argues persuasively that the U-shaped notches are different
because in the claimed design, "the 'u-shaped cutout' has the appearance of
a scalloped feature with consistent thickness and smooth curvature." *Id.*  In
support of this position Mr. Peters explains that "[t]he shape of the scalloped
feature thus mimics the upper surface of the protrusion, which likewise has a
smooth curvature and a nearly identical thickness.  The relatedness of these
features again promotes the cohesive overall appearance of the '625 Patent's
design."  Ex. 2004 ¶ 73.  LKQ's declarant, Mr. Hill, likewise testified in his
deposition about the U-shaped notch: "[I]t's going to be very significant to

IPR2020-00534
Patent D797,625 S

the designer to use that space. Normally that is either a mirror pocket or it's used as a window . . . [s]o it's very significant to a designer to manage that area." Ex. 2008, 18:13–19:3.

We are also persuaded that Lian lacks the inflection line (as LKQ refers to it), i.e., the third crease (as GM calls it), as illustrated below the first and second crease of the claimed design. *See* Ex. 1001, Figs 1, 2. GM's declarant, Mr. Peters, testifies that in the claimed design, "[w]hile subtle, the third crease has significant impact on the overall appearance of the fender in the eyes of the ordinary observer." Ex. 2004 ¶ 77. We appreciate that LKQ's declarant, Mr. Hill, testifies that "the fender of Lian curves convexly to a maximum at approximately the same location on the fender panel as the inflection line of the '625 Patent." Ex. 1004 ¶ 63. However, Mr. Hill's testimony does not explain sufficiently that Lian shows a corresponding visually apparent element. We reproduce, below, a cropped version of Lian's Figure 4.



IPR2020-00534
Patent D797,625 S

Shown above is cropped version of Lian's Figure 4, an elevation view of Lian's fender design. Mr. Hill would not commit during his deposition that Lian shows a corresponding crease or line:

> Q. Yeah. There's no line within the red circle on the Lian close-up, is there?
>
> []
>
> THE WITNESS: No. There's the surface, and I can infer the -- the inflection, the wide line.
>
> []
>
> Q. But there's no line like the kind shown in the '625 patent?
>
> []
>
> THE WITNESS: One being a shaded 3D model and one being a line drawing, they -- there is no line in the Lian.

Ex. 2006, 77:3–14. In light of certain general consistencies between the parties' witnesses, we find persuasive Mr. Peters' testimony that Lian "lacks both the appearance provided by the third crease itself, as well as the distinct change between light and dark surface shading associated with the third crease." Ex. 2004 ¶ 78. Whatever nomenclature we give this element in the design, we are not persuaded that the inflection line or third crease, an ornamental feature illustrated in the claimed design, is shown by Lian.

On this record, considering altogether the differences between the overall appearances of the claimed design and the design shown in Lian, LKQ does not establish that Lian "creates 'basically the same' visual impression" as the patented design. The claimed design includes the visually disparate elements discussed above including the upper protrusion, the u-shaped notch, the door cut line, a circular wheel arch, the lower rear terminus, the specific sculpting of the first and second creases along with the

IPR2020-00534
Patent D797,625 S

concavity line, and the inflection line below the first and second creases. *See Durling*, 101 F.3d at 103.  Neither the Petition nor the Reply, each of which dismisses many of these elements as minor, adequately accounts for these ornamental features of the patented design.  *See, e.g.*, Pet. Reply 12 ("Any difference between the door cut lines, such as the 'depth' to which the door advances beyond the U-shaped notch or the height of its apex, is likely too minor for an ordinary observer to even notice." (citing Ex. 1004 ¶¶ 32–34)).

In sum, a preponderance of the evidence supports a conclusion that LKQ fails to identify "a single reference that creates 'basically the same' visual impression" as the patented design.  *Durling*, 101 F.3d at 103.  That failure provides an independent basis for concluding that LKQ fails to carry its burden of proving that the subject matter of the challenged claim of the '625 patent would have been obvious at the time of the invention.

