**No. 21-2348**

# United States Court of Appeals for the Federal Circuit

**LKQ CORPORATION, KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,**

***Appellants,***

***v.***

**GM GLOBAL TECHNOLOGY OPERATIONS LLC,**

***Appellee.***

ON APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN INTER PARTES REVIEW NO. IPR2020-00534

## RESPONSE BRIEF OF APPELLEE GM GLOBAL TECHNOLOGY OPERATIONS LLC

Joseph A. Herriges
John A. Dragseth
FISH & RICHARDSON P.C.
60 South 6th Street
3200 RBC Plaza
Minneapolis, MN 55402
(612) 335-5070

Nitika Gupta Fiorella
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
(302) 652-5070

Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Avenue S.W., Suite 1000
Washington, D.C. 20024
(202) 783-5070

*Attorneys for Appellee*
*GM Global Technology Operations LLC*

Dated: April 6, 2022

# CERTIFICATE OF INTEREST

Counsel for Appellee GM Global Technology Operations LLC ("GM")

certifies the following:

1. Provide the full names of all entities represented by undersigned counsel in this case.

   **GM Global Technology Operations LLC**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **None/Not Applicable**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **General Motors Company**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Dorothy P. Whelan, Craig Deutsch, Grace Kim, Jennifer Huang, Fish & Richardson P.C.**

5. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

   **None/Not Applicable**

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**

April 6, 2022

*/s/ Joseph A. Herriges*
Joseph A. Herriges

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........ ii

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

STATEMENT OF THE ISSUES ........ 3

INTRODUCTION ........ 4

STATEMENT OF THE FACTS ........ 6

I. The ’625 Patent: A Unique and Cohesive Vehicle Fender Design ........ 6

II. The Asserted Art: A Fender Design with Different Shapes and Features ........ 12

III. The Proceedings Below: The Board Diligently Analyzed the Designs as a Whole and found Substantial Differences ........ 17

SUMMARY OF THE ARGUMENT ........ 22

STANDARD OF REVIEW ........ 23

ARGUMENT ........ 24

I. Substantial Evidence Supports The Board’s Finding That Lian Does Not Anticipate the Claimed Design ........ 24

A. Substantial Evidence Supports the Board’s Definition of the Ordinary Observer ........ 24

B. Substantial Evidence Supports the Board’s Finding that the Overall Appearance of Lian and the ’625 Design are Not Substantially Similar ........ 30

1. The Board Properly Compared the Designs as a Whole and Did Not Rely on a Crowded Art

Theory to Find the Differences Between the Designs Substantial ........ 31

2. Substantial Evidence Supports the Board's Findings that the Differences it Identified Are Meaningful ........ 36

II. The Board Correctly Found That LKQ Failed To Prove The Claimed Design Would Have Been Obvious ........ 39

A. The *Rosen* Requirement Remains Good Law and LKQ Forfeited the Argument that *KSR* Overruled It ........ 40

B. The Board Properly Found that LKQ Failed to Satisfy the First Step of the *Durling* Test for Obviousness ........ 43

CONCLUSION ........ 49

CERTIFICATE OF COMPLIANCE ........ 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Automotive Body Parts Ass'n. v. Ford Global Techs., LLC*
930 F.3d 1314 (Fed. Cir. 2019) ....................27

*Apple, Inc. v. Samsung Elecs. Co.*,
678 F.3d 1314 (Fed. Cir. 2012) ....................41

*Arminak & Assocs., Inc. v. saint-Gobatin Calmar, Inc.*,
501 F.3d 1314 (Fed. Cir. 2007) ....................25, 26, 28, 30

*Campbell Soup Co. v. Gamon Plus, Inc.*,
10 F.4th 1268 (Fed. Cir. 2021) (*Campbell II*) ....................39, 41, 43

*Campbell Soup Co. v. Gamon Plus, Inc.*,
939 F.3d 1335 (Fed. Cir. 2019) (*Campbell I*)....................39, 41, 43

*Consol. Edison Co. of New York v. N.L.R.B.*,
305 U.S. 197 (1938)....................23

*Crocs, Inc. v. Int'l Trade Comm'n*
598 F.3d 1294 (Fed. Cir. 2010) ....................37

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
807 F.2d 955 (Fed. Cir. 1986....................36

*Durling v. Spectrum Furniture Co.*,
101 F.3d 100 (Fed. Cir. 1996) ....................*passim*

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008) ....................25, 26, 30

*In re Google Technology Holdings LLC*,
980 F.3d 858 (Fed. Cir. 2020) ....................41

*Gorham Mfg. Co. v. White*
81 U.S. 511 (1871)....................28, 30, 43

*Hafco Foundry & Mach. Co., Inc. v. GMS Mine Repair & Maint., Inc.*,
953 F.3d 745 (Fed. Cir. 2020) ....................31

*In re Jolley*,
308 F.3d 1317 (Fed. Cir. 2002) ....................23

*Keystone Retaining Wall Sys. Inc. v. Westrock, Inc.*,
997 F.2d 1444 (Fed. Cir. 1993) ....................28

*KSR Int'l Co. v. Telflex, Inc.*,
550 U.S. 398 (2007).................... *passim*

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................2

*Merck & Cie v. Gnosis S.P.A.*,
808 F.3d 829 (Fed. Cir. 2015) ....................23

*Mojave Desert Holdings, LLC v. Crocs, Inc.*,
844 F. App'x 343 (Fed. Cir. 2021) ....................23

*MRC Innovations, Inc. v. Hunter Mfg., LLP*,
747 F.3d 1326 (Fed. Cir. 2014) ....................40, 42

*Phigenix, Inc. v. Immunogen, Inc.*,
845 F.3d 1168 (Fed. Cir. 2017) ....................2

*Qualtrics, LLC v. OpinionLab, Inc.*,
679 F. App'x 1016 (Fed. Cir. 2017) ....................36

*Richardson v. Stanley Works, Inc.*,
597 F.3d 1288 (Fed. Cir. 2010) ....................36

*In re Rosen*,
673 F.2d at 391 .................... *passim*

**Statutes**

5 U.S.C. § 706(2)(E) ....................23

35 U.S.C. § 102....................3

35 U.S.C. § 103....................3

## STATEMENT OF RELATED CASES

No appeal has previously been taken from the proceedings below from the Patent Trial and Appeal Board's decision in IPR2020-00534. Counsel for Appellee is not aware of any other case pending in this Court or any other court or agency that may directly affect this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

LKQ has not established its standing to appeal. Standing requires an "injury in fact"—evidence of "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks and citations omitted). "To constitute a concrete injury, the harm must actually exist, or appear imminent—a conjectural or hypothetical injury will not suffice." *Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1171 (Fed. Cir. 2017) (citations omitted).

LKQ has the burden to establish its standing, meaning it was required to "identify the relevant evidence demonstrating its standing at the first appropriate time, whether in response to a motion to dismiss or in the opening brief." *Id*. at 1171-73. LKQ presented no such evidence before the Board or in its opening brief here. The total of LKQ's standing support is a single, conclusory attorney assertion in its Jurisdiction Statement (at 1) alleging that it "currently offer[s] for sale a product that Appellants believe Appellee would deem to infringe the design patent challenged in [the underlying IPR], and Appellants reasonably believe that Appellee would commence legal proceedings against Appellants alleging infringement of that design patent." That does not establish standing. Accordingly, this appeal should be dismissed.

