**2021-2348**

# United States Court of Appeals for the Federal Circuit

LKQ CORP. & KEYSTONE AUTOMOTIVE INDUSTRIES, INC.

*Appellants*,

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,

*Appellee*,

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board in IPR2020-00534
(JJ. Scott A. Daniels, Grace K. Obermann, and Christopher G. Paulraj)

## CORRECTED BRIEF OF AMICI CURIAE AMERICAN PROPERTY CASUALTY INSURANCE ASSOCIATION AND NATIONAL ASSOCIATION OF MUTUAL INSURANCE COMPANIES IN SUPPORT OF THE PETITION FOR REHEARING EN BANC

John L. Cordani, Jr.
Benjamin M. Daniels
ROBINSON & COLE LLP
280 Trumbull St.
Hartford, CT 06103
(860) 275-8287
jcordani@rc.com
bdaniels.rc.com

Kyle G. Hepner
ROBINSON & COLE LLP
1201 Pennsylvania Ave. NW
Suite 820
Washington, DC 20004
(771) 213-5605
khepner@rc.com

*Attorneys for Amicus Curiae*

April 7, 2023

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Counsel for the Amici Curiae the American Property Casualty Insurance Association and the National Association of Mutual Insurance Companies hereby certify the following:

1. The full name of evert party or amicus represented by us is:

   American Property Casualty Insurance Association;

   National Association of Mutual Insurance Companies.

2. The full names of all real parties in interest for the entities if different from the entities:

   N/A.

3. All parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   John L. Cordani, Jr., ROBINSON & COLE LLP, 280 Trumbull St., Hartford, CT 06103. Kyle Hepner, ROBINSON

& COLE LLP, 1201 Pennsylvania Ave, NW, Suite 820, Washington DC 20004. Benjamin Daniels, ROBINSON & COLE LLP, 280 Trumbull St., Hartford, CT 06103.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   LKQ Corporation, et al. v. GM Global Technology Operations LLC, Fed. Cir. 2022-1253.

6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees), pursuant to Fed. Cir. R. 47.4(a)(6):

   None.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i
TABLE OF CONTENTS .......... iii
TABLE OF AUTHORITIES .......... iv
STATEMENT OF INTEREST OF AMICI CURIAE .......... 1
INTRODUCTION .......... 2
ARGUMENT .......... 4
I. There is a Strong Need for a Competitive Market in Automotive Repair Parts .......... 4
II. The *Rosen/Durling* Test Creates an Anti-Competitive Landscape .......... 6
III. *Egyptian Goddess* Demonstrates the Incompatibility of the *Rosen/Durling* Test with Flexible Obviousness under KSR .......... 7
A. *Egyptian Goddess* Mandates a Holistic Approach to Designs .......... 7
B. The Inflexibility of *Rosen/Durling* is Inconsistent with *Egyptian Goddess* .......... 8
C. KSR-Style Flexibility Harmonizes Design-Obviousness with *Egyptian Goddess* .......... 10
CONCLUSION .......... 15
CERTIFICATE OF SERVICE .......... 16
CERTIFICATE OF COMPLIANCE .......... 17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Automotive Body Parts Ass'n v. Ford Global Tech., LLC*,
930 F.3d 1314 (Fed. Cir. 2019) .......... 4

*Berlinger v. Busch Jewelry Co.*,
48 F.2d 812 (2d Cir. 1931) .......... 12

*Durling v. Spectrum Furniture Co., Inc.*,
101 F.3d 100 (Fed. Cir. 1996) .......... 2, 8, 9

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008) (en banc) .......... 3, 7, 8, 9, 10, 11, 14, 15

*Gorham Co. v. White*,
81 U.S. 511 (1871) .......... 8, 10, 14

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
589 F.3d 1233 (Fed. Cir. 2009) .......... 8

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) .......... 3, 7, 9, 10, 12, 14, 15

*Litton Sys., Inc. v. Whirlpool Corp.*,
728 F.2d 1423 (Fed. Cir. 1984) .......... 13

*Northrup v. Adams*,
18 F. Cas. 374 (C.C.E.D. Mich. 1877) .......... 11, 12

*In re Rosen*,
673 F.2d 388 (CCPA 1982) .......... 2, 7, 9, 11, 13

*In re Schilling*,
421 F.2d 747 (CCPA 1970) .......... 13

*Smith v. Whitman Saddle Co.*,
148 U.S. 674 (1893) .......... 10, 11, 12, 14

*Titan Tire Corp. v. Case New Holland, Inc.*,
566 F.3d 1372 (Fed. Cir. 2009) .......... 10

