2021-2348

# United States Court of Appeals
# for the Federal Circuit

LKQ CORP. & KEYSTONE AUTOMOTIVE
INDUSTRIES, INC.

*Appellants,*

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,

*Appellee,*

Appeal from the United States Patent and Trademark Office
Patent Trial and Appeal Board in IPR2020-00534
(JJ. Scott A. Daniels, Grace K. Obermann, and Christopher G. Paulraj)

**BRIEF OF AMICI CURIAE AMERICAN PROPERTY CASUALTY
INSURANCE ASSOCIATION, NATIONAL ASSOCIATION OF
MUTUAL INSURANCE COMPANIES, AND CERTIFIED
AUTOMOTIVE PARTS ASSOCIATION IN SUPPORT OF
APPELLANTS EN BANC REHEARING**

John L. Cordani, Jr.
Benjamin M. Daniels
ROBINSON & COLE LLP
280 Trumbull St.
Hartford, CT 06103
(860) 275-8287
jcordani@rc.com
bdaniels.rc.com

Kyle G. Hepner
ROBINSON & COLE LLP
1201 Pennsylvania Ave. NW
Suite 820
Washington, DC 20004
(771) 213-5605
khepner@rc.com

*Attorneys for Amicus Curiae*

August 28, 2023

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Counsel for the Amici Curiae the American Property Casualty Insurance Association, the National Association of Mutual Insurance Companies, and The Certified Automotive Parts Association hereby certify the following:

1. The full name of evert party or amicus represented by us is:

   American Property Casualty Insurance Association;

   National Association of Mutual Insurance Companies; and

   The Certified Automotive Parts Association.

2. The full names of all real parties in interest for the entities if different from the entities:

   N/A.

3. All parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities:

   None.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case)

i

are:

> John L. Cordani, Jr., ROBINSON & COLE LLP, 280
>
> Trumbull St., Hartford, CT 06103. Kyle Hepner, ROBINSON
>
> & COLE LLP, 1201 Pennsylvania Ave, NW, Suite 820,
>
> Washington DC 20004.

5. The title and number of any case known to counsel to be
   pending in this or any other court or agency that will directly
   affect or be directly affected by this court's decision in the
   pending appeal:

   None.

6. Any information required under Fed. R. App. P. 26.1(b)
   (organizational victims in criminal cases) and 26.1(c)
   (bankruptcy case debtors and trustees), pursuant to Fed. Cir.
   R. 47.4(a)(6):

   None.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................. i

TABLE OF CONTENTS ......................................................... iii

TABLE OF AUTHORITIES ..................................................... iv

STATEMENT OF INTEREST OF AMICI CURIAE ............................. 1

INTRODUCTION ................................................................ 3

ARGUMENT ..................................................................... 5

    I.   There is a Strong Need for a Competitive Market in Automotive Repair Parts ............................................... 5

    II.  The *Rosen/Durling* Test Creates an Anti-Competitive Landscape .................................................................. 7

    III.  This Court's Design-Patent Precedents Will Help Clarify the *Rosen-Durling* Test ....................................... 8

    IV.  The Correct Test For Design Patent Obviousness Must Remain Focused on Designs as a Whole ............................ 10

CONCLUSION ................................................................... 16

CERTIFICATE OF SERVICE ................................................... 17

CERTIFICATE OF COMPLIANCE ............................................. 18

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Automotive Body Parts Ass'n v. Ford Global Tech., LLC*,
930 F.3d 1314 (Fed. Cir. 2019) ........................................................... 5

*Berlinger v. Busch Jewelry Co.*,
48 F.2d 812 (2d Cir. 1931) ................................................................ 14

*Durling v. Spectrum Furniture Co., Inc.*,
101 F.3d 100 (Fed. Cir. 1996) ............................................................ 3

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008) (en banc) ..............4, 9, 10, 11, 13, 15, 16

*Gorham Co. v. White*,
81 U.S. 511 (1871) .............................................................................. 9

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) .......................................................................... 12, 15

