**2021-2348**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**LKQ CORP. & KEYSTONE AUTOMOTIVE INDUSTRIES, INC.**

*Appellants,*

v.

**GM GLOBAL TECHNOLOGY OPERATIONS LLC,**

*Appellee.*

Appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board in PGR2020-00055 (JJ. Ken B. Barrett, Scott A. Daniels, and Robert L. Kinder)

# BRIEF OF *AMICUS CURIAE* AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION IN SUPPORT OF NEITHER PARTY

Salvatore Anastasi, Second Vice President
AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION
BARLEY SNYDER
2 Great Valley Parkway, Suite 110
Malvern, PA 19355
Telephone: (610) 722–3899
sanastasi@barley.com

August 28, 2023

Christopher V. Carani
Dunstan H. Barnes
*Counsel of record*
MCANDREWS, HELD & MALLOY, LTD
500 West Madison Street, Suite 3400
Chicago, Illinois 60661
Telephone: (312) 775–8000
ccarani@mcandrews-ip.com
dbarnes@mcandrews-ip.com

Attorneys for *Amicus Curiae*
AMERICAN INTELLECTUAL PROPERTY LAW ASSOCIATION

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2021-2348

**Short Case Caption** LKQ Corp., et al. v. GM Global Technology Operations LLC

**Filing Party/Entity** American Intellectual Property Law Association

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/28/2023

Signature: /s/ Christopher V. Carani

Name: Christopher V. Carani

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| American Intellectual Property Law Association | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vi

STATEMENT OF INTEREST OF *AMICUS CURIAE* .......... ix

ARGUMENT .......... 1

I. INTRODUCTION .......... 1

II. *KSR* NEITHER OVERRULES NOR ABROGATES EITHER *ROSEN* OR *DURLING* .......... 4

A. *KSR* Calls For A Flexible, Expansive Approach To Obviousness, But Does Not Prohibit Implementation Of A Structured Analytical Framework .......... 4

B. The *Rosen-Durling* Framework Serves A Valuable Role For Assessing Obviousness In The Design Patent Context. .......... 6

C. As Seen In Precedent Of This Court, The *Rosen-Durling* Framework Provides A Flexible And Expansive Approach .......... 12

1. The Primary Reference Inquiry Is Not An *Absolute* Rule, But Rather A *General* Rule Applied With Common Sense Exceptions .......... 13

2. To Serve As A Reasonable Starting Point, The Overall Appearance Of A Primary Reference Need Only Be "*Basically* The Same" As The Overall Appearance Of The Claimed Design, Not "Identical" Or Even "Substantially The Same." .......... 18

3. The Perspective Of A Designer Of Ordinary Skill In The Art Is Applied With Common Sense In Mind And Without Undue Limitations Or Restrictions. .......... 24

III. ELIMINATING THE CURRENT *ROSEN-DURLING* FRAMEWORK WOULD CAUSE UNNECESSARY UNCERTAINTY AND DESTABLIZATION IN A CHALLENGING BUT REASONABLY WELL-FUNCTIONING AREA OF DESIGN PATENT LAW .......... 26

IV. DESIGN PATENTS ARE FUNDAMENTALLY DIFFERENT THAN UTILITY PATENTS AND WARRANT A TAILORED FRAMEWORK FOR ASSESSING OBVIOUSNESS. ....................27

V. CONCLUSION....................31

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS....................33

# TABLE OF AUTHORITIES

## CASES

*Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc.*
853 F.2d 1557 (Fed. Cir. 1988) ....................24

*Campbell Soup Co. v. Gamon Plus, Inc.*
939 F.3d 1335 (Fed. Cir. 2019) .................... 14, 15

*Durling v. Spectrum Furniture Co.*
101 F.3d 100 (Fed. Cir. 1996) .................... passim

*Egyptian Goddess, Inc. v. Swisa, Inc.*
543 F.3d 665 (Fed. Cir. 2008) (*en banc*) .................... 17, 28

*Graham v. John Deere Co.*
383 U.S. 1 (1966).................... 4, 5, 30, 31

*In re Borden*
90 F.3d 1570 (Fed. Cir. 1996) .................... 7, 12, 24

*In re Glavas*
230 F.2d 447 (CCPA 1956) ....................8

*In re Jennings*
182 F.2d 207 (CCPA 1950) ....................9

*In re Nalbandian*
661 F.2d 1214 (CCPA 1981) .................... 1, 2, 22, 25

*In re Rosen*
673 F.2d 388 (CCPA 1982) .................... passim

*Int'l Seaway Trading Corp. v. Walgreens Corp.*
589 F.3d 1233 (Fed. Cir. 2009) ....................19

*Jore Corp. v. Kouvato, Inc.*
117 F. App'x 761 (Fed. Cir. 2005) .................... 22, 23

*KSR Int'l Co. v. Teleflex Inc.*
550 U.S. 398 (2007).................... passim

*LKQ Corp. v. GM Glob. Tech. Operations LLC*
No. 2021-2348, 2023 WL 328228 (Fed. Cir. Jan. 20, 2023)....................31

*MRC Innovations, Inc. v. Hunter Mfg., LLP*
747 F.3d 1326 (Fed. Cir. 2014) .................... passim

*Smith v. Whitman Saddle Co.*
148 U.S. 674 (1893) .......... 15, 16

*Teleflex, Inc. v. KSR Int'l Co.*
119 Fed. App'x 282 (Fed. Cir. 2005) .......... 4

*Teleflex, Inc. v. KSR Int'l Co.*
298 F. Supp. 2d 581 (E.D. Mich. 2003.) .......... 4

*Titan Tire Corp. v. Case New Holland, Inc.*
566 F.3d 1372 (Fed. Cir. 2009) .......... 19, 20

