IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LKQ CORPORATION, KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,
*Appellants,*

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,
*Appellee,*

_____

No. 2021-2348

_____

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFIC, PATENT TRIAL AND APPEAL BOARD IN IPR202-00534.

_____

**BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
ON REHEARING *EN BANC* IN SUPPORT OF NEITHER PARTY**

_____

Of Counsel:

Melissa N. Patterson
Brian J. Springer
 *Attorneys, Appellate Staff*

Civil Division, Room 7537
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 616-5446


August 28, 2023

Thomas W. Krause
 *Solicitor*
William La Marca
 *Special Counsel for IP Litigation*
Brian Racilla
 *Associate Solicitor*

Office of the Solicitor
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035
*Attorneys for the Director of the
United States Patent and Trademark Office*

# **TABLE OF CONTENTS**

I.    INTEREST OF THE UNITED STATES...……………………………… 1

II.   STATEMENT OF THE CASE...…………………………………… 2

    A.    Background…………………………………………………... 3

        1.  Legal Background…………………………………………... 3

        2.  The underlying IPR proceeding………………………………. 7

        3.  This Court's panel decision affirming the Board………………… 9

III.  SUMMARY OF THE ARGUMENT……………………………... 11

IV.   ARGUMENT………………………………….……………………… 13

    A.    The Supreme Court's Expansive and Flexible Approach to § 103 Provides a Foundation for the Proper Obviousness Analysis for Design Patents…………………………………………………... 14

    B.    While the *Rosen-Durling* Test Protects Against Hindsight, Its Rigid Application Runs Counter to an Appropriately Expansive and Flexible Obviousness Inquiry…………………………………... 18

        1.  *Rosen's* articulation of the "basically the same" test was to broadly protect against improper use of hindsight………………………. 19

        2.  The *Rosen-Durling* test runs counter to the Supreme Court's expansive and flexible approach to § 103……………………….. 22

    C.    The Court Should Modify the *Rosen-Durling* Test to Ensure Its Consistency With the Supreme Court's Guidance Regarding § 103….. 26

    D.    Policy Considerations Support the Retention of the Rosen-Durling Framework, but the Court's Clarification Is Necessary To Ensure Its Application Consistent With Supreme Court Precedent……………... 29

V.    CONCLUSION…..……………………………………………………… 32

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Borden,*
    90 F.3d 1570 (Fed. Cir. 1996)....................................................... 4, 15, 21

*Campbell Soup Co. v. Gamon Plus, Inc.,*
    10 F.4th 1268 (Fed. Cir. 2021) ..............................................15, 22, 24, 28

*Campbell Soup Co. v. Gamon Plus, Inc.,*
    939 F.3d 1335 (Fed. Cir. 2019) ................................................................ 16

*In re Cho,*
    813 F.2d 378 (Fed. Cir. 1987).................................................................. 25

*Durling v. Spectrum Furniture Co., Inc.,*
    101 F.3d 100 (Fed. Cir. 1996)..........................................................*passim*

*Gorham Co. v White,*
    81 U.S. 511 (1871) ................................................................................... 29

*Graham v John Deere Co.,*
    383 U.S. 1 (1966) ............................................................................*passim*

*In re Jennings,*
    182 F.2d 207 (C.C.P.A. 1950)............................................................19, 20

*In re Kahn,*
    441 F.3d 977 (Fed. Cir. 2006) ................................................................... 5

*KSR Int'l Co. v Teleflex, Inc.,*
    550 U.S. 398 (2007)..........................................................................*passim*

*LKQ Corp. v. GM Global Technology Operations LLC,*
    2023 WL 328228 (Fed. Cir. Jan. 20, 2023) .................................. 2, 9, 10, 11

*Mintz v. Dietz & Watson, Inc.,*
    679 F.3d 1372 (Fed. Cir. 2012) ............................................................... 28

*MRC Innovations, Inc. v. Hunter Mfg., LLP,*
    747 F.3d 1326 (Fed. Cir. 2014) ........................................................ 16, 22, 29

*Randall Mfg. v. Rea,*
    733 F.3d 1355 (Fed. Cir. 2013) ........................................................ 18

*In re Rosen,*
    673 F.2d 388 (C.C.P.A. 1982) ........................................................ *passim*

*Samsung Elecs. Co. v. Apple Inc.,*
    580 U.S. 53 (2016) ........................................................ 4, 25

*In re Schnell,*
    46 F.2d 203 (C.C.P.A. 1931) ........................................................ 4

*Smith v. Whitman Saddle Co.,*
    148 U.S. 674 (1893) ........................................................ 2, 23, 24

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) ........................................................ 13

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997) ........................................................ 13

*Stone Container Corp. v. United States,*
    229 F.3d 1345 (Fed. Cir. 2000) ........................................................ 24

*Titan Tire Corp. v. Case New Holland, Inc.,*
    566 F.3d 1372 (Fed. Cir. 2009) ........................................................ 16

*Troy v. Samson Mfg. Corp.,*
    758 F.3d 1322 (Fed. Cir. 2014) ........................................................ 13

**Statutes**

35 U.S.C. §§ 1, 2 (2006) ........................................................ 1

35 U.S.C. § 103 ........................................................ *passim*

35 U.S.C. §§ 103 and 171(b) ........................................................ 2

35 U.S.C. § 171(a) ................................................................................ 3

35 U.S.C. § 171(b) ............................................................................4, 15

Patent Act ......................................................................................4, 23

