No. 2021-2348

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

LKQ CORPORATION and KEYSTONE
AUTOMOTIVE INDUSTRIES, INC.,
*Appellants,*

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,
*Appellee.*

On Appeal from United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2020-00534

## BRIEF OF *AMICI CURIAE* INSTITUTE FOR DESIGN SCIENCE AND PUBLIC POLICY AND THIRTY-SIX DISTINGUISHED INDUSTRIAL DESIGNERS IN SUPPORT OF NEITHER PARTY

Perry J. Saidman
Perry Saidman, LLC
8601 Georgia Avenue
Suite 603
Silver Spring, MD 20910
(202) 236-0753
ps@perrysaidman.com

Matthew J. Dowd
Robert J. Scheffel
Dowd Scheffel PLLC
1717 Pennsylvania Ave., NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com
rscheffel@dowdscheffel.com

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 2021-2348 |
| **Short Case Caption** | LKQ Corporation v. GM Global Technology Operations |
| **Filing Party/Entity** | Amici Curiae Institute for Design Science and Public Policy and 36 Designers |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 08/28/2023

Signature:    /s/ Matthew J. Dowd

Name:       Matthew J. Dowd

**FORM 9. Certificate of Interest**

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| See Exhibit A | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑     Additional pages attached

FORM 9. Certificate of Interest

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| Matthew J. Dowd<br>Dowd Scheffel PLLC | Robert J. Scheffel<br>Dowd Scheffel PLLC | Perry S. Saidman<br>Perry Saidman, LLC |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)   ☐   No   ☑   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable            ☐   Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# ADDENDUM

# List of *Amici Curiae*

1) Institute for Design Science and Public Policy (IDSPP.org)

2) Charles Lee Mauro MSc, CHFP, IDSA, President & Founder, Mauro Usability Science, Founder & Chairman, Institute for Design Science and Public Policy (IDSPP), Consultant to: Apple, Amazon, Facebook, Microsoft, Goldman Sachs, Amicus Design Research

3) Christopher Daniel Morley MSc, Senior Vice President and Director of Research, Mauro Usability Science, Founding Board Member, IDSPP, Amicus Design Research

4) Peter Bressler
FIDSA, Former President, IDSA, Founder and Leader of Bresslergroup, Inc., Adjunct Associate Professor, Drexel University, Adjunct Associate Professor, University of Pennsylvania

5) Jon Christopher Hacker
Former Chair of Product Design, Art Center College of Design, Former Chief Design Officer Johnson & Johnson, Former Vice President of Design, Herman Miller, Former Vice President of Design Aveda Co., Former Vice President of Design Steuben Glass

6) Gordon Bruce
Owner, Gordon Bruce Design, LLC, Former Eliot Noyes Design Executive, IBM, Thinking Machines, Founder Innovation Design Lab Samsung, Renowned Design Expert and Lecturer Serving Global Clients, Lecturer Harvard University, Judge Red Dot Awards

7) Anthony Andre
Past President Human Factors and Ergonomics Society, Director, Interface Analysis Associates, Adjunct Professor, San Jose State University

8) David Hodge
Principal, New Story Space, Clients Including, Sony, Knoll,

Steelcase, International Award-Winning Film Director, and Producer (Life on Wheels), Former Apple Senior Designer

9) Valerie Fenster
Senior Director, Packaging & Human Factors Engineering, Akero Therapeutics, Former Head of Human Factors Research Amgen, Abbott, and Citibank

10) George McCain
FIDSA, Fellow and Chair Emeritus, IDSA, Principal, McCainDesign. Fluke Corporation, Corporate Design Manager

11) Adrian O'Heney
Principal Industrial Designer, Stryker Corporation

12) Michael Derocher
Former Design Director, HP Inc.

13) Joellyn Gray
Principal, GrayMatter Advisory Services, LLC, Former Director of Marketing, Fujifilm North America

14) Nancy Perkins
FIDSA, President, Perkins Design Ltd., Instructor, Carnegie Mellon University, Illinois Institute of Technology, University of Illinois Chicago

15) Timothy Fletcher
FIDSA, President, One Business Design, LLC, Clients Including Coca-Cola, Delta Airlines, Bank of America

16) Carlton Lay
Associate Professor of Industrial Design, Auburn University

17) Joyce Thomas
Associate Professor of Industrial Design, Auburn University, Senior Designer Electrolux

18) Jennifer Pierce
Founder, Singular XQ, Founder Mindtree Consulting

19) James Kaufman
Emeritus Professor, Ohio State University, Notre Dame, University
of Cincinnati

20) Sal Ziauddin
Owner, Maverick & Blueberry

21) Deborah George
President, Growing Emerging Managers' Services, Executive HSBC

22) Gustavo Lopes Jota
Marketing and Design Manager, Digitei S.A

23) Pieter den Heten
Head of Design, Usable Thinking, Former Senior Manager CX and
Product Design Publicis Sapient

24) Esteban Fridman
Founder, NeuroUnicorn, Clinical Associate of NINDS-NIH, Former
Assistant Professor of Neuroscience, Weill Cornell Medicine

25) Roger Belveal
UX Architect, Belveal Art & Design, Numerous former positions in
design management at leading Fortune 500 corporations.

26) Theo Mandel
Founder and Principal, Interface Design and Development, LLC,
Former Senior User Interface Design Architect, IBM

27) Sridhar Dhulipala
Founder, Strategic Advisory for Experience, Founding Member of UX
Design Practice, Infosys

28) Scott Peterson
LIDSA, President, Scott Peterson Design, Inc., Former Senior
Industrial Designer, Tektronix

29) Michael Derocher
Former Design Manager and Design Director, HP Inc., Xerox and
Uniden

30) Lloyd Philpótt
    Design Consultant, PhilpoDesign.com

31) Angela Yeh
    Founder, CEO, & Chief Talent Strategist, Yeh Ideology, Advisory
    Counsel IDSA, IDSA Chapter Chair NY

32) Edward Dorsa
    Emeritus Associate Professor of Industrial Design, Virginia Tech

33) RitaSue Siegel
    Founder, RitaSue Siegel Resources, Global expert on design
    education and professional recruiting. Director of Placement,  Pratt
    Institute

34) Steven Visser
    Fulbright Professor of Industrial Design, Purdue University. Leading
    Design IP Expert

35) Haig Khachatoorian
    Professor Emeritus of Industrial Design, NCSU College of Design

36) Michael Garten
    Consultant, MD Garten Design, Former Director of Project
    Management, TEAGUE

37) John Stram
    L/IDSA, Former Industrial Design/Graphic Manager, IBM, Former
    Director of Design Division, Seal Furniture & Systems, Manager of
    Design/Permanent Fixtures & Temporary Displays, American
    Greetings Corporation, Former Instructor at Ohio State University,
    Park University, and University of Kansas

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTEREST OF *AMICI CURIAE* ................................................................ 1

SUMMARY OF THE ARGUMENT ......................................................... 3

ARGUMENT ............................................................................................. 6

I.   The Design Process Informs The Proper Inquiry For Design-Patent Obviousness .................................................................. 6

    A.   The Design Process ................................................................ 6

    B.   Companies Develop Designs with Consumers as the Intended Audience—Not Expert Designers ........................ 10

    C.   The Overall Appearance of a Design Counts, Not the Individual, Discrete Features ............................................... 14

II.   The Court's Path To The Existing Open Question About The Correct Standard For Design-Patent Obviousness ...................... 17

    A.   *Gorham v. White* is Directly Relevant to the Issue of Obviousness ......................................................................... 18

    B.   *Laverne* Nailed It ................................................................. 20

    C.   *Nalbandian* Pulled Out the Nail ......................................... 21

    D.   *Titan Tire*—An Open Question ........................................... 23

III.   Realign Design-Patent Validity and Infringement By Applying The Ordinary Observer To Obviousness And Restoring The Statutory Anticipation Analysis ........................... 24

    A.   The Current Misalignment .................................................... 25

    B.   How to Fix the Misalignment ............................................... 28

IV.   The *Rosen* Two-Step Test For Obviousness Needs To Be Modified ......................................................................................... 30

A. *Rosen*'s Primary-Reference Requirement is Appropriate Under the Ordinary Observer Test ....................................... 31

B. The Court Should Discard or Tightly Restrict the Use of Secondary References ........................................................ 33

V. The Court's En Banc Questions ................................................... 36

VI. Conclusion ....................................................................................... 38

ADDENDUM (Listing *Amici Curiae*)

CERTIFICATE OF COMPLIANCE

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,*
    396 U.S. 57 (1969) ................................................................. 37

*Delta T, LLC v. Dan's Fan City, Inc.,*
    No. 8:19-cv-1731-VMC-SPF, 2021 WL 458022
    (M.D. Fla. Feb. 9, 2021) ...................................................... 13

*Dennison Manufacturing Co. v. Panduit Corp.,*
    475 U.S. 8 (1986) (per curiam) .......................................... 37

*Durling v. Spectrum Furniture Co.,*
    101 F.3d 100 (Fed. Cir. 1996) ......................... 30, 31, 36, 37

*Egyptian Goddess v. Swisa, Inc.,*
    543 F.3d 665 (Fed. Cir. 2008) (en banc) .......... 17, 18, 23, 24, 27

*Gorham v. White,*
    81 U.S. 511 (1871) ......................................... 17, 18, 19, 20

*Graham v. John Deere Co. of Kansas City,*
    383 U.S. 1 (1966) ..................................................... 22, 37

*Hupp v. Siroflex of America, Inc.,*
    122 F.3d 1456 (Fed. Cir. 1997) ......................................... 30

*In re Borden,*
    90 F.3d 1570 (Fed. Cir. 1996) ........................................... 31

*In re Glavas,*
    230 F.2d 447 (C.C.P.A. 1956) ........................................... 31

*In re Harvey,*
    12 F.3d 1061 (Fed. Cir. 1993) ........................................... 31

*In re Jennings,*
    182 F.2d 207 (C.C.P.A. 1950) .............................. 31, 34, 35

*In re Laverne,*
   356 F.2d 1003 (C.C.P.A. 1966) ................................................ 20, 21, 22

*In re Nalbandian,*
   661 F.2d 1214 (C.C.P.A. 1981) ............................................ 21, 22, 23

*In re Rosen,*
   673 F.2d 388 (C.C.P.A. 1982) ...................................................... *passim*

*International Seaway Trading Corp. v. Walgreens Corp.,*
   589 F.3d 1233 (Fed. Cir. 2009) ...................................................... 25, 29

*KSR International Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007) ...................................................................... 36, 37

*Peters v. Active Manufacturing Co.,*
   129 U.S. 530 (1889) ............................................................................ 25

*Peters v. Active Manufacturing Co.,*
   21 F. 319 (S.D. Ohio 1884) ................................................................ 25

*Richardson v. Suzuki Motor Co.,*
   868 F.2d 1226 (Fed. Cir. 1989) .......................................................... 29

*Sakraida v. Ag Pro, Inc.,*
   425 U.S. 273 (1976) ............................................................................ 37

*Titan Tire Corp. v. Case New Holland, Inc.,*
   566 F.3d 1372 (Fed. Cir. 2009) .................................................... 23, 24

*United States v. Adams,*
   383 U.S. 39 (1966) .............................................................................. 37

**Statutes**

35 U.S.C. § 102 .................................................................................. 28, 30

35 U.S.C. § 103 ........................................................................ 20, 22, 28, 30

35 U.S.C. § 171 ........................................................................................ 30

## Other Authorities

Alina Stankevich,
*Explaining the Consumer Decision-Making Process: Critical
Literature Review*, 2 Journal of International Business
Research & Marketing 7 (2017) ......................................................... 16

Andreas Gegenfurtner, et al.,
*Expertise Differences in the Comprehension of Visualizations:
A Meta-Analysis of Eye-Tracking Research in Professional Domains*,
23 Educational Psychology Review 523 (2011) .................................. 11

Charles L. Mauro & Christopher Morley,
*Why the Future of Design Patent Protections Will Rely on Modern
Neuroscience, Not Constitutional and Legal Reversionism*,
36 Berkeley Technology Law Journal 277 (2022) .............................. 17

Charles L. Mauro, et al.,
*Development and Initial Validation of an Empirical Ordinary
Observer Test for Design Patent Infringement* (June 5, 2020) ........... 13

Charles L. Mauro, et al.,
*The Impact of Design Experts in the Application of the
Ordinary Observer Test in Design Patent Litigation*
(Working Paper) ..................................................................... 11, 12, 27

*How to Start Car Design Education – Part 02*, Automotive Design Plant
(June 28, 2022), https://automotivedesignplanet.com/how-to-start-
car-design-education-part-02 ............................................................ 7

Janice M. Mueller & Daniel Harris Brean,
*Overcoming the "Impossible Issue" of Nonobviousness in Design
Patents*, 99 Kentucky Law Journal 419 (2011) ................ 18, 26, 29, 35

Mike Winder, *Down to a Science: Charles Mauro's Expertise in
Neuroscience-Based Design Research Dates Back to His ArtCenter
Education*, Dot Magazine (May 16, 2019) .................................... 16, 17

Paul Hekkert, et al.,
   *"Most Advanced, Yet Acceptable": Typicality and Novelty as*
   *Joint Predictors of Aesthetic Preference in Industrial Design*,
   94 British Journal of Psychology 111 (2010) ..................................... 14

Perry Saidman,
   *Design Patents are Sinking in* International Seaway*:*
   *Rethinking Design Patent Anticipation* (Feb. 5, 2020),
   https://ssrn.com/abstract=3532376 ..................................................... 29

Peter H. Bloch, *Seeking the Ideal Form: Product Design and*
   *Consumer Response*, 59 Journal of Marketing 16 (1995).................. 32

Raymond Loewy, *Never Leave Well Enough Alone* (1951) ..................... 14

Rikke Friis Dam, Interaction Design Foundation,
   *The MAYA Principle: Design for the Future, but Balance it with Your*
   *Users' Present* (2021),
   https://www.interaction-design.org/literature/article/design-for-the-
   future-but-balance-it-with-your-users-present .................................. 14

Stephen E. Palmer,
   *Vision Science: Photons to Phenomenology* (1999) ......................... 8, 34

Vincent Rieuf, et al.,
   *Immersive Moodboards, a Comparative Study of Industrial Design*
   *Inspiration Material*, 13 Journal of Design Research 78 (2015) ......... 8

Xin (Shane) Wang, et al.,
   *The Journal of Consumer Research at 40: A Historical Analysis*,
   42 Journal of Consumer Research 5 (2015)........................................ 15

*Your Car Begins with a Moodboard*, Motor Equipment News,
   Dec. 2020, at 21 .................................................................................... 9

## INTEREST OF *AMICI CURIAE*[1]

*Amicus Curiae* Institute for Design Science and Public Policy ("IDSPP") is an independent, non-profit professional organization founded in 2011 to support the integration of design science and design intellectual property rights. IDSPP's current efforts focus on tracking and supporting critical design research trends relevant to advancing design intellectual property rights in the United States and globally.

Individual *Amici Curiae* are leading industrial design professionals, fashion designers, user experience ("UX") designers, design executives, design research professionals, and design academics. *Amici* have decades of experience providing product design services to leading corporations, including Apple, Facebook, Amazon, Microsoft, Merck, Samsung, American Airlines, AT&T, Citibank, Coca-Cola, Ford, General Electric, General Motors, Goldman Sachs, The Harvard Endowment, Herman Miller, Hewlett Packard, Google, IBM, Knoll, Lenovo, LG, Louis Vuitton, Mobil Oil, Motorola, the New York Stock Exchange, NASA, Nike, Pfizer,

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any other person has contributed money intended to fund the preparation or submission of this brief. Individual *Amici Curiae* are listed in the attached Addendum.

Procter & Gamble, Starbucks, Target, Whirlpool, Xerox, and many, many others.

*Amici* include past presidents of the Industrial Designers Society of America ("IDSA") and the Human Factors and Ergonomics Society, and a past Chair of the Design Protection Section of the IDSA. *Amici* have lectured at leading graduate programs, including Harvard University, MIT Sloan School of Management, Stanford University, University of Pennsylvania, and many others. Collectively, *Amici* have written and contributed to hundreds of leading business, academic, and news publications, including *UC Berkeley Law Review*, *Business Week*, *The New York Times*, *Innovations Magazine*, *Science*, and *The Wall Street Journal*.

*Amici* have been invited speakers at leading law conferences on design patents, including multiple speaking sessions at USPTO Design Day and the European Union. *Amici* have been consulting or testifying experts in hundreds of design patent cases including those which have formed the basis for modern design patent law. *Amici* have received hundreds of U.S. and international design awards. Collectively, *Amici* include named inventors on hundreds of U.S. design and utility patents.

We have based our professional lives on the assumption that designs are patentable and worth enforcing when infringed. *Amici* have no personal interest in the outcome of this dispute, though *Amici* have consulted for both parties.

## SUMMARY OF THE ARGUMENT

Design patents are an extraordinarily important form of intellectual property. Their importance continues to grow because the marketplace and social interactions more generally are increasingly driven by visual information and cues. For that reason, the present case is a critical opportunity for the Court to make several needed adjustments to design patent law to ensure that the law aligns with the role of designs in the marketplace and how designs are developed and perceived.

First, a deeper understanding of the design process and how design innovation functions in the marketplace is a necessary predicate to answering the Court's en banc questions. The design process's main objective is to create innovation that is distinguishable from other designs and which is attractive to consumers. Empirical research has expanded the understanding that neither designers nor consumers view product de-

signs as an assemblage of individual parts. Studies have likewise confirmed that an experienced designer perceives designs differently than the average consumer—the latter of which is the intended target/user of design innovation.

Second, that experiential foundation of design innovation underscores several deficiencies with current design-patent law—one being the open question of whether the "ordinary observer" test should apply to the obviousness analysis. Precedent shows how this open question developed, and the Court now has an opportunity with this case to clarify the applicable standard for assessing obviousness of design patents.

Third, the Court should clarify that the ordinary observer—not the ordinary designer—applies to deciding nonobviousness of design patents. This clarification would remedy the status quo, which leads to anomalous outcomes between patentability and infringement. Applying the ordinary observer test also aligns with the real-world understanding and application of design innovation.

Fourth, the novelty analysis for designs should be restored to its traditional and statutory basis. Correctly applying the ordinary observer for both anticipation and obviousness leads to the anomalous outcome

4

where both analyses reduce to the same effective test, with anticipation using "substantially the same" and obviousness using "basically the same." The answer is to restore the anticipation analysis to its classical formulation—requiring identicality to find a lack of novelty.

Fifth, the Court should largely retain the *Rosen* two-step test for analyzing obviousness, but the second step should be eliminated or restricted to narrow circumstances. This approach aligns the obviousness analysis with how designers and consumers view product designs—not as an assemblage of individual parts but as a holistic perception. Secondary references should be used not at all or only in very circumscribed situations where the differences between the claimed design and the prior art are *de minimis*, and such differences are shown in one or more products in the exact same category of products as the claimed design.

Finally, *Amici* provide concise answers to the Court's en banc questions. The present brief focuses primarily on if and how the *Rosen-Durling* test should be modified, and *Amici* also provide their experienced perspective on the additional en banc questions.

5

## ARGUMENT

### I. The Design Process Informs The Proper Inquiry For Design-Patent Obviousness

#### A. The Design Process

The processes for creating protectable solutions for functional innovations (utility patents) versus visual design innovations (design patents) are so fundamentally different that they do not support the same tests for obviousness. The deep-rooted differences stem from the very nature of what engineers do versus what designers do when they create their respective innovations. *Amici* collectively have hundreds of years' worth of design experience, and their experience confirms the deep-rooted differences. And many recent studies have confirmed Amici's experience in the field.

The typical utilitarian innovation (subject to a utility patent) flows from combining discrete engineering concepts and technologies into new functional solutions for specific problems. Even the creation of new pharmaceutical products flows from a novel combination of atoms and molecules. The discrete elements of a functional invention are captured by the discrete limitations of a utility patent claim.

Design innovation is different.  It does not and cannot rely on the mere combination of discrete visual design elements.  It instead results from the holistic manipulation of an entire three-dimensional shape in a continuous series of refinements.  The innovative design produces a unified, visual impression that represents the entire product in the mind of a consumer.  The fact that a design patent claim refers to the overall appearance of a design as shown in the drawings reflects this reality.

The photograph below shows a designer working on initial concepts for the design for an automobile.[2]



---

[2] *How to Start Car Design Education – Part 02*, Automotive Design Plant (June 28, 2022), https://automotivedesignplanet.com/how-to-start-car-design-education-part-02.

The designer works on a unified whole object, consistent with how the human mind perceives shapes of designed objects in the marketplace. Human shape-perception generally processes three-dimensional objects as a three-dimensional whole ("top-down processing"), not as an assemblage of discrete elements. *See* Stephen E. Palmer, *Vision Science: Photons to Phenomenology* 85 (1999). The combination of discrete elements into a whole object is not consistent with modern neuroscience and shape perception science. *See id.*

While designers do conduct research when developing their designs, their research generally is not narrowly limited to discrete components of competitive products. Rather, their research captures examples from a very wide range of visually stimulating objects from many different categories.

In their research, a designer uses a "mood board," which is "a graphical/semantic composition explaining the designers' take on the client requested universe, theme or ambiance." Vincent Rieuf, et al., *Immersive Moodboards, a Comparative Study of Industrial Design Inspiration Material*, 13 J. Design Res. 78, 85 (2015). The visual designer is not necessarily seeking discrete design details, but the mood board provides "many

8

inspirational functions," including "a design context," "the trigger of idea generation," and "the structuring of anchors for mental representations"—all intended to lead to a final visual design solution to convey to the customer when seen in the marketplace.  Rieuf, *supra*, at 85.

For instance, the image below shows a mood board for the design of a new automobile, capturing the wide range of "images, words and even textures that give technical and emotional information about the elements to be included in a specific design." *Your Car Begins with a Moodboard*, Motor Equipment News, Dec. 2020, at 21, 21.[3]



---

[3] https://motorequipmentnews.co.nz/article/your-car-begins-moodboard.

With mood boards, designers capture a wide range of visually stimulating materials, textures, and images of other products. When designing a new automobile, they may research a disparate collection of items such as motorcycle images, colors, fabric samples, office ergonomic chair photos, sneakers, clocks, and much more, as shown above.

### B. Companies Develop Designs with Consumers as the Intended Audience—Not Expert Designers

Companies seek design patent protection to protect the value of their products in the mind of the consumer, when viewed in the competitive landscape of modern retail. The only variable that is relevant in the protection of a company's products is whether a competing design is substantially the same, which, if so, would drain value from the original product.

Companies do not conduct market research using ordinary designers as study respondents for the purpose of understanding consumer response to the appearance of products. Instead, companies utilize actual consumers (ordinary observers) in studies to ascertain the impact that the visual design of their products has on purchase decisions. Thus, it is the consumer's perception rather than the designer's perception that matters.

10

As confirmed by extensive, peer-reviewed research, professional designers approach visual assessments differently than consumers. For instance, experts in their respective fields outperform non-experts in visual assessments, including how expert radiologists can "detect cancer in a mammogram in a split second," as well as other fields such as "fish classification," "car driving," and the "arts." Andreas Gegenfurtner, et al., *Expertise Differences in the Comprehension of Visualizations: A Meta-Analysis of Eye-Tracking Research in Professional Domains*, 23 Educ. Psychol. Rev. 523, 524 (2011). A comprehensive meta-analysis study examined how "experts, when compared with non-experts, had shorter fixation durations, more fixations on task-relevant areas, and fewer fixations on task-redundant areas." *Id.* Assessing whether a design is obvious through the eye of the consumer is thus scientifically much different than assessing it through the designer's expert perspective.

A recent study utilizing a widely accepted and validated design sensitivity testing methodology found that designers are more sensitive to design and see more detailed differences when examining designs for similarities/differences compared to consumers, *i.e.*, the ordinary observer. Charles L. Mauro, et al., *The Impact of Design Experts in the*

*Application of the Ordinary Observer Test in Design Patent Litigation*, (Working Paper). This disparity in design sensitivity may lead to a bias in decisionmaking when compared to decisionmaking by an ordinary observer.

The realities of design development and perception are not accurately reflected in current law, as explained below. Obviousness for design patents is assessed through the eyes of an ordinary designer. That standard is not aligned, however, with how designers develop products and designs in the real-world. Nor is it consistent with how consumers perceive those products and designs in the marketplace. Instead, the question of obviousness should be determined through the lens of the ordinary observer's response to the visual design of a product as viewed in the marketplace.

The differences between an ordinary designer and an ordinary observer are the genesis of a long-standing problem with the current use of the ordinary-designer test in an obviousness analysis. Ordinary designers do not possess critical backgrounds in market research theory and

practice, and their backgrounds negatively skew the outcome of obviousness determinations. The least biased and most appropriate means of assessing obviousness is therefore the ordinary observer test.

Some courts have accepted advanced versions of the ordinary observer test methodology that utilize large-sample, professionally developed, and scientifically validated consumer surveys designed to improve the reliability of the ordinary observer test when evaluating infringement. *See, e.g.*, *Delta T, LLC v. Dan's Fan City, Inc.*, No. 8:19-cv-1731-VMC-SPF, 2021 WL 458022, at *6-8 (M.D. Fla. Feb. 9, 2021); *see also* Charles L. Mauro, et al., *Development and Initial Validation of an Empirical Ordinary Observer Test for Design Patent Infringement* 4 (June 5, 2020) (presenting "a methodology for applying data-driven decision-making and modern neuroscience-based research to design patent infringement litigation").[4] These methods provide the fact finder with scientifically valid, objective data on the ordinary observer test for infringement, and can do the same for the issue of obviousness.

---

[4] https://ssrn.com/abstract=3620088.

## C.     The Overall Appearance of a Design Counts, Not the Individual, Discrete Features

Modern marketing science validates that, when consumers purchase products, they seek a combination of newness and familiarity that only consumers can assess.  This reality of consumer behavior is the foundation of the "Most Advanced Yet Acceptable" theory ("MAYA theory") of product design, developed initially by Raymond Loewy, the founding father of industrial design.  Raymond Loewy, *Never Leave Well Enough Alone* 277-78 (1951).  Loewy developed some of the most iconic designs in U.S. commerce, including The Air Force One logo, the Coca-Cola bottle, the Shell Oil logo, the U.S. Postal Service logo, and the Greyhound logo.  *See* Rikke Friis Dam, Interaction Design Foundation, *The MAYA Principle: Design for the Future, but Balance It with Your Users' Present* (2021).[5]

Confirming the principles of MAYA design theory, peer-reviewed research has shown, for example, that modern consumer products (such as automobiles, telephones, and teakettles) must look the most advanced possible, yet still have the basic proportions and angular visual impression of a typical product.  This combination is a measure of familiarity.

---

[5]   https://www.interaction-design.org/literature/article/design-for-the-future-but-balance-it-with-your-users-present.

*See, e.g.*, Paul Hekkert, et al., *"Most Advanced, Yet Acceptable": Typicality and Novelty as Joint Predictors of Aesthetic Preference in Industrial Design*, 94 Brit. J. Psychology 111, 121 (2010) ("The findings of all three studies demonstrate that typicality and novelty are jointly and equally effective in explaining the aesthetic preference of consumer products.").

Designers actually measure the success of a design in its visual ability to invoke in consumers certain reactions to and associations with the underlying product. Thus, the perspective of consumers, *i.e.*, ordinary observers, can meaningfully measure whether or not a design has succeeded in creating the intended distinct visual impression. To the extent that the design-patent system purports to reward designers of nonobvious designs with a patent, it would be more appropriate for consumers, not designers, to effectively decide whether the design creates a visual impression worthy of protection. If such an ordinary observer believes that a particular design is basically the same as a prior art design, it should not be granted a patent.

How consumers seek information and make purchase decisions, both in brick-and-mortar retail and in online marketplaces, are a vast and extensively documented area of research. *See generally* Xin (Shane)

Wang, et al., *The Journal of Consumer Research at 40: A Historical Analysis*, 42 J. Consumer Res. 5 (2015).  Consumers make purchase decisions with a predetermined product category in mind.  Alina Stankevich, *Explaining the Consumer Decision-Making Process: Critical Literature Review*, 2 J. Int'l Bus. Res. & Mktg. 7, 10 (2017) (reviewing how a consumer "starts an information search" "[a]fter the consumer has developed a need/want").  They do not randomly seek information from other product categories.  A consumer interested in purchasing an SUV automobile will not conduct an information search about vacuum cleaners.  *See id.*  Moreover, there is no way to objectively combine visual design features from different product categories, or even visual design features from within the same category, because companies sell whole unified products and not discrete visual design component parts that can be arbitrarily combined to make a new visual "product."

As one of the *Amici* Charles Mauro has explained, "[u]sability research used to be about handing a product to a user, putting them in a lab, giving them a task, recording it, and getting their personal impressions."  Mike Winder, *Down to a Science: Charles Mauro's Expertise in*

*Neuroscience-Based Design Research Dates Back to His ArtCenter Education*, Dot Magazine (May 16, 2019).[6]  Now, though, complex scientific studies can include "3D spatial tracking, electromyography, cognitive workload analysis, microfacial expression analysis, map neurophysiological activity with EEG, and more," all providing insight to how consumers conceive designs.  *Id.*  Researchers "can peer very deeply into preferences, motivations, errors, satisfaction and many different variables that have been virtually impossible to tap into historically."  *Id.*; *see also* Charles L. Mauro & Christopher Morley, *Why the Future of Design Patent Protections Will Rely on Modern Neuroscience, Not Constitutional and Legal Reversionism*, 36 Berkeley Tech. L.J. 277, 281-82 (2022) (explaining how the current legal tests are deficient and "there has been virtually no attempt to define the hypothetical observer using experimentally validated and statistically rigorous research").

## II.    The Court's Path To The Existing Open Question About The Correct Standard For Design-Patent Obviousness

The vast weight of precedent, including *Gorham v. White*, 81 U.S. 511 (1871), and *Egyptian Goddess v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir.

---

[6] https://www.artcenter.edu/connect/dot-magazine/articles/charles-mauro-down-to-a-science.html.

2008) (en banc), supports the proposition that obviousness should be judged by an ordinary observer. The case-law history has not been as clear, however. As recently as 2009, this Court remarked that it was an open question of whether the ordinary observer test should apply to obviousness as well as infringement. The Court should use this case as an opportunity to remedy the existing incongruity. *See generally* Janice M. Mueller & Daniel Harris Brean, *Overcoming the "Impossible Issue" of Nonobviousness in Design Patents*, 99 Ky. L.J. 419 (2011).

## A.    *Gorham v. White* is Directly Relevant to the Issue of Obviousness

In *Gorham v. White*, 81 U.S. 511 (1871), the Supreme Court formulated the test for determining whether a patented design is infringed by a later design. The question there was whether the "sameness of appearance" should be judged through the eyes of an expert or the eyes of an ordinary observer. *Id.* at 527-28. The Court held the latter, explaining that, if infringement were determined through the eyes of a person engaged in the manufacture or sale of articles containing such designs"—*i.e.*, the ordinary designer—"[s]uch a test would destroy all the protection which the act of Congress intended to give" and "[t]here never could be piracy of a patented design." *Id.* at 527.

18

The Court expanded on its reasoning by Highlighting the important distinction between the ordinary observer and the ordinary designer, noting that, "[m]uch less than that which would be substantial identity in [the designers'] eyes would be undistinguishable in the eyes of men generally, of observers of ordinary acuteness." *Id.* at 528.  Ordinary observers "are the principal purchasers of the articles to which designs have given novel appearances, and if they are misled, and induced to purchase what is not the article they supposed it to be . . . the patentees are injured . . . ." *Id.*

The Supreme Court's ruling in *Gorham* is important for many reasons.  First, a person versed in designs would almost always notice differences between two designs when compared to similar analysis by the ordinary observer.  This observation aligns with the empirical research discussed above. *See supra.* Second, it is the ordinary observer—individuals of ordinary intelligence who are principal purchasers of the articles—who are the proper judges of "substantial sameness."  This observation again accurately captures the current role of design innovation—it is intended to be used by the consumers, not merely by fellow

expert designers. And third, the purpose of design patent law—to promote progress in the decorative arts—is best served by having ordinary observers, *i.e.*, "those who buy and use," *id.* at 528, as the judges of whether two designs are substantially the same.

## B. *Laverne* Nailed It

Almost a century after *Gorham*, this Court's predecessor (the Court of Customs and Patent Appeals) essentially adopted *Gorham*'s approach in *In re Laverne*, 356 F.2d 1003 (C.C.P.A. 1966). *Laverne* involved a chair design that was rejected as being obvious over the prior art. *Id.* at 1003-04. The patent examiner had concluded that the claimed design was obvious because the two designs were well "within the skill of a competent designer." *Id.* at 1004-05. On appeal, the CCPA considered whether "a person having ordinary skill in the art" per § 103 was an ordinary designer or ordinary observer. *Id.* at 1006.

The court cogently observed "the test of patentability of an admittedly new design cannot be whether it is no more than a 'competent designer' might produce." *Id.* What must be done instead, as the court explained, "is to determine obviousness to the ordinary intelligent man." *Id.* "The test is inherently a visual test, for the design is nothing more

than appearance [and] no special skill is required to determine what things look like." *Id.*

Applying the "ordinary intelligent man" standard to the facts of the case, Judge Rich, writing for the court, proceeded (as an ordinary observer would) to identify "a number of differences," "the cumulative effect of which is unquestionably to create a different appearance." *Id.* at 1006-07. Notably, the court's reliance on a "cumulative" appearance evokes the holistic approach to design development and perception, as discussed above.

## C.    *Nalbandian* Pulled Out the Nail

Fifteen years after *Laverne*, the CCPA changed course in *In re Nalbandian*, 661 F.2d 1214 (C.C.P.A. 1981), when it faced an apparent split among the circuit courts. The court noted that, "[s]ince the *Laverne* decision, the Second, Third, Tenth and District of Columbia circuits have specifically considered the 'ordinary observer' test," as formulated by *Laverne*, but "rejected it." *Id.* at 1215. In an effort to "close this schism," the CCPA declared that "the test of *Laverne* will no longer be followed" and therefore held that the "ordinary designer"—not the "ordinary observer"—applies to design-patent obviousness. *Id.* at 1216.

21

The court premised its overruling of *Laverne* on the Supreme Court's holding in *Graham v. John Deere*, 383 U.S. 1 (1966), which of course was applying the "the level of ordinary skill in the art" standard in the context of a utility-patent case. Of note, *Laverne* was decided in March 1966, about a month after *Graham* issued. Thus, when Judge Rich wrote the unanimous *Laverne* decision, he and the other CCPA judges were presumably aware of *Graham* but rightfully believed that it had limited, if any, applicability in the design-patent context.[7]

The CCPA in *Nalbandian* also contended that the standard of "ordinary designer" is helpful because of the objective evidence which can be brought to bear by submitting an affidavit from the expert, which the

---

[7] Indeed, Judge Rich, in concurrence "as the father of the so-called 'ordinary observer' test," noted that "[t]he real problem, however, is not whether the § 103 fictitious 'person' is an ordinary observer or an ordinary designer but with the necessity under Title 35 of finding unobviousness in a design." 661 F.2d at 1218. He further recalled how the 1952 Patent Act was not intended to solve the conundrum of how a design can be "nonobvious" or "inventive." *Id.* at 1218-20. Judge Rich elaborated on then-pending legislation which would have addressed "the real problem," but it was never enacted—all of which further highlights why § 103 is not intended to be a uniform standard for both design patents and utility patents.

court curiously admitted would be subjective. 661 F.2d at 1217. It concluded that "[n]o affiant can be qualified as an expert ordinary observer." *Id.* Then, somewhat inconsistently, the court said that there is no problem in using the ordinary observer standard in infringement determinations.

### D. *Titan Tire*—An Open Question

Almost thirty years after *Nalbandian*, the "ordinary observer" versus "ordinary designer" debate arose before this Court in *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372 (Fed. Cir. 2009). The Court faced the renewed question because the full Court had recently abrogated the point-of-novelty test for infringement with its decision in *Egyptian Goddess*.

In *Egyptian Goddess*, the unanimous Court "returned the focus of the infringement inquiry to a comparison of the designs as a whole from the perspective of an ordinary observer, while at the same time recognizing that the background prior art may provide context for this analysis." *Titan Tire*, 566 F.3d at 1384 (citing *Egyptian Goddess*, 543 F.3d at 676-77). As the Court recognized, "although the approach we adopt will frequently involve comparisons between the claimed design and the

23

prior art, it is not a test for determining validity, but is designed solely as a test of infringement." *Id.* (quoting *Egyptian Goddess*, 543 F.3d at 678). The Court continued: "[E]ven though this [C]ourt has reestablished the ordinary observer test as the controlling doctrine applicable to design patent infringement, it is not clear to what extent, if any, the doctrine applicable to obviousness should be modified to conform to the approach adopted by this [C]ourt in *Egyptian Goddess*." *Id.*

The Court in *Titan Tire* therefore concluded that it was an open question of whether the ordinary observer test should apply to design-patent obviousness as well as to infringement. *Id.* Under the specific facts, though, the Court had no reason to answer the question. *Id.* This issue remains unanswered today, and *Amici* respectfully submit that the Court can and should resolve it in the present case in order to improve the state of design-patent law.

## III. Realign Design-Patent Validity and Infringement By Applying The Ordinary Observer To Obviousness And Restoring The Statutory Anticipation Analysis

*Titan Tire*'s recognition and implicit invitation lead to *Amici*'s next point of showing how the legal *status quo* presents a severe disconnect

between design-patent validity and infringement. As real-world design-ers, *Amici* are adversely impacted by the inconsistent application of the law and submit that this case presents an opportunity to fix the law so that it aligns with marketplace realities of design innovation.

## A. The Current Misalignment

In general, "it has been well established for over a century that the same test must be used for both infringement and anticipation." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir. 2009). That general principle stems from the old maxim of "'[t]hat which infringes, if later, would anticipate, if earlier.'" *Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889) (quoting *Peters v. Active Mfg. Co.*, 21 F. 319, 321 (S.D. Ohio 1884)). That maxim urges the same analytical symmetry in the design-patent context, whether for infringement or validity, includ-ing novelty and nonobviousness. But that, unfortunately, is not the case for design-patent obviousness.

As noted, infringement and novelty are currently assessed using the ordinary *observer* test, but obviousness is assessed using the ordinary *designer* test. *See supra*. This incongruity can lead to anomalous results. For instance, one can have a situation where an accused design does not

25

infringe an earlier-patented design, but that same accused design could be rendered obvious by the patented design (if the latter pre-dated it), and the only reason is because the analyses are assessed using different standards.  Infringement is through the eyes of the ordinary observer, whereas obviousness is through the more experienced eyes of the ordinary designer.

More specifically, the incongruity creates a situation where, for example, Design 1 does not infringe a patent claiming Design 2, but that same Design 2 could (if earlier in time) render Design 1 as obvious, even though Design 1 does not fall within the scope of the patent on Design 2. *See* Mueller & Brean, *supra*, at 547 (explaining in further detail this incongruity).  Understanding how designers and humans perceive objects underscores the problematic and illogical asymmetry since the scope of a design patent is effectively different for validity and infringement purposes. When the current law leads to inconsistent and incompatible results, *Amici* respectfully submit that something is amiss.

In view of how design innovation occurs, *see supra*, the anomalous result should not be surprising.  The designer, after all, will have greater visual acuity than an ordinary observer.  The designer will also have

greater knowledge and familiarity with the design process itself. The designer will likely be less inclined to view design combinations and modifications as "substantially the same." *See* Charles L. Mauro, et al., *The Impact of Design Experts in the Application of the Ordinary Observer Test in Design Patent Litigation* (Working Paper).

This incongruity is further highlighted by the fact that there appears to be little, if any, meaningful difference between the articulated tests for infringement and obviousness. Infringement uses the "substantially the same" articulation, *Egyptian Goddess*, 543 F.3d at 670, whereas obviousness uses the "basically the same" articulation, *In re Rosen*, 673 F.2d 388, 391 (C.C.P.A. 1982). *Amici* are hard-pressed to ascertain any difference between "substantially the same" and "basically the same." Nor does there appear to be any meaningful difference when considering the realities of the design-innovation process, as discussed above.

The current inconsistencies harm the policy goal of the design-patent system. The design-patent system is intended to promote progress in design innovation, but that progress is hindered when the protectability and enforcement of designs are adjudged by inconsistent standards.

Designs that are visually distinct from one another for purposes of infringement should each be equally eligible for patent protection.

## B.     How to Fix the Misalignment

Anticipation and obviousness should both be adjudged by the same ordinary-observer standard for design patents.  That much should be readily accepted, based on the above.

But accepting that proposition does lead to another issue: If the tests for both anticipation and obviousness are to be judged by an ordinary observer, the two tests would reduce to the same effective analysis, as explained below.  That outcome—judging anticipation and obviousness through the same analysis—cannot be, of course.  The answer to this quirk is to restore the anticipation analysis in the design-patent context to its classical formulation, aligned with the statutory requirements.

Anticipation requires each and every element of a claimed invention to be disclosed in a single prior art reference.  *See* 35 U.S.C. § 102 (referring to the "claimed invention"); *id.* § 103 ("notwithstanding that the claimed invention is not identically disclosed as set forth in section 102").  In the utility-patent context, "[t]he *identical* invention must

28

be shown in as complete detail as is contained in the . . . claim." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1236 (Fed. Cir. 1989) (emphasis added).

In the design-patent context, the current anticipation analysis is different, however. The test for design patent anticipation uses "substantially the same" as the test. *Int'l Seaway*, 589 F.3d at 1239. Design-patent anticipation thus incorporates the broader "substantially the same" analysis.[8]

The important point here is that, when the ordinary observer standard is applied to obviousness, the current anticipation test becomes identical to the obviousness analysis. Both tests would use the ordinary observer perspective, and the analyses would rely on an identical standard: "substantially the same" for anticipation and "basically the same" for obviousness. There is no meaningful difference between the two.

---

[8] One might ask how design-patent anticipation morphed from "identical" to "substantially the same." This resulted from an overly loose application of the *Peters* maxim that fails to account for the doctrine of equivalents, which does not apply in the design-patent context. *See* Mueller & Brean, *supra*, at 572 n.549; *see also* Perry Saidman, *Design Patents are Sinking in* International Seaway: *Rethinking Design Patent Anticipation* (Feb. 5, 2020), https://ssrn.com/abstract=3532376.

The simple solution to that quirk is to restore the anticipation test to its longstanding, traditional requirement of identicality. That formulation of anticipation conforms to the statutory requirement. *See* 35 U.S.C. §§ 102, 103. It would also align with this Court's statement that "the factual inquiry in determining anticipation over a prior art reference is the same as utility patents applications." *Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1461 (Fed. Cir. 1997) (citing 35 U.S.C. § 171). While differences between design innovation and utility innovation warrant different approaches in the obviousness context, the same cannot be said for anticipation. Nor is there any statutory basis for doing so.

## IV.  The *Rosen* Two-Step Test For Obviousness Needs To Be Modified

The present case challenges the *Rosen* two-step analysis, including as later applied by *Durling v. Spectrum Furniture Co.*, 101 F.3d 100 (Fed. Cir. 1996). *Amici* submit that the *Rosen* test provides a valid and useful paradigm for assessing the obviousness of design patents, and that it can be improved as suggested herein.

### A.    *Rosen*'s Primary-Reference Requirement is Appropriate Under the Ordinary Observer Test

Under *Rosen*, to establish obviousness, "one must find a single reference, a something in existence, the design characteristics of which are basically the same as the claimed design." 673 F.2d at 391. The selection of the primary reference, known as a *Rosen* reference, considers the "visual impression created by the patented design as a whole." *Durling*, 101 F.3d at 103 (citing *Rosen*, 673 F.2d at 391). If a primary reference is found, other "secondary" references "may be used to modify it to create a design that has the same overall visual appearance as the claimed design." *Durling*, 101 F.3d at 103; *see also In re Harvey*, 12 F.3d 1061, 1063 (Fed. Cir. 1993). This "long-standing test for the proper combination of references has been 'whether they are so related [to the primary reference] that the appearance of certain ornamental features in one would suggest the application of those features to the other.'" *Rosen*, 673 F.2d at 391 (quoting *In re Glavas*, 230 F.2d 447, 450 (C.C.P.A. 1956)); *see also In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996). The test is intended to safeguard against hindsight-based picking-and-choosing of elements from various, marginally related references. *See, e.g., In re Jennings*, 182 F.2d 207, 208 (C.C.P.A. 1950).

The first step of the *Rosen* test is well-suited when using the ordinary observer (as opposed to the ordinary designer). An ordinary observer is fully capable of looking at two designs—the claimed design and the primary reference—and assessing whether the two designs are basically the same. An ordinary observer, using the "substantially the same" rubric, does it routinely when it comes to determining infringement, and there is no reason they cannot do it when it comes to obviousness. If an ordinary observer can make the ultimate judgment about whether a patent may be enforced against an infringer, they are certainly equipped to make a similar judgment when it comes to whether the patent should have been issued in the first place.

Further, the primary-reference requirement comports with how designs are developed, used, and perceived in the real-world commercial context. Consumers generally evaluate the desirability of a product based on its overall appearance, not its component parts. *See* Peter H. Bloch, *Seeking the Ideal Form: Product Design and Consumer Response*, 59 J. Marketing 16 (1995). In making such a decision, such ordinary observers compare the overall appearance of the product to other like-kind products. Ordinary observers perceive the product as a whole, and they

generally do not dissect the product into discrete elements.  Thus, to evaluate whether a claimed design is sufficiently distinct from the prior art in overall appearance, it makes sense to have to produce a single reference that is quite close to the claimed design, one that is "basically the same."

In contrast, the ordinary designer will likely consider a much broader field of prior art than would an ordinary observer and will be more likely to rely on an overall design from an unrelated art.  *See, e.g.*, *Rosen*, 673 F.3d at 390 (explaining that, with respect to the claimed coffee table design, an ordinary designer's consideration would be broader and include "designs of contemporary furniture other than coffee tables").  Thus, the current requirement for a primary reference that has characteristics "basically the same" as the claimed design, when considered through the ordinary-observer lens, properly safeguards against an overly expansive assessment of what prior art be the starting point for an obviousness challenge.

## B.    The Court Should Discard or Tightly Restrict the Use of Secondary References

One necessary modification to the *Rosen* test is to discard or tightly restrict the use of secondary references in the obviousness analysis.  As

noted, *Rosen* permits combining references, but that framework should be eliminated or tightly cabined to specific instances. Otherwise, the combination of references will lead to outcomes not consistent with the goals of promoting design innovation.

From *Amici*'s perspective, the concept of combining two, three, or more specific references is anathema to the design-innovation process. As explained above, designers do not pick and choose individual elements and then simply connect the pieces. Moreover, picking and choosing elements of designs are not how consumers perceive design innovation. The consuming public views designs as a whole and not as an assemblage of discrete design elements. *See Palmer*, *supra*.

Furthermore, the case law fails to identify a strong, evidence-based rationale for combining references for design patents. *Rosen*, for example, relied on *Jennings* as an example of an obviousness analysis resting on combining prior art, but *Jennings* was a case where five different prior-art references were used, and the court reversed the rejection, emphasizing that the claimed design "must be viewed as a whole," and "compared with something in existence—not with something that might be brought into existence by selecting individual features from prior art and

combining them, particularly where combining them would require modification of every individual feature." 182 F.2d at 208.

If secondary references are to be cited against a claimed design, such secondary references should be limited to those that disclose exactly the same type of article as the primary *Rosen* reference. *Rosen*'s language regarding "so related" as to "suggest" the combination (as amorphous as those words are) should require instead that the secondary references are not simply analogous to the article embodying the claimed design but are precisely the same type of article. The differences between a *Rosen* reference and the claimed design must be very few and very minor (essentially *de minimis*). *See* Mueller & Brean, *supra*, at 547 (recommending that "such secondary references should be limited to those that disclose exactly the same type of article as the primary *Rosen* reference").

Ultimately, combining references should be done with great hesitation and only under the narrowest of circumstances. Because of the latitude afforded under *Rosen*'s second step, the current obviousness analysis can lead to conclusions that conflict with how designers create innovation, how consumers perceive that innovation, and how progress in design innovation can best be promoted.

35

## V.    The Court's En Banc Questions

The above analysis primarily addresses Question C of the Court's en banc order. *Amici* offer the following concise answers to the Court's remaining en banc questions. *Amici*'s answers flow from the discussion above, as well as other concepts, some of which should be adequately addressed in the briefs of the parties and other *amici*.

**Question A.**   In *Amici*'s view, *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), does not overrule or abrogate *Rosen* or *Durling*. While *KSR* applies to § 103, the text of the statute itself recognizes that the obviousness analysis is different for utility patents as compared to design patents. Any application of the statute is necessarily confined by "the art to which the claimed invention pertains." 35 U.S.C. § 103. Design innovation is a decidedly different "art" than utility innovation, and thus applying § 103 in the design art can—and should—have different considerations than in the utility art.

**Question B.** Nothing in *KSR* suggests or indicates that its holding applies to design-patent law. As noted above, the text of § 103 makes every analysis dependent on "the art to which the claimed invention per-

36

tains." It therefore should come as no surprise that, since the 1952 Patent Act, the five Supreme Court cases (besides *KSR*) to decide the obviousness of a utility patent or application have never hinted that those decisions apply without any qualification to the obviousness analysis for design patents. *See Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 8 (1986) (per curiam); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57 (1969); *United States v. Adams*, 383 U.S. 39 (1966); *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966). Thus, *KSR*'s rejection of the overly rigid application of the teaching-suggestion-motivation test for utility patents does not mean that the existing flexibility in design-patent obviousness analysis is insufficient.

**Question D.** *Amici* are not aware of any other precedent that clarifies the *Rosen-Durling* test.

**Question E.** Eliminating the *Rosen-Durling* test will unnecessarily harm design innovation. Improving the test, as recommended in this brief, would greatly simplify the obviousness analysis for design patents and bring added legal certainty, which in turn will advance the progress of design innovation.

37

**Question F.** *Amici* believe that this question will be adequately addressed by the briefs of the parties and other *amici*.

## VI.  Conclusion

For the foregoing reasons, *Amici* ask that this Court hold that (a) an ordinary observer test applies to obviousness; (b) the test for anticipation revert to its long-standing test that the prior art reference must be identical to the claimed design; (c) the first step of *Rosen* remains the same but applied using the ordinary observer test to judging whether the two designs are basically the same; and (d) *Rosen*'s second step should be either eliminated or applied in the narrowest of circumstances.

Date: August 28, 2023                Respectfully submitted,

By: */s/ Matthew J. Dowd*
Matthew J. Dowd
Robert J. Scheffel
Dowd Scheffel PLLC
1717 Pennsylvania Avenue, NW
Suite 1025
Washington, D.C. 20006
(202) 559-9175
mdowd@dowdscheffel.com
rscheffel@dowdscheffel.com

Perry J. Saidman
Perry Saidman, LLC
8601 Georgia Ave., Suite 603
Silver Spring, MD 20910

(202) 236-0753
ps@perrysaidman.com

*Counsel for Amici Curiae*

# ADDENDUM

## List of *Amici Curiae*

1) Institute for Design Science and Public Policy (IDSPP.org)

2) Charles Lee Mauro MSc, CHFP, IDSA, President & Founder, Mauro Usability Science, Founder & Chairman, Institute for Design Science and Public Policy (IDSPP), Consultant to: Apple, Amazon, Facebook, Microsoft, Goldman Sachs, Amicus Design Research

3) Christopher Daniel Morley MSc, Senior Vice President and Director of Research, Mauro Usability Science, Founding Board Member, IDSPP, Amicus Design Research

4) Peter Bressler
FIDSA, Former President, IDSA, Founder and Leader of Bresslergroup, Inc., Adjunct Associate Professor, Drexel University, Adjunct Associate Professor, University of Pennsylvania

5) Jon Christopher Hacker
Former Chair of Product Design, Art Center College of Design, Former Chief Design Officer Johnson & Johnson, Former Vice President of Design, Herman Miller, Former Vice President of Design Aveda Co., Former Vice President of Design Steuben Glass

6) Gordon Bruce
Owner, Gordon Bruce Design, LLC, Former Eliot Noyes Design Executive, IBM, Thinking Machines, Founder Innovation Design Lab Samsung, Renowned Design Expert and Lecturer Serving Global Clients, Lecturer Harvard University, Judge Red Dot Awards

7) Anthony Andre
Past President Human Factors and Ergonomics Society, Director, Interface Analysis Associates, Adjunct Professor, San Jose State University

8) David Hodge
Principal, New Story Space, Clients Including, Sony, Knoll,

Steelcase, International Award-Winning Film Director, and Producer (Life on Wheels), Former Apple Senior Designer

9) Valerie Fenster
Senior Director, Packaging & Human Factors Engineering, Akero Therapeutics, Former Head of Human Factors Research Amgen, Abbott, and Citibank

10) George McCain
FIDSA, Fellow and Chair Emeritus, IDSA, Principal, McCainDesign. Fluke Corporation, Corporate Design Manager

11) Adrian O'Heney
Principal Industrial Designer, Stryker Corporation

12) Michael Derocher
Former Design Director, HP Inc.

13) Joellyn Gray
Principal, GrayMatter Advisory Services, LLC, Former Director of Marketing, Fujifilm North America

14) Nancy Perkins
FIDSA, President, Perkins Design Ltd., Instructor, Carnegie Mellon University, Illinois Institute of Technology, University of Illinois Chicago

15) Timothy Fletcher
FIDSA, President, One Business Design, LLC, Clients Including Coca-Cola, Delta Airlines, Bank of America

16) Carlton Lay
Associate Professor of Industrial Design, Auburn University

17) Joyce Thomas
Associate Professor of Industrial Design, Auburn University, Senior Designer Electrolux

18) Jennifer Pierce
Founder, Singular XQ, Founder Mindtree Consulting

19) James Kaufman
    Emeritus Professor, Ohio State University, Notre Dame, University
    of Cincinnati

20) Sal Ziauddin
    Owner, Maverick & Blueberry

21) Deborah George
    President, Growing Emerging Managers' Services, Executive HSBC

22) Gustavo Lopes Jota
    Marketing and Design Manager, Digitei S.A

23) Pieter den Heten
    Head of Design, Usable Thinking, Former Senior Manager CX and
    Product Design Publicis Sapient

24) Esteban Fridman
    Founder, NeuroUnicorn, Clinical Associate of NINDS-NIH, Former
    Assistant Professor of Neuroscience, Weill Cornell Medicine

25) Roger Belveal
    UX Architect, Belveal Art & Design, Numerous former positions in
    design management at leading Fortune 500 corporations.

26) Theo Mandel
    Founder and Principal, Interface Design and Development, LLC,
    Former Senior User Interface Design Architect, IBM

27) Sridhar Dhulipala
    Founder, Strategic Advisory for Experience, Founding Member of UX
    Design Practice, Infosys

28) Scott Peterson
    LIDSA, President, Scott Peterson Design, Inc., Former Senior
    Industrial Designer, Tektronix

29) Michael Derocher
    Former Design Manager and Design Director, HP Inc., Xerox and
    Uniden

30) Lloyd Philpótt
   Design Consultant, PhilpoDesign.com

31) Angela Yeh
   Founder, CEO, & Chief Talent Strategist, Yeh Ideology, Advisory
   Counsel IDSA, IDSA Chapter Chair NY

32) Edward Dorsa
   Emeritus Associate Professor of Industrial Design, Virginia Tech

33) RitaSue Siegel
   Founder, RitaSue Siegel Resources, Global expert on design
   education and professional recruiting. Director of Placement,  Pratt
   Institute

34) Steven Visser
   Fulbright Professor of Industrial Design, Purdue University. Leading
   Design IP Expert

35) Haig Khachatoorian
   Professor Emeritus of Industrial Design, NCSU College of Design

36) Michael Garten
   Consultant, MD Garten Design, Former Director of Project
   Management, TEAGUE

37) John Stram
   L/IDSA, Former Industrial Design/Graphic Manager, IBM, Former
   Director of Design Division, Seal Furniture & Systems, Manager of
   Design/Permanent Fixtures & Temporary Displays, American
   Greetings Corporation, Former Instructor at Ohio State University,
   Park University, and University of Kansas

FORM 19. Certificate of Compliance with Type-Volume Limitations                              Form 19
                                                                                             July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2021-2348

**Short Case Caption:** LKQ Corporation v. GM Global Technology Operations LLC

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [✓] the filing has been prepared using a proportionally-spaced typeface and includes 6,891 words.

- [ ] the filing has been prepared using a monospaced typeface and includes _____ lines of text.

- [ ] the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 08/28/2023          Signature:   /s/ Matthew J. Dowd

                          Name:        Matthew J. Dowd