CASE NO. 2021-2348

———————

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————

LKQ CORP. & KEYSTONE AUTOMOTIVE INDUSTRIES,
INC.

*Appellants,*

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,

*Appellee.*

———————

Appeal from the United States Patent and Trademark Office Patent
Trial and Appeal Board in  No. IPR2020-00534
(JJ. Scott A. Daniels, Grace K. Obermann, Christopher G. Paulraj)

———————

CORRECTED BRIEF OF AMICI CURIAE PATENT LAW PROFESSORS,
THE REPAIR ASSOCIATION, SECUREPAIRS, IFIXIT, AND US PIRG IN
SUPPORT OF APPELLANTS ON EN BANC REHEARING

Phillip R. Malone
JUELSGAARD INTELLECTUAL
 PROPERTY & INNOVATION CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Tel: (650) 724.1900
Jipic@law.stanford.edu

Counsel for Amici Curiae

# CERTIFICATE OF INTERESRT

Pursuant to Federal Circuit Rules 29(a) and 47.4, counsel for amici curiae certifies that:

1.      The full names of the amici I represent are: Patent Law Professors (See Attachment A), The Digital Right to Repair Coalition (The Repair Association), Securepairs, iFixit, and United States Public Interest Research Group, Inc. (US PIRG).

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) I represent is: N/A.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the amici curiae I represent are: None.

4.      The names of all law firms and the partners or associates that appeared for the amici I represent or are expected to appear in this Court (and who have not or will not enter an appearance in this case) are: None.

5.      The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal: LKQ Corp., et al. v. GM Global Technology Operations LLC, Fed. Cir. Case No. 2021-1253.

6. All information required by Federal Rule of Appellate Procedure 26.1(b) and (c) that identifies organizational victims in criminal cases and debtors and trustees in bankruptcy cases is: None.

August 31, 2023

/s/ Phillip R. Malone
Phillip R. Malone
Counsel for Amici Curiae
JUELSGAARD INTELLECTUAL PROPERTY &
 INNOVATION CLINIC
Mills Legal Clinic at Stanford Law School

## ATTACHMENT A TO CERTIFICATE OF INTEREST

Amici curiae patent law professors are listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Mark Bartholomew**
University at Buffalo School of Law, The State University of New York

**Professor Shubha Ghosh**
Syracuse University College of Law

**Professor Aaron Perzanowski**
University of Michigan

**Professor Ana Santos Rutschman**
Charles Widger School of Law, Villanova University

**Professor Joshua D. Sarnoff**
DePaul University College of Law

**Professor Katherine J. Strandburg**
New York University School of Law

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ................................................................. *iv*

ATTACHMENT A TO CERTIFICATE OF INTEREST ...................................... *iii*

TABLE OF AUTHORITIES .................................................................. *v*

INTEREST OF AMICI CURIAE .......................................................... 1

ARGUMENT ................................................................................ 3

I.    This Court Should Repudiate the *Rosen-Durling* Approach To Obviousness. ................................................................. 3

    A.    Congress Foreclosed Design Patent Doctrinal Exceptionalism. ................................................................. 3

    B.    This Court Should Conform Its Design Patent Obviousness Doctrine to the PHOSITA's (DOSA's) Perspective. ........................... 5

    C.    This Court Should Conform Its Design Patent Obviousness Doctrine to KSR's Treatment of the *PHOSITA's* Creativity. .............. 7

II.   Design Patent Obviousness Should Involve a Holistic Inquiry Based on What Designers Actually Do. ....................................... 12

CONCLUSION ............................................................................ 21

Attachment A – List of Amici ........................................................ 22

Certificate of Service .............................................................. 23

Certificate of Compliance with Type-Volume Limitations .............................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed Cir. 2012) ............................................................19

*Ashley Furniture Indus., Inc. v. Lifestyle Enter., Inc.*,
  574 F. Supp. 2d 920 (W.D. Wis. 2008) ................................................18

*In re Borden*,
  90 F.3d 1570 (Fed. Cir. 1996) ..............................................................14

*In re Carlson*,
  983 F.2d 1032 (Fed. Cir. 1992) ............................................................19

*In re Clay*,
  966 F.2d 656 (Fed. Cir. 1992) ................................................................9

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) ............................................................18

*Durling v. Spectrum Furniture Co., Inc.,*
  101 F.3d 100 (Fed. Cir. 1996) ……………………………….....................*passim*

*Ecolochem, Inc. v. Southern California Edison Co.*,
  227 F.3d 1361 (Fed. Cir. 2000) ..............................................................8

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
  599 F. Supp. 2d 1307 (S.D. Fla. 2009) ................................................11

*KSR International Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007) ..........................................................................*passim*

*LKQ Corp. v. GM Global Tech. Op. LLC*,
  2023 WL 328228 (Fed. Cir. Jan. 20, 2023) ..........................................13

*In re Nalbandian*,
  661 F.2d 1214 (C.C.P.A. 1981) ............................................................16

*Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) ...........................................................17

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...........................................5

*In re: Rosen*,
  673 F.2d 388 (CCPA 1982)……………………………….....................*passim*

*Sealy Tech., LLC v. SSB Mfg. Co.*,
  825 F. App'x 795 (Fed. Cir. 2020).....................................................18

*Smith v. Whitman Saddle Co.*,
  148 U.S. 674 (1893) ............................................................................6

**Statutes**

35 U.S.C. § 103 .............................................................................5, 6

35 U.S.C. § 112(a) ............................................................................5

35 U.S.C. § 171(b).........................................................................3, 5

Act of Aug. 29, 1842, Ch. 263, § 3, 5 Stat. 543-44 (1842) ......................3

**Other Authorities**

Christopher Buccafusco, Mark A. Lemley & Jonathan S. Masur,
  *Intelligent Design*, 68 DUKE L.J. 75 (2018) ................................11, 17

Claudia M. Eckert, Stacey Martin & Earl Christopher, *References to
  Past Designs*, *in* STUDYING DESIGNERS 3 (J.S. Gero & N.
  Bonnardel eds., 2005)........................................................................14

Howard T. Markey, Talk given April 26, 1983 (quoted in Ronald D.
  Hantman, *Why Not the Statute? Revisited*, 83 J. PAT. &
  TRADEMARK OFF. SOC'Y 685 (2001) ……………………………….................4

Jason J. DuMont & Mark D. Janis, *The Origins of American Design
  Patent Protection*, 88 IND. L.J. 837 (2013) ......................................3, 4

Jeanne C. Fromer, *A Psychology of Intellectual Property,* 104 NORTHWESTERN U. L. REV. 1441 (2010) ............................................................ 15

Joshua D. Sarnoff, *Design Patents Are Theft, Not Just A "Fraud Upon the Public," Who Need Legislation To Restore Their Repair Rights,* 36 BERKELEY TECH. L.J. 169 (2021) .......................................................... 6

Mark Bartholomew, *Nonobvious Design,* 108 IOWA L. REV. 601 (2023) ............................................................................................................ 6

Mark P. McKenna & Jessica Silbey, *Investigating Design*, 84 U. PITT. L. REV. 127 (2022) ................................................................................ 12, 14, 15

P. Gu, M. Hashemian & A.Y.C. Nee, *Adaptable Design* ........................................ 13

Peter S. Menell & Ella Korren, *Design Patent Law's Identity Crisis*, 36 BERKELEY TECH. L.J. 1 (2021) ...................................................................... 11

Sarah Burstein & Saurabh Vishnubhakat, *The Truth About Design Patents*, 71 AM. U. L. REV. 1221 ......................................................................... 17

Sarah Burstein, *Whole Designs,* 92 U. COLO. L. REV. 181 (2021) .......................... 19

Seda Yilmaz, Shanna R. Daly, Colleen M. Seifert & Richard Gonzalez, *How Do Designers Generate New Ideas? Design Heuristics Across Two Disciplines*, 1 DESIGN SCI. 1 (2015) .............................. 13

U.S. Const., Art. I, § 8, cl. 8 ................................................................................. 5, 12

## INTEREST OF AMICI CURIAE

Amici Curiae patent law professors, listed in Appendix A, regularly study, teach, and write about patent law, including design patent law, at law schools throughout the United States.[1] They have no personal interest in the outcome of this case. But they do share a professional interest in assuring the conceptual clarity and proper functioning of the patent laws so as to serve the public interest.[2]

Amicus The Digital Right to Repair Coalition, better known as the Repair Association, is a non-profit organization that represents more than 400 member companies across a variety of industries. Its mission is to advocate for responsible public policy on issues related to repair. The Repair Association is centered around a simple principle: consumers should have the right to repair the products they own. As design patents increase the cost of repair, the proper standard for non-obviousness is a growing concern within the repair industry.

---

[1] All professor amici are participating in their individual capacity and not on behalf of their institutions.

[2] Pursuant to paragraph 6 of this Court's June 30, 2023 order, this brief is being filed without consent of the parties or further leave of the court, and within 14 days after service of LKQ's en banc opening brief. No party or party's counsel authored this brief in whole or in part or contributed money that was intended to fund preparing or submitting this brief. No person other than amici or their counsel contributed money that was intended to fund preparing or submitting this brief. Out of an abundance of caution, counsel for *amici* also notes that one of the professor amici, Aaron Perzanowski, did minor consulting work for appellant LKQ in this case, reading its rehearing brief and offering comments, but had no involvement in drafting, in whole or in part, any of the substance of this amici brief.

Amicus Securepairs is a group of more than 300 information technology and cyber security professionals who support the right to repair. Founded in 2018, Secure Repairs acts as a bridge between policy makers and subject matter experts in the cybersecurity of personal electronics, home appliances, machinery, and critical infrastructure. Secure Repairs has been a prominent and important voice in the ongoing, national conversation about the rights of owners and independent repair professionals to service, repair, maintain, and tinker with their property.

Amicus iFixit is the open-source, online repair manual for everything. Its mission is to provide people with the knowledge to make their things work for as long as possible. iFixit sells repair parts, repair kits, and tools for everything from smartphones to appliances, but it does not currently sell automotive components. iFixit is committed to making repair accessible and affordable.

Amicus United States Public Interest Research Group, Inc. (US PIRG") is an independent, non-partisan organization that works for the public interest. Its team of national policy staff and state office directors across the country serve as counterweights to the influence of powerful special interests that threaten the public's health, safety and well-being. Since 1970, PIRG has used research, public education, advocacy, and litigation to win real results.

**ARGUMENT**

I.  **This Court Should Repudiate the _Rosen-Durling_ Approach to Obviousness.**

A.  **Congress Foreclosed Design Patent Doctrinal Exceptionalism.**

Congress chose to place the protection of aesthetic advances for physically useful articles of manufacture under the patent laws. Jason J. DuMont & Mark D. Janis, _The Origins of American Design Patent Protection,_ 88 IND. L.J. 837, 847-74 (2013). But Congress simultaneously made clear that all the same utility patent law requirements were to apply to designs, except where Congress had explicitly provided otherwise: "all the regulations and provisions which now apply to the obtaining and protection of patents not inconsistent with the provisions of this act shall apply to [design patents]." Act of Aug. 29, 1842, Ch. 263, § 3, 5 Stat. 543-44 (1842).

Congress preserved this language essentially unmodified in every major revision to the design patent law. The most recent formulation is even more explicit in rejecting design patent exceptionalism: "The provisions of this title relating to patents for inventions shall apply to patents for designs, _except as otherwise provided_." 35 U.S.C. § 171(b) (emphasis added).  Thus, from the beginning, design patents should have been required to conform as much as possible to utility patent law principles and doctrines, rather than seeking to fit patent law to any design-

3

specific concerns. That was the legislative choice, which courts should not have been free to disregard, whether or not it was a sensible one.

Except where *Congress* has explicitly specified otherwise, there should be no exceptional approach to design patent law statutory doctrines ("provisions") that render them different from utility patent law doctrines. Congress, not the Supreme Court, moreover, has imposed this requirement of consistency. As Professors DuMont and Janis have explained, "[b]y retaining the incorporation clause as utility patent law diverged from copyright law, Congress has forced blind obedience to a principle that even [Patent Commissioner] Ellsworth might not have supported." DuMont & Janis, *supra,* at 874. Unfortunately, sometimes blind obedience is required. As the former Chief Judge of this court used to say, "When all else fails, read the instructions…. When the patent statute (35 USC) is present, the advice has been far too often ignored." Howard T. Markey, Talk given April 26, 1983 (quoted in Ronald D. Hantman, *Why Not the Statute? Revisited,* 83 J. PAT. & TRADEMARK OFF. SOC'Y 685, 685 (2001). Thus, in response to this court's question (E) regarding "causing uncertainty" by "eliminating or modifying the design patent obviousness test," the answer is: This court should always obey the *clear* statutory law and should always correct its past *clearly* mistaken statutory interpretations

## B. **This Court Should Conform Its Design Patent Obviousness Doctrine to the PHOSITA's (DOSA's) Perspective.**

Utility patent law doctrines are to be determined by reference to the hypothetical "person having ordinary skill in the art to which the claimed invention pertains" (the "PHOSITA" or "POSA"). 35 U.S.C. § 103. *See also, e.g.,* 35 U.S.C. § 112(a) ("any person skilled in the art to which it pertains, or with which it is most nearly connected"); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) ("the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art"). Given Section 171(b), *all* design patent law doctrines should be determined by reference to the "Designer of Ordinary Skill in the Art" ("DOSA") – really to a PHOSITA in designer's clothing.

The reason to determine nonobviousness from the perspective of the PHOSITA/DOSA, moreover, is because the purpose of the patent laws is to "promote the Progress of Science and useful Arts." U.S. Const., Art. I, § 8, cl. 8. Patent laws (even for designs) should focus on technological or aesthetic *advancement,* not on protecting consumers or competitors from marketplace confusion. The latter is the purpose and function of the trademark and unfair competition laws.

Of course, for design patent infringement and novelty, the Supreme Court and this court have employed the perspective of the "ordinary observer," seeking to

protect that person from "confusion." This *judicial* approach is in tension with Congress' explicit statutory command to follow utility patent law principles. *Cf., e.g.,* Joshua D. Sarnoff, *Design Patents Are Theft, Not Just A "Fraud Upon the Public," Who Need Legislation To Restore Their Repair Rights,* 36 BERKELEY TECH. L.J. 169, 171 (2021) ("These category errors make[] design patent a chimera of trademark and copyright law that should have no place in our intellectual property zoo."). But there can be little doubt that it is the DOSA's perspective that should govern when it comes to *nonobviousness*. *See* 35 U.S.C. § 103 ("would have been obvious … to a person having ordinary skill in the art"). Whether and when a design constitutes a creative advance in aesthetics (a "new," "original and ornamental," and "nonobvious" design) can only be assessed by the standards of the field. Akin to other PHOSITAs, DOSAs are invariably seeking to achieve particular (perceptual) effects by employing different "shapes" that have different aesthetic "utility." *Smith v. Whitman Saddle Co.,* 148 U.S. 674, 681 (1893). *See generally, e.g.,* WALTER ISAACSON, STEVE JOBS (2011).

To be sure, there can be elements of subjectivity in the evaluation of aesthetic features. But design also lends itself to objective analysis, and both legislative intent and Supreme Court precedent foreclose an "all new designs are innovative" approach. *See* Mark Bartholomew, *Nonobvious Design,* 108 IOWA L. REV. 601, 604-05 (2023) (discussing the objective neurobiology of aesthetics). In contrast, at least

one opinion below incorrectly treated designs as exceptional, by classifying design

as immeasurable fine art rather than as measurable design art:

> [T]he considerations involved in determining obviousness are different
> in design patents. Obviousness of utility patents requires considerations
> such as unexpected properties, utility, and function. Design patents, on
> the other hand, relate to considerations such as the overall appearance,
> visual impressions, artistry, and style of ornamental subject matter.
> *Ornament is in the eyes of the beholder. Functional utility is objective.*

Dkt. 45, ECF No. 18 (emphasis added).

For the DOSA, advances in ornamentation are not "in the eyes of the beholder"

or too hopelessly subjective to evaluate. Rather they can be measured against the full

array of prior art to determine whether they represent a creative advance in the field.

To the extent *Rosen* and *Durling* replace the DOSA's perspective with a rigid and

simplistic search for identity between the design at issue and a single example from

prior art, they should be overruled. As discussed below, the Supreme Court in *KSR*

*International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), reversed precisely the same

kinds of erroneous approaches (as in *Rosen* and *Durling*) to considering the full

scope of a PHOSITA's (DOSA's) skill and creativity in determining

nonobviousness.

### C. This Court Should Conform Its Design Patent Obviousness Doctrine to *KSR's* Treatment of the *PHOSITA's* Creativity.

The *Rosen-Durling* approach to design patents makes two exceptional

departures from the Supreme Court's holding in *KSR*. The first is to require starting

with a single, prior art reference "the design characteristics of which are basically the same as the claimed design." *In re: Rosen,* 673 F.2d 388, 391 (CCPA 1982). The second is that "secondary references may *only* be used to modify the primary reference if they are '*so related* [to the primary reference] that the appearance of certain ornamental features in one *would suggest* the application of those features to the other.'" (emphasis added and citation omitted). Both of these rigid rules are in conflict with *KSR*'s express instructions for determining nonobviousness.

First, the Supreme Court in *KSR* rejected any requirement that modification (by combining disparate prior art elements) occur in any particular order, *i.e.,* by requiring the analysis to start with a "primary" reference. Prior to *KSR,* this court had decided *Ecolochem, Inc. v. Southern California Edison Co.,* 227 F.3d 1361 (Fed. Cir. 2000), in which it sought to prevent "blueprinting" (combining multiple prior art elements) in an effort to combat potential "hindsight bias." But *KSR* instead found it "[c]ommon sense . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR*, 550 U.S. at 420-21. The Court concluded that "[r]igid preventative rules that deny factfinders recourse to common sense" are "neither necessary under our case law nor consistent with it." *Id*. And that law should apply equally to designs as to inventions, as Congress instructed.

8

The "basically the same" design characteristics approach of *Rosen* also perpetuates the over-extended "analogous art" approach of *In re Clay,* 966 F.2d 656, 658-59 (Fed. Cir. 1992), which *KSR* impliedly overturned. The Supreme Court noted that a PHOSITA may start with *any* element in the prior art and may modify it or combine it with other elements in the art to achieve the patented invention, even by seeking to solve *a different problem* than that actually solved by the inventor. "The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art. Under the correct analysis, *any need or problem* known in the field of endeavor at the time of invention and addressed by the patent *can provide a reason for combining the elements* in the manner claimed." *KSR*, 550 U.S. at 420 (emphasis added). The Court continued by noting that it was an error to assume that a PHOSITA would "be led only to those elements of prior art designed to solve the same problem.... The idea that a designer hoping to make an adjustable electronic pedal would ignore Asano because Asano was designed to solve the constant ratio problem makes little sense," because a "person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 425. As a result, "[j]ust as it was possible to begin with the objective to upgrade Asano to work with a computer-controlled throttle, so too was it possible to take an adjustable electronic pedal like Rixon and seek an improvement that would avoid the wire-chafing problem." *Id*. at 420, 425 (emphasis added). The same standard—

"any need or problem known in the field"—should be considered a reason for combining in design patent nonobviousness as well.

Second, *Durling*'s insistence that modification of the primary reference is only possible with a "so-related" "suggestion" in the prior art, *Durling*, 101 F.3d at 103, is the kind of rigid, formalistic approach that *KSR* forbid when it rejected this court's former requirement of a "teaching, suggestion, or motivation" ("TSM") in the prior art to find obviousness. "The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *KSR,* 550 U.S. at 419. Indeed, "[t]he diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way. In many fields ... it often may be the case that market demand, rather than scientific literature, will drive *design* trends." *Id*. (emphasis added).

In other words, there is no requirement in utility patent law to start with a "primary reference" in the same field having "basically the same" characteristics, which then can only be modified by "suggested" "secondary" references in order to prove obviousness for inventions. And the statute requires that utility patent requirements apply to design patents, including for nonobviousness. Given their conflict with both Congressional instructions and Supreme Court precedent, this court should abrogate the *Rosen* and *Durling* tests.

*Rosen* and *Durling* are also bad policy. By demanding a virtually identical primary reference, the *Rosen* test allows any design to be deemed nonobvious if its near duplicate does not already exist. This approach threatens to set the bar for design patentability so low as to reward "mere changes of detail which may produce 'novelty' but do not reflect 'invention.'" *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 599 F. Supp. 2d 1307, 1314 (S.D. Fla. 2009) (quoting *Hadco Prods., Inc. v. Walter Kiddie & Co.*, 462 F.2d 1265, 1274 (3d Cir. 1972)), *aff'd in part, vacated in part*, 589 F.3d 1233 (Fed. Cir. 2019).

Overly permissive awards of design patents come with various costs. Subsequent designers are forced to transact around commonplace designs that have secured a patent and consumers face higher prices. Christopher Buccafusco, Mark A. Lemley & Jonathan S. Masur, *Intelligent Design*, 68 DUKE L.J. 75, 78 (2018). In addition, protection of designs obvious to designers risks insulating functional elements of ornamental designs from competition. Peter S. Menell & Ella Korren, *Design Patent Law's Identity Crisis*, 36 BERKELEY TECH. L.J. 1, 145 (2021) ("Product designers can now gain protection for functional features without meeting the higher requirements of the utility patent system."). The better approach, as described below, is to assess nonobviousness holistically from the perspective of a DOSA.

## II.   Design Patent Obviousness Should Involve a Holistic Inquiry Based on What Designers Actually Do.

The problems of the *Rosen-Durling* tests can be avoided by replacing them with a holistic inquiry that asks whether a combination of various design references would have been obvious to the ordinary DOSA in the relevant field.[3] Utility patent law recognizes that ordinary inventive activity may involve the combination of multiple relevant references. Design patent law should do the same. A test for design nonobviousness satisfied by any trivial difference from the prior art cannot be said to incentivize "progress" in design, which must be the ultimate objective for this area of law. U.S. Const., Art. I, § 8, cl. 8.

Undoubtedly, the comparison necessary for assessing nonobviousness has to start somewhere, but that somewhere need not be a "primary" reference but rather any prior art reference and any problem that would lead to its combination with other references to create the design "whole." *See supra* (discussing *KSR*). The unique *Rosen* and *Durling* tests openly clash with settled law. Courts assessing utility patent nonobviousness must consider evidence that a creator would have had reason to

---

[3] Because designers often work in teams, the DOSA may be more likely to be a team having disciplinary expertise in many fields. *See* Mark P. McKenna & Jessica Silbey, *Investigating Design*, 84 U. PITT. L. REV. 127, 152 (2022) ("We learned early in our interviews that the goal and practice of interdisciplinarity pervades design work."). This is another reason why the analogical arts test makes even less sense for design than for utility patents, where it still should be understood to have been impliedly overruled by *KSR.*

combine relevant prior art to form a new invention. *KSR,* 550 U.S. at 418. The same is true for designs. *See, e.g., LKQ Corp. v. GM Global Tech. Op. LLC,* 2023 WL 328228, at *13 (Fed. Cir. Jan. 20, 2023) (Stark, J. concurring) ("In this way, the *Durling* test can prevent the consideration of a combination of prior art references.... This all seems to conflict with *KSR*'s instructions...."). Requiring a primary reference before turning to any other evidence of nonobviousness blinds courts to relevant information expressly blessed by the Supreme Court for nonobviousness determinations, including "the effects of demands known to the design community" and "the background knowledge possessed by a person having ordinary skill in the art." *KSR*, 550 U.S. at 418.

Consideration of combinations of relevant prior art from the outset (instead of only considering a single reference) aligns with the way industrial designers actually work. Adapting existing designs – and elements of designs – for new purposes is essential to product design. *See, e.g.,* P. Gu, M. Hashemian & A.Y.C. Nee, *Adaptable Design*, 53 CIRP ANNALS 539, 540 (2004) (discussing importance to designers of reusing products and designs for changed circumstances). But designers do not simply take one existing visual design, study it to the exclusion of all others, and figure out a way to make their own design slightly different. Instead, the design process often begins by seeking a variety of diverse concepts from different sources, then subsequently winnowing down those ideas. *See, e.g.,* Seda Yilmaz, Shanna R.

Daly, Colleen M. Seifert & Richard Gonzalez, *How Do Designers Generate New Ideas? Design Heuristics Across Two Disciplines*, 1 DESIGN SCI. 1, 1-2 (2015); Claudia M. Eckert, Stacey Martin & Earl Christopher, *References to Past Designs*, *in* STUDYING DESIGNERS 3, 8 (J.S. Gero & N. Bonnardel eds., 2005) ("When designers look for new ideas for entire designs or particular aspects of a design, they review their own past designs and the designs of their competitors.").

The design process necessarily involves multiple design influences, and designers seek to integrate multiple influences to make a complete design with a blend of familiarity and novelty meant to appeal to consumers. *See, e.g.,* Bartholomew, *supra*, at 629 (discussing how designers balance familiarity with novelty). *Cf.* McKenna & Silbey, *supra,* at 165 ("By being 'hybrid' and 'T-shaped' the designer can dissect and reconnect pieces of the problem with ease, facilitating synergies among the disciplines in ways that professionals without the cross-disciplinary nimbleness cannot. Instead of the depth of expertise designating the designer as the person who does 'X,' that expertise becomes the basis for making connections and developing new abilities, broadening the range of problems to be solved and the methods by which to solve them.").

Nevertheless, this court has mistakenly held that "obviousness cannot be based on selecting features from the prior art and assembling them to form an article similar in appearance to the claimed design." *In re Borden,* 90 F.3d 1570, 1574 (Fed.

Cir. 1996). But combining features of design from multiple sources in the prior art is *exactly* what DOSAs do and what *KSR* instructs should be considered ("pieces of a puzzle"). *See, e.g.,* McKenna & Silbey, *supra,* at 169 ("Critical to the design 'problem finding' process is going outside the particular field . . . and locating analogous systems or solutions in unrelated places . . . . This broad search for problems and their solutions expands the scope of design practice and expertise and resists compartmentalization and hierarchy."); *see also KSR,* 550 U.S. at 421 ("any need or problem known in the field" may provide a reason for combining elements). If the test for design nonobviousness is meant to beneficially influence the efforts of designers and their employers, it should reflect their actual behavior. *See* Jeanne C. Fromer, *A Psychology of Intellectual Property*, 104 Northwestern U. L. Rev. 1441, 1458-59 (2010) (discussing importance of understanding the psychology of invention to better structure patent law to induce creativity).

Of course, one must not combine different elements of the prior art if it would not be obvious to a DOSA to do so (because there is no "apparent reason to combine"). *Cf. KSR,* 550 U.S. at 481 ("Often, it will be ***necessary*** for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion

15

claimed by the patent at issue.") (emphasis added). But that is hornbook utility patent law, and it provides no basis for having to start with a primary reference for inventions or designs. *Cf. id.* at 420 ("The first error of the Court of Appeals … was to foreclose this reasoning by holding that courts and patent examiners should look only to the problem the patentee was trying to solve.")

The primary reference test may have been improperly adopted out of prudential concerns about legal actors qualitatively evaluating aesthetic features, as opposed to scientific or technical ones. *See, e.g., In re Nalbandian*, 661 F.2d 1214, 1219 (C.C.P.A. 1981) (Rich, J., concurring) (referring to "obviousness in design patent cases" as the "impossible issue"). But the fact that a task is hard is not reason to avoid it when required by statute. Further, that courts may be more prone to hindsight bias when combining multiple references rather than modifying a primary one to assess a claimed design is not a sufficient reason to alter the actual test for obviousness, any more than it was for inventions and utility patents. *See KSR,* 550 U.S. at 421 ("The Court of Appeals, finally, drew the wrong conclusion from the risk of courts and patent examiners falling prey to hindsight bias.… Rigid preventative rules that deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.").

The question of when different references should be evaluated in combination, moreover, is one that courts are actually well-equipped to address. Just as in the

utility patent context, different evidence and information can be deployed in assessing the obviousness of incorporating multiple design features. There may be express teachings on a particular combination. Other combinations may be "common sense." *Id.* at 420-21 ("Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle."). If the range of alternatives in the design field is small, the combination of those (relatively few) alternatives is more likely to be obvious. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.,* 520 F.3d 1358, 1364 (Fed. Cir. 2008) (an "easily traversed, small and finite number of alternatives . . . might support an inference of obviousness"). In some cases, expert testimony can shed light on whether a combination features from designs of the same (or sufficiently similar) article of manufacture would be obvious to a DOSA. The point is that if the ill-advised *Rosen* requirement is abandoned, there are many things already used in the utility patent context that can be brought to bear in determining the obviousness of a design combination.

Under *Rosen* and *Durling*, designs are rarely if ever found obvious, which jeopardizes the purpose of design patents as a spur to innovation. *See* Buccafusco et al., *supra*, at 79-80 (describing the design nonobviousness threshold in federal litigation as "trivially low"); Sarah Burstein & Saurabh Vishnubhakat, *The Truth*

17

*About Design Patents*, 71 AM. U. L. REV. 1221, 1274-79 (analyzing data to show that "acquiring design patents is much easier than the conventional wisdom holds"). Without a primary reference requirement, greater attention can be paid to whether the prior art actually discouraged the design choice at issue. *Cf. DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 1326 (Fed. Cir. 2009) ("An inference of nonobviousness is especially strong where the prior art's teachings undermine the very reason being proffered as to why a person of ordinary skill would have combined the known elements."). Under the current *Rosen-Durling* approach, however, almost any difference from the prior art makes a design nonobvious, including routine design choices that would be part of any DOSA's standard toolkit. For example, a design choice to replace a more ornate furniture veneer with a plain one rendered a design nonobvious. *Ashley Furniture Indus., Inc. v. Lifestyle Enter., Inc.,* 574 F. Supp. 2d 920, 932-33 (W.D. Wis. 2008). The same was true for a decision to display the same features as the prior art but with more contrast. *Sealy Tech., LLC v. SSB Mfg. Co.,* 825 F. App'x 795, 799 (Fed. Cir. 2020). Such choices are readily apparent to a DOSA and should be considered insufficient to earn patent protection.

A better approach would be to limit nonobviousness to those design choices that depart from standard design practice or that might be considered unlikely to appeal to consumers, as DOSAs would then be less likely to have an "apparent

reason to combine" design elements to achieve the claimed design. *See* Bartholomew, *supra*, at 638-44 (discussing the relevance of design choices that are more difficult for consumers to process); *cf. Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1330-32 (Fed. Cir. 2012) (noting *reduced* contrast between design features in Apple iPad as compared to prior tablet computers). Not every difference from the prior art should count for nonobviousness. Earlier decisions of this court, from before the primary reference requirement fully took hold, adopted this perspective. For example, even if the prior art for a consumer product emphasizes asymmetry between two compartments, a symmetrical design should be declared obvious as "it would have been obvious to one of ordinary skill in the art to create a 'normal' or symmetrical orientation for a design." *In re Carlson,* 983 F.2d 1032, 1038-39 (Fed. Cir. 1992).

Finally, it bears noting that although designs *are* and *should* be understood "as a whole," *id.* at 1039, nothing in that fact affects that designs for useful articles of manufacture are made up of different aesthetic components (even if those different components are not specified by enumerating limitations as in utility patent claims, and even if linguistic terms may not exist to describe those components and designers cannot yet articulate the principles on which the aesthetic effects operate). *See, e.g.*, Sarah Burstein, *Whole Designs,* 92 U. COLO. L. REV. 181, 207 (2021) ("'[d]esign is the organization of parts into a coherent whole.' In creating a coherent

whole, '[c]ertain underlying elements and principles guide the designer in every field ... first, the elements of design—space, line, shape, mass, color, texture, and pattern; then the principles of design—unity, variety, balance, emphasis, rhythm, proportion, and scale.'") (citation omitted). It is precisely the combination of (unenumerated) aesthetic elements that creates the overall visual impression that must be assessed for novelty, originality and ornamentality, and nonobviousness under the same patent law doctrines. Such aesthetic combination (like useful element combination for inventions) is why a DOSA is needed to assess nonobviousness of designs in light of multiple aesthetic elements that exist in the prior art. And such aesthetic combination is why this court's nonobviousness doctrine needs to reject the *Rosen-Durling* approach and replace it with the *KSR* approach.

In summary, the key is to evaluate design nonobviousness from the perspective of the designer(s) of ordinary skill in the art. Without some kind of creative advance beyond the prior art, the design should be deemed obvious and unprotectable. Design patents cannot promote innovation if the nonobviousness test largely mimics the test for novelty, while constraining the art that a DOSA can be thought to consider and the motivations that a DOSA has for combining elements to achieve the aesthetic results of design "wholes." And to achieve the proper analysis, all this court needs to do is to state that the same approach for utility patents should also apply to design patents when evaluating obviousness, substituting a DOSA for

a PHOSITA given that a DOSA must evaluate the nonobviousness of aesthetic rather than functional combinations of elements.

## **CONCLUSION**

This court should abrogate *Rosen* and *Durling,* should reiterate that the proper test for design obviousness is that articulated in *KSR,* and should thereby restore the legislatively required uniformity of design and utility patent obviousness doctrines.

August 31, 2023                           Respectfully submitted,


By: /s/ Phillip R. Malone

Phillip R. Malone
JUELSGAARD INTELLECTUAL
 PROPERTY AND INNOVATION CLINIC
  Mills Legal Clinic at Stanford
  Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel: (650) 725-6369
jipic@law.stanford.edu

Counsel for Amici Curiae

## <u>ATTACHMENT A – LIST OF AMICI</u>

Amici curiae patent law professors are listed below. Affiliation is provided for identification purposes only; all signatories are participating in their individual capacity and not on behalf of their institutions.

**Professor Mark Bartholomew**
University at Buffalo School of Law, The State University of New York

**Professor Shubha Ghosh**
Syracuse University College of Law

**Professor Aaron Perzanowski**
University of Michigan

**Professor Ana Santos Rutschman**
Charles Widger School of Law, Villanova University

**Professor Joshua D. Sarnoff**
DePaul University College of Law

**Professor Katherine J. Strandburg**
New York University School of Law

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2023, I caused the foregoing CORRECTED BRIEF OF AMICI CURIAE PATENT LAW PROFESSORS, THE REPAIR ASSOCIATION, SECUREPAIRS, IFIXIT, AND US PIRG IN SUPPORT OF APPELLANTS ON EN BANC REHEARING to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

August 31, 2023          /s/ Phillip R. Malone

Phillip R. Malone
JUELSGAARD INTELLECTUAL PROPERTY
   AND INNOVATION CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305-8610
Tel: (650) 725-6369
jipic@law.stanford.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATIONS

I hereby certify as follows:

1.    The foregoing CORRECTED BRIEF OF AMICI CURIAE PATENT LAW PROFESSORS, THE REPAIR ASSOCIATION, SECUREPAIRS, IFIXIT, AND US PIRG IN SUPPORT OF APPELLANTS ON EN BANC REHEARING complies with the type-volume limitation of Fed. Cir. R. 29(b) as specified in paragraph 6 of this Court's June 30, 2023 order. The brief is printed in proportionally spaced 14-point type, and the brief has 5022 words according to the word count of the word-processing system used to prepare the brief (excluding the parts of the motion exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)).

2.    The brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac in 14-point Times New Roman font.

August 31, 2023                     /s/ Phillip R. Malone
                                    Phillip R. Malone

                                    *Counsel for Amici Curiae*