*(d) The Second Step of the Durling Test*

Accordingly, for the reasons given above, LKQ fails also to establish by a preponderance of the evidence that the challenged claim is unpatentable based on the ground that asserts Lian as a *Rosen* reference, in combination with 2010 Hyundai Tucson.  Pet. 66–76 (asserting Lian as the primary reference in the challenge identified as Ground 3).  We need not, therefore, reach the second step of the Durling test because the first step has not been met.

## III. CONCLUSION

LKQ has not proved by a preponderance of the evidence that the claim of the '625 patent is anticipated by Lian or would have been obvious over Lian alone or in combination with 2010 Hyundai Tucson.

IPR2020-00534
Patent D797,625 S

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1 | 102 | Lian | | 1 |
| 1 | 103 | Lian | | 1 |
| 1 | 103 | Lian and 2010 Hyundai Tucson | | 1 |
| | | **Overall Outcome** | | 1 |

## IV. ORDER

For the reasons given, it is

ORDERED that, based on a preponderance of the evidence, the claim of the '625 patent has not been shown to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, any party to the proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00534
Patent D797,625 S

For PETITIONER:

Barry F. Irwin
Reid Huefner
IRWIN IP LLC
birwin@irwinip.com
rhuefner@irwinip.com

PATENT OWNER:

Dorothy P. Whelan
Craig A. Deutsch
Grace J. Kim
Jennifer Huang
Joseph A. Herriges (Pro Hac Vice)
FISH & RICHARDSON P.C.
whelan@fr.com
deutsch@fr.com
gkim@fr.com
jjh@fr.com
herriges@fr.com

US00D797625S

(12) **United States Design Patent**    (10) Patent No.:    **US D797,625 S**
Perkins    (45) Date of Patent:    **    Sep. 19, 2017**

(54) **VEHICLE FRONT FENDER**

(71) Applicant: **GM GLOBAL TECHNOLOGY OPERATIONS LLC**, Detroit, MI (US)

(72) Inventor: **Jeffrey W. Perkins**, Rochester, MI (US)

(73) Assignee: **GM Global Technology Operations LLC**, Detroit, MI (US)

(**) Term: **15 Years**

(21) Appl. No.: **29/575,313**

(22) Filed: **Aug. 24, 2016**

(51) **LOC (10) Cl.** ............................................... **12-16**

(52) **U.S. Cl.**
USPC ............................................................ **D12/184**

(58) **Field of Classification Search**
USPC ...... D12/88, 90, 91, 92, 181, 184, 196, 400;
D21/424, 433, 434; 280/727, 770, 847,
280/848, 849; 296/181.1, 181.5, 198
CPC ........ B62D 25/00; B62D 25/04; B62D 25/16;
B62D 25/161; B62D 25/184; B62D 25/18
See application file for complete search history.

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| D570,742 S | 6/2008 | Takagi et al. |
| D592,105 S | 5/2009 | Dean et al. |
| D597,447 S | 8/2009 | Folden |
| D600,595 S | 9/2009 | Nakamura et al. |
| D601,925 S | 10/2009 | O'Donnell |
| D603,755 S | 11/2009 | Peters |
| D604,203 S | 11/2009 | O'Donnell |
| D605,082 S | 12/2009 | Munson |
| D605,083 S | 12/2009 | Manoogian, II et al. |
| D605,977 S | 12/2009 | Zipfel et al. |
| D605,978 S | 12/2009 | Wolff et al. |
| D608,249 S | 1/2010 | Peters |

| | | |
|---|---|---|
| D608,690 S | 1/2010 | Folden et al. |
| D608,691 S | 1/2010 | Zak, Jr. et al. |
| D609,608 S | 2/2010 | Boniface et al. |
| D611,387 S | 3/2010 | Thompson et al. |
| D611,879 S | 3/2010 | Kim et al. |
| D612,297 S | 3/2010 | Peters et al. |
| D613,645 S | 4/2010 | Song et al. |
| D615,458 S | 5/2010 | Thompson et al. |
| D618,595 S | 6/2010 | Ware et al. |
| D623,090 S | 9/2010 | Cox et al. |
| D627,262 S | 11/2010 | Ikeda et al. |
| D635,488 S | 4/2011 | Phipps |
| D644,147 S | 8/2011 | Suh et al. |
| D644,567 S | 9/2011 | Kozub |
| D657,718 S | 4/2012 | Zipfel et al. |
| D659,052 S | 5/2012 | Ware et al. |
| D659,053 S | 5/2012 | Ware et al. |
| D668,182 S | 10/2012 | Barba Franco et al. |
| D668,183 S | 10/2012 | Smart |
| D678,820 S | 3/2013 | Son et al. |
| D678,821 S | 3/2013 | Ikeda et al. |
| D680,909 S | 4/2013 | Munson et al. |
| D680,910 S | 4/2013 | David |
| D684,899 S | 6/2013 | Baker |

(Continued)

*Primary Examiner* — Rosemary K Tarcza
*Assistant Examiner* — Yolanda Robinson
(74) *Attorney, Agent, or Firm* — Reising Ethington P.C.

(57)    **CLAIM**

The ornamental design for a vehicle front fender, as shown and described.

**DESCRIPTION**

FIG. 1 is a perspective view of the vehicle front fender;
FIG. 2 is a side view thereof;
FIG. 3 is front view thereof; and,
FIG. 4 is a top view thereof.
In the drawings, the portions shown by broken lines form no part of the claimed design.

**1 Claim, 2 Drawing Sheets**





**LKQ - Ex. 1001 p. 1**

## US D797,625 S
Page 2

(56)                    **References Cited**

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D685,305 S | * | 7/2013 | Tase | D12/184 |
| D686,536 S | | 7/2013 | McCabe et al. | |
| D692,798 S | | 11/2013 | Thurber | |
| D692,799 S | | 11/2013 | Smith et al. | |
| D696,157 S | | 12/2013 | Loeb | |
| D699,629 S | | 2/2014 | Ikeda et al. | |
| D699,649 S | * | 2/2014 | Okue | D12/184 |
| D700,871 S | | 3/2014 | O'Donnell et al. | |
| D703,103 S | | 4/2014 | Lee | |
| D704,103 S | | 5/2014 | Mack et al. | |
| D704,607 S | * | 5/2014 | Thurber | D12/184 |
| D705,132 S | | 5/2014 | Ware et al. | |
| D705,699 S | | 5/2014 | Ware et al. | |
| D713,298 S | | 9/2014 | Dyson | |
| D713,764 S | | 9/2014 | Ferlazzo et al. | |
| D716,696 S | | 11/2014 | Thole et al. | |
| D716,706 S | | 11/2014 | Thole et al. | |
| D716,709 S | | 11/2014 | Thole et al. | |
| D717,696 S | | 11/2014 | Thole et al. | |
| D718,189 S | | 11/2014 | Krieg et al. | |
| D718,683 S | | 12/2014 | Thole et al. | |
| D722,282 S | | 2/2015 | Loeb | |
| D722,533 S | | 2/2015 | Thole et al. | |
| D722,534 S | | 2/2015 | Munson et al. | |
| D724,510 S | | 3/2015 | McMahan et al. | |
| D725,001 S | | 3/2015 | McMahan et al. | |
| D726,591 S | | 4/2015 | Jacob | |
| D730,776 S | | 6/2015 | Smart | |
| D730,783 S | | 6/2015 | Henriques et al. | |
| D732,427 S | | 6/2015 | Loeb | |
| D732,429 S | | 6/2015 | Loeb | |
| D732,430 S | | 6/2015 | Loeb | |
| D732,431 S | | 6/2015 | Loeb | |
| D732,432 S | | 6/2015 | Aengenheyster | |
| D732,433 S | | 6/2015 | Aengenheyster | |
| D732,435 S | | 6/2015 | Mackay | |
| D733,002 S | | 6/2015 | Loeb | |
| D735,611 S | | 8/2015 | Aengenheyster | |
| D735,627 S | | 8/2015 | Smith | |
| D736,451 S | | 8/2015 | Smith | |
| D739,306 S | | 9/2015 | McMahan et al. | |
| D739,317 S | | 9/2015 | McMahan et al. | |
| D741,223 S | | 10/2015 | Kim et al. | |
| D743,309 S | | 11/2015 | Thole et al. | |
| D743,313 S | | 11/2015 | Smith et al. | |
| D743,314 S | | 11/2015 | Thole et al. | |
| D743,857 S | | 11/2015 | McMahan et al. | |
| D744,158 S | | 11/2015 | Willett et al. | |
| D745,086 S | | 12/2015 | Finos et al. | |
| D745,719 S | | 12/2015 | Boniface et al. | |
| D745,725 S | | 12/2015 | McMahan et al. | |
| D745,726 S | | 12/2015 | McMahan et al. | |
| D745,837 S | | 12/2015 | Smith et al. | |
| D746,726 S | | 1/2016 | McMahan et al. | |
| D746,727 S | | 1/2016 | Smith et al. | |
| D746,728 S | | 1/2016 | Smith et al. | |
| D746,729 S | | 1/2016 | Boniface et al. | |
| D746,730 S | | 1/2016 | Kim et al. | |
| D747,514 S | | 1/2016 | McMahan et al. | |
| D747,515 S | | 1/2016 | McMahan et al. | |
| D747,819 S | | 1/2016 | Thole et al. | |
| D749,021 S | | 2/2016 | Boniface et al. | |
| D749,026 S | | 2/2016 | Smith et al. | |
| D749,027 S | | 2/2016 | McMahan et al. | |
| D749,246 S | | 2/2016 | Thole et al. | |
| D749,249 S | | 2/2016 | Thole et al. | |
| D749,250 S | | 2/2016 | Thole et al. | |
| D749,985 S | | 2/2016 | Kozub et al. | |
| D749,997 S | | 2/2016 | McMahan et al. | |
| D750,001 S | * | 2/2016 | Thole | D12/184 |
| D753,032 S | | 4/2016 | Smith et al. | |
| D753,033 S | | 4/2016 | Thole et al. | |
| D753,034 S | | 4/2016 | Thole et al. | |
| D753,035 S | | 4/2016 | Boniface et al. | |
| D753,559 S | | 4/2016 | McMahan et al. | |
| D753,560 S | | 4/2016 | McMahan et al. | |
| D753,567 S | | 4/2016 | Boniface et al. | |
| D754,571 S | | 4/2016 | Boniface et al. | |
| D754,572 S | | 4/2016 | McMahan et al. | |
| D755,088 S | | 5/2016 | McMahan et al. | |
| D756,869 S | | 5/2016 | McMahan et al. | |
| D756,870 S | * | 5/2016 | Tsutamori | D12/184 |
| D758,271 S | | 6/2016 | McMahan et al. | |
| D762,151 S | * | 7/2016 | Luk | D12/184 |
| D763,753 S | * | 8/2016 | Hammoud | D12/184 |
| D764,362 S | * | 8/2016 | Pevovar | D12/184 |
| D766,149 S | * | 9/2016 | Kim | D12/184 |
| D767,460 S | * | 9/2016 | Kozub | D12/196 |
| D768,551 S | * | 10/2016 | Arroba | D12/196 |
| D773,361 S | * | 12/2016 | Kim | D12/181 |
| D780,065 S | * | 2/2017 | Suzuki | D12/91 |
| D781,180 S | * | 3/2017 | Minami | D12/91 |
| D781,192 S | * | 3/2017 | Kozub | D12/181 |
| D784,857 S | * | 4/2017 | Ishii | D12/91 |
| D785,521 S | * | 5/2017 | Smith | D12/181 |

* cited by examiner

**LKQ - Ex. 1001 p. 2**



FIG. 1

FIG. 2

LKQ - Ex. 1001 p. 3



**FIG. 3**



**FIG. 4**

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2021-2348

**Short Case Caption:** LKQ Corporation, et al v. GM Global Technology Operations LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes __13,972__ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: __01/26/2022__

Signature: /s/ Barry F. Irwin

Name: Barry F. Irwin

Save for Filing