## STATEMENT OF THE ISSUES

1. Whether substantial evidence supports the Board's finding that Lian does not anticipate under 35 U.S.C. § 102 because LKQ failed to show that Lian's design is substantially the same as the '625 design.

2. Whether the Board properly concluded that the '625 design is not obvious under 35 U.S.C. § 103 because LKQ failed to (1) identify the correct visual impression that design creates as a whole and (2) identify a proper primary reference that creates basically the same visual impression as the patented design, where either one of LKQ's failures is independently sufficient to find the claims not obvious.

## INTRODUCTION

The case that LKQ presents on appeal either ignores the Board's well-grounded factual findings or raises new arguments LKQ failed to make below, and thus forfeited. Neither is grounds for finding error and the Court should affirm.

First, LKQ spends much of its brief arguing that reversal is appropriate because the Board purportedly adopted the wrong definition of an ordinary observer for anticipation. Specifically, LKQ argues that the ordinary observer should be limited to the ***original*** purchaser of a vehicle, even though the factual record is replete with evidence that persons interested in the appearance of the claimed design included people in the replacement market. Indeed, LKQ itself conceded that "there are other potential observers of an automobile or its constituent parts during the lifetime of a vehicle (e.g., a repair shop mechanic working on the owner's vehicle, or an auto parts store employee helping the owner to order replacements)." Appx0182-0183. The Board acted well within its fact-finding role in relying on such evidence to define the ordinary observer as including both a vehicle consumer and a replacement parts buyer.

Similarly, LKQ urges reversal on the "crowded field" issue, when the Board sided with LKQ below and expressly refused to adopt GM's argument on this point. *See* Appx0013 ("We are not persuaded . . . that GM has provided sufficient facts or evidence for the Board to determine that vehicle fender design is a

relatively crowded art.”). Grasping for some foothold for reversal, LKQ waxes at length about irrelevant logic exercises, asking the Court to ignore the Board’s determination and find impropriety in the Board’s unremarkable acknowledgment that ordinary observers would come to the table with background knowledge informing their perception. This is routine fact finding, not legal error.

LKQ ends its Blue Brief by raising a new argument that it failed to raise below: that the requirement for a primary *Rosen* reference in design patent obviousness is inconsistent with *KSR*. But nowhere—in its Petition or otherwise—did LKQ raise this argument before the Board. The only place LKQ mentioned *KSR* was in reference to the “so related” test for combining references, which has nothing to do with the *Rosen* argument LKQ now raises on appeal. Although this issue might be interesting as an academic exercise, the Court need not and should not address it in this case where it was not properly raised and briefed below.

For all these reasons, the Court should affirm the Board’s decision.

## STATEMENT OF THE FACTS

### I. THE ’625 PATENT: A UNIQUE AND COHESIVE VEHICLE FENDER DESIGN

GM has been a leader in vehicle design and automotive engineering for decades. One of its recent innovations relates to a unique, cohesive design for a car’s front fender, which it currently uses in its 2018-2020 Chevrolet Equinox. Appx0882-0884. As shown in U.S. Patent D797,625 S (“the ’625 patent”), GM’s design includes a coordinated set of multiple features that contribute to the fender’s distinct overall appearance in the eyes of the ordinary observer. Appx0006-0011; Appx0016-0017. As GM’s expert testified, and the Board credited, these features are the kinds of details that “are readily noticed by the ordinary observer.” Appx0023; *see id.* (“Thus, we find persuasive GM’s and Mr. Peters’ assertions that, when considering the overall appearance of a vehicle fender, ‘details are readily noticed by the ordinary observer.’”).

One of the most prominent features of the claimed design is the wheel arch. Appx0892-0893; Appx0897-0905; *see generally*, Appx0878-0889. As shown below, GM’s design includes a distinct shape of the **wheel arch and terminus** where the arch has a smooth, continuous, and circular perimeter that extends from the front corner to the rear bottom corner of the fender:




Appx0063 (annotated Fig. 2); Appx0827-0828; Appx0900-0901. GM's expert explained the significance of this feature:

> The smooth and consistent curvature of the door cut line echoes the smooth and consistent curvature of the circular wheel arch shape. I note further that the shape of the door cut line and the wheel arch also complement the smooth and consistent curvature of the "first" and "second" creases and other sculpting of the fender.

Appx0892-0892.

GM's design also includes a distinct shape for the **<u>door cut line</u>**. Appx0034-0036; Appx0821-0822; Appx0893. As shown below in blue, like the wheel arch, the door cut line has a smooth and consistent curvature between the fender's bottom and the "protrusion" at fender's top:




Appx0063 (annotated Fig. 2); Appx00821-0822; Appx0838-0839; Appx0892-0893; Appx0908-0909. GM's expert again explained the effect of this feature on the overall design:

> [T]he appearance of the door cut line ***would have had a substantial impact on the overall appearance of the design***. Not only does the door cut line account for a substantial portion of the fender perimeter, but it provides an important interfacing feature. The door cut line interfaces with and adjacent door panel of the vehicle, and thus the shape of the door cut line must match the shape of the corresponding vehicle panel.

Appx0893 (emphasis added).

The **<u>shape of the protrusion</u>** in GM's design is also distinct, having a consistent width along the upper surface of the protrusion from front to back:



Appx0063 (annotated Fig. 1); Appx0038; Appx0822-0824; Appx0889-0901; *see also id.* at Appx0993 ("The 'protrusion' interfaces with the vehicle 'A-pillar" and has a distinct three-dimensional shape. For example, the 'protrusion' has an upper surface and a side surface separated by a crease that extends across the 'protrusion.'"). According to GM's expert, "the appearance of the specific features of the protrusion would have been particularly notable to the ordinary observer's impression of the overall appearance of the fender because of the requirement that these features match with other components of the vehicle." Appx0895.

Similar to the door cut line and lower edge, the patented design also includes other lines and surfaces having smooth, arcing shapes that provide a distinctive **sculpting**. Appx0038-0039; Appx0824-0826; Appx0895-0896. For example, the "first" and "second" creases, illustrated in red below, gently curve between respective ends. The "concavity" line and third crease slightly arch from end to end as well. Appx0895-0897. As GM's expert explained, these lines cooperate

with the smooth, arching lines of the door cut line and lower edge, and the contoured surfaces between these lines, to provide an overall appearance of smooth, curving shapes. Appx0824-0826; Appx0895-0901; *see also* Appx0038-0039; Appx0042-0045. Each line starts at a lower position toward the fender's front (left side in FIG. 2 below) and ends at a higher position:




Appx0063 (annotated Fig. 2); Appx0824; Appx0897-0900. Importantly, the first crease serves as a "character line," the position and direction of which is critical to the overall appearance in the eyes of the ordinary observer. Appx0898-0899; Appx0902-0907. As GM's expert explained:

> [T]he "first crease" . . . is critical to the overall appearance in the eyes of the ordinary observer because it ***serves as a "character line."*** The curvature and relative positioning of the "first crease" helps set a tone for the proportions and body shape of the fender, as well as other parts to which the fender connects, such as the bumper, head lights, side panels, and rear portions of the vehicle.

Appx0898-0899 (emphasis added). GM's expert further described how the curvature and relative positioning of the first crease helps set a tone for the proportions and body shape of the fender, as well as other parts to which the fender connects, such as the bumper, head lights, and side panels. *Id.*

Finally, the patented design includes a **<u>horizontal crease</u>** near the lower portion of the fender that extends between the wheel arch and the lateral edge:



Appx0063 (annotated Figs. 1 and 2); Appx0827; Appx0892-0893; *see also* Appx0039. This feature contributes to the fender's overall sculpted appearance, and adds a focal location that extends to the right of the wheel arch. Appx0892. The focal location created by this crease divides the lower portion near the wheel arch from the upper portion of the panel and is highlighted by shade lines above and below the crease. Appx0899 (GM's expert explaining that "[t]he focal feature that is created by the third crease divides the lower wheel arch portion from the upper portion of the panel").

Each of these design aspects are important not only because of their individual characteristics, but also because of how they fit together; the fender is just one part of the vehicle, but it interfaces with everything from the wheels, to the hood, to the doors, to the mirrors, to the windows, and more. *See* Appx0884 ("[T]he designer must create the design in view of the overall theme of the vehicle, and do so in a way that the various design elements work together to create an innovative, unique, and coherent overall visual appearance that evokes a particular emotional response from the customer."). GM's patented design evokes a smooth, continuous, and curved look—as opposed to, for example, a more angular design—which an ordinary observer would understand should match the overall look and feel of the vehicle as a whole, making even nuanced differences to the fender design important. Appx0901-0907.

The '625 patent has a single claim to the "ornamental design for a vehicle front fender, as shown and described" in the patent. Appx0061.

## II. THE ASSERTED ART: A FENDER DESIGN WITH DIFFERENT SHAPES AND FEATURES

No prior art reference depicts the claimed aspects of GM's patented fender design. LKQ focuses on the Lian patent, U.S. Patent D773,340 S, but Lian addresses a vehicle, not a fender, and even the fender of that vehicle has a very different design.

Lian's figures 1, 4, and 6 show the front fender in the most detail:



FIG. 1



FIG. 4



FIG. 6

Appx0024–0026. As shown, Lian's fender has important differences when compared to GM's design. *See* Appx0907-0946. For example, as even LKQ concedes, Lian's **wheel arch and terminus** are visually different from those in the '625 patent, having a more square design for the arch and an additional flange on the terminus:

| '625 PATENT | LIAN |
|---|---|
|  Ex. 1001, FIG. 2 (cropped, annotated) |  Ex. 1006, FIG. 4 (cropped, annotated) |

Appx0031-0032. Differences between the **door cut line** and **shape of the protrusion** between the two designs are also readily apparent, with Lian's door cut line being more angular, having pronounced changes in direction, and its protrusion varying in width from left to right:









Appx0893-0895. As GM's expert explained, "the appearance of the door cut line would have had a substantial impact on the overall appearance of the design[,]" Appx0893, because it "interfaces with an[] adjacent door panel of the vehicle, and thus the shape of the door cut line must match the shape of the corresponding vehicle panel[,]" *id*. Even the sculpting of Lian is different, as it includes

straighter, more angular lines and features, compared to the soft, smooth curvatures of the ’625 design:




FIG. 2



Appx0895-0897; Appx0925-0932. According to both sides’ experts, a fender’s sculpting is part of what contributes to its uniqueness. *See* Appx0926 (“The sculpting of the ’625 Patent is unique and characterized by smooth, arcing lines and contours.”); Appx1636 (explaining, by LKQ’s expert, that “the sculpting on the side of a vehicle including on a fender . . . are going to be meaningful to the ordinary observer”).

And finally, Lian does not even include any **lower horizontal crease** in its design. As GM’s expert explained, this crease (sometimes called the “third crease”) serves as a visual “anchor” to which the other features of the fender relate:




Appx0900; Appx0920-0923; Appx1600; *see* Appx0892 (explaining that "[t]here are several key features of the '625 Patent that provide the claimed design with a smooth, arcuate, cohesive overall appearance including its . . . lower horizontal crease").

## III. THE PROCEEDINGS BELOW: THE BOARD DILIGENTLY ANALYZED THE DESIGNS AS A WHOLE AND FOUND SUBSTANTIAL DIFFERENCES

LKQ is an aftermarket manufacturer in the collision repair industry that sells replacement car parts, including replacement fenders, bumpers, and grilles. Appx0700. Unlike GM, LKQ does not invest in designing the replacement parts it sells; instead, it copies the designs of Original Equipment Manufacturers, like GM, so it can offer replicas of parts that are damaged in accidents. Appx0700. Up until recently, LKQ and GM had an agreement that allowed LKQ to practice many of GM's design patents to make its copied parts. Appx0702 ("Because it is important to LKQ to be able to copy GM's designs, GM and LKQ have historically had a

confidential Design Patent License Agreement under which LKQ had a license to practice many of GM's design patents."). As the parties attempted to negotiate terms for a renewal of that agreement, which was set to expire in February 2022, LKQ petitioned for IPR of the single '625 claim. Appx0702 ("Although GM and LKQ recently attempted to renegotiate the terms of that license, those negotiations broke down, which led to LKQ filing this IPR.").

In its petition, LKQ alleged anticipation by Lian and obviousness in view of Lian alone or Lian combined with a publication that depicts the 2010 Hyundai Tucson. Appx0160-0162. LKQ described the '625 design in terms of just three generic features: the general shape and direction of its "top protrusion"; the presence and general orientation of its first and second creases, concavity line, and horizontal crease (which LKQ called an "inflection line"); and its "angular front elevation profile." Appx0154-0157; Appx0781. The Board instituted review on the single claim of the '625 design but did not adopt LKQ's construction of the claim. Instead, the Board agreed with GM that "LKQ's construction offers an overly simplified interpretation of the '625 design." Appx0782. Ultimately, the Board concluded at the institution stage that no verbal description of the claim was necessary because "the best description of the ornamental features of the '625 design comes from the drawings themselves." Appx0783.

Despite the Board's guidance, LKQ did not revise its claim construction during trial to account for the specific claimed design features. Appx0005; *see* Appx0154-0157. In its Final Written Decision, the Board thus again agreed with GM that LKQ's construction was too generic and that further description and detail was necessary. Appx0014. After evaluating the parties' arguments and their experts' opinions, the Board concluded that, in addition to the features identified by LKQ's construction, certain other elements of the fender are "readily observable and relevant to the overall appearance of the claimed design," including the wheel arch and terminus, the door cut line, the shape of the protrusion, the distinctive sculpting, and the horizontal crease—all the features described above. Appx0016-0017. Notably, in reaching its claim construction decision, the Board rejected GM's "crowded art" theory—the very same theory LKQ now complains the Board improperly applied. Appx0012–0013.

The Board further addressed the parties' factual dispute over who is the "ordinary observer" for anticipation. Appx0020-0023. While LKQ argued that the ordinary observer should be the retail customer of an automobile, GM argued that the ordinary observer should include people like repair shop professionals or other commercial buyers who purchase replacement fenders to repair parts on customers' vehicles. Appx0020-0021. The Board ultimately concluded, as it did at Institution, that the ordinary observer includes ***both*** "a commercial buyer of

replacement vehicle parts and a retail consumer of an automobile." Appx0021-0022 (adopting the Institution Decision's definition of the ordinary observer). In doing so, the Board recognized that the '625 patent claims a specific part of a vehicle—the front fender—not the vehicle as a whole. Appx0021. The Board further understood, based on the record presented by the parties, that the relevant context for evaluating the ordinary observer included the repair and replacement market, and concluded that both the vehicle owner and the repair purchaser would have an interest in returning the vehicle back to its original design. Appx0021; *see* Appx0704 ("[T]he ordinary observer includes commercial buyers who purchase replacement vehicle front fenders to repair a customer's vehicle, such as repair shop professionals."); Appx0021 (same). The Board also expressly acknowledged and rejected the same arguments LKQ is now making to try to limit the ordinary observer to the original purchaser of a vehicle, finding that the "determination of the ordinary observer is factually dependent" and that, under the facts of this case, the ordinary observer includes not only the vehicle consumer but also the repair consumer. Appx0021-0022.

Next, the Board carefully compared the overall appearance of the front fender in Lian to that of the '625 design, paying attention to all of the relevant and nuanced features that it determined an ordinary observer would appreciate. *See* Appx0030-0045. While it recognized certain similarities between the designs,

it also found many differences in their overall appearance, and concluded that LKQ failed to show that the designs were substantially similar such that an ordinary observer would be deceived into purchasing one, thinking it to be the other. Appx0045.

On obviousness, the Board adopted LKQ's definition of the ordinary designer, but still found LKQ failed to show the claims were obvious in view of Lian alone or Lian and the 2010 Hyundai Tucson publication. Appx0024; Appx0048-0058. As it noted in its anticipation analysis, the Board again concluded that LKQ failed to account adequately for many relevant elements of the '625 design and thus did not identify the "correct visual impression created by the patented design as a whole" as the *Durling* obviousness test requires. Appx0050 (citation omitted). While that finding alone would have been dispositive, Appx0050-0051, the Board further found LKQ failed to carry its burden for a second, independent reason: LKQ did not satisfy the *Durling* test requirement to identify a single reference (also called a *Rosen* reference) that "creates basically the same visual impression as the patented design," Appx0057 (quotation marks omitted). Importantly, while LKQ now argues on appeal that the Board should not have applied the *Rosen* standard for selecting a primary reference, LKQ did not make this argument before the Board. Instead, LKQ tried to rely on Lian again to satisfy this standard, but the Board again walked through the many differences in

overall appearance between Lian and the claimed design, and found Lian did not meet this prong of the test for obviousness. Appx0045-0058.

## SUMMARY OF THE ARGUMENT

The Board thoroughly evaluated LKQ's arguments and properly found against LKQ on a number of highly factual issues. Substantial evidence supports each of the Board's findings, so this Court should affirm.

On anticipation, the Board weighed the evidence and properly concluded that the ordinary observer encompasses vehicle owners and replacement part buyers. LKQ wants to exclude these people and focus solely on the new automobile purchaser, but the Board already pressure-tested and rejected this argument, relying in part on LKQ's own characterization of the market in support. The Board then carefully compared Lian and the '625 design as a whole and concluded they are not substantially similar. In doing so, the Board did not, as LKQ argues, conclude fender design is a "crowded art." Instead, the Board simply recognized that many prior art fender designs exist and said that fact was relevant in understanding how an ordinary observer would perceive differences between various designs. Substantial evidence supports the Board's fact-finding.

On obviousness, the Board correctly found LKQ failed to satisfy its burden. LKQ's primary argument in response is that *KSR* overruled the *Rosen* single-reference requirement. But LKQ never made this argument to the Board, so it has

forfeited it. Moreover, LKQ is incorrect, evidenced by the numerous design cases from this Court that have applied the *Rosen* single-reference requirement well after *KSR*. Applying the controlling (and correct) framework, the Board properly found that LKQ (1) failed to identify "the correct visual impression created by the patented design as a whole" and (2) failed to show that Lian creates "basically the same" visual impression as the '625 design. Substantial evidence supports each finding, though the Court need only affirm on one to uphold the Board's decision.

## STANDARD OF REVIEW

This Court reviews questions of law, such as claim construction and ultimate obviousness determinations, *de novo* and factual determinations underlying obviousness for substantial evidence. *See* 5 U.S.C. § 706(2)(E); *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 833 (Fed. Cir. 2015). "Anticipation is a question of fact that [is] review[ed] for substantial evidence." *Mojave Desert Holdings, LLC v. Crocs, Inc.*, 844 F. App'x 343, 347 (Fed. Cir. 2021) (citing *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 877 F.3d 1361, 1368 (Fed. Cir. 2017)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Where "two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon

review for substantial evidence." *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002).

# ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT LIAN DOES NOT ANTICIPATE THE CLAIMED DESIGN

The Board made a number of factual findings to support its anticipation decision. First, it properly considered the parties' arguments and expert opinions to conclude that the ordinary observer encompasses both automobile and repair shop customers, given that both purchase the specific patented part—a front car fender. Second, it properly considered Lian and the '625 design as a whole and determined they were not substantially similar, based on the prominent differences between the two. In doing so, the Board correctly recognized that a number of prior art fender designs exist, which, while not alone sufficient to establish fender design as a "crowded art," is relevant in understanding how an ordinary observer would perceive even nuanced differences between various designs. Because substantial evidence supports each factual finding, the Court should affirm.

### A. Substantial Evidence Supports the Board's Definition of the Ordinary Observer

The definition of the ordinary observer was a hotly disputed fact issue from the initial briefs in the IPR through the oral hearing. In fact, the Board questioned LKQ extensively at the hearing on the very argument that LKQ now makes (over 8 pages of hearing transcript). There, like here, LKQ argued that the ordinary

observer should only be the ***original*** purchaser of the vehicle, not people associated with the fender repair. Appx1764-1772. Understandably, the Judges were surprised by LKQ's argument, because the parties' briefing emphasized the repair market, and those briefs framed the dispute as whether, in that repair context, the ordinary observer was the car owner or the repair shop worker. Appx1764; Appx0182-0183 (LKQ arguing that "there are other potential observers of an automobile or its constituent parts during the lifetime of a vehicle (e.g., a repair shop mechanic working on the owner's vehicle, or an auto parts store employee helping the owner to order replacements)"). But the Judges engaged LKQ in a lengthy back-and-forth to try to understand LKQ's position, and ultimately, under the specific facts of this case, rejected it. Appx1764-1772; Appx0020-0023. Substantial evidence supports the Board's finding.

As the Board recognized, defining the ordinary observer is factually dependent and made on a case-by-case basis. *See Arminak & Assocs., Inc. v. saint-Gobatin Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008). Here, the Board recognized that the ordinary observer includes both a vehicle consumer and a replacement parts buyer. Appx0022. The Board explained that it found persuasive the assertions of GM's declarant Mr. Peters that, when considering the overall appearance of a vehicle fender, "details are readily noticed

by the ordinary observer" because the "vehicle owner and repair shop person would desire to return a vehicle in most cases to its original appearance." Appx0023. LKQ has even acknowledged that "replacement automobile body parts[] are typically purchased on behalf of vehicle owners by repair shops." Appx0021 (citation omitted).

LKQ's primary argument on appeal (at 15-17) appears to be that the Board improperly viewed the ordinary observer in repair market context, as opposed to the new vehicle purchase context. In support, LKQ asserts (at 16-17) that "a fender is designed to be integrated into and marketed as part of a complete automobile" and thus argues that it is the new purchaser of an automobile for whom a fender is designed. But as the Board properly recognized, the '625 design is not the design of a whole vehicle—it is a design of a specific part of a vehicle. The ordinary observer must be the person who purchases ***that part*** or is otherwise sufficiently interested in ***that part***, not necessarily the vehicle as a whole. *Arminak*, 501 F.3d at 1323; *see Egyptian Goddess*, 543 F.3d at 665 ("[T]he ordinary observer is a person who is either a purchaser of, or sufficiently interested in, the item that displays the patented designs[.]"). Here, after considering the parties' arguments and testimony from experts, the Board concluded that people who buy repair and replacement fenders after an accident are purchasers of, and have sufficient interest in, the specific part at issue here—a front fender.

Appx0022. Indeed, even LKQ agrees (at 17) that there is a significant market for the repair of the vehicle—*i.e.*, a market for the claimed fender alone. LKQ itself sells only replacement parts and has even declared to U.S. Customs and Border Protection that "automobile owners seek to repair their automobiles in a way that returns their automobile as closely as possible to its original appearance and condition." Appx0021 (quotation marks and brackets omitted). As such, substantial evidence supports the Board's finding that the proper ordinary observer includes both a vehicle owner and a replacement parts buyer in the repair context.

LKQ tries to avoid affirmance on this factual determination by complaining (at 18-23) that the Board was inconsistent with Supreme Court and Federal Circuit precedent. Not so. For example, LKQ relies on *Automotive Body Parts Ass'n. v. Ford Global Techs., LLC*, but that case is entirely irrelevant: it did not deal with anticipation of a design patent and did not even mention the "ordinary observer" test at all in the opinion. 930 F.3d 1314 (Fed. Cir. 2019). The portion of the decision that LKQ cites relates to the Court's analysis on whether the "aesthetic functionality" test should apply to design patents. *Id.* at 1321. If anything, the decision ***supports*** the Board's finding. One of LKQ's arguments (at 17) is that only new car purchasers are "purchasing the design" while replacement part purchasers are simply "matching the design" they already bought. But in *Automotive Body Parts*, this Court recognized that "if a consumer assesses the

aesthetic of a design in considering whether to purchase it, the design *is* a matter of concern." 930 F.3d at 1321. Vehicle owners and repair shop personnel looking for a replacement part that matches the original vehicle are still assessing the design of the part and thus are "purchasing the design" just like the new car purchaser. Similarly, LKQ relies on *Gorham Mfg. Co. v. White*, but that case centered on whether the ordinary observer should be an expert in the field of silverware design or an ordinary purchaser of silverware; it said nothing about whether the ordinary purchaser should be a new silverware set purchaser or someone looking for a replacement piece for their silverware set. 81 U.S. 511, 527–28 (1871). *Gorham* is inapposite.

This case is far more similar to *Arminak* and *Keystone* (cited by the Board, Appx0022), in which this Court recognized that the ordinary observer was the purchaser of ***a component part*** of a later-assembled product as opposed to the purchaser of the later-assembled product. *See Arminak*, 501 F.3d at 1321 (finding the ordinary observer was the purchaser of a sprayer shroud to be used in a sprayer bottle and not the purchaser of the assembled sprayer bottle); *Keystone Retaining Wall Sys. Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir. 1993) (finding the ordinary observer was the purchaser of the patented wall blocks, not the purchaser of the assembled walls). LKQ tries to twist the holdings of these cases (at 20) to support its argument that the ordinary observer is the "purchaser to whom the

design is marketed as its primary customer." But even viewing the question as LKQ does results in the same answer the Board found: it is the vehicle owner who replaces a fender and the repair shop worker who buys the replacement fender to whom the fender design is marketed. Indeed, LKQ agrees that a new car purchaser does not buy the fender itself, they buy the full vehicle, Appx1769, so the only "purchasers" relevant here are those who actually purchase the fender on its own. LKQ's argument (at 21) that GM's expert testified that designers make vehicles for purchasers of the vehicle is entirely irrelevant to this point; the fact remains that there is an indisputable market for purchase of the patented design alone, so those purchasers must be included in the definition of an ordinary observer.

LKQ's remaining arguments also fall short. First, LKQ says (at 17) that replacement parts are only sold if the part is damaged and needs replacement. Even if this is true, there is a market for replacement parts precisely because vehicle owners with damaged cars need these parts, as LKQ acknowledges. That not every vehicle owner will need to purchase a replacement front fender further supports that the ordinary observer for a front fender design patent should be those owners who ***do need*** the replacement front fender (and the commercial buyers who purchase these parts for the owners).

Second, LKQ says (at 22) that "defining the ordinary observer as the purchaser of a replacement part would illogically create two different standards of

anticipation"—one for designs routinely sold as repair parts and one for those that are not. LKQ is again incorrect. There is no danger of creating two different standards of anticipation because, as the Board explained at the hearing, the ordinary observer is a case-specific inquiry. Appx1765; Appx1771-1772; *see also* Appx0022 (citing *Arminak*, 501 F.3d at 1323). While in some cases the facts may support identifying the replacement part purchaser as the ordinary observer, the same may not hold true for a different case on different facts. *See* Appx1765; Appx1771-1772. Here, the Board properly found that this case falls into the former category because the patented design is not for just any part on a car—it is for one that is commonly impacted in collisions and thus is commonly bought in the after-market, repair and replacement context. Appx1765 (Judge Oberman noting that the fender is a "part that gets hit a lot"). Substantial evidence supports the Board's multiple factual findings as to the ordinary observer, so this Court should not disturb the Board's decision on this point.

### B. Substantial Evidence Supports the Board's Finding that the Overall Appearance of Lian and the '625 Design are Not Substantially Similar

The ordinary observer test requires a factfinder to determine whether "in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one

patented is infringed by the other." *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham*, 82 U.S. at 528). In other words, the test requires comparing the patented design with the article's overall appearance from the viewpoint of the ordinary observer. *Hafco Foundry & Mach. Co., Inc. v. GMS Mine Repair & Maint., Inc.*, 953 F.3d 745, 751 (Fed. Cir. 2020) ("The controlling inquiry is how the ordinary observer would perceive the article."). Substantial evidence supports the Board's application of this test.

### 1. The Board Properly Compared the Designs as a Whole and Did Not Rely on a Crowded Art Theory to Find the Differences Between the Designs Substantial

The Board properly applied the law and, in a careful and methodical analysis, compared the overall appearance of Lian to that of the '625 design, and found that LKQ failed to show the two were substantially similar. Appx0033. In doing so, the Board recognized "certain articulable and visible similarities in the overall appearance of the claimed design and Lian that would be apparent to the ordinary observer." Appx0030–0031. However, the Board further explained that "[c]onsidering the design ***as a whole***," it was persuaded by GM's evidence and the testimony of GM's expert that an ordinary observer would also evaluate certain "visually significant features in defining the overall appearance of the claimed design and find them to be missing in Lian." Appx0033 (emphasis added); Appx1866 (same); *see generally* Appx0907-0938.

The Board found a number of differences between Lian and the '625 design including that (1) that the fender body sculpting is different, Appx0039; (2) Lian lacks the inflection line, Appx0040-0041; and (3) the first and second creases are different, Appx0041-0042. According to GM's expert, who the Board credited, these differences can "dramatically affect or change the character of the vehicle." Appx0881. For example, GM's expert explained that "lines can create a more aggressive and sporty look . . . or, if the angles are more subdued, it can create a more neutral look[.]" Appx0881. Additionally, the "angles and lines on a vehicle are important not only alone, but also with respect to their relationship with other design elements" because the angles and lines work in parallel to "define the overall sculpture of the vehicle" as a whole. Appx0882. These differences, even when subtle, can impact the overall appearance of a vehicle fender. Appx0880; Appx0883 ("The importance of small differences in vehicle design is also reflected in the fact that consumers use those differences as vehicle identifiers, without having to rely on emblems to identify specific vehicles.").

LKQ argues in response (at 35-40) that the Board "failed to compare the designs as a whole," and improperly focused on GM's "checklist of differences." Not so. Throughout its careful analysis, the Board repeatedly made clear that it considered the designs as a whole to evaluate their overall appearance, and found that LKQ did not show the designs, as a whole, were substantially similar.

Appx0033 ("Considering the design as a whole, we are persuaded by Mr. Peters' testimony and GM's evidence[.]"); Appx0045 ("Having reviewed the complete record, including both parties' evidence and arguments, and having considered the overall appearance of the claimed design as compared to that of Lian . . . LKQ has not established persuasively that the '625 patent design and the design of Lian are substantially the same under the ordinary observer analysis."). While LKQ may disagree, substantial evidence supports the Board's findings, so its decision must stand.

Instead of taking the Board's findings head on, LKQ bases its assertion (at 36-37) on its own view that the differences GM and the Board relied on are actually "trivial." But this argument is simply another effort by LKQ to rehash factual arguments that it lost. There was ample evidence to support the Board's finding that the differences are not trivial because they "increase in importance when" considered "within the context of the prior art." Appx0035. The Board credited GM's expert's testimony that even "nuanced" differences "would have had a substantial impact on the overall appearance of the fender designs to the ordinary observer." Appx0036 (quoting Appx0893). The Board acknowledged the visual similarities between the designs, but simply found that, in light of the important visual differences, the overall appearance between the two was not substantially the same. Appx0045.

In an attempt to undercut the Board's reliance on GM's expert, LKQ claims (at 37) that GM's expert conceded he did not assess the design as a whole, but that is manifestly untrue. GM's expert repeatedly stated that considering the claimed design as a whole is exactly what he did. *See, e.g.*, Appx0885-0887 ("I understand that the 'ordinary observer' analysis requires consideration of the design as a whole, and not individual features or aspects of the design in isolation[.]"). The Board was well within its discretion to credit GM's expert, and that decision does not constitute reversible error.

Many of LKQ's arguments on this point also fail because they are based on its incorrect assertion that the ordinary observer should be limited to a new car purchaser. For example, LKQ says (at 37) that Lian and the '625 design are highly similar when viewed "from the perspective of a correctly defined ordinary observer." It further criticizes GM's expert (at 37) for only identifying "various differences he thought would be observable" without explaining "why the designs as a whole were not substantially similar to a vehicle purchaser." This again misrepresents the record; GM's expert explained in his report and deposition that he compared the "overall theme of the vehicle" as a whole. Appx0884; Appx1411-1413. The Board's analysis and conclusions, stated above, reflect that fact. Appx0033-0034, 0045.

Finally, LKQ makes much (at 24-35) of the Board's supposed reliance on GM's crowded art theory, when the Board did no such thing. In fact, the Board expressly declined to find that "vehicle fender design is a relatively crowded art," rendering LKQ's arguments on this point moot. Appx0012-0013. Yet LKQ persists, citing (at 24-25) sections of the Board's decision where it recognized that other prior art fender designs exist. There was no error in the Board's analysis. While the Board recognized it would be improper to apply the "crowded art" theory to elevate the importance of small differences between the designs, it acknowledged that "there are many different front fender designs" and found that "this fact helps illustrate ***both commonalities and differences*** among the designs." Appx0013 (emphasis added).

This is precisely what the Board did in its analysis—it considered the prior art fender designs, where appropriate, to demonstrate both the similarities and differences an ordinary observer would perceive and find relevant when comparing Lian to the claimed design.[1] This is simply an acknowledgment of the background knowledge an ordinary observer brings to the table. The recognition of the skill level of an ordinary observer—or, in the utility context, the skilled artisan—is routine. LKQ essentially urges the Court to ignore that background knowledge or

[1] Because the Board did not apply a crowded art theory for invalidity, LKQ's contention (at 26) that such a theory should only be used for infringement and not validity is irrelevant.

skill level—inconsistent with common sense and this Court's case law. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986) ("The person of ordinary skill is a hypothetical person who is presumed to be aware of all the pertinent prior art."); *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010) (explaining that "[t]he patentee must establish that an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design"); *see also Qualtrics, LLC v. OpinionLab, Inc.*, 679 F. App'x 1016, 1020 (Fed. Cir. 2017) (non-precedential) (demonstrating that a court can consider the "background knowledge of a skilled artisan").

#### 2. Substantial Evidence Supports the Board's Findings that the Differences it Identified Are Meaningful

LKQ also contends (at 40-42) that the differences the Board identified, after considering the full record before it, were not real. LKQ's characterizations are again based on its own view that these differences are "trivial," which the Board was free to discredit in favor of contrary evidence from GM. For example, LKQ (at 41) faults the Board's finding that the first and second creases in Lian are substantially linear and angled as compared to the smooth, curved lines in the claimed design, asserting that GM's expert, Mr. Peters, "admitted" that Lian's first and second creases were curved as well. As GM explained in its sur-reply, LKQ overstates Mr. Peters' testimony. Appx1588-1597; *see generally* Appx1583-1614.

Mr. Peters repeatedly opined that "Lian is characterized by slanted lines" and its creases have "substantially consistent linear trajectory," Appx0927-0928, which is precisely what the Board cited and properly credited, Appx0043. LKQ latches onto a single line from Mr. Peters' deposition testimony where he agreed that "based on th[e] image" counsel had showed him, Lian's first crease had "gentle downward curvature." Appx1436-1437. Yet nowhere does LKQ explain how those statements are inconsistent: Mr. Peters was evaluating Lian as a whole (as he was supposed to do) and found that Lian's sculpting has ***substantially consistent*** linear trajectory compared to the claimed design.[2] That one of Lian's creases may have a gentle downward curvature does not mean that, overall, Lian's sculpting is not linear and angular, as Mr. Peters described and the Board rightly found. Certainly there is at least substantial evidence to support the Board on this point.

LKQ similarly overstates Mr. Peters' testimony when it says (at 43) he admitted there is no horizontal crease in the claimed design (which LKQ calls an inflection line). Instead, on the very same pages LKQ cites from Mr. Peters' deposition, he explained the opposite of what LKQ argues: that the shade lines above and below the horizontal crease have a change in direction, thus making the

[2] LKQ asserts that *Crocs, Inc. v. International Trade Commission*, requires considering the design as a whole, but that case is different because it involved looking at differences for infringement purposes, an issue that is not present here. 598 F.3d 1294, 1302–03 (Fed. Cir. 2010).

horizontal feature a "crease," even under LKQ's definition. Appx1468-1471. The Board was free to credit his testimony over that of LKQ's expert in considering whether the horizontal crease is actually a crease and whether the absence of any such crease in Lian is a meaningful difference between the designs.

LKQ also complains (at 41-42) that the Board found the concavity line not prominent, but still found it presented a "nuanced difference" that contributes to the overall appearance of the claimed design as compared to Lian. Appx0045. All that shows is that the Board was in fact focused on the "overall appearance" and recognized that even if a particular difference is not itself prominent it may still (as GM's expert explained) contribute to an overall different feel in the design. It was balancing and weighing evidence, which a fact-finder is entitled to do under the substantial evidence standard.

Finally, LKQ takes issue (at 44) with the Board's analysis of the differences between the designs' protrusions, but it cites only its expert's testimony. The Board was free to reject LKQ's expert's opinion in favor of GM's expert's testimony that Lian's protrusion was substantially different in shape such that it created a different visual effect from the claimed design. Appx0036-0038. While LKQ disagrees with the Board's finding on this difference, that disagreement is not grounds for reversal.

Simply put, LKQ's arguments boil down to a disagreement with the Board's factual finding on the ordinary observer and its factual findings on the relevance and impact of undisputed differences between the designs in terms of their overall appearance. Substantial evidence supports the Board's findings, so this Court should affirm the Board's decision that Lian does not anticipate the '625 patent.

## II. THE BOARD CORRECTLY FOUND THAT LKQ FAILED TO PROVE THE CLAIMED DESIGN WOULD HAVE BEEN OBVIOUS

"[T]he ultimate inquiry under section 103 [for design patents] is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (citation omitted). In *Durling*, this Court explained that, to answer this question, a factfinder must determine "whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design." *Id*. That inquiry involves two steps. First, the factfinder must identify "a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design[,]'" often called a *Rosen* reference. *Id.* (quoting *In re Rosen*, 673 F.2d 388, 391 (CCPA 1982)). This first step encompasses two parts: one must "(1) discern the correct visual impression created by the patented design as a whole; and (2) determine whether there is a single reference that creates 'basically the same' visual impression." *Id.* at 103; *Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1340 (Fed. Cir. 2019) (*Campbell I*) (same). "Second, if a primary reference exists,

the trier of fact must determine whether, using secondary references, an ordinary designer would have modified the primary reference to create a design that has the same overall visual appearance as the claimed design." *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir. 2021) (*Campbell II*). The second steps requires a determination of whether the secondary reference is "so related [to the primary reference] that the appearance of certain ornamental features in one would suggest application of those features to the other." *MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1331 (Fed. Cir. 2014*)* (internal quotation marks and citation omitted).

The Board faithfully applied the two prongs of *Durling*'s first step and found that LKQ failed both: it did not meet its burden to identify the "correct visual impression" created by the '625 design as a whole, and it failed to show as a factual matter that Lian's design creates "basically the same" visual impression as the claimed design. Because the Board committed no error in either of these findings, the Court should affirm.

### A. The *Rosen* Requirement Remains Good Law and LKQ Forfeited the Argument that *KSR* Overruled It

LKQ's primary argument on obviousness does not address the Board's findings or analysis. Instead, LKQ argues, for the first time, that *KSR* overruled the *Rosen* requirement to identify a single reference that is "basically the same" as the claimed design. *KSR Int'l Co. v. Telflex, Inc*., 550 U.S. 398 (2007). But LKQ never made this argument to the Board. Instead, LKQ vaguely stated in its Petition

that "*KSR* [advises] against rigid restrictions on the scope of an obviousness analysis" and that *KSR* "prescribed a more flexible approach to obviousness[.]" Appx0174. At best, this vague argument relates to the ***second*** step of the *Durling* test—the "so related" test that was not even implicated in the Board's decision. LKQ is clear about this point in its Petition:

> To the extent that the 'so related' test operates to unduly limit the scope of design patent obviousness, such an overly restrictive view would run afoul of *KSR's* proscription against rigid restrictions on the scope of an obviousness analysis.

Appx0174. LKQ never argued, as it belatedly does now, that *KSR* somehow overruled the *Rosen* requirement that the Board properly applied to reject LKQ's obviousness arguments. Because LKQ failed to raise this argument before the Board, this Court should deem it forfeited and reject the argument on that basis alone. *In re Google Technology Holdings LLC*, 980 F.3d 858, 863–64 (Fed. Cir. 2020) (explaining that the patentee had forfeited the claim construction arguments by not adequately having first made them to the Board). Nor has LKQ met the high burden of avoiding forfeiture's natural result, since *KSR*'s holding was certainly known to its counsel, and nothing prevented it from making its current argument before now.

Even if not forfeited, LKQ's argument is wrong, as evidenced by the numerous Federal Circuit decisions that, as recently as last year, have applied the *Rosen* single-reference test even after *KSR* issued in 2007. *E.g.*, *Campbell II*, 10

F.4th at 1275; *Campbell I*, 939 F.3d at 1340; *MRC Innovations*, 747 F.3d at 1331; *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1331 (Fed. Cir. 2012). Tellingly, LKQ cites many of these cases in its brief, but does not acknowledge that they apply *Rosen* post-*KSR*. Nor does it cite any controlling cases that even hint that *Rosen* may no longer be good law. Instead, LKQ relies (at 56-59) on inapplicable law from regional circuits and from before the Federal Circuit was even established, illustrating the weakness in its argument.

Moreover, the *Rosen* single-reference requirement has nothing to do with the test for motivation to combine references at issue in *KSR*. Rather, it is the "so related" aspect of the design patent obviousness requirement that relates to combining references, and LKQ takes no issue with that here.

Beyond that, the current test for obviousness of design patents still allows for the flexibility touted in *KSR*. The *Rosen* test asks first whether a reference creates "basically the same" visual impression as the patented design. *Rosen*, 673 F.2d at 391. It does not mandate any particular way for the factfinder to reach the conclusion of whether the two designs are basically the same, leaving significant flexibility for the factfinder to consider the totality of the circumstances in each case. That the analysis begins with a single reference, as opposed to many references, does not hamper the factfinder's ability to evaluate the *Graham* factors

in determining whether an ordinary designer would have found a design claim obvious in view of the prior art.

LKQ also briefly argues (at 59-60) that the current obviousness test is flawed because the "basically the same" test for obviousness and the "substantially similar" test for anticipation have the same scope. LKQ's assertion is entirely unsupported and contrary to the descriptions of these tests that the Supreme Court and this Court have set forth. As the Supreme Court has explained, the "substantially similar" test asks whether a reference is so similar to the claimed design that it would "deceive [an ordinary] observer, inducing him to purchase one supposing it to be the other." *Gorham*, 81 U.S. at 528. In contrast, this Court has described the "basically the same" test for obviousness in more lenient terms, asking whether the references have "substantial differences in their overall visual appearances" or whether one would require "major modifications" to be visually similar to the other. *Campbell II*, 10 F.4th at 1275 (brackets and quotation marks omitted). As such, LKQ's unsupported attempt to find error in the current obviousness test fails.

### B. The Board Properly Found that LKQ Failed to Satisfy the First Step of the *Durling* Test for Obviousness

Applying the controlling (and proper) framework, the Board found that LKQ failed to satisfy either prong of the *Durling* test: first, it failed to identify "the correct visual impression created by the patented design as a whole" and second, it

failed to show that Lian creates "basically the same" visual impression as the patented design. *Campbell I*, 939 F.3d at 1340. As the Board noted, Appx0050-0051, either of these failures is dispositive, so this Court need only affirm on one to uphold the Board's decision.

First, substantial evidence supports the Board's finding that LKQ did not identify the correct visual impression created by the '625 design. As discussed in detail above, the Board considered LKQ's and GM's positions and concluded that LKQ's proposed construction of the '625 claim "offers a starting point, but does not go far enough, in describing the overall appearance of the claimed design." Appx0048; Appx0014-0015; *see* Appx0016 ("Considering the overall appearance of the '625 design, we determine that LKQ's proposed construction is incomplete."). As also described above, the Board carefully walked through the record and credited GM's expert's testimony that a number of additional elements must be considered to arrive at the proper visual impression of the '625 design as a whole, including the shape, orientation, and look of the door cut line, wheel arch and terminus, protrusion, and sculpting of the '625 design. Appx0047; Appx0050; *see also* Appx0026-0045. Because LKQ's obviousness analysis rested solely on its own overly general description of the visual impression created by the '625 design, and did not account for the multiple other relevant features that contribute to the '625 design, the Board properly concluded that LKQ's failure to correctly identify the visual impression of the claimed design doomed its obviousness case. Appx0050-0051.

While the Board could have stopped there, it went further to evaluate the second prong of *Durling*'s first step: whether, when considering the correct visual impression of the '625 design, Lian creates "basically the same" visual impression. Again, the Board found LKQ's evidence lacking, and again substantial evidence supports that finding. The Board methodically compared multiple views of Lian with figures of the '625 patent, considered the parties' and experts' arguments and evidence, and concluded that, while the two designs "share certain vehicle fender elements," "a complete visual comparison of the overall appearance of both designs sufficiently shows that the two designs are quite different." Appx0053.

For example, the Board found it was "immediately apparent" that the wheel arches of the two designs are meaningfully different—the arch of the '625 patent is circular, while Lian's is more squared off:

| '625 PATENT | LIAN |
| --- | --- |
|  |  |
| Ex. 1001, FIG. 2 (cropped, annotated) | Ex. 1006, FIG. 4 (cropped, annotated) |

Appx0053; *see* Appx0031-0032. As the Board noted, even LKQ's expert agreed that the wheel arch can be a significant feature in the eyes of an ordinary designer,

further supporting the Board's finding that this difference affects the overall visual impression of the designs. Appx0053; Appx1630-1631; *see* Appx1701 (agreeing that "the shape of the wheel arch is different between the '625 Patent and Lian").

The Board further evaluated the differences between the designs' fender termini and door cut lines and their effect on the overall visual appearance of the designs. Appx0054. With respect to the terminus, the Board found Lian to be visually different from the claimed design because it "has a rearward protrusion formed more sharply curved on the lower portion of the door cut line," as shown in the illustration above. Appx0054. With respect to the door cut line, the Board concluded that Lian has a more angular, sharper bend at the crease than the claimed design:



Appx0054 ("A reasonable observation of Lian's door cut line reveals a more angular, sharper bend at the second crease."). While the Board acknowledged LKQ's expert's testimony that these elements "might not be considered highly

significant by an ordinary designer," it "balance[d] that testimony along with [GM's expert] Mr. Peters' testimony that . . . the door cut line would have had a substantial impact on the overall appearance of the design" and concluded that, "even if not overly significant" both features "influence and differentiate the overall appearance of the claimed design and Lian." Appx0054 (quotation marks omitted); Appx0893 ("[T]he appearance of the door cut line would have had a substantial impact on the overall appearance of the design."); *id.* ("The door cut line interfaces with an[] adjacent door panel of the vehicle, and thus the shape of the door cut line must match the shape of the corresponding vehicle panel."). This balancing of competing evidence is precisely the sort of exercise that the substantial evidence standard leaves to the factfinder.

The Board also considered the shape of the protrusion in both designs and found them to be "visually different in meaningful ways." Appx0054. Again crediting GM's expert, the Board recognized that, in particular, the U-shaped notches in the designs (shown in the below figure via red text) are different, where the claimed design's U-shaped cutout "ha[s] the appearance of a scalloped feature with consistent thickness and smooth curvature":




Appx0055 (citation omitted). The Board further considered both experts' testimony in determining whether the U-shaped notch contributes to the visual impression of the design, and expressly noted that LKQ's expert said that it would be "very significant to the designer to use that space" of the U-shaped notch, whether it be as a mirror pocket or as a window. Appx0055-0056; Appx1632.

Finally, the Board considered aspects of the sculpting of the designs and again found differences that impacted their visual impressions. For the third crease (also called the "lower horizontal crease" or "inflection line") the Board noted the "general inconsistencies between the parties' witnesses" but ultimately found GM's expert's testimony persuasive, that "Lian lacks both the appearance provided by the third crease itself, as well as the distinct change between light and dark surface shading associated with the third crease." Appx0057 (quotation marks omitted). Again, this consideration of competing evidence is a task the substantial evidence standard leaves to the Board.

All the above shows the highly factual analysis the Board conducted to ultimately conclude that "[o]n this record, considering altogether the differences between the overall appearances of he claimed design and the design shown in Lian, LKQ d[id] not establish that Lian creates basically the same visual impression as the patented design." Appx0057 (quotation marks omitted). As such, the Board properly found that LKQ failed to identify a proper *Rosen* reference. Appx0058. LKQ thus could not meet its burden on obviousness, so the Board did not need to move to the second *Durling* step and evaluate the Tucson reference. *In re Rosen*, 673 F.2d at 391 (explaining that absent a proper primary reference, it is not possible to show that a design is obvious). Substantial evidence supports the Board's finding on this point, so this Court should affirm the Board's decision for this independent reason.

## CONCLUSION

For the foregoing reasons, this Court should affirm the Board's decision that the challenged claim of the '625 patent is not unpatentable.

Dated: April 6, 2022

Respectfully submitted,

*/s/ Joseph A. Herriges*

Joseph A. Herriges
John A. Dragseth
FISH & RICHARDSON P.C.
60 South 6th Street, 3200 RBC Plaza
Minneapolis, MN 55402

(612) 335-5070
herriges@fr.com; dragseth@fr.com

Nitika Gupta Fiorella
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
(302) 652-5070
fiorella@fr.com

Laura E. Powell
FISH & RICHARDSON P.C.
1000 Maine Avenue S.W., Suite 1000
Washington, D.C. 20024
(202) 783-5070
powell@fr.com

*Attorneys for Appellee GM Global Technology Operations LLC*

**CERTIFICATE OF COMPLIANCE**

The foregoing document is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The Brief contains 9,842 words, excluding the parts of the brief exempted by Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.

Dated: April 6, 2022

*/s/ Joseph A. Herriges*
Joseph A. Herriges