*In re Winslow*,
365 F.2d 1017 (CCPA 1966) .......... 12

**Statutes**

35 U.S.C. § 103 .......... 3

**Other Authorities**

Mark Bartholomew, *Nonobvious Design*,
108 Iowa L. Rev. 601 (2023) .......... 6

*The New Normal? Auto Insurers Continue to Struggle with Inflation*, APCIA, (October 2022), *available at* https://www.apci.org/ attachment/static/7023/ .......... 5

Sarah Burstein, *Is Design Patent Examination Too Lax?*,
33 Berkeley Tech. L.J. 607 (2018) .......... 6

Tracy-Gene Durkin, Pauline Pelletier, Daniel Gajewski & Deirdre Wells, *Design Patents Prove Successful on Enforcement, Defense* (May 4, 2020, 12:36 PM), *available at* https://www.law360.com/articles/1254579/design-patents-prove-successful-on-enforcement-defense .......... 6

U.S. Patent Statistics Chart Calendar Years 1963-2020, *available at* https://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.htm .......... 6

## STATEMENT OF INTEREST OF AMICI CURIAE

The American Property Casualty Insurance Association ("APCIA") is the primary national trade association for home, auto, and business insurers. APCIA promotes and protects the viability of private competition for the benefit of consumers and insurers, with a legacy dating back 150 years. APCIA's member companies write more than $187 billion in automobile insurance nationwide, constituting 58% of the market.

On issues of importance to the insurance industry and its customers, APCIA advocates sound public policies in legislative and regulatory forums at the state and federal levels and files amicus curiae briefs in significant cases before state and federal courts. This advocacy includes support for open markets and regulatory standards that protect consumers and help foster a competitive and financially sound insurance market. [1]

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amicus curiae states that no counsel for any party authored this brief in whole or in part, and no party or counsel for a party made any monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, their members, or their counsel made any monetary contribution to the brief's preparation or submission.

The National Association of Mutual Insurance Companies ("NAMIC") consists of more than 1,500 member companies, including seven of the top 10 property/casualty insurers in the United States. The association supports local and regional mutual insurance companies on main streets across America as well as many of the country's largest national insurers. NAMIC member companies write $357 billion in annual premiums and represent 69 percent of homeowners, 56 percent of automobile, and 31 percent of the business insurance markets. Through its advocacy programs NAMIC promotes public policy solutions that benefit member companies and the policyholders they serve and fosters greater understanding and recognition of the unique alignment of interests between management and policyholders of mutual companies.

## INTRODUCTION

APCIA and NAMIC's members and their policyholders have a significant interest in a robust and competitive market for insured auto repair.

Appellants' Request for Rehearing ably explains how "the rigid approach to evaluating obviousness of designs under *In re Rosen*, 673 F.2d 388 (CCPA 1982) and *Durling v. Spectrum Furniture Co., Inc.*, 101

F.3d 100 (Fed. Cir. 1996) is [in]consistent with the Supreme Court's interpretation of 35 U.S.C. § 103 in *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007)." Req. for Rehearing, Doc. 53 at p.2.

Because of the overly rigid *Rosen/Durling* test, original equipment manufacturers (OEMs) are able to obtain and enforce design patents on insignificant part-variations year-over-year in a crowded field. These design patents, which would otherwise be deemed obvious to an ordinary designer, unfairly exclude competitive aftermarket repair parts from the marketplace and thereby substantially increase repair costs. Rehearing *en banc* should be granted because the inflexibility of the *Rosen/Durling* test conflicts with how designs should be viewed under *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (*en banc*).

# ARGUMENT

## I. There is a Strong Need for a Competitive Market in Automotive Repair Parts

American consumers benefit greatly from lower auto repair costs, which in turn decrease insurance premiums. Prior to the development of a competitive repair-parts market, consumers were stuck with the monopolistic price of OEM parts. The availability of competitive repair parts (also known as aftermarket or generic parts) results in lower prices, greater consumer choice, and better quality. Freeing competitive[2] aftermarket repair parts from the shadow of unoriginal design patents on minor year-over-year design tweaks will redound significantly to the benefit of American consumers without stifling real design innovation.

By increasing the overall costs of repairs, the lack of competitive repair parts affects not only the cost of parts but also the decision of whether to repair or replace a damaged car. Higher part costs mean higher repair estimates, and if a repair estimate exceeds the value of a vehicle, it is considered a total loss. As a result, consumers would be

[2] While consumers seek replacement parts "that restore the original appearance of their vehicles," the Court has ruled that "aesthetic functionality" does not curtail design patents. *Automotive Body Parts Ass'n v. Ford Global Tech., LLC*, 930 F.3d 1314, 1319 (Fed. Cir. 2019).

harmed by having to both pay higher repair costs and purchase a replacement vehicle.

Furthermore, in the wake of recent supply chain issues, freeing aftermarket parts from unoriginal design patents will give consumers options when facing delays in obtaining parts from OEMs. Removing generic parts from the market through design patenting means consumers would be unable to repair their vehicles promptly.

Finally, while there is never a good time to impose increased costs on consumers, now is a particularly inopportune time. As documented in APCIA's recent white paper, "The New Normal? Auto Insurers Continue to Struggle with Inflation," a number of factors—including litigation trends, increased claim severity, and most notably inflation in insurance claim costs rising much faster than overall inflationary trends—have combined to dramatically increase the cost of repairing automobiles in recent years. APCIA, 7-9, (October 2022), https://www.apci.org/attachment/static/7023/. Continued enforcement of monopolistic and unoriginal design patents will only exacerbate this trend.

## II. The *Rosen/Durling* Test Creates an Anti-Competitive Landscape

Design patent filings and issuances have more than doubled in the last 20 years. U.S. Patent Statistics Chart Calendar Years 1963-2020, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.htm. Allowance rates for design patents also well exceed those for utility applications. *Id.*; *see also* Mark Bartholomew, Nonobvious Design, 108 Iowa L. Rev. 601, 602 (2023) ("The PTO initially rejects nearly ninety percent of all utility patent applications, yet it approves ninety percent of all design patent applications."), Sarah Burstein, Is Design Patent Examination Too Lax?, 33 Berkeley Tech. L.J. 607, 610 (2018) ("[T]he U.S. Court of Appeals for the Federal Circuit has made it nearly impossible for the USPTO to reject any design patent claim--regardless of how ordinary, banal, or functional the claimed design might be.").

Federal courts also rarely deem a design patent invalid. *See* Tracy-Gene Durkin, Pauline Pelletier, Daniel Gajewski & Deirdre Wells, *Design Patents Prove Successful on Enforcement, Defense*, LAW360 (May 4, 2020, 12:36 PM) (finding that design patents

survive validity challenges in eighty-two percent of federal court cases).[3] Importantly, the requirement for a primary reference pursuant to *Rosen* creates a rigid test that is overly difficult to satisfy. Bartholomew, *supra*, at 608-10.

The combination of easily obtained and difficult-to-challenge design patents can allow OEMs to extend rights over slight design modifications as car models evolve slowly year-over-year, resulting in highly crowded fields of prior art. The *Rosen/Durling* framework is therefore too rigid and lacks the common sense and flexibility required by *KSR*.

## III. *Egyptian Goddess* Demonstrates the Incompatibility of the *Rosen/Durling* Test with Flexible Obviousness under *KSR*

While Appellants' ably describe the incompatibility of *Rosen/Durling* with *KSR*, the inflexibility of the *Rosen/Durling* standard is best understood and resolved in light of this Court's *en banc* decision in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008).

### A. *Egyptian Goddess* Mandates a Holistic Approach to Designs

The Court's *Egyptian Goddess* decision abrogated the point-of-novelty test under which "the accused device must appropriate the

[3] https://www.law360.com/articles/1254579/design-patents-prove-successful-on-enforcement-defense [https://perma.cc/8H8S-XGNJ]

novelty in the patented device which distinguishes it from the prior art" for there to be infringement. 543 F.3d at 670. The point-of-novelty test had "proved difficult to apply in cases in which there are several different features that can be argued to be points of novelty in the claimed design." *Id.* at 677. Instead, the Court returned to the "ordinary observer" test of *Gorham Co. v. White*, 81 U.S. 511 (1871), which focused on "whether the accused design has appropriated the claimed design as a whole." *Id.*

Soon after *Egyptian Goddess*, the Court updated its standard for anticipation of design patents to be consistent with the holistic ordinary observer test. *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009). However, the Court has never revisited the ramifications of *Egyptian Goddess* on obviousness. This case presents a timely and critically important opportunity to do so.

### B. The Inflexibility of *Rosen/Durling* is Inconsistent with *Egyptian Goddess*

The *Rosen/Durling* standard focuses on identifying a "single" prior art design, "the design characteristics of which are basically the same as the claimed design." *Durling*, 101 F.3d at 103. Once that primary reference is found, other prior art or design considerations can be used to "modify the primary reference" to incorporate particular "features" to

"create a design that has the same overall visual appearance as the claimed design." *Id.*

This surgical methodology for evaluating the obviousness of a design holds the same flaws as the point-of-novelty test rejected in *Egyptian Goddess*. By searching for that "single" reference that is closest to the claimed design, the *Rosen/Durling* test essentially seeks to identify point(s) of novelty—*i.e.,* those dissected differences between a claimed design and the supposedly "closest" prior art. It then evaluates if those characteristics are sufficiently non-obvious to be patentable, whether it be because the "*Rosen* reference" is too different standing alone or whether, even if close, secondary references do not adequately close the gap on the points of novelty. The *Rosen/Durling* test does not compare the claimed design with the prior art holistically through the eyes of the ordinary designer.

Just as Judge Stark's concurring opinion in this case recognized the "substantial tension between the Supreme Court's holding in *KSR* and our *Durling* test,"[4] Judge Plager wrote for a unanimous panel of the Court about the tension between *Rosen/Durling* and *Egyptian Goddess*:

[4] Doc. 48 at 10 (Stark, J. concurring).

> This [*Rosen/Durling*] process, first finding a primary reference in the prior art and then modifying it with secondary prior art references to demonstrate the claimed design's obviousness, may have a tendency to draw the court's attention to individual features of a design rather than the design's overall appearance. In this respect, it is similar to the "point of novelty" test that until recently was used in the infringement side of design patent law.

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1383 (Fed. Cir. 2009) ("it is not clear to what extent, if any, the doctrine applicable to obviousness should be modified to conform to the approach adopted by this court in *Egyptian Goddess*").

However, the Court did not have occasion to address this tension in *Titan Tire*, just as it also left the implications of *KSR* for another day. *Id.* at 1383-84. Granting *en banc* review in this case will allow the Court to resolve these open and important issues.

C. KSR-Style Flexibility Harmonizes Design-Obviousness with *Egyptian Goddess*

As noted above, *Egyptian Goddess* returned design-patent-infringement to the holistic standard of *Gorham*. And as ably demonstrated by Appellants, the teachings of *KSR* should return design-patent-obviousness to *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893).

*Whitman Saddle* involved the automobiles of its day—horses. In evaluating the patentability of Whitman's saddle design, the Court framed its analysis around the fact that "there were several hundred styles of saddles or saddletrees belonging to the prior art, and that it was customary for saddlers to vary the shape and appearance of saddletrees in numerous ways, according to the taste and fancy of the purchaser." *Id.* at 681. It thus holistically compared the claimed saddle design against a crowded field of prior art to conclude that Whitman's saddle was not sufficiently original. *See also Egyptian Goddess*, 543 F.3d at 673 (explaining *Whitman Saddle*'s dual holdings in equity on unpatentability and non-infringement). While consistent with *Egyptian Goddess*, this methodology is simply not possible under the surgical *Rosen/Durling* standard and its requirement for a single *Rosen* reference.

*Whitman Saddle* was by no means unique in its approach to design-obviousness. The Court in *Whitman Saddle*, 148 U.S. at 679, cited *Northrup v. Adams* with approval, wherein soon-to-be Justice Brown explained that "[t]he same general principles" of obviousness "extend to both" utility and design patents. 18 F. Cas. 374, 374 (C.C.E.D. Mich.

1877). This again suggests that Appellants are correct that design-obviousness must be squared with *KSR*.

Moreover, *Northrup* goes on to account for the differences between utility and design patents. Where the focus of utility patents is on the novelty of features, the core of design patents is "originality." *Id.* "If a combination of old designs be patentable at all, of which I have some doubt, the combination must be such as to produce a new appearance. If the effect produced be simply the aggregation of familiar designs, it would not be patentable." *Id.* at 375. Thus, again, the court emphasized holistic comparison of the claimed design with the full scope and content of the prior art. *See also In re Winslow*, 365 F.2d 1017, 1020 (CCPA 1966) (in considering obviousness, "first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him.").

For many years, the lower courts applied *Whitman Saddle* in this way. For example, the Second Circuit compared a wedding ring design holistically with a crowded prior art in *Berlinger v. Busch Jewelry Co.*, 48 F.2d 812, 813 (2d Cir. 1931). It rejected the patentee's attempt to dissect individual features against individual prior art references. *See id.* ("A

design is not patentable merely because it can be distinguished in appearance from prior designs. Its creation must involve the exercise of inventive faculty."). This carried through to this Court's predecessor where, only a few years before *Rosen*, it found a design unpatentable based on a significant combination of two prior art references. *See In re Schilling*, 421 F.2d 747, 750 (CCPA 1970) ("When considering the patentability of a design it is the appearance as a whole which must be considered, and the mere fact that there are differences over the prior art structures is not alone sufficient to justify a holding that the design is patentable."). It did so over a dissent that presaged *Rosen* in decrying the fact that neither one of the two references, standing alone, closely resembled the claimed design. *Id.*

*Rosen/Durling* departed from a long history of evaluating design-obviousness holistically in view of the full scope and content of the prior art. It did so around the same time that the point-of-novelty test rose to prominence for infringement with *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423 (Fed. Cir. 1984). Both focused on analytic dissections of individual design differences and features, resulting in a narrower scope for infringement and a more constrained role for obviousness.

*Egyptian Goddess* freed design patents to be given broader infringement play under *Gorham*. But retention of *Rosen/Durling* has resulted in in lopsided unfairness doubly harmful to aftermarket repair competitiveness. Consistent with *KSR*, design-obviousness must similarly be given the flexible play afforded under *Whitman Saddle*. Rehearing *en banc* should be granted because the *Rosen/Durling* test fails for the same reason as the point-of-novelty test.

## CONCLUSION

For these reasons, APCIA and NAMIC support LKQ's petition and urge the Court to grant *en banc* review and align the standards for design patent obviousness with the Supreme Court's decision in *KSR* under the holistic approach to designs endorsed by *Egyptian Goddess*.

Dated: April 7, 2023

Respectfully submitted,

*/s/ John L. Cordani, Jr.*
John L. Cordani, Jr.
Benjamin M. Daniels
ROBINSON & COLE LLP
280 Trumbull St.
Hartford, CT 06103
(860) 275-8287
jcordani@rc.com
bdaniels@rc.com

Kyle G. Hepner
ROBINSON & COLE LLP
1201 Pennsylvania Ave. NW Suite 820
Washington, DC 20004
(771) 213-5605
khepner@rc.com

*Attorneys for Amici Curiae American Property Casualty Insurance Association and Association of Mutual Insurance Companies*

## CERTIFICATE OF SERVICE

I hereby certify that service on all parties was made through electronic filing the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the court's electronic-filing system on April 7, 2023 pursuant to Federal Circuit Rule 25(c)(2).

Dated: April 7, 2023

Respectfully submitted,

*/s/ John L. Cordani, Jr.*

John L. Cordani, Jr.
ROBINSON & COLE LLP
280 Trumbull St.
Hartford, CT 06103
(860) 275-8287
jcordani@rc.com

*Attorney for Amici Curiae American Property Casualty Insurance Association and Association of Mutual Insurance Companies*

## CERTIFICATE OF COMPLIANCE

Counsel certifies as follows:

1. This brief complies with the type-volume limitations of Federal Circuit Rule 35(g)(3) because this brief contains 2,517 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2. This brief has been prepared with a proportionally-spaced font type with size and spacing that complies with the typeface and style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure.

Dated: April 7, 2023

Respectfully submitted,

*/s/ John L. Cordani, Jr.*

John L. Cordani, Jr.
ROBINSON & COLE LLP
280 Trumbull St.
Hartford, CT 06103
(860) 275-8287
jcordani@rc.com

*Attorney for Amici Curiae American Property Casualty Insurance Association and Association of Mutual Insurance Companies*