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
589 F.3d 1233 (Fed. Cir. 2009) ................................................. 9, 10, 11

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) .............................................. 3, 4, 8, 9, 12, 15, 16

*Northrup v. Adams*,
18 F. Cas. 374 (C.C.E.D. Mich. 1877) ........................................ 13, 14

*In re Rosen*,
673 F.2d 388 (CCPA 1982) ........................................................ 3, 8, 15

*In re Schilling*,
421 F.2d 747 (CCPA 1970) ........................................................ 14, 15

*Smith v. Whitman Saddle Co.*,
148 U.S. 674 (1893) .................................................................... 4, 13

*Titan Tire Corp. v. Case New Holland, Inc.*,
  566 F.3d 1372 (Fed. Cir. 2009) ...................................................... 8, 10

*In re Winslow*,
  365 F.2d 1017 (CCPA 1966) ............................................................... 13

**Statutes**

35 U.S.C. § 103 ........................................................................................ 3, 12

**Other Authorities**

Mark Bartholomew, *Nonobvious Design*, 108 Iowa L. Rev.
  601, 602 (2023) ....................................................................................... 7

"The New Normal? Auto Insurers Continue to Struggle with
  Inflation," APCIA, 7-9 (October 2022), *available at*
  *https://www.apci.org/ attachment/static/7023/* ............................ 6

Sarah Burstein, *Is Design Patent Examination Too Lax?*, 33
  Berkeley Tech. L.J. 607, 610 (2018) ..................................................... 7

Tracy-Gene Durkin, Pauline Pelletier, Daniel Gajewski &
  Deirdre Wells, *Design Patents Prove Successful on
  Enforcement, Defense* (May 4, 2020, 12:36 PM), *available
  at https://www.law360.com/articles/1254579/design-
  patents-prove-successful-on-enforcement-defense* ............................... 7

U.S. Patent Statistics Chart Calendar Years 1963-2020,
  *available at*
  *https://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_
  stat.htm* .............................................................................................. 7

## STATEMENT OF INTEREST OF AMICI CURIAE

The American Property Casualty Insurance Association ("APCIA") is the primary national trade association for home, auto, and business insurers. APCIA promotes and protects the viability of private competition for the benefit of consumers and insurers, with a legacy dating back 150 years. APCIA's member companies write more than $187 billion in automobile insurance nationwide, constituting 58% of the market.

On issues of importance to the insurance industry and its customers, APCIA advocates sound public policies in legislative and regulatory forums at the state and federal levels and files amicus curiae briefs in significant cases before state and federal courts. This advocacy includes support for open markets and regulatory standards that protect consumers and help foster a competitive and financially sound insurance market. [1]

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for amicus curiae states that no counsel for any party authored this brief in whole or in part, and no party or counsel for a party made any monetary contribution intended to fund the preparation or submission of this brief. No person other than amici curiae, their members, or their counsel made any monetary contribution to the brief's preparation or submission.

The National Association of Mutual Insurance Companies ("NAMIC") consists of more than 1,500 member companies, including seven of the top 10 property/casualty insurers in the United States. The association supports local and regional mutual insurance companies on main streets across America as well as many of the country's largest national insurers. NAMIC member companies write $357 billion in annual premiums and represent 69 percent of homeowners, 56 percent of automobile, and 31 percent of the business insurance markets. Through its advocacy programs NAMIC promotes public policy solutions that benefit member companies and the policyholders they serve and fosters greater understanding and recognition of the unique alignment of interests between management and policyholders of mutual companies.

The Certified Automotive Parts Association ("CAPA") was founded in 1987 and is the nation's only independent, non-profit certification organization for automotive repair parts. CAPA's purpose is to ensure that both consumers and the industry have the means to identify high-quality parts via the CAPA Quality Seal. CAPA is an ANSI-accredited standards developer for competitive repair parts. CAPA's certification program is a valuable public service that provides consumers, auto body

shops, parts distributors, and insurance adjusters with reliable, objective means to identify quality replacement parts: parts that will fit, perform, last and be every bit as safe as the originals. CAPA has no vested interest in the sale of these parts or in selling certification services: the public interest is the heart of CAPA's program.

## INTRODUCTION

APCIA and NAMIC's members and their policyholders and CAPA have a significant interest in a robust and competitive market for insured auto repair.

Appellants' Brief in Support of *En Banc* Rehearing ably explains how the rigid approach to evaluating obviousness of designs under *In re Rosen*, 673 F.2d 388 (CCPA 1982) and *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100 (Fed. Cir. 1996) is inconsistent with the Supreme Court's interpretation of 35 U.S.C. § 103 in *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007). [cite].

Because of the overly rigid *Rosen-Durling* test, original equipment manufacturers (OEMs) are able to obtain and enforce design patents on insignificant part-variations year-over-year. The crowded field of prior art on such part-designs resembles the crowded field of saddle designs

3

considered by the Supreme Court in *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893), leading to a conclusion of invalidity. But under the undue rigidity of the *Rosen-Durling* test, design patents—which would otherwise be deemed obvious to an ordinary designer—unfairly exclude competitive aftermarket repair parts from the marketplace and thereby substantially increase repair costs, imposing an unfair and unnecessary burden on Amici, to be sure, but more importantly on the millions of automobile owners who are their customers.

The Court should abrogate the *Rosen-Durling* test and replace it with one that allows for the flexibility contemplated by *KSR* while also considering patented and prior art designs *as wholes* in accord with *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (*en banc*). The *Rosen-Durling* test was created with the salutary intention of preventing design patents from being dissected into "features" or "elements" as with utility patents. But in doing so, it unduly restricted the role of obviousness for design patents. APCIA, NAMIC, and CAPA herein propose a test for design obviousness that both achieves the flexibility mandated by *KSR* and *Whitman Saddle* while also avoiding analytic dissection of ornamental designs. It does so by avoiding the

combination/modification methodology of evaluating obviousness for utility patents.

## ARGUMENT

## I.    There is a Strong Need for a Competitive Market in Automotive Repair Parts

American consumers benefit greatly from lower auto repair costs, which in turn decrease insurance premiums. Prior to the development of a competitive repair-parts market, consumers were stuck with the monopolistic price of OEM parts. The availability of competitive repair parts (also known as aftermarket or generic parts) results in lower prices, greater consumer choice, and better quality. Freeing competitive[2] aftermarket repair parts from the shadow of unoriginal design patents on minor year-over-year design tweaks will redound significantly to the benefit of American consumers without stifling real design innovation.

By increasing the overall costs of repairs, the lack of competitive repair parts affects not only the cost of parts but also the decision of

---

[2] While consumers seek replacement parts "that restore the original appearance of their vehicles," the Court has ruled that "aesthetic functionality" does not curtail design patents. *Automotive Body Parts Ass'n v. Ford Global Tech., LLC*, 930 F.3d 1314, 1319 (Fed. Cir. 2019).

whether to repair or replace a damaged car. Higher part costs mean higher repair estimates, and if a repair estimate exceeds the value of a vehicle, it is considered a total loss. As a result, consumers would be harmed by having to both pay higher repair costs and purchase a replacement vehicle.

Furthermore, in the wake of recent supply chain issues, freeing aftermarket parts from unoriginal design patents will give consumers options when facing delays in obtaining parts from OEMs. Removing generic parts from the market through design patenting means consumers would be unable to repair their vehicles promptly.

Finally, while there is never a good time to impose increased costs on consumers, now is a particularly inopportune time. As documented in APCIA's recent white paper, "The New Normal? Auto Insurers Continue to Struggle with Inflation," a number of factors—including litigation trends, increased claim severity, and most notably inflation in insurance claim costs rising much faster than overall inflationary trends—have combined to dramatically increase the cost of repairing automobiles in recent years. APCIA, 7-9, (October 2022), https://www.apci.org/

attachment/static/7023/. Continued enforcement of monopolistic and unoriginal design patents will only exacerbate this trend.

## II.    The *Rosen/Durling* Test Creates an Anti-Competitive Landscape

Design patent filings and issuances have more than doubled in the last 20 years. U.S. Patent Statistics Chart Calendar Years 1963-2020, https://www.uspto.gov/web/offices/ac/ido/oeip/taf/us_stat.htm. Allowance rates for design patents also well exceed those for utility applications. *Id.*; *see also* Mark Bartholomew, Nonobvious Design, 108 Iowa L. Rev. 601, 602 (2023) ("The PTO initially rejects nearly ninety percent of all utility patent applications, yet it approves ninety percent of all design patent applications."), Sarah Burstein, Is Design Patent Examination Too Lax?, 33 Berkeley Tech. L.J. 607, 610 (2018) ("[T]he U.S. Court of Appeals for the Federal Circuit has made it nearly impossible for the USPTO to reject any design patent claim--regardless of how ordinary, banal, or functional the claimed design might be.").

Federal courts also rarely deem a design patent invalid. *See* Tracy-Gene Durkin, Pauline Pelletier, Daniel Gajewski & Deirdre Wells, *Design Patents Prove Successful on Enforcement, Defense*, LAW360 (May 4, 2020, 12:36 PM) (finding that design patents

survive validity challenges in eighty-two percent of federal court cases).[3]

Importantly, the requirement for a primary reference pursuant to *Rosen*

creates a rigid test that is overly difficult to satisfy. Bartholomew, *supra*,

at 608-10.

The combination of easily obtained and difficult-to-challenge design

patents can allow OEMs to extend rights over slight design modifications

as car models evolve slowly year-over-year, resulting in highly crowded

fields of prior art. The *Rosen/Durling* framework is therefore too rigid

and lacks the common sense and flexibility required by *KSR*.

## III.    This Court's Design-Patent Precedents Will Help Clarify the *Rosen-Durling* Test

The court's *en banc* order asked whether any of its precedents have

already taken steps to clarify the *Rosen-Durling* test. Doc. 86 at 3(D). In

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1383 (Fed.

Cir. 2009), the court observed:

> This [*Rosen-Durling*] process, first finding a primary
> reference in the prior art and then modifying it with
> secondary prior art references to demonstrate the claimed
> design's obviousness, may have a tendency to draw the court's
> attention to individual features of a design rather than the
> design's overall appearance. In this respect, it is similar to the

---

[3] https://www.law360.com/articles/1254579/design-patents-prove-successful-on-enforcement-defense [https://perma.cc/8H8S-XGNJ]

"point of novelty" test that until recently was used in the infringement side of design patent law.

This criticism of the *Rosen-Durling* test lights a clarifying path forward for the Court that will reconcile design obviousness with *KSR* and *Egyptian Goddess*.

Core to *Egyptian Goddess* was the abrogation of the point-of-novelty test under which "the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art" for there to be infringement. 543 F.3d at 670. The point-of-novelty test had "proved difficult to apply in cases in which there are several different features that can be argued to be points of novelty in the claimed design." *Id.* at 677. Instead, the Court returned to the "ordinary observer" test of *Gorham Co. v. White*, 81 U.S. 511 (1871), which focused on "whether the accused design has appropriated the claimed design ***as a whole***." *Id.* (emphasis added).

The court quickly adapted *Egyptian Goddess* to design anticipation in *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009). It emphasized the key insight that analytical "focus on minor differences" between designs is inimical to the law of designs. *Id.* However, *Int'l Seaway* still described a dissection methodology in

9

reference to obviousness based in the *Rosen-Durling* methodology. *Id.* (noting that obviousness involved "whether to combine earlier references to arrive at a single piece of art for comparison with the [patented] design or to modify a single prior art reference").

Nonetheless, *Titan Tire*, *Egyptian Goddess* and *Int'l Seaway* underscore the key difference between design patents and utility patents, which is relevant for infringement, anticipation, *and* obviousness. Their insight is that courts must scrupulously avoid a tendency to focus on "features" of a design or on an analytical dissection of elemental differences between designs. Staying true to that insight is what will allow the court to properly modify the test for design-patent obviousness.

## IV.    The Correct Test For Design Patent Obviousness Must Remain Focused on Designs as a Whole

The court's *en banc* order asked: "[i]f the court were to eliminate or modify the *Rosen-Durling* test, what should the test be for evaluating design patent obviousness challenges?" Doc. 86. At 3(C).  These *amici curiae* propose that the test for design patent obviousness should be: whether the differences between the claimed design and prior art designs, all individual designs being considered as a whole as they would be seen by an ordinary observer, are such that the claimed design as a

whole would have been obvious to a person having ordinary skill in the art at the time of the invention. While a design-challenger can identify a specific prior art design as "primary" in the sense of being closest to the claimed design, the proposed obviousness test would not require that its "design characteristics" be "basically the same as the claimed design."

Additionally, the obviousness test should not involve proposed modifications or combinations of features of prior art designs to create new hypothetical designs as described in *Int'l Seaway*, 589 F.3d. at 1240. Rather, the test should remain focused on consideration of one or more prior art references *as individual wholes* as compared to the claimed design *as a whole*. But that is not to say that various features of the designs may not be recognized and described by witnesses, experts, or courts. One may speak about "various features of the claimed design as they relate to…the prior art" without "placing undue emphasis on particular features of the design and risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole." *See Egyptian Goddess*, 543 F.3d at 680.

These *amici curiae*'s proposed obviousness test is supported by the following authority:

1.    It is consistent with the plain text of 35 U.S.C. § 103.

2.    It is consistent with the *Graham v. John Deere Co.*, 383 U.S. 1 (1966) factors. The proposed test involves a determination of the scope and content of the prior art through the identification of prior art designs. The differences between the claimed design and the prior art are assessed, remaining focused on designs as a whole as they would be seen by an ordinary observer. The level of ordinary skill in the art is *then* brought to bear on the analysis in an evaluation of *originality* of the design. And, of course, secondary factors can be considered.

3.    It is consistent with the flexibility mandated by *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). While the *Durling-Rosen* test correctly tried to avoid the pitfalls of piecing together a hypothetical design from individual features in the prior art, it did so in a way that introduced undue rigidity to determinations of obviousness. Under these *amici curiae*'s test, a court would no longer need to find one single prior art design that is "basically the same" as the claimed design. Nor would there be a strict "modification" methodology whereby "certain ornamental features in one [design] would suggest the application of those features to the other." Rather, the court can consider the prior art

*holistically*, and in light of the level of ordinary skill in the art, make a determination regarding the originality of the claimed design. *See also In re Winslow*, 365 F.2d 1017, 1020 (CCPA 1966) (in considering obviousness, "first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him.").

    4.    It is supported by the Supreme Court's approach to design obviousness in *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893). In evaluating the patentability of Whitman's saddle design, the Court framed its analysis around the fact that "there were several hundred styles of saddles or saddletrees belonging to the prior art, and that it was customary for saddlers to vary the shape and appearance of saddletrees in numerous ways, according to the taste and fancy of the purchaser." *Id.* at 681. It thus holistically compared the claimed saddle design against a crowded field of prior art to conclude that Whitman's saddle was not sufficiently original. *See also Egyptian Goddess*, 543 F.3d at 673 (explaining *Whitman Saddle*'s dual holdings in equity on unpatentability and non-infringement).

5.    It is supported by the precedent that the Court cited with approval in *Whitman Saddle*, namely *Northrup v. Adams*, 18 F. Cas. 374, 374 (C.C.E.D. Mich. 1877). That court explained how, while the focus of utility patents is on the novelty of features, the core of design patents is "originality." *Id.* "If a combination of old designs be patentable at all, of which I have some doubt, the combination must be such as to produce a new appearance. If the effect produced be simply the aggregation of familiar designs, it would not be patentable." *Id.* at 375.

6.    It is supported by the precedents of the circuit courts prior to this court's creation. For example, the Second Circuit compared a wedding ring design holistically with a crowded prior art in *Berlinger v. Busch Jewelry Co.*, 48 F.2d 812, 813 (2d Cir. 1931). It rejected the patentee's attempt to dissect individual features against individual prior art references. *See id.* ("A design is not patentable merely because it can be distinguished in appearance from prior designs.").

7.    It is supported by this court's predecessor, which found a design unpatentable based on the combined holistic impact of two prior art references. *See In re Schilling*, 421 F.2d 747, 750 (CCPA 1970) ("When considering the patentability of a design it is the appearance as a whole

which must be considered, and the mere fact that there are differences over the prior art structures is not alone sufficient to justify a holding that the design is patentable."). It did so over a dissent that presaged *Rosen* in decrying the fact that neither one of the two references, standing alone, closely resembled the claimed design. *Id.*

The *Rosen-Durling* test was predicated on the correct instinct to avoid analytic dissection of designs. *Rosen-Durling* just did not go far enough. And in stopping short, *Rosen-Durling* introduced rigidity to obviousness that is inconsistent with *KSR*. The above-proposed test ensures that designs are *always* evaluated as wholes. To determine obviousness, a person of ordinary skill in the art surveys the prior-art design landscape, even if that involves many "styles of saddles" (or styles of automobile fenders) in a crowded field. Was the patented design obvious in view of the prior art? Or does the patented design exhibit true originality? The trier can make that determination in light of the *Graham* factors by focusing on the designs as a whole under *Egyptian Goddess*.

## CONCLUSION

For these reasons, APCIA, NAMIC, and CAPA support LKQ's position and urge the Court *en banc* to align the standards for design patent obviousness with the Supreme Court's decision in *KSR* under the holistic approach to designs endorsed by *Egyptian Goddess*.

Dated: August 28, 2023          Respectfully submitted,

                              */s/ John L. Cordani, Jr.*
                              John L. Cordani, Jr.
                              Benjamin M. Daniels
                              ROBINSON & COLE LLP
                              280 Trumbull St.
                              Hartford, CT 06103
                              (860) 275-8287
                              jcordani@rc.com
                              bdaniels@rc.com

                              Kyle G. Hepner
                              ROBINSON & COLE LLP
                              1201 Pennsylvania Ave. NW Suite 820
                              Washington, DC  20004
                              (771) 213-5605
                              khepner@rc.com

                              *Attorneys for Amici Curiae American Property*
                              *Casualty Insurance Association, National*
                              *Association of Mutual Insurance Companies,*
                              *and the Certified Automotive Parts Association*

# CERTIFICATE OF SERVICE

I hereby certify that service on all parties was made through electronic filing the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the court's electronic-filing system on August 28, 2023 pursuant to Federal Circuit Rule 25(c)(2).


Dated: August 28, 2023                    Respectfully submitted,

                                      */s/ John L. Cordani, Jr.*

                                      John L. Cordani, Jr.
                                      ROBINSON & COLE LLP
                                      280 Trumbull St.
                                      Hartford, CT 06103
                                      (860) 275-8287
                                      jcordani@rc.com


                                      *Attorneys for Amici Curiae American Property Casualty Insurance Association, National Association of Mutual Insurance Companies, and the Certified Automotive Parts Association*

# CERTIFICATE OF COMPLIANCE

Counsel certifies as follows:

1. This brief complies with the type-volume limitations of Federal Circuit Rule 35(g)(3) because this brief contains 2,984 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2. This brief has been prepared with a proportionally-spaced font type with size and spacing that complies with the typeface and style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure.

Dated: August 28, 2023              Respectfully submitted,

*/s/ John L. Cordani, Jr.*

John L. Cordani, Jr.
ROBINSON & COLE LLP
280 Trumbull St.
Hartford, CT 06103
(860) 275-8287
jcordani@rc.com

*Attorneys for Amici Curiae American Property*
*Casualty Insurance Association, National*
*Association of Mutual Insurance Companies,*
*and the Certified Automotive Parts Association*

18