**STATUTES**

35 U.S.C. § 101 .......... 27

35 U.S.C. § 102 .......... 28

35 U.S.C. § 103 .......... passim

35 U.S.C. § 171 .......... 27, 28

**OTHER AUTHORITIES**

DONALD S. CHISUM, 1 CHISUM ON PATENTS
§ 23.03[6] (2023) .......... 30

Gordon Russell, GOOD DESIGN IS NOT A LUXURY (1949), reprinted in
IN GOOD SHAPE: STYLE IN INDUSTRIAL PRODUCTS 1900 TO 1960, 73–74
(Stephen Bayley ed., 1979) .......... 29

Janice Mueller and Daniel Harris Brean, *Overcoming the "Impossible Issue" of Nonobviousness in Design Patents*
99 KY. L.J. 419 (2011) .......... 29

Jason J. Du Mont & Mark D. Janis, *The Origins of American Design Patent Protection*
88 Ind. L.J. 837 (2013) .......... 27

Jason J. Du Mont, *A Non-Obvious Design: Reexamining the Origins of the Design Patent Standard*
45 GONZ. L. REV. 531, 606 (2010) .......... 8, 18

MANUAL FOR PATENT EXAMINING PROCEDURE
1502.01 DISTINCTION BETWEEN DESIGN AND UTILITY PATENTS (9th ed., Rev. Jul. 2022) .......... 27

MANUAL FOR PATENT EXAMINING PROCEDURE
1504.03 NONOBVIOUSNESS (9th ed., Rev. Jul. 2022) .......... 26

Sarah Burstein, *Guest Post: "Design Patent Exceptionalism" Isn't*
PATENTLY-O BLOG (July 6, 2023)
https://patentlyo.com/patent/2023/07/design-patent-exceptionalism.html ........28

Sarah Burstein, *In Defense of Rosen References*
PATENTLY-O BLOG (Dec. 6, 2022)
https://patentlyo.com/patent/2022/12/defense-rosen-references.html............7, 10

Sarah Burstein, *Visual Invention*
16 Lewis & Clark L. Rev. 169 (2012) .................................................... 9, 24, 29

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

The American Intellectual Property Law Association ("AIPLA") is a national bar association representing the interests of approximately 7,000 members engaged in private and corporate practice, government service, and academia. AIPLA's members represent a diverse spectrum of individuals, companies, and institutions involved directly or indirectly in the practice of patent, trade secret, trademark, and copyright law, as well as other fields of law relating to intellectual property. Our members represent both owners and users of intellectual property. AIPLA's mission includes providing courts with objective analyses to promote an intellectual property system that stimulates and rewards invention, creativity, and investment while accommodating the public's interest in healthy competition, reasonable costs, and basic fairness. AIPLA has no stake in either of the parties to this litigation or in the result of this case. AIPLA's only interest is in seeking correct and consistent interpretation of the law as it relates to intellectual property issues. AIPLA is authorized to file its brief consistent with the order granting rehearing *en banc*.[1]

[1] No person, party or party's counsel, other than amicus curiae or its counsel, authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting this brief.

# ARGUMENT

## I. INTRODUCTION

*KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), neither overrules nor abrogates either *In re Rosen*, 673 F.2d 388 (CCPA 1982), or *Durling v. Spectrum Furniture Co.*, 101 F.3d 100 (Fed. Cir. 1996). The existing *Rosen-Durling* framework for assessing non-obviousness in the design patent context complies with *KSR*'s principles by providing an expansive and flexible approach that leaves ample room for factfinders to exercise common sense, logic, and good judgment. As shown by this court's precedent, the *Rosen-Durling* framework has built-in flexibility and expansiveness, including that: (i) the primary reference inquiry is not an *absolute* rule, but rather a *general* rule with common sense in mind; (ii) a viable primary reference need only be "*basically* the same" (not the "same" or "substantially the same") as the overall appearance of the claimed design to provide a *reasonable* starting point for a design patent obviousness analysis; and (iii) the perspective of the designer of ordinary skill in the art is applied with common sense and without undue limitations or restrictions.

Since the adoption of the non-obviousness requirement of 35 U.S.C. § 103 in the 1952 Patent Act, the provision's application to design patents has been a challenging matter. *See In re Nalbandian*, 661 F.2d 1214, 1216 (CCPA 1981) ("In the field of design the analysis is not so easy."). Indeed, in 1981, and after thirty

years of wrestling with the issue, Circuit Judge Rich famously called it the "impossible issue." *Id*. at 1219 (Judge Rich chronicling the legislative history of the adoption of § 103, including the reluctance to have it apply to design patents, and noting with consternation "the impossible issue of obviousness in design patentability cases"). Nonetheless, in 1982, in *Rosen*, Judge Rich and his colleagues pressed on and arrived at a practical, thoughtful, and reliable approach to the difficult issue. The approach is mindful of the fundamental differences between design patents and utility patents and provides a tailored and reasonable approach to the tricky question of what is "obvious," not just merely *possible*, in the design patent context.

With *Rosen's* primary reference inquiry, supplemented in 1996 by *Durling's* "so related" criterion for combining secondary references, the *Rosen-Durling* framework has provided the courts, the United States Patent and Trademark Office (USPTO), and the public a workable framework for assessing obviousness in the design patent context *for over 40 years*. The *Rosen-Durling* framework has been used with relative ease and predictability to assess the patentability of hundreds of thousands of designs patents, many of which are active today. Eliminating or modifying the framework would cause unnecessary uncertainty in an otherwise settled and reasonably well-functioning area of the law. For the reasons discussed herein, AIPLA urges the *en banc* Court to maintain the existing *Rosen-Durling*

framework for assessing compliance with 35 U.S.C. § 103 in the design patent context.

As discussed in detail below, AIPLA responds to the questions posed by the *en banc* court as follows:

**Response to Question A:** *KSR* neither overrules nor abrogates either *Rosen* or *Durling.*

**Response to Question B:** (See Response to Question A.)

**Response to Question C:** (See Response to Question A.)

**Response to Question D:** Precedent from this court shows that the *Rosen-Durling* framework has been applied in a flexible and expansive manner.

**Response to Question E:** Eliminating or modifying the *Rosen-Durling* framework would cause significant uncertainty in a challenging area of design patent law that has operated reasonably well for over 40 years.

**Response to Question F:** Fundamental differences between design patents and utility patents warrant a tailored approach to assessing design patent obviousness.

## II. *KSR* NEITHER OVERRULES NOR ABROGATES EITHER *ROSEN* OR *DURLING*.

### A. *KSR* Calls For A Flexible, Expansive Approach To Obviousness, But Does Not Prohibit Implementation Of A Structured Analytical Framework.

To understand the command of *KSR*, it is important to revisit what was actually at issue in that case. To begin, *KSR* regarded a utility patent (not a design patent) for connecting an adjustable vehicle control pedal to an electronic throttle control. KSR argued that the combination of the two elements was obvious, and the claim was therefore not patentable. The district court had followed *Graham v. John Deere Co*., 383 U.S. 1 (1966), and compared the teachings of the prior art to the asserted utility patent claims and found "little difference." *Teleflex Inc. v. KSR Int'l Co*., 298 F. Supp. 2d 581, 592 (E.D. Mich. 2003). The Federal Circuit reversed, ruling that the district court had not been "strict enough" in applying the prevailing Teaching-Suggestion-Modification ("TSM") test. *Teleflex, Inc. v. KSR Int'l Co*., 119 Fed. App'x 282, 288 (Fed. Cir. 2005). Ultimately, the Supreme Court reversed on the basis that the Federal Circuit had "analyzed the issue in a narrow, rigid manner inconsistent with § 103 and our precedents." *KSR*, 550 U.S. at 428.

While much attention is given to the Court's broad statements "rejecting the rigid approach" of the Federal Circuit and emphasizing that "our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its TSM test here," the Court later in its opinion made clear that "[t]here is

no *necessary inconsistency* between the idea underlying the TSM test and the *Graham* analysis." *Id.* at 415, 419 (emphasis added). The problem, the Court found, was with the Federal Circuit's "*application* of the TSM test." *Id.* at 419 (emphasis added). Indeed, the Court indicated that rules and structured analytical frameworks are not problematic *per se* but rather only become problematic when they "deny factfinders recourse to common sense." *Id.* at 421.

Specifically, the Court held that the Federal Circuit erred in applying the TSM test because: (i) it required that courts look *only* to the problem *the patentee* was trying to solve, thus ignoring that the question of obviousness is not whether the combination was obvious to the patentee, but whether the combination was obvious *to a person of ordinary skill in the art*; (ii) it required that courts could only find obviousness if the prior art was designed *to solve the same problem*, thus ignoring that "familiar items may have obvious uses beyond their *primary* purposes"; (iii) it stated unequivocally that a claim cannot be obvious merely by showing the combination of elements was "obvious to try"; and (iv) it went too far to try to mitigate hindsight bias. *Id.* at 420–21. The Court expressly noted that the Federal Circuit had "since elaborated a broader conception of the TSM test than was applied in the instant matter" that may be more flexible and consistent with *Graham*, but those decisions were not before the Court. *Id.* at 421–22.

Thus, *KSR* rejected only the Federal Circuit's particular *application* of the TSM test, not the use of a structured analytical framework for analyzing obviousness. Moreover, it is worth noting that the Court in *KSR* neither mentioned nor addressed design patents or the *Rosen-Durling* framework. Indeed, the Court criticized the Federal Circuit's approach regarding issues that are unrelated and inapplicable to design patent obviousness, including, what was the "problem to be solved" and whether a modification would have been "obvious to try." Simply put, nothing in *KSR* can be fairly understood to, directly or indirectly, overrule or abrogate the *Rosen-Durling* framework, whose origins at the time of *KSR* had been in place for 15 years.

### B. The *Rosen-Durling* Framework Serves A Valuable Role For Assessing Obviousness In The Design Patent Context.

The *Rosen-Durling* framework begins by looking for "a reference, a something in existence, the design characteristics of which are basically the same as the claimed design." *Rosen*, 673 F.2d at 391. This reference is sometimes referred to as a "primary reference," "basic reference," or "*Rosen* reference." The primary reference looks for a reasonable starting point to begin the analysis and thus need only be *generally* similar in overall appearance compared to that of the claimed design. Using a single *existing* piece of prior art with a generally similar overall appearance avoids the temptation to disassociate and rearrange bits and pieces from the prior art in a (contrived) effort to arrive at the overall claimed design. *See In re*

*Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996) ("A finding of obviousness cannot be based on selecting features from the prior art and assembling them to form an article similar in appearance to the claimed design."). Professor Burstein, a well-known legal scholar in the design patent space, calls this the "Frankenart approach":

> Unmooring the § 103 inquiry from this primary reference requirement would allow challengers to pick and choose visual elements from the prior art to combine into "Frankenart." The Frankenart approach would devolve the § 103 inquiry into whether a designer *technically* could have created the claimed design based on the prior art, as opposed to (the more proper question of) whether it would have been *visually* obvious to do so.

Sarah Burstein, *In Defense of Rosen References*, PATENTLY-O BLOG (Dec. 6, 2022), https://patentlyo.com/patent/2022/12/defense-rosen-references.html. Safeguarding against this temptation is critically important in the design patent context as all designs, no matter how unique, are a composition of pre-existing lines, curves, and surfaces. Hindsight reconstruction is an extreme risk in the design patent context, as recreating a claimed design is a simple task when you have it in hand; there is no need for reverse engineering or experimentation to arrive at the claimed design. Once a designer has seen it, a designer can recreate it. Unlike utility patent claims, design patent claims are not divisible into a preamble and individual claim elements. Indeed, the "all elements" rule from utility patent law does not apply to design patents. Instead, design patents are assessed by looking at the *overall appearance* of the claimed design. To avoid these known pitfalls, the primary reference inquiry

rightly focuses on the obviousness of *the overall appearance of the claimed design*, rather than the obviousness of individual aspects of the claimed design. *See* Jason J. Du Mont, *A Non-Obvious Design: Reexamining the Origins of the Design Patent Standard*, 45 GONZ. L. REV. 531, 606 (2010) (with *Rosen* the Federal Circuit "began employing another tactic aimed at minimizing the severity and subjectivity of § 103 on designs.")

While all aesthetic design elements are in the prior art and all modifications are readily possible, to make a case that a design is rendered obvious, there still needs to be *reasons* shown for why one of ordinary skill the art would have been motivated to have made such aesthetic design modifications. *See In re Glavas*, 230 F.2d 447, 451 (CCPA 1956) (finding that the Board erroneously rejected an application for design patent where the constituent aesthetic features of the claimed design were all found in the prior art, but there was no suggestion in the prior art to combine them.) Practically speaking, in the design patent context, there *rarely* is an obvious reason to make an aesthetic design modification. The chances of there being obvious reasons to make *multiple* aesthetic design modifications *are even slimmer.* Thus, as a prudential rule, and in view of this improbability, the *Rosen* primary reference inquiry looks to see if there is a single prior art design where *most of the aesthetic design choices have in fact been made.* The absence of a primary reference is

compelling evidence that the entire claimed design is non-obvious. As Professor Burstein astutely notes:

> If a new design is so different from other products of its type that no primary reference can be found, that would generally be strong evidence of nonobviousness.

Sarah Burstein, *Visual Invention*, 16 LEWIS & CLARK L. REV. 169, 200 (2012). Such a framework guards against trying to compare a claimed design "with something that *might* be brought into existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature . . . ." *In re Jennings*, 182 F.2d 207, 208 (CCPA 1950) (emphasis added).

Thus, in the design patent context where (i) every aesthetic design modification is possible, (ii) the risk of hindsight reconstruction is very high, and (iii) there rarely is an obvious reason for making an aesthetic design modification let alone multiple aesthetic design modifications, the primary reference inquiry serves the valuable purposes of:

(a) focusing the inquiry on the overall appearance of the claimed design rather than obviousness of individual ornamental aspects;

(b) guarding against "Frankenart" where disassociated bits and pieces from the prior art are cobbled together to arrive at the claimed design; and

(c) identifying compelling (yet rebuttable) evidence of non-obviousness if no primary reference is identified.

In sum, "because it plays such a valuable role in properly focusing the § 103 inquiry, *the primary reference requirement should be retained as a general rule*." Sarah Burstein, *Visual Invention*, 16 LEWIS & CLARK L. REV. 169, 200 (2012) (emphasis added); *see also* Sarah Burstein, *In Defense of Rosen References*, PATENTLY-O BLOG (Dec. 6, 2022) ("[P]roperly and flexibly applied, this general approach makes sense for designs and is consistent with *KSR*.").

The facts of *Rosen* illustrate why the primary reference approach makes good sense. In *Rosen*, a prior art design patent for an ornamental design of a desk (U.S. Patent No. D240,185) disclosed all of the constituent elements of Rosen's claimed design for an ornamental design for a table:

**Asserted Primary Reference**
**D240,185**





**Claimed Design**





With the prior art design elements in hand, and with enough manipulation and rearranging, a designer of ordinary skill in the art undoubtedly *could have arrived* at the claimed design. But the needed aesthetic design modifications were not obvious and would have been substantial, including (i) duplicating the upper semi-circle table top surface, removing the three "V-shaped" notches and then conjoining the resultant two pieces together to make a perfect circle, (ii) then positioning and attaching three notched "V-shaped" legs evenly around, and under, that circular table top, (iii) then eliminating the side apron and instead leaving the entire outer edge of the circular table top exposed, and (iv) lastly converting the notched opaque semi-circular table top surface of the prior art with an unnotched edge-to-edge transparent circular table top that rested on top of the "V-shaped" legs. The *Rosen* court concluded that making all those aesthetic design modifications would be a bridge too far:

> The modifications of Rosen [desk] necessary to achieve appellant's table design would destroy fundamental characteristics of the Rosen [desk] design.

*Id.* at 391. Despite the fact that the constituent aesthetic design elements were all present in the prior art, it simply defied probability that a designer, unprompted, would have strung together all of those aesthetic design modifications. Thus as a practical matter the *Rosen* court looked first to see if there was a basic reference that had, *in fact,* already made the majority of those design choices; the *Rosen* court looked for a *reasonable* starting point - a reference that was "basically the same" in

overall visual appearance (*i.e.*, generally similar in appearance). The *Rosen* court took a common sense approach and wisely used the absence of any reference that was even “basically the same” as compelling (albeit rebuttable) evidence that the claimed design was not obvious.

Assuming a primary reference has been identified, *Durling* then provides guidance on when it is appropriate to make aesthetic design modifications. Like *Rosen*, *Durling* recognizes the reality that while all aesthetic design modifications are *possible*, few would have been obvious to a designer of ordinary skill in the art at the time. *Durling* permits modifications when the secondary reference is “‘so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.’” *Durling*, 101 F. 3d. at 103 (quoting *Borden*, 90 F.3d at 1574). This approach is again rooted in pragmatism and serves as a proxy for ensuring that there was *some aesthetic reason* to make *aesthetic design modifications* (other than just to arrive at the claimed design in a hindsight-based obviousness analysis).

### C. As Seen In Precedent Of This Court, The *Rosen-Durling* Framework Provides A Flexible And Expansive Approach.

While providing courts, the USPTO, practitioners, and the public with a structured analytical framework with guideposts for assessing the challenging issue of design patent obviousness, the *Rosen-Durling* framework has built-in flexibility

and expansiveness to ensure that factfinders are not denied "recourse to common sense."

As seen in precedent from this court, the *Rosen-Durling* framework has been applied in a manner that ensures this flexibility and expansiveness, including that (i) the primary reference inquiry is not an *absolute* rule, but rather a *general* rule with common sense exceptions, (ii) a viable primary reference need only be "*basically* the same" (not the "same" or "substantially the same") as the overall appearance of the claimed design to provide a reasonable starting point for a design patent obviousness analysis, and (iii) the perspective of a designer of ordinary skill in the art is applied with common sense and without undue limitations or restriction. As discussed in more detail below, ensuring that these well-established principles are adhered to secures proper application of the *Rosen-Durling* framework going forward.

### 1. The Primary Reference Inquiry Is Not An *Absolute* Rule, But Rather A *General* Rule Applied With Common Sense Exceptions.

The *Rosen* primary reference inquiry provides a useful starting point that should be employed as a *general* rule; it is not, and must not be rigidly applied as, an *absolute* rule. While the absence of any prior art reference for the type of article of manufacture that looks even "basically the same" is compelling evidence that a design would not have been obvious, the challenger can still rebut this evidence by

making a showing that there are nonetheless exceptional circumstances as to why the design is rendered obvious. Here again, the framework permits, and must be applied in a manner to accommodate, common sense exceptions. Examples can be seen in cases decided both before and after *Rosen*. For example, a common sense exception may apply when there is nothing more required than combining two known components that have been specifically designed to be assembled together in a typical manner. *See KSR*, 550 U.S. at 405 ("[T]he simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement.").

A case showing a common sense exception to the primary reference inquiry is *Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335 (Fed. Cir. 2019). There, the Federal Circuit reviewed a determination of non-obviousness made by the Patent Trial and Appeal Board, which held that an asserted reference (Linz) was not a proper primary reference under *Rosen* because Linz did not show a cylindrical can, which was one of the few claimed aspects claimed in U.S. Patent No. D612,646.

**Asserted Prior Art**
**Can Dispenser (Linz)**




**D612,646**
**Gravity feed dispenser display**




The Federal Circuit reversed, holding that Linz was indeed "basically the same" as the claimed design even though it did not show a cylindrical can. The Federal Circuit correctly refused to rigidly apply the primary reference inquiry and instead employed common sense. The court noted that Linz was a *can dispenser*, and thus even if no cylindrical can was shown in the drawings of Linz, it was reasonable to infer (and visually insert) a cylindrical can. *Id.* at 1340–41 (Fed. Cir. 2019).

This common sense application is also consistent with prior Supreme Court design patent decisions. In *Smith v. Whitman Saddle Co.*, 148 U.S. 674, 681 (1893) , the Supreme Court found that an otherwise novel saddle design would not warrant design patent protection where the novel saddle design was merely a combination of the rear half of one prior art saddle (the "Jennifer-McClellan") and the front half of another prior art saddle (the "Granger Tree").

**<u>D10,844</u>**
**(Whitman) "Saddle"**

**Rear half from Prior Art**
**"Jennifer-McClellan" Saddle**

**Front half from Prior Art**
**"Granger Tree" Saddle**




The Court concluded: "Nothing more was done in this instance . . . than to put the two halves of these saddles together in the exercise of the ordinary skill of workmen of the trade, and in the way and manner ordinarily done." *Id.* The evidence showed that all that was required to arrive at the Whitman saddle was to put together two known prior art saddle halves in a known way that was ordinarily done for aesthetic reasons. Even if neither the Jennifer-McClellan nor Granger Tree saddles would have been considered a "primary reference," this type of "assembly" of two

component parts *that are normally assembled together* would be a common sense exception to the *Rosen* primary reference inquiry.

It is worth noting that this flexible "general rule" approach is similar to the approach the Federal Circuit took in *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (*en banc*), with respect to claim construction. There, the *en banc* court did not outright prohibit verbalizations of design patent claims during claim construction. Instead, it left room for exceptions and held that as a "*general matter*" verbalizations of design patent claims should not be performed by district courts.

> We therefore leave the question of verbal characterization of the claimed designs to the discretion of trial judges, *with the proviso that as a general matter, those courts should not treat the process of claim construction as requiring a detailed verbal description of the claimed design, as would typically be true in the case of utility patents.*

*Id.* at 680 (emphasis added). *Egyptian Goddess'* general rule for design patent claim construction has been in place for nearly fifteen years, and the approach has worked well. With both claim construction and obviousness, the Federal Circuit has avoided absolute rules and instead wisely laid down *general rules* that accommodate common sense. Given the broad spectrum of design patent subject matter, this approach is prudent as it provides flexibility and expansiveness.

### 2. To Serve As A Reasonable Starting Point, The Overall Appearance Of A Primary Reference Need Only Be "*Basically* The Same" As The Overall Appearance Of The Claimed Design, Not "Identical" Or Even "Substantially The Same."

As noted above, the *Rosen-Durling* framework merely looks for a primary reference that is "*basically* the same" in overall appearance as the claimed design to provide a reasonable starting point for the analysis. *Rosen*, 673 F.2d at 391 (emphasis added). To ensure that the primary reference inquiry does not drift into a rigid, nonsensical rule, the modifier "*basically*" must be given effect. "Basically the same" means "generally" or "roughly" similar in appearance. The appearance should be similar enough to create basically the same visual impression.[2] What "basically the same" means will vary depending on the specific design and type of article of manufacture at issue. As noted above, the spirit of the primary reference inquiry is to guard against contrived and improbable combinations that belie common sense in the design patent context. The reference need only be close enough that it can serve as a logical and reasonable starting point to serve this purpose. Importantly, "basically the same" does not mean "the same" or even "substantially the same;" for

---

[2] *See* Jason J. Du Mont, *A Non-Obvious Design: Reexamining the Origins of the Design Patent Standard*, 45 GONZ. L. REV. 531, 608 (2010) ("The Federal Circuit has provided some sign posts for determining when the reference is not basically the same, such as: (1) where the reference needs a major modification to make it look like the claimed design; and (2) where the court must revert to a design concept, instead of the visual appearance as a whole to find the references basically the same.").

if it did, the prior art reference would be anticipating and there would be no need to resort to an obviousness analysis. *See Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1240 (Fed. Cir. 2009) (holding that the "substantially the same" standard used for design patent infringement should also be used for determining design patent anticipation). Put differently, there must be daylight between the standards "basically the same" and "substantially the same."

To provide context as to the level of similarity that suffices to meet the "basically the same" standard, it is instructive to review cases where the standard has been applied. For example, in *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1374 (Fed. Cir. 2009) , the design patent at issue, U.S. Patent No. D360,862, claimed the ornamental appearance for a tractor tire. At the district court, and in response to plaintiffs' motion for preliminary injunction, defendant argued that plaintiffs were not likely to prevail on the merits because the asserted design patent was obvious in view of the prior art. The district denied the motion and plaintiffs appealed. On appeal, plaintiffs-appellants argued that the district court erred in its obviousness analysis as there was not a proper primary reference. The plaintiffs-appellants pointed out several noticeable visual differences between the claimed design and the three proffered primary references.

**Asserted Primary References** **Asserted Patent**

**5,188,563**




**5,337,814**



**Maxi-Trac**



**D360,862**



Notwithstanding these differences, the Federal Circuit held that *any of the three asserted prior art references* could serve as a primary reference for the design patent obviousness inquiry:

> *The trial court would have been entitled to consider any one of these references to be a primary reference.* Each of these references, in particular the ’683 patent and the Ram Maxi-Trac . . . has design characteristics that are basically the same as those of Titan’s patented design, a tire tread with interlocking lugs having two bent rib portions that extend diagonally in the same direction of travel toward the tire’s centerline and culminate in enlarged, multi-sided lug heads that are closely spaced and extend slightly over the centerline.

*Id. at* 1381 (emphasis added). Thus, the Federal Circuit rejected an exacting approach in applying the primary reference inquiry, instead holding that the primary reference need only be close enough that it can serve as a logical and reasonable starting point for an obviousness analysis.

Another example of how the framework is applied is seen in *MRC Innovations v. Hunter Mfg., LLP*, 747 F.3d 1326 (Fed. Cir. 2014). In *MRC*, the Federal Circuit

held that an asserted primary reference, the "Eagles Pet Jersey," was "basically the same" in overall appearance as the claimed design of U.S. Patent No. D634,488. The Federal Circuit pointed out three visual differences, which the district court had deemed "major differences":

> [T]here are three differences: (1) the patented design has a V-neck collar where the Eagles jersey has a round neck; (2) the patented design contains an interlock fabric panel on the side portion of the design rather than mesh; and (3) the patented design contains additional ornamental surge stitching on the rear portion of the jersey.

*Id*. at 1332.

**<u>Asserted Primary Reference</u>**
**Prior Art Eagles Pet Jersey**




**<u>Asserted Patent</u>**
**D643,488**




Notwithstanding these readily apparent visual differences, the Federal Circuit concluded that the Eagles Pet Jersey was a primary reference.

> Nor did the district court err in finding that the design characteristics of the '488 design created "basically the same" overall visual impression as the Eagles jersey prior art reference. As the district court noted, both designs contain the same overall shape, similar fabric, and ornamental surge stitching.

*Id.* at 1332-33. Signaling that even less visual similarity would suffice, the Federal Circuit pointed to other prior cases, namely *Jore v. Kouvato* and *In re Nalbandian*:

> Indeed, we have permitted prior art designs to serve as "primary references" when their differences are as great or greater than the differences in this case. *See Jore Corp. v. Kouvato, Inc.*, 117 F. App'x 761, 763 (Fed. Cir. 2005) (finding prior art drill bit to be a primary reference despite containing a smooth cylindrical shaft rather than the grooved hexagonal shaft of the claimed design); *In re Nalbandian*, 661 F.2d 1214, 1217-18 (CCPA 1981) (finding tweezer design obvious in light of prior art reference that contained vertical rather than horizontal fluting and straight rather than curved pincers).

*Id*. at 1333.

As for *Nalbandian*, below is a visual comparison of the asserted primary reference and the claimed design. Both were directed at illuminable tweezers. Despite the readily apparent visual differences, they did not serve as a bar to a finding of obviousness. *Nalbandian*, 661 F.2d at 1217.

| **<u>Asserted Primary Reference</u>**<br>**D175,259 (Johnson)** | **<u>Claimed Design</u>**<br>**Appl. No. 792,482** |
|---|---|
|  |  |

As for *Jore,* below is a visual comparison of the asserted primary reference and the claimed design. Both were directed at reduced shank drill bits. The asserted

design patent, U.S. Patent No. D419,575, specifically claimed, among other things, a hexagonal shank with a circumferential groove. The asserted primary reference, the Triumph Prior Art Bit, had neither of those design elements. Instead, the Triumph bit had a cylindrical shaft without any groove. *Jore*, 117 F. App'x at 763. Despite being readily apparent visual differences, they did not serve as a bar to a finding of obviousness.

| **Asserted Primary Reference (Triumph Prior Art Bit)** | **Asserted Patent D419,575** |
| --- | --- |
|  |  |

As shown through prior decisions of this court, giving effect to the word "basically" in the standard "basically the same" when identifying a primary reference ensures that the *Rosen-Durling* framework is applied in a flexible and expansive manner. Even though the identified primary references had notable visual differences, each gave the *similar overall impression*, and thus could serve as a starting point for a design patent obviousness analysis. Of course, the more aesthetic design modification that are needed to arrive at the claimed design, the more difficult it typically will be for a challenger to establish its case for obviousness. Thus, the challenger has the prerogative to find the visually closest piece of prior art.

### 3. The Perspective Of A Designer Of Ordinary Skill In The Art Is Applied With Common Sense In Mind And Without Undue Limitations Or Restrictions.

"The central inquiry in analyzing an ornamental design for obviousness is whether the design would have been obvious to 'a designer of ordinary skill who designs articles of the type involved.'" *Borden*, 90 F.3d at 1574 (Fed. Cir. 1996) (citing *Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1564 (Fed. Cir. 1988). This hypothetical designer of ordinary skill in the art is a designer of "ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421. The designer of ordinary skill in the art is assumed to be able to make obvious and routine modifications to a design, such as changing the overall color or material of the design, scaling the whole design up or down, or changing the orientation of a design. *See* Sarah Burstein, *Visual Invention*, 16 LEWIS & CLARK L. REV. 169, 272 (2012) (noting that such changes are "very basic changes that require minimal aesthetic conception; therefore, they should be considered within the realm of ordinary creativity.").

A good example of this is *MRC*. There, the Federal Circuit affirmed the district court's finding that "adding ornamental surge stitching on top of a preexisting seam was an insubstantial change that would have been obvious to a skilled designer." *MRC*, 747 F.3d at 1335. The Federal Circuit further noted that the added surge stitching "merely followed the visual lines created by the seams of the

V2 jersey; in other words, it served only to highlight a design feature that had already existed in the V2 prior art jersey." *Id.* at 1335, n.6. This was a common sense approach to how a designer of ordinary skill would have viewed and approached the design.

The CCPA also applied a common sense approach in *In re Nalbandian*. In *Nalbandian*, the CCPA held that it was "well within the skill of an ordinary designer in the art to make the modification of the fluting and that it would have been obvious to do so" where the only visual differences between a claimed illuminable tweezer and a prior art illuminable tweezer were "finger grips of a slightly different shape" and "straight, rather than slightly curved pincers." *Nalbandian*, 661 F.2d at 1217–18. When employing the breadth of knowledge of a designer of ordinary skill in the art, routine change and "common knowledge in the art" should be fully countenanced. *See In re Nalbandian*, 661 F.2d at 1216.

Because the design patent obviousness analysis is performed in view of, and without undue restriction or limitation on, the skill set of the hypothetical ordinary designer in the relevant field, there is inherent flexibility in the obviousness analysis. Indeed, common sense modifications and routine changes must fall within the realm of ordinary creativity of a hypothetical ordinary designer. Vigilance to this principle ensures proper application of *Rosen-Durling* framework going forward.

## III. ELIMINATING THE CURRENT *ROSEN-DURLING* FRAMEWORK WOULD CAUSE UNNECESSARY UNCERTAINTY AND DESTABLIZATION IN A CHALLENGING BUT REASONABLY WELL- FUNCTIONING AREA OF DESIGN PATENT LAW.

*Rosen* was decided in 1982; *Durling* was decided in 1996. For decades, courts, the USPTO and the public have come to rely on the *Rosen-Durling* framework to assess compliance with the non-obviousness requirement in the design patent context. During this time, a considerable body of design patent jurisprudence has developed, which provides needed guidance in this known challenging area of patent law. The USPTO has developed a set of examination procedures built upon the *Rosen-Durling* framework. *See, e.g.*, MANUAL FOR PATENT EXAMINING PROCEDURE, 1504.03 NONOBVIOUSNESS (9th ed., Rev. Jul. 2022). Further, *Rosen* has peacefully coexisted with *KSR* for the past 15 years. Given the significant challenges with applying "obviousness" in the design patent context, the *Rosen-Durling* framework has been a success. Eliminating this framework now carries great risk, including exposing up to 400,000 U.S, design patents to substantial uncertainty, upsetting settled expectations for applicants before the USPTO and the public at large, and raising unnecessary hurdles to obtaining design patent protection for meritorious designs.

## IV. DESIGN PATENTS ARE FUNDAMENTALLY DIFFERENT THAN UTILITY PATENTS AND WARRANT A TAILORED FRAMEWORK FOR ASSESSING OBVIOUSNESS.

Design patents fundamentally differ from utility patents and warrant certain approaches and frameworks tailored to those differences. "In general terms, a 'utility patent' protects the way an article is used and works (35 U.S.C. 101), while a 'design patent' protects the way an article looks (35 U.S.C. 171)." MANUAL FOR PATENT EXAMINING PROCEDURE, 1502.01 DISTINCTION BETWEEN DESIGN AND UTILITY PATENTS. While the Patent Act includes an incorporation clause in 35 U.S.C. § 171, such that all statutory provisions of the Patent Act apply equally to design patents unless otherwise noted, *the application of those statutory provisions to design patents* has diverged consistently from utility patents in many significant ways. *See* Jason J. Du Mont & Mark D. Janis, *The Origins of American Design Patent Protection*, 88 IND. L.J. 837, 874 (2013) (discussing fundamental differences between design patents and utility patents including the very manner in which they are claimed). Given the fundamentally different nature of each right and how they are claimed, the courts have necessarily adopted different guidelines for obviousness (as well as for infringement, novelty, written description, and enablement).

> Design patents cover different things (ornamental designs as opposed to useful inventions). They are claimed differently (using central as opposed to peripheral claiming). They are fundamentally different types of patents. General principles may be transferrable but the actual tests are generally not.

> Consider novelty. Section 102 says a patentable invention must be novel. Section 171(b) says that this requirement of novelty applies to designs. But that doesn't mean that the judicially-created tests for determining when a useful invention is novel also must be used to determine when a design is novel.

Sarah Burstein, *Guest Post: "Design Patent Exceptionalism" Isn't*, PATENTLY-O BLOG (July 6, 2023), https://patentlyo.com/patent/2023/07/design-patent-exceptionalism.html. In other words, even though Section 103 applies equally to both utility and design patents, it does not follow that the obviousness analysis for utility and design patents must proceed in exactly the same way.

Indeed, requiring identical obviousness analyses for utility and design patents *would run counter to KSR*, which emphasizes a "flexible" approach precisely to take into account that what may be obvious for one type of invention may be different for another. By comparison, cases like *Egyptian Goddess* (involving design patent claim construction) lead from *Markman* but then suggest things like separating ornamental and functional components, or explaining drafting symbols—both of which would be completely nonsensical as applied to utility patents. *See Egyptian Goddess*, 543 F.3d at 679. Likewise, well-known utility obviousness concepts like "obvious to try" and "likelihood of success" have amorphous or no meaning within the context of design. Even the question under Section 103 for design patents is different than utility patents in that obviousness is assessed from the perspective of "a *designer* of

ordinary skill who designs articles of the type involved" (rather than a person of ordinary skill in the art or a "skilled artisan"). *See Durling*, 101 F.3d at 103.

More specifically, unlike the assessment of obviousness in the utility patent context, the design patent obviousness analysis is not guided by the "problem to be solved" or "predictable results." These concepts from *KSR* have no meaningful or logical application to the design patent obviousness inquiry. *See* Janice Mueller & Daniel Harris Brean, *Overcoming the "Impossible Issue" of Nonobviousness in Design Patents*, 99 KY. L.J. 419, 544 (2011) ("Designers' choices are essentially artistic, unlike the functional motivations facing inventors of utility inventions, to whom the word 'obvious' has meaning."). Rather, the aesthetic design process is much more open-ended, where the designer has almost endless *possible* individual aesthetic choices for all aspects of the design (*e.g.*, curved or straight, convex or concave, long or short, narrow or wide). *See* Sarah Burstein, *Visual Invention*, 16 LEWIS & CLARK L. REV. 169, 200 (2012) ("[T]he designer's problem is still a fairly open-ended one, with many possible—and few obvious—solutions."); *see also* Gordon Russell, GOOD DESIGN IS NOT A LUXURY (1949), reprinted in IN GOOD SHAPE: STYLE IN INDUSTRIAL PRODUCTS 1900 TO 1960, 73–74 (Stephen Bayley ed., 1979) ("To any design problem there are many possible solutions; there is no one perfect solution, and sometimes, as in the design of a flower vase, there are hundreds or even thousands of shapes which would do the job."); *see also* DONALD S. CHISUM,

1 CHISUM ON PATENTS § 23.03[6] (2023) (stating that the designer's problem is "more open-ended" than that of a technical inventor).

Thus, while there are many possible design choices, very few can be said to be "obvious." Instead, the selection, coordination and arrangement of aesthetic design elements *is the very act of design*. Even though each individual aesthetic design choice may have been possible at the time of creation, and well within the skill set of a designer of ordinary skill in the art, design patents protect the overall appearance of *the combination* of those individual choices. By seeking a primary reference, the *Rosen-Durling* framework smartly focuses the obviousness analysis on the *overall appearance*, rather than the obviousness of each those possible individual design choices. The *Rosen-Durling* framework recognizes that rarely is there an "obvious" motivation to make a design choice, let alone a series of design choices.

Because design patents, by definition, are focused on the novelty or non-obviousness of the overall appearance of something (*i.e.*, the visual impression created by the patented design as a whole), an obviousness analysis consistent with the *Graham* framework necessarily involves comparing the claimed design "with something in existence," *i.e.*, with something that can provide an overall visual impression for comparison. Judge Lourie correctly noted that the analysis "has to start from somewhere." *LKQ Corp. v. GM Glob. Tech. Operations LLC*, No. 2021-

2348, 2023 WL 328228, at *8 (Fed. Cir. Jan. 20, 2023) (Lourie, J., concurring). Once you have that "something" that actually exists, *Rosen* then says you need to see whether the overall visual impression of that something is "basically the same as" the claimed design. This is analogous to the *Graham* test and Section 103 language that the "differences" between the prior art and the claimed invention "as a whole" must be "obvious," or the *KSR* finding that there was "little difference" between the teachings of the prior art and the patent claims.

## V. CONCLUSION

For the reasons discussed herein, AIPLA respectfully submits that (1) *KSR* did not overrule or abrogate either *Rosen* or *Durling*; (2) when the "basically the same" and "so related" criteria are properly applied, the *Rosen-Durling* framework avoids a "narrow conception" of obviousness and allows for an expansive and flexible approach consistent with the principles of *KSR*; and (3) eliminating the *Rosen-Durling* framework would cause unnecessary uncertainty in an area of design patent law that has worked reasonably well for over 40 years.

August 28, 2023

Respectfully submitted,

Salvatore Anastasi, Second Vice President
AMERICAN INTELLECTUAL PROPERTY
LAW ASSOCIATION
BARLEY SNYDER
2 Great Valley Parkway, Suite 110
Malvern, PA 19355
Telephone: (610) 722–3899
sanastasi@barley.com

Christopher V. Carani
Dunstan H. Barnes
*Counsel of record*
MCANDREWS, HELD & MALLOY, LTD
500 West Madison Street, Suite 3400
Chicago, Illinois 60661
Telephone: (312) 775–8000
ccarani@mcandrews-ip.com
dbarnes@mcandrews-ip.com

Attorneys for *Amicus Curiae*
AMERICAN INTELLECTUAL PROPERTY
LAW ASSOCIATION

FORM 19. Certificate of Compliance with Type-Volume Limitations

Form 19
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2021-2348

**Short Case Caption:** LKQ Corp., et al. v. GM Global Technology Operations LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 6,962 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ______ lines of text.
- [ ] the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 08/28/2023

Signature: /s/ Christopher V. Carani

Name: Christopher V. Carani