Patent Act of 1842, § 3, 5 Stat. 543, 543-44 ...................................... 3

U.S. Code Title 35 ...........................................................................3, 4

**Other Authorities**

37 C.F.R. § 1.153(a) ............................................................................ 4

MPEP § 1504.03(I) ........................................................................... 15

Rebecca S. Eisenberg, *Obvious to Whom? Evaluating Inventions from the Perspective of PHOSITA*, Berkeley Tech. L. J. 19(3):885-906 (2004) ....................... 17

USPTO 2022-2026 Strategic Plan, Objectives 2.1 and 4 available at https://www.uspto.gov/sites/default/files/documents/USPTO_2022-2026_Strategic_Plan.pdf (last accessed Aug. 22, 2023) ..................................... 1

iv

## I.    INTEREST OF THE UNITED STATES

The United States respectfully submits this *amicus* brief in response to the Court's invitation.  The United States Patent and Trademark Office (USPTO) is the executive-branch agency responsible for examining patent applications, issuing patents, conducting post-issuance review of patents, and through the Department of Commerce (DOC), advising the President on domestic and international issues of intellectual property policy.  *See* 35 U.S.C. §§ 1, 2 (2006).  In furtherance of its Constitutional mandate, the USPTO works to "issue and maintain robust and reliable patents that incentivize and protect innovation" and that can be used as a tool to "bring innovation to impact for the public good."[1]  Over the past decade, the USPTO has received increasing numbers of design patent applications, illustrating the increasingly prominent role designs play in our economy.  Presently, the USPTO receives approximately 50,000 design patent applications a year.  Design protection not only allows companies to differentiate their offerings, but can also guard against knock-off goods that erode our economy.  The U.S. Government has an interest in a standard for obviousness that (i) incentivizes initial innovation, as well as the public disclosures that facilitate follow-on innovation, (ii) results in a robust and

---

[1] See USPTO 2022-2026 Strategic Plan, Objectives 2.1 and 4 available at https://www.uspto.gov/sites/default/files/documents/USPTO_2022-2026_Strategic_Plan.pdf (last accessed Aug. 22, 2023).

reliable patent right that can be used to attract the investment needed to bring innovations to market, (iii) fosters competition, and (iv) can be equitably and consistently applied by patent examiners, the USPTO's Central Reexamination Unit and Patent Trial and Appeal Board (PTAB), and the courts.

## II.    STATEMENT OF THE CASE

This matter arises from an appeal to this Court from *inter partes* review proceeding no. IPR2020-00534 regarding U.S. design patent no. D797,625.  After the panel issued its decision, *LKQ Corp. v. GM Global Technology Operations LLC*, 2023 WL 328228 (Fed. Cir. Jan. 20, 2023), LKQ petitioned for rehearing *en banc*.  LKQ asserted that the obviousness test for design patents established in *In re Rosen,* 673 F.2d 388 (C.C.P.A. 1982), and *Durling v. Spectrum Furniture Co., Inc.,* 101 F.3d 100 (Fed. Cir. 1996) – the test applied by the Board in this case – is contrary to the statutory language of 35 U.S.C. §§ 103 and 171(b), and Supreme Court precedent including  *KSR Int'l Co. v Teleflex, Inc.*, 550 U.S. 398 (2007), *Graham v John Deere Co.*, 383 U.S. 1 (1966), and *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893).  The Court vacated the panel opinion, granted rehearing *en banc*, and invited the United States to participate as amicus curiae.  ECF No. 86 (No. 21-2348).

The Court's order lists six questions regarding what effect, if any, *KSR* has on *Rosen* and *Durling* and whether the Court should eliminate or modify the *Rosen-Durling*

test. *Id.* The key issues are how *KSR* should be applied to design patents and to what extent *KSR* requires that the *Rosen-Durling* test be clarified and/or modified. For the reasons articulated below, the United States urges the Court to clarify that the *Rosen-Durling* test should be modified to better accord with the principles underlying the *KSR* decision's discussion of § 103. Such a modification would return to the first principles of obviousness articulated in *Rosen* and *Durling*, flow from the application of *KSR* to the design patent context, and advance the USPTO's mission by articulating an approach that could be equitably and consistently applied by the Office.

## A.     Background

### 1.     Legal background

Since 1842, the patent laws have authorized the issuance of patents not only for useful inventions, but also for ornamental designs. *See* Patent Act of 1842, § 3, 5 Stat. 543, 543-44; *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 524 (1872). "[S]ubject to the conditions and requirements of" Title 35 of the U.S. Code, a patent is available to "[w]hoever invents any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171(a). A patentable design "gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied, or

to which it gives form." *Samsung Elecs. Co. v. Apple Inc.*, 580 U.S. 53, 56 (2016) (quoting *Gorham*, 81 U.S. at 525).

Design patents contain a single claim stating that the patent claims an "ornamental design" for a particular "article" of manufacture, "as shown" in drawings contained in the specification. 37 C.F.R. § 1.153(a). A patent may be obtained for a surface design such as an "ornament, impression, print, or picture" that is applied to an article of manufacture or for the "design for a shape or configuration for an article of manufacture." *In re Schnell*, 46 F.2d 203, 209 (C.C.P.A. 1931).

The Patent Act specifies that "[t]he provisions of [Title 35] relating to patents for inventions shall apply to patents for designs, except as otherwise provided." 35 U.S.C. § 171(b). Thus, the obviousness inquiry under 35 U.S.C. § 103 applies to design patents. *See In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996) ("Design patents are subject to the same conditions on patentability as utility patents, including the nonobviousness requirement of 35 U.S.C. § 103.").

The Supreme Court in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966)—interpreting 35 U.S.C. § 103 in the context of utility patents—identified various factors relevant in determining whether a claimed invention would have been obvious. The Court instructed that "the scope and content of the prior art are

4

to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Id.* at 17. The Court indicated that "secondary considerations," like "commercial success, long felt but unsolved needs, [and] failure of others," may be useful "indicia of obviousness or nonobviousness." *Id.* at 17-18.

In the intervening years, the Federal Circuit had held that there must be "[a] suggestion, teaching, or motivation to combine the relevant prior art teachings" to render the claimed invention impermissibly obvious under § 103. *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006). The Supreme Court rejected that "teaching, suggestion, or motivation" test in *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). The Court determined that this "rigid approach" could not be squared with the "expansive and flexible approach" that the statute and Supreme Court cases call for. *Id.* at 415. While recognizing that the Federal Circuit's test "captured a helpful insight" by examining the "reason[s] that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does," the Court rejected the application of "rigid and mandatory formulas" in determining whether an invention would have been obvious. *Id.* at 418-19.

5

This case concerns the Federal Circuit's obviousness jurisprudence in the design patent context. The Federal Circuit decisions most relevant here—*In re Rosen*, 673 F.2d 388 (C.C.P.A. 1982), and *Durling v. Spectrum Furniture Co.*, 101 F.3d 100 (Fed. Cir. 1996)—set forth the *Rosen-Durling* standard. In *Rosen*, the court declared that "there must be a reference, a something in existence, the design characteristics of which are basically the same as the claimed design in order to support a holding of obviousness." *Rosen*, 673 F.2d at 391. In other words, the court required "an adequate starting point, a basic reference which embodies similar design concepts." *Id.*

In *Durling*, the Federal Circuit articulated the test as follows: "the first step in an obviousness analysis for a design patent" involves "determin[ing] whether there is a single reference that creates 'basically the same' visual impression" as the patented design as a whole. 101 F.3d at 103 (quoting *Rosen*, 673 F.2d at 391). If such a reference exists, other references "may only be used to modify th[at] primary reference if they are so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Id.* (alteration and quotation marks omitted).

6

## 2.     The underlying IPR proceeding

This case concerns *inter partes* review of GM Global's U.S. design patent no. D797,625 (the "'625 patent"), which claims an "ornamental design for a vehicle front fender."  LKQ contended that the '625 patent was anticipated or would have been obvious in view of Lian (U.S. design patent no. D773,340), identified as the "primary" *Rosen* reference, and Tucson,[2] identified as the "secondary" *Durling* reference.  A side-by-side comparison of the '625 patent's claimed design and the primary and secondary references provided by LKQ in its petition for rehearing en banc is reproduced below:

---

[2] 2010 Hyundai Tucson Brochure, copyright 2009, *available at* https://www.auto-brochures.com/makes/Hyundai/Tucson/Hyundai_US%20Tucson_2010.pdf (last accessed Aug. 16, 2023).



| '625 PATENT<br>*CLAIMED DESIGN* | LIAN (PRIOR ART)<br>*PRIMARY REFERENCE* | TUCSON (PRIOR ART)<br>*SECONDARY REFERENCE* |
|---|---|---|

In analyzing obviousness, the Board "consider[ed] the overall appearance of the claimed design from the perspective of the ordinary designer . . . [to determine] whether or not the overall appearance of Lian is 'basically the same' as the claimed fender." Appx51 (citing *MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1331 (Fed. Cir. 2014)). The Board identified several differences including: (1) the

8

wheel arch shape and terminus, (2) the door cut line, (3) the protrusion, (4) the sculpting, (5) the first and second creases, (6) the inflection line (i.e., third crease), and (7) the concavity line. Appx30-45. The Board determined that these "visually disparate" features contributed to different overall appearances; whereas Lian has a linear, angled appearance, the claimed design is smooth and curved. Appx43. Because of these differences, the Board determined that Lian was not "basically the same" design and thus could not serve as a *Rosen* reference for purposes of the *Rosen-Durling* test. That ended the Board's obviousness inquiry. Under the *Rosen-Durling* test, the Board did not go on to analyze either what LKQ's secondary Tucson reference discloses or what an ordinary designer would have known at the time of the invention. Appx58.

### 3.    This Court's panel decision affirming the Board

On appeal, a panel of this Court affirmed the Board's decision. In affirming, the panel held that it was "bound to apply existing [design patent] law to this appeal" because it was "not clear" that the Supreme Court's decision in *KSR* "overruled *Rosen* and *Durling*." *LKQ Corp. v GM Global Tech*, 2023 WL 328228, at *6 (Fed. Cir. Jan. 20, 2023). In particular, the panel noted that "*KSR* did not involve or discuss design patents," the subject "addressed by *Rosen* and *Durling*." *Id.* at *6. With respect to this case, the panel found that the Board had properly stopped the

9

analysis at step one of the *Rosen-Durling* test because LKQ had failed to establish that the Lian reference was "basically the same" as the claimed design. *Id.*

Judges Lourie and Stark provided separate opinions expressing views about whether the *Rosen-Durling* test should be revised in light of *KSR*. Judge Lourie contended that *KSR* "did not overrule *Rosen*," because *KSR* did not involve design patents which are "quite different compared with utility patents." *Id.* at *8-9. He noted that "*Rosen* was not essentially incorrect" and that its statement that "the primary reference must have the design characteristics that are 'basically the same' as those of the claimed design … hardly reflects the rigidity" condemned by *KSR*. *Id.* at *8. While Judge Lourie recognized that *Rosen* may have "overstated its point" in formulating the basically-the-same standard, he observed that the obviousness inquiry "has to start from somewhere." *Id.*

Judge Stark agreed that substantial evidence supported the Board's determination that LKQ had failed to show that the '625 patent was anticipated or would have been obvious, but he declined to join the majority in rejecting the argument that *KSR* overruled *Rosen* because he found that LKQ had forfeited that argument. *Id.* While acknowledging that "it was not clear the Supreme Court has overruled *Rosen* or *Durling*," Judge Stark emphasized that "a strong case can be made that the step one *Rosen* reference requirement is precisely the type of limiting, rigid

10

rule *KSR* faulted" because failure to identify a *Rosen* reference requires the obviousness analysis to stop. *Id.* at *13. As a result, Judge Stark expressed concern that the current framework can "prevent the consideration of a combination of prior art references," "deprive the tribunal of the opportunity to consider other factors that often drive the analysis in utility patent obviousness cases," and "prevent consideration of the ordinary designer's creativity." *Id.* Judge Stark also observed that "[a]dditional rigidity that might not be appropriate in a post-*KSR* world arguably exists at step two of the *Durling* test, which limits consideration solely to prior art references that are 'so related' to the identified *Rosen* reference that 'the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Id.* In sum, Judge Stark recognized there was "substantial tension between the Supreme Court's holding in *KSR* and [the] *Durling* test." *Id.*

## III.    SUMMARY OF THE ARGUMENT

There is no question that the principles the Supreme Court has announced regarding § 103, including the *Graham* factors and *KSR*'s emphasis on the need for an "expansive and flexible" approach, apply to design patents. The only question is how those principles should apply. While this Court's *Rosen-Durling* test reflects helpful insights that help guard against the improper use of hindsight in the

obviousness inquiry, it has become overly restrictive in several respects, and should be reformulated to reflect the expansive and flexible principles the Supreme Court has articulated in the utility-patent context.

The United States therefore urges the Court to adopt a test that preserves the basic *Rosen-Durling* framework but replaces *Rosen*'s "basically the same" terminology with language directing the examiner or other factfinder to inquire whether there is a suitable starting point or base reference broadly having a similar overall visual effect as the claimed design. The Court should make clear that the lack of such a reference should not cut off the obviousness inquiry but may signal that the obviousness case is not particularly strong. The Court should also eliminate *Durling*'s "so-related" requirement in order to allow the decisionmaker to take into account the ordinarily skilled designer's experience, creativity, and common sense, when considering combinations involving the base reference.

Under such an approach, at each step of the inquiry, the decisionmaker should consider the claimed design as a whole and take into account not just the ordinarily skilled designer's experience, creativity, and common sense, but also may consider factors including what market demands and industry customs exist in the design community, which ornamental features are commonplace in the relevant field, the extent to which ornamental features are motivated by functional

12

considerations, and whether industry designers face similar design problems as other industries or otherwise look to other industries for design ideas.

## IV.    ARGUMENT

The *Rosen-Durling* test, currently applied, is in tension with the Supreme Court's instructions in *KSR* that § 103's obviousness inquiry is to be conducted through an expansive and flexible approach.  If *Rosen* and *Durling* had been decisions of the Supreme Court, this Court would be bound to follow them even after *KSR* because "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).  However, panels have more leeway to conclude that this Court's own precedent "has been implicitly overruled as inconsistent with intervening Supreme Court authority." *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014).  This Court need not decide whether those circumstances are satisfied here because the *en banc* Court has the power to modify or overrule its past precedent, including *Rosen* and *Durling*, even absent intervening guidance from the Supreme Court.  *South Corp. v. United States*, 690 F.2d 1368, 1370 n.2 (Fed. Cir. 1982).

In the view of the United States, an expansive and flexible approach should guide the obviousness inquiry in the design-patent, as well as the utility-patent, context (section A).  The *Rosen-Durling* test was originally designed to protect against

13

the improper use of hindsight bias to deem designs obvious, but it has been too

rigidly applied (section B). An appropriate inquiry would preserve the *Rosen-Durling*

guardrail against hindsight, while not depriving decisionmakers of the full panoply of

tools for assessing obviousness (section C). Finally, such an approach would

comport with sound patent policy and the USPTO's interest in an obviousness

inquiry that can be fairly administered by its examiners across tens of thousands of

patent applications (section D).

### A.   The Supreme Court's Expansive and Flexible Approach to § 103 Provides a Foundation for the Proper Obviousness Analysis for Design Patents

A patent may not be granted "if the differences between the claimed

invention and the prior art are such that the claimed invention as a whole would

have been obvious before the effective filing date of the claimed invention to a

person having ordinary skill in the art to which the claimed invention pertains." 35

U.S.C. § 103. As the Supreme Court explained in the utility patent context, this

obviousness analysis turns on "several basic factual inquiries," including (1) "the

scope and content of the prior art," (2) "differences between the prior art and the

claims at issue," (3) "the level of ordinary skill in the pertinent art," and (4) any

"secondary considerations [such] as commercial success, long felt but unmet needs,

[and] failure of others" that may have value as "indicia of obviousness or

14

nonobviousness." *Graham*, 383 U.S. at 17-18; *see also* MPEP § 1504.03(I).

Importantly, design patents have no exemption from § 103 (*see* 35 U.S.C. § 171(b)), and the obviousness framework articulated in *Graham* applies equally to the design-patent context. *See Borden*, 90 F.3d at 1574 ("Design patents are subject to the same conditions on patentability as utility patents, including the nonobviousness requirement of 35 U.S.C. § 103."). As reflected in the fourth *Graham* factor, objective evidence of nonobviousness, such as commercial success and copying of the design by others, may be relevant to the evaluation of obviousness of a design claim, *see* MPEP § 1504.03(I), subject to the same requirements as utility patents, including the necessary showing that the evidence of nonobviousness is sufficiently connected to the claimed design. *Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1276 (Fed. Cir. 2021).

This Court has recognized that the *Graham* factors apply to the visual obviousness analysis required by design claims. For example, this Court explained that the first three *Graham* factors are folded into and addressed by "determining whether a designer of ordinary skill would have combined teachings of the prior art to create 'the same overall visual appearance as the claimed design.'" *Campbell Soup*, 10 F.4th at 1275 (quoting *Durling*, 101 F.3d at 103). This comports with this Court's longstanding recognition, including in *Rosen* and *Durling*, that "the ultimate inquiry

15

under § 103 is whether the claimed design"– that is, the overall appearance or visual effect – "would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Durling*, 101 F.3d at 103 (citing *Rosen*, 673 F.2d at 390); *see also Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1339-40 (Fed. Cir. 2019); *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1380-81 (Fed. Cir. 2009). And, a critical part of that analysis involves visually comparing the claimed design with the design disclosed in the prior art, *see Durling*, 101 F.3d at 103 (asking "whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design"), as well as assessing secondary considerations when presented, *see MRC*, 747 F.3d at 1335-36.

In *KSR*, addressing a utility patent, the Supreme Court cautioned against "transform[ing] [a] general principle into a rigid rule that limits the obviousness inquiry," even when "[t]here is no necessary inconsistency between the idea underlying [a particular] test and the *Graham* analysis." *KSR*, 550 U.S. at 419. The Supreme Court explained that § 103 requires "an expansive and flexible approach" that eschews "rigid and mandatory formulas." *Id.* at 415, 419. A particularly strong obviousness case will exist if the prior art is very similar to the claimed invention and "the simple substitution of one known element for another" would close the gap. *Id.* at 417. And, when the analysis involves the more complicated endeavor of

16

combining "interrelated teachings of multiple patents," decisionmakers may consult "the effects of demands known to the design community or present in the marketplace" and "the background knowledge possessed by a person having ordinary skill in the art." *See id.* at 418. Further, it can be important to consider the "need[s] or problem[s] known in the field of endeavor" that would have prompted a skilled artisan to make the requisite combination. *Id.* at 420. The inquiry, however, should not ignore "inferences and creative steps" or "common sense" possessed by skilled artisans in the field. *Id.* at 418, 421; *see also id.* at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."); *see also* Rebecca S. Eisenberg, *Obvious to Whom? Evaluating Inventions from the Perspective of PHOSITA*, Berkeley Tech. L. J. 19(3):885-906 (2004) ("An invention that seems obvious to a person having ordinary skill in the field might nonetheless seem patentworthy to a person who lacks such skill, even after reading the prior art record.").

While aspects of the obviousness inquiry the Supreme Court has articulated in utility-patent cases may take on a slightly different focus or salience when applied to design patents, the fundamentals of that inquiry should be the same. For example, the analysis proceeds from the perspective of a legally fictitious person with ordinary skill designing articles of the type involved. Whereas the hypothetical skilled artisan in the utility context seeks to improve a product's operation, the hypothetical skilled

17

designer in the design patent context seeks to improve a product's appearance. But as in the case of the skilled artisan, the skilled designer's background knowledge will be informed by the state of the art, including what market demands and industry customs exist in the design community, which ornamental features are commonplace in the relevant field, and whether industry designers face similar design problems as other industries or otherwise look to other industries for design ideas. *Cf. Randall Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013) (approving the use of documentary evidence to show "a familiar, even favored, approach" in the relevant art). These considerations provide insight into the types of design choices that a skilled designer would make. Thus, there is no reason that *KSR*'s discussion of the expansive and flexible principles undergirding the obviousness inquiry should not be equally applicable in the design patent context.

**B.    While the *Rosen-Durling* Test Protects Against Hindsight, Its Rigid Application Runs Counter to an Appropriately Expansive and Flexible Obviousness Inquiry.**

As originally formulated, the *Rosen-Durling* test was intended to guard against hindsight bias, and it continues to serve that valuable purpose. As currently applied, however, the test is in tension with the expansive and flexible approach reaffirmed in *KSR*.

**1.    *Rosen*'s articulation of the "basically the same" test was to broadly protect against improper use of hindsight**

18

In *Rosen*, the claimed design was to a coffee table with a circular glass top with notches cut into three V-shaped legs to slot in the tabletop. 673 F.2d at 389. The primary prior-art reference disclosed a desk with a semi-circular opaque top where notches were cut into the tabletop itself to slot in three V-shaped legs. *Id.* The Court explained that achieving the coffee table's "visual impression of lightness and suspension in space" was not simply a matter of modifying the desk by "interchang[ing]" or "add[ing]" features from other references. *Id.* at 391. Instead, that sort of modification would "destroy fundamental characteristics" of the desk. *Id.* The Court therefore reversed the agency's rejection on obviousness grounds, disagreeing that the coffee table design could be characterized "as a mere 'regrouping' of various furniture elements, without providing a basic reference which this 'regrouping' might modify." *Id.*

The *Rosen* Court applied an earlier opinion from this Court's predecessor that had overturned an obviousness rejection that was made by "selecting features taken from five different patents, that is, [one] feature from one patent, another from another, etc." to arrive at the proposed design. *In re Jennings*, 182 F.2d 207, 208 (C.C.P.A. 1950). The *Jennings* Court explained that "the appearance of the design must be viewed as a whole, as shown by the drawing, or drawings, and compared with something in existence—not with something that might be brought into

19

existence by selecting individual features from prior art and combining them, particularly where combining them would require modification of every individual feature." *Id.* In other words, a proposed obviousness combination may fail where there is no prior art with a similar overall visual impression. This articulation is expansive and flexible but still protects against hindsight reconstructions. It does not unduly constrict the references that may ground the analysis and serve as a helpful starting point; however, it also views the design as a whole and thereby discourages a narrow focus on (or a process of picking and choosing) individual features from disparate references.

Relying on the principles underlying the *Jennings* decision, the *Rosen* Court explained that the examiner must identify a primary reference—i.e., prior art already in existence—whose modification or combination with other references to achieve the claimed design would not "require modification of every individual feature" or "destroy fundamental characteristics" of the primary reference's design. *Rosen*, 673 F.2d at 391 (quoting *Jennings*, 182 F.2d at 208). This rationale recognizes a key concept in obviousness jurisprudence—namely, an analysis that depends on mixing and matching disparate design elements across a range of sources without a compelling reason may be infected by "hindsight bias" and "*ex post* reasoning"—that was later reinforced by the Supreme Court. *KSR*, 550 U.S. at 421.

20

It was in this context that the *Rosen* Court observed that the Board had failed to identify an "adequate starting point":

> The board's reliance upon obviousness of construction, apropos of a mechanical patent, ignores the need for an adequate starting point, a basic reference which embodies similar design concepts.

673 F.2d at 391. In summarizing this proposition, the *Rosen* Court coined the "basically the same" language when it stated that "there must be a reference, a something in existence, the design characteristics of which are basically the same as the claimed design in order to support a holding of obviousness." *Id.* Therefore, the *Rosen* Court's use of "basically the same" is best read as highlighting the usefulness of "an adequate starting point, a basic reference which embodies similar design concepts."[3]

2.   The ***Rosen-Durling*** **test runs counter to the Supreme Court's expansive and flexible approach to § 103**

---

[3] Citing to *Rosen*, this Court has previously recognized the broader meaning of the phrase, stating "[i]n order for secondary references to be considered, however, there must be some suggestion in the prior art to modify the *basic design* with features from the secondary references." *Borden*, 90 F.3d at 1574 (emphasis added).

As currently expressed, the *Rosen-Durling* test involves a two-step process. The first step requires the identification of a single reference, "a something in existence, the design characteristics of which are basically the same as the claimed design." *Rosen*, 673 F.2d at 391. Recently, this Court synthesized its case law to explain that "[t]o be 'basically the same,' the designs at issue cannot have substantial differences in their overall visual appearances or require major modifications; any differences must instead be slight." *Campbell Soup*, 10 F.4th at 1275 (cleaned up; citations omitted). The obviousness analysis moves to the second step only if the first step is satisfied. In the second step, "other 'secondary' references may be used to modify [the primary reference] to create a design that has the same overall visual appearance as the claimed design," as long as the secondary references are "so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *MRC*, 747 F.3d at 1331 (cleaned up; citation omitted). In *MRC*, the Court explained that a reference may be considered "sufficiently 'related' for that test to apply" when the reference design is "'closely akin' to the claimed design." 747 F.3d at 1334 (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)).

While the *Rosen-Durling* test captures some helpful insights, the test has been interpreted too narrowly and applied too rigidly. As applied, the test often operates

22

as a bright-line rule because the obviousness analysis ends if there is no primary *Rosen* reference that satisfies the strict requirement of having "basically the same" visual impression as the claimed design. The obviousness inquiry can likewise end prematurely in the second step, if no secondary reference satisfies *Durling*'s strict requirement that it be "so related" to the primary reference. Such categorical rules conflict with the more expansive and flexible approach to obviousness espoused in *Graham* and *KSR*, as well as other Supreme Court cases rejecting bright-line rules that were not adequately grounded in the Patent Act.

    *Rosen*'s "basically the same" and *Durling*'s "so-related" inquiries also conflict with the obviousness approach in early Supreme Court precedent. *See Smith v. Whitman Saddle,* 148 U.S. 674 (1893). In *Whitman Saddle*, the claimed design was for a saddle that essentially combined the front half of one prior art saddle with the rear half of another prior art saddle. The Court highlighted evidence in the record that showed "there were several hundred styles of saddles or saddletrees belonging to the prior art, and that it was customary for saddlers to vary the shape and appearance of saddletrees in numerous ways, according to the taste and fancy of the purchaser." 148 U.S. at 681. The Court also found the evidence showed that both halves of the claimed saddle design were used on a variety of prior-art saddles and determined that "the addition of a known cantle to a known saddle, in view of the fact that such

23

use of the cantle was common," did not produce a patentable design.  *Id.*  The Court indicated that the claimed design would have been obvious in view of its analysis of the considerations underlying saddle design, even though neither prior-art saddle would likely qualify as "basically the same" as the claimed design or "so related" to each other under the current conception of the *Rosen-Durling* test.  The proper obviousness analysis should be more flexibly applied to permit factfinders to consider the universe of prior art and other design considerations that would point to the obviousness of a claimed design.[4]

To the extent that this Court's case law reads *Rosen* to allow only "slight" differences between the claimed design and the prior art, *Campbell Soup*, 10 F.4th at 1275, that formulation is narrower than the *Rosen* court originally indicated and has impacted the USPTO's and courts' ability to make and sustain obviousness rejections of design claims.  Over time, these tribunals have shifted from the original broader understanding of *Rosen* toward an impermissibly rigid application of the "basically the same" standard.  *See, e.g.*, LKQ Br. at 49-50, ECF No. 91 (*compare Carter* (C.C.P.A. 1982), *Petersen Mfg.* (Fed. Cir. 1984), *Black & Decker* (N.D. Ill. 1986)

---

[4] While it is possible to view *Whitman Saddle*'s discussion of patentability as dicta because the case ultimately affirmed on the basis of non-infringement, 148 U.S. 674, that discussion is at minimum "explicit and carefully considered" statements from the Supreme Court regarding obviousness that this Court "must follow."  *Stone Container Corp. v. United States*, 229 F.3d 1345, 1350 (Fed. Cir. 2000).

*with Para Gear Equip.* (N.D. Ill. 2005), *Apple* (Fed. Cir. 2012); *see also Vanguard*

(B.P.A.I. 2009) (holding that a credit card without a hole in it could not serve as a

*Rosen* reference for claimed design of a credit card with a hole), *aff'd Vanguard*

*Identification Systems, Inc. v. Kappos*, 407 F. App'x 479 (Fed. Cir. 2011)).[5]

    The facts of this case highlight the need for a more expansive and flexible

approach to the obviousness inquiry in the design-patent context.  As shown above,

the '625 patent design is visually quite similar to the prior art design depicted in

Lian, yet the Board—following this Court's current articulation of *Rosen* and

*Darling*—determined that the two were not "basically the same."  Although the

United States does not have a view as to whether the '625 patent should be declared

obvious in light of the differences found by the Board, the Board should have had

the opportunity to consider whether those missing features could be found in other

similar prior-art references or could be shown to be commonly used elements of

automotive styling as relevant considerations.  Application of the "basically the

same" test improperly cut off all further consideration of what an ordinary designer

---

[5] We note that this Court in *In re Cho*, 813 F.2d 378 (Fed. Cir. 1987), rejected an argument that a design feature that was functional should be discounted in the obviousness analysis.  While it is possible to limit *Cho* to its facts, we believe that the *en banc* Court here can usefully clarify that functional considerations can sometimes drive design choices, and features chosen for functional reasons may receive diminished weight in the obviousness analysis.

might have considered obvious and precluded any consideration whatsoever of the

secondary reference that showed a similar fender design in the same industry with

features missing from Lian.  In short, the obviousness analysis should not be

truncated at the first step as it was here.

### C.    The Court Should Modify the *Rosen-Durling* Test To Ensure Its Consistency With the Supreme Court's Guidance Regarding § 103

As demonstrated by the examples above, the "basically the same" language of

*Rosen* has been read to eliminate appropriate starting-point references and to

foreclose consideration of facts that might demonstrate that a designer of ordinary

skill would have combined teachings of the prior art to create the same overall visual

effect as the claimed design.  The origin of this problem lies largely in the choice of

terminology—i.e., "basically the same"—used by the *Rosen* court to describe how to

identify a proper starting point for the obviousness inquiry, not in the underlying

principles on which the decision was based.  This Court should modify the *Rosen-*

*Durling* test to ensure an expansive and flexible approach in alignment with *KSR*.

Accordingly, the Court should replace the "basically the same" terminology,

jettison the so-related requirement, clarify that *Rosen* and *Durling* should still serve as

a framework for protecting against hindsight, and caution that the test should not be

used as a rigid tool that truncates the obviousness analysis.  Under this

reformulation, the inquiry begins with an "adequate starting point" reference to properly ground the obviousness analysis. After all, § 103 itself focuses on "the differences between the claimed invention and the prior art," 35 U.S.C. § 103, and "the scope and content of the prior art," *Graham*, 383 U.S. at 17. The most pertinent references are those that broadly have a similar overall visual effect as the claimed design. Where "every individual feature" of a reference would have to be modified, or where a modification would "destroy fundamental characteristics" of the reference's design, that reference would not provide a particularly helpful starting point. *Rosen*, 673 F.2d at 391 (quoting *Jennings*, 182 F.2d at 208). Under this modified approach, the focus on the claimed design as a whole avoids affording outsized significance to individual features but does not demand that there be a reference that is virtually identical to the claimed design.

After identifying a base reference, the next step in the obviousness inquiry should examine the extent to which that reference needs to be modified in order to achieve the claimed design, considering secondary references along with an ordinary designer's experience, creativity, and common sense. Taking into account the characteristics of a designer in the field, the test would allow for modifications that are driven by consumer demand for certain features, that are motivated by functional considerations, or that embody features so prevalent in the prior art that

27

adding them to a claimed design would be an obvious design choice. Furthermore, rather than automatically terminating the inquiry in the absence of a strikingly similar base reference, the examiner or other factfinder should have flexibility to assess nonobviousness in light of the sorts of evidence identified above.

This approach would provide important guidance while preserving the expansive and flexible inquiry the Supreme Court has announced in applying § 103 to utility patents. When considering a design patent, the first three *Graham* factors are examined by determining whether a designer of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design. *See Campbell Soup*, 10 F.4th at 1275. However, the objective indicia of nonobviousness accounted for in the fourth *Graham* factor—which "help inoculate the obviousness analysis against hindsight," *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1378 (Fed. Cir. 2012)—have proven difficult to apply in the design patent context given the difficulty of demonstrating a nexus between the evidence of nonobviousness and the claimed design. *Campbell Soup*, 10 F.4th at 1277 n.1 ("[I]t is . . . hard to envision a commercial product that lacks any significant functional features such that it could be coextensive with a design patent claim."); *see also MRC*, 747 F.3d at 1336. The proposed test preserves *Rosen-Durling*'s protection against

hindsight and thus compensates for the ineffectiveness of objective indicia in the

design context.

> **D.  Policy Considerations Support the Retention of the *Rosen-Durling* Framework, but the Court's Clarification Is Necessary To Ensure Its Application Consistent With Supreme Court Precedent**

The U.S. patent system seeks to provide incentives for innovation and public

disclosures that will contribute to follow-on innovation, while not unduly restricting

competition.  As the Supreme Court explained in *Gorham v White*, 81 U.S. 511

(1871):

> The acts of Congress which authorize the grant of patents for designs
> were plainly intended to give encouragement to the decorative arts. . . .
> The law manifestly contemplates that giving certain new and original
> appearances to a manufactured article may enhance its salable value, may
> enlarge the demand for it, and may be a meritorious service to the
> public.  It therefore proposes to secure for a limited time to the
> ingenious producer of those appearances the advantages flowing from
> them.

*Id.* at 524-25.  If a design would be obvious only when the overall appearance of the

prior art is nearly identical to the claimed design, there is a risk of overrunning the

marketplace with otherwise-obvious designs, thwarting legitimate competition.  *See*

*KSR*, 550 U.S. at 402 ("Granting patent protection to advances that would occur in

the ordinary course without real innovation retards progress and may, for patents

combining previously known elements, deprive prior inventions of their value or

29

utility."). On the other hand, if obviousness can be found by picking and choosing ornamental features from disparate references without explanation, then current patent holders will be vulnerable to broad invalidity challenges and prospective patent seekers will be unable to obtain the protection required to encourage innovation.

Over the past decade, the USPTO has received increasing numbers of design patent applications, illustrating the prominent role designs play in our economy. Presently, the USPTO receives approximately 50,000 design patent applications a year. Design patents not only allow companies to differentiate their offerings, but they can also protect against knock-off goods that can erode our economy. While this case concerns an invalidity challenge to an issued patent, this Court's guidance regarding the obviousness inquiry will also affect the patent-application process, in which USPTO patent examiners must determine whether a design is sufficiently nonobvious that a patent grant is warranted in the first instance. Any obviousness inquiry should account for the on-the-ground need for guidance that can be fairly and equitably administered by examiners across the tens of thousands of design-patent applications the USPTO receives each year.

LKQ's proposal overlooks many of these practical concerns. For example, LKQ asserts that "*courts and litigants* would have no peculiar difficulty in comparing

image-based design patent claims with prior art designs" because they can employ "the *assistance of design experts*." LKQ Br. at 58-59, ECF No. 91 (emphases added); *see also id.* at 36-38 (arguing that "*courts* have access to a variety of sources of evidence to assist them" including *expert testimony* about "wealth of knowledge and creativity" in a field, "knowledge of design trends and engineering constraints," "awareness of competitors' designs," and "design demands and market pressures.") (emphasis added). However, this approach would prove infeasible to administer during examination, where the USPTO has limited means and resources to gather evidence. *See id.* at 36. The Court should not endorse a regime that erases the importance of an appropriate starting point and leaves decisionmakers without guidance about how to "apply flexible principles to determine what the [skilled designer] would have found obvious." *See id.* at 42.

## V.    CONCLUSION

To ensure the obviousness standard is properly applied, the United States respectfully urges the Court to clarify that the *Rosen-Durling* test should be modified to accord with the Supreme Court's approach to § 103.

31

Respectfully submitted,


/s/ Thomas W. Krause
THOMAS W. KRAUSE
*Solicitor*

WILLIAM La MARCA
*Special Counsel for IP Litigation*

BRIAN RACILLA
*Associate Solicitor*

OFFICE OF THE SOLICITOR
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
*Attorneys for the Director of the*
*United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULES OF APPELLATE PROCEDURE 29(d) AND 32(a)(7)(B)

I hereby certify that this amicus brief complies with the type-face and volume limitations set forth in Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because the type face is Garamond, proportionally spaced, fourteen-point font, and the number of words in this brief is 6846, according to the word count of Microsoft Word

*/s/ Thomas W. Krause*
THOMAS W. KRAUSE
*Office of the Solicitor*
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
Tel: (571) 272-9035