No. 21-2348

# United States Court of Appeals for the Federal Circuit

**LKQ CORPORATION; KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,**

*Appellants,*

*v.*

**GM GLOBAL TECHNOLOGY OPERATIONS LLC,**

*Appellee.*

ON APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, PATENT TRIAL AND APPEAL BOARD IN INTER PARTES REVIEW NO. IPR2020-00534

## EN BANC RESPONSE BRIEF OF APPELLEE GM GLOBAL TECHNOLOGY OPERATIONS LLC

Joseph A. Herriges
John A. Dragseth
Sarah Jack
FISH & RICHARDSON P.C.
60 S. 6th Street, Suite 3200
Minneapolis, MN 55402
(612) 335-5070

Nitika Gupta Fiorella
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
(302) 652-5070

*Attorneys for Appellee*
*GM Global Technology Operations LLC*

Dated:  October 12, 2023

# CLAIM OF U.S. PATENT NO. D797,625

The ornamental design for a vehicle front fender, as shown and described.



FIG. 1

FIG. 2

FIG. 3

FIG. 4

Appx0063-0064.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee GM Global Technology Operations LLC ("GM") certifies the following:

1. Provide the full names of all entities represented by undersigned counsel in this case.

   **GM Global Technology Operations LLC**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **None/Not Applicable**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **General Motors Company**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Dorothy P. Whelan, Craig Deutsch, Grace Kim, Jennifer Huang, and Fish & Richardson P.C.**

5. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **LKQ Corp. v. GM Global Technology Operations LLC, No. 2022-1253 (Fed. Cir.)**

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**

October 12, 2023                    */s/ Joseph A. Herriges*
                                    Joseph A. Herriges

# **TABLE OF CONTENTS**

**Page**

CERTIFICATE OF INTEREST ................................................................ ii

STATEMENT OF RELATED CASES .................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 2

QUESTIONS PRESENTED .................................................................... 3

INTRODUCTION .................................................................................. 5

STATEMENT OF THE FACTS .............................................................. 7

SUMMARY OF THE ARGUMENT ....................................................... 12

ARGUMENT ......................................................................................... 13

I.  DESIGN PRESENTS UNIQUE ISSUES THAT REQUIRE A
    TAILORED OBVIOUSNESS FRAMEWORK ...........................13

II. THE *ROSEN-DURLING* FRAMEWORK PRESENTS A
    PROPER FRAMEWORK FOR ADDRESSING DESIGN
    PATENT OBVIOUSNESS ........................................................17

    A.  The *Rosen* Primary Reference Requirement Provides an
        Appropriate Starting Point for Design Patent
        Obviousness.........................................................................18

    B.  The "So Related" Step Ensures There Is an Articulable
        Design-Based Reason to Modify the Primary Reference. ..................23

III. THE COURT SHOULD MAINTAIN THE *ROSEN-DURLING*
     FRAMEWORK FOR DESIGN PATENT OBVIOUSNESS.......................25

    A.  The *Rosen-Durling* Framework Is Consistent with *KSR*
        and Its Teachings.................................................................26

        1.  *KSR* did not explicitly or implicitly overrule *Rosen*
            or *Durling*. ...................................................... 26

       2.     *KSR* did not prohibit the use of frameworks, like *Rosen-Durling*, in analyzing obviousness. .............................. 29

   B.     The *Rosen-Durling* Framework Provides Flexibility Consistent with the Instruction of *KSR*. ...............................32

   C.     The *Whitman Saddle* Case Poses No Additional Problem to the *Rosen-Durling* Framework.........................................37

   D.     Practical Considerations Support Maintaining the *Rosen-Durling* Framework............................................................43

       1.     *Stare decisis* is particularly strong here. .................................. 43

       2.     Congress has repeatedly accepted the framework. .................. 49

IV.   AT MOST, THIS COURT SHOULD CLARIFY *ROSEN-DURLING*, NOT ABANDON IT ...................................................52

CONCLUSION ................................................................................... 56

CERTIFICATE OF COMPLIANCE ....................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3form, Inc. v. Lumicor, Inc.*,
  678 F. App'x 1002 (Fed. Cir. 2017) ..................................................42, 46

*Altana Pharma AG v. Teva Pharms. USA, Inc.*,
  566 F.3d 999 (Fed. Cir. 2009) ...........................................................31

*Apple, Inc. v. Samsung Elecs. Co.*,
  678 F.3d 1314 (Fed. Cir. 2012) ...........................................28, 42, 46

*Berry Sterling Corp. v. Pescor Plastics, Inc.*,
  215 F.3d 1351 (Fed. Cir. 1999) .........................................................42

*In re Borden*,
  90 F.3d 1570 (Fed. Cir. 1996) ......................................................3, 36

*Campbell Soup Co. v. Gamon Plus, Inc.*,
  10 F.4th 1268 (Fed. Cir. 2021) ...................................................*passim*

*Campbell Soup Co. v. Gamon Plus, Inc.*,
  939 F.3d 1335 (Fed. Cir. 2019) ...................................................*passim*

*Catalina Lighting, Inc. v. Lamps Plus, Inc.*,
  295 F.3d 1277 (Fed. Cir. 2002) ...................................................42, 43

*In re Chung*,
  243 F.3d 561 (Fed. Cir. 2000) ...........................................................42

*Daiichi Sankyo Co. v. Matrix Lab'ys, Ltd.*,
  619 F.3d 1346 (Fed. Cir. 2010) .........................................................31

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009) .........................................................29

*Durling v. Spectrum Furniture Co.*,
  101 F.3d 100 (Fed. Cir. 1996) ....................................................*passim*

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
  543 F.3d 665 (2008) (en banc) .........................................5, 14, 15, 53

*Eisai Co. v. Dr. Reddy's Lab'ys, Ltd.*,
  533 F.3d 1353 (Fed. Cir. 2008) ....................................................30, 32

*Francis v. S. Pac. Co.*,
  333 U.S. 445 (1948)..........................................................................50

*Girouard v. United States*,
  328 U.S. 61 (1946).............................................................................50

*In re Glavas*,
  230 F.2d 447 (C.C.P.A. 1956) ..................................................*passim*

*Golden Eye Media USA, Inc. v. Evo Lifestyle Products Ltd.*
  No. 2021-2096, 2022 WL 2232517 (Fed. Cir. 2022)..............35, 42, 46

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...........................................................................43

*In re Haruna*,
  249 F.3d 1327 (Fed. Cir. 2001) .........................................................42

*High Point Design LLC v. Buyers Direct, Inc.*,
  730 F.3d 1301 (Fed. Cir. 2013) ....................................................42, 46

*Hupp v. Siroflex of Am., Inc.*,
  122 F.3d 1456 (Fed. Cir. 1997) ....................................................17, 42

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
  589 F.3d 1233 (Fed. Cir. 2009) ....................................................16, 33

*In re Jennings*,
  182 F.2d 207 (C.C.P.A. 1950)..................................................5, 16, 21

*Jore Corp. v. Kouvato, Inc.*,
  117 F. App'x 761 (Fed. Cir. 2005) ......................................39, 40, 41, 42

*Kimble v. Marvel Entm't LLC*,
  576 U.S. 446 (2015)........................................................43, 44, 47, 48

*In re Klein*,
  647 F.3d 1343 (Fed. Cir. 2011) .........................................................29

vi

*KSR International Co. v. Teleflex Inc.*,
   550 U.S. 398 (2007) ...................................................................*passim*

*In re Laverne*,
   356 F.2d 1003 (C.C.P.A. 1966) ...........................................................15

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*
   744 F.3d 1272 (Fed. Cir. 2014) (en banc) .........................................43

*In re Maatita*,
   900 F.3d 1369 (Fed. Cir. 2018) ..........................................................16

*In re Mann*,
   861 F.2d 1581 (Fed. Cir. 1988) ..........................................................47

*Missouri v. Ross*,
   299 U.S. 72 (1936) ..............................................................................50

*MRC Innovations, Inc. v. Hunter Mfg., LLP*,
   747 F.3d 1326 (Fed. Cir. 2014) .....................................................*passim*

*In re Nalbandian*,
   661 F.2d 1214 (C.C.P.A. 1981) .............................................15, 37, 53

*OddzOn Prod., Inc. v. Just Toys, Inc.*,
   122 F.3d 1396 (Fed. Cir. 1997) ..........................................................42

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
   678 F.3d 1280 (Fed. Cir. 2012) ..........................................................31

*Richardson v. Stanley Works, Inc.*,
   597 F.3d 1288 (Fed. Cir. 2010) ..........................................................14

*In re Rosen*,
   673 F.2d 388 (C.C.P.A. 1982) ......................................................*passim*

*Sealy Tech., LLC v. SSB Mfg. Co.*,
   825 F. App'x 795 (Fed. Cir. 2020) .....................................................42

*Sealy Tech., LLC v. SSB Mfg. Co.*,
   825 F. App'x 801 (Fed. Cir. 2020) ................................................42, 46

*Smith v. Whitman Saddle Co.*,
   148 U.S. 674 (1893)................................................................37, 38, 39, 41

*Spigen Korea Co. v. Ultraproof, Inc.*,
   955 F.3d 1379 (Fed. Cir. 2020) .............................................28, 33, 42

*Takeda Chem. Indus. Ltd. v. Alphapharm Pty.*,
   492 F.3d 1350 (Fed. Cir. 2007) ...................................................30, 32

*Teleflex, Inc. v. KSR Int'l Co.*,
   119 F. App'x 282 (Fed. Cir. 2005) ..................................................27

*Titan Tire Corp. v. Case New Holland, Inc.*,
   566 F.3d 1372 (Fed. Cir. 2009) ..............................................*passim*

*United States v. Elgin, Joliet & E. Ry. Co.*,
   298 U.S. 492 (1936)..........................................................................50

*United States v. Ryan*,
   284 U.S. 167 (1931)..........................................................................50

## Statutes

35 U.S.C. § 112 ....................................................................................16

35 U.S.C. § 103 ...............................................................17, 27, 49, 50

Cooperative Research and Technology Enhancement (CREATE) Act of 2004, Pub.
   L. No. 108-453, § 2, 118 Stat. 3596, 3596 (2004)..............................50

Domestic Publication of Foreign Filed Patent Applications Act of 1999, Pub. L.
   No. 106-113, § 4505, 113 Stat. 1501, 1501A-565 (1999)..................50

Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3(c), 125 Stat. 284, 287
   (2011) .................................................................................................50, 51

Patent Law Amendments Act of 1984, Pub. L. No. 98-622, § 1, 98 Stat. 3383, 3384
   (1984) .................................................................................................50

Pub. L. No. 104-41, § 1, 109 Stat. 351, 351 (1995)....................................50

**Other Authorities**

Sarah Burstein, *Visual Invention*, 16 LEWIS & CLARK L. REV. 169 (2012) ............15

1 Donald S. Chisum, *Chisum on Patents* (2023) ......................................................15

Bryan A. Garner et al., The Law of Judicial Precedent (2016) ...............................45

H.R. 1057, 114th Cong. (1st Session 2015).............................................................51

H.R. 1707, 118th Cong. (1st Session 2023).............................................................51

H.R. 3664, 117th Cong. (1st Session 2021).............................................................51

Manual of Patent Examining Procedure § 1504.03 .................................................48

Janice M. Mueller & Daniel H. Brean, *Overcoming the "Impossible Issue" of Nonobviousness in Design Patents*, 99 KY. L.J. 419 (2011) ........................15, 16

Opening Brief for Defendants-Appellants, *Apple Inc. v. Samsung Elecs. Co.*, No. 2014-1335, 2014 WL 2586819 (Fed. Cir. May 23, 2014)..........................47

## STATEMENT OF RELATED CASES

There have been no other appeals in or from the Patent Trial and Appeal Board's decision in IPR2020-00534, concerning U.S. Patent D797,625 ("the '625 Patent"), before this or any other appellate court.  Case No. 2022-1253, an appeal from the PTAB's decision in PGR2020-00055, is stayed pending the Court's decision in this appeal.

## <u>JURISDICTIONAL STATEMENT</u>

As set out in GM's Panel Response Brief (Dkt. 19 at 2), LKQ lacks Article III standing to appeal the Board's decision.

## QUESTIONS PRESENTED

A. Does *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), overrule or abrogate *In re Rosen*, 673 F.2d 388 (C.C.P.A. 1982), and *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100 (Fed. Cir. 1996)?

B. Assuming that *KSR* neither overrules nor abrogates *Rosen* and *Durling*, does *KSR* nonetheless apply to design patents and suggest the court should eliminate or modify the *Rosen-Durling* test? In particular, please address whether *KSR*'s statements faulting "a rigid rule that limits the obviousness inquiry," 550 U.S. at 419, and adopting "an expansive and flexible approach," *id.* at 415, should cause us to eliminate or modify: (a) *Durling*'s requirement that "[b]efore one can begin to combine prior art designs . . . one must find a single reference, 'a something in existence, the design characteristics of which are basically the same as the claimed design,'" 101 F.3d at 103 (quoting *Rosen*, 673 F.2d at 391); and/or (b) *Durling*'s requirement that secondary references "may only be used to modify the primary reference if they are 'so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other,'" *id.* at 103 (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)) (internal alterations omitted).

C. If the court were to eliminate or modify the *Rosen-Durling* test, what should the test be for evaluating design patent obviousness challenges?

D. Has any precedent from this court already taken steps to clarify the *Rosen-Durling* test?  If so, please identify whether those cases resolve any relevant issues.

E. Given the length of time in which the *Rosen-Durling* test has been applied, would eliminating or modifying the design patent obviousness test cause uncertainty in an otherwise settled area of law?

F. To the extent not addressed in the responses to the questions above, what differences, if any, between design patents and utility patents are relevant to the obviousness inquiry, and what role should these differences play in the test for obviousness of design patents?

## **INTRODUCTION**

This Court and its predecessor have made clear over decades of case law—from *Jennings* to *Egyptian Goddess*—that the design patent analysis must remain focused on the overall visual appearance of the design as a whole.  This makes good sense, particularly in the context of obviousness, where the seemingly straightforward nature of a design can create a unique temptation to use hindsight to concoct a "FrankenArt" design from bits and pieces of various prior art.  The *Rosen-Durling* framework provides an objective guardrail against this temptation, requiring the factfinder to start with something that is already in existence and close to the claimed design.  It supplies an anchor for the analysis and properly focuses the inquiry on the design as a whole.

At the same time, the *Rosen-Durling* framework does not go so far as to impose the kind of overly rigid rule that *KSR* prohibits.  This Court has repeatedly endorsed non-statutory frameworks for obviousness, and adopted different approaches depending on the nature of the art.  *Rosen-Durling* provides one such approach tailored to design patents: it allows factfinders to flexibly use their instincts, their creativity, and their common sense to determine whether a primary reference exists and, if so, whether there is a design-based motivation to modify that reference.  The propriety of this standard is evidenced by its longevity and consistent application.  Indeed, as the Panel noted, in the over fifteen years since

*KSR*, the Court "has decided over fifty design patent appeals," consistently applying *Rosen* and *Durling* without meaningful challenge.  *Panel Opinion* at 13.[1] And while LKQ cries foul at the purported rigidity of the current framework, it concedes (at 42-43), that ***sixty percent*** of post-*KSR* design patent obviousness appeals applying the *Rosen-Durling* framework have ended in a judgment of invalidity.  Hardly a sign of undue rigidity.

At bottom, while design patent obviousness presents unique challenges—Judge Rich famously called it an "impossible issue"—the *Rosen-Durling* framework is a practical solution that is tailored to those challenges and maintains flexibility in its application.  Disrupting that standard, particularly with the free-for-all approach LKQ urges, would create uncertainty and upend the longstanding, workable balance in which neither the Supreme Court nor Congress has found fault.  The Court should reject LKQ's attempt to abandon any framework and re-affirm what has been implicitly acknowledged during the fifteen years since *KSR*: *Rosen-Durling* is a balanced solution for assessing design patent obviousness.

---

[1] As used herein, "*Panel Opinion*" refers to Docket 48 at ECF 1-15, "*Lourie, J. Additional Views*" refers to Docket 48 at ECF 16-19, and "*Stark, J. Concurrence*" refers to Docket 48 at ECF 20-32.

## STATEMENT OF THE FACTS

This case is about the Board's factual determination that LKQ's chosen prior art was too different to render obvious GM's vehicle fender design, as claimed in the '625 Patent.[2]

The vehicle-design field is one in which nuance matters.  As GM's expert testified in the underlying IPR, "vehicle consumers recognize small and nuanced design details."  Appx0906; *see also* Appx0880 ("Vehicle design is a field in which small differences can have significant impact both to the designer or design team who are designing the vehicle, but also to the end purchaser of the vehicle."); *see also* Appx0881-0884.  Given this, as GM's expert stated, "a particular line or angle on a fender or hood can dramatically affect or change the character of the vehicle."  Appx0881.  The vehicle-design field is also one in which designers focus on the holistic and overall appearance of a vehicle or part; it is not an endeavor "in which the designer simply picks and chooses from a menu of options to create the design."  Appx0884.

GM is a leader in vehicle design and automotive engineering, and has invested millions of dollars designing hundreds of new and innovative vehicles and parts, on which it has obtained numerous design patents.  LKQ, on the other hand,

---

[2] GM's Panel Response Brief contains a fulsome discussion of the proceedings below.  Dkt. 19 at 17-22.

does not do any design work at all.  Rather, it commissions overseas manufacturers to replicate the designs of Original Equipment Manufacturers, like GM, so it can sell copy parts in the United States.  Until 2022, GM and LKQ had a confidential Design Patent License Agreement under which LKQ paid GM to practice many of GM's design patents.  *See* Appx0702.

The '625 Patent covers one of GM's recent innovations, and relates to a unique, cohesive design for a front fender.  *See* Appx0882-0884.  As explained below, and as the Board ultimately found, the '625 Patent includes a coordinated set of features that contribute to a distinct overall appearance.  Appx0006-0011; Appx0016-0017.  These features include the shape of the wheel arch and terminus; the door cut line; the shape of the upper protrusion; distinctive sculpting; and a sculpted horizontal crease.  Appx0016-0017; *see also* Appx0821-0828; Appx0889-0901.  Collectively, these features contribute to a design having a smooth, continuous, and curved appearance, as opposed to an angular or aggressive design.  *See* Appx0890 ("[T]he claimed design includes sculpted surfacing that provides an overall appearance that is smooth, arcuate, consistent, and athletic."); Appx0901 ("Each of the features that I have described above contribute to the overall appearance and design of the '625 Patent, evoking a distinctive visual image and impression that is smooth, arcuate, and consistent.").

LKQ's IPR focused on the Lian patent as its primary reference.  Unlike the curved, flowing shape of the '625 Patent, the evidence showed that Lian had a segmented, boxy, and angular appearance.  *See*, *e.g.*, Appx0909 ("Lian's door cut line provides a segmented appearance that includes a series of angle changes."); Appx0918 ("Lian's crease lacks a curved appearance, does not provide a visual connector between the hood and the A-pillar, and terminates part way across the protrusion."); Appx0919-0920 ("Lian's design . . . lacks the characteristic smooth curvature of the claimed design."); Appx0927 ("The sculpting of the '625 Patent includes curving, flowing shapes—Lian is characterized by slanted lines that lack the overall appearance of the claimed design.").  After considering the parties' arguments and evidence, the Board found that Lian had an overall appearance that was "quite different" from the '625 Patent.  Appx0053.  In doing so, the Board found LKQ failed to address in its Petition many relevant elements of the '625 Patent and thus did not identify "the correct visual impression created by the patented design as a whole."  Appx0050 (quoting *Durling*, 101 F.3d at 103).

Nevertheless, the Board evaluated each of the relevant features, and determined that the '625 Patent includes features across all aspects of the fender, creating a distinct overall impression from Lian:

> On this record, considering altogether the differences between the overall appearance of the claimed design and the design shown in Lian, LKQ does not establish that Lian "creates 'basically the same' visual impression" as the patented design.  The claimed design includes the

visually disparate elements discussed above including the upper protrusion, the u-shaped notch, the door cut line, a circular wheel arch, the lower rear terminus, the specific sculpting of the first and second creases along with the concavity line, and the inflection line below the first and second creases.

Appx0057-0058; *see also* Appx0045-0058.  Specifically, the Board found that Lian exhibited an overall appearance that was boxier, sharper, and more angular than the '625 Patent.  *See* Appx0053 ("Compared to the claimed consistently circular wheel arch, Lian depicts a more square profile matched by the square planar edge of the wheel arch extending from the front angled edge to the fender terminus, lower right."); Appx0054 ("A reasonable observation of Lian's door cut line reveals a more angular, sharper bend at the second crease.").  Based on these factual findings, and LKQ's evidentiary failures, the Board found that LKQ had not proven that Lian was a *Rosen* reference having "basically the same" overall visual impression.  Appx0057-0058.  As the Panel previously held, substantial evidence supports that factual finding.  *Panel Opinion* at 14-15.

Notably, while LKQ claims now that *KSR* overruled the *Rosen* primary reference requirement, it did not raise this issue before the Board.  Rather, it made only cursory mention of the second *Rosen-Durling* step, objecting to any "overly restrictive" application of that step.  Appx0174 ("To the extent the 'so related' test operates to unduly limit the scope of design patent obviousness, such an overly restrictive view would run afoul of *KSR*'s proscription against rigid restrictions on

the scope of an obviousness analysis."). LKQ did not propose any alternative to *Rosen-Durling* for analyzing the '625 Patent's obviousness.

The Panel nevertheless considered LKQ's argument that *KSR* overruled the *Rosen-Durling* framework and held that it did not clearly do so. The Panel explained that "*KSR* did not involve or discuss design patents," and observed that during the "more than fifteen years since *KSR* was decided, this Court has decided over fifty design patent appeals" and has "continually applied *Rosen* and *Durling*." *Panel Opinion* at 13. Because *KSR* did not clearly overrule the Court's precedent, the Panel evaluated LKQ's appeal under the operative *Rosen-Durling* framework and affirmed the Board's decision. Providing additional views, Judge Lourie considered and rejected LKQ's argument that the *Rosen-Durling* framework is unduly rigid in contravention of *KSR*'s mandated flexibility. *Lourie, J. Additional Views* at 4. He explained that design patents are distinct from utility patents and present different considerations, which require different analytical frameworks, and that the *Rosen-Durling* framework properly demands an appropriate starting point for design obviousness. *Id.* at 2-3; *see also id.* at 4 ("One has to start from somewhere."). Judge Stark also wrote separately and explained that he would have found LKQ forfeited the issue. *Stark, J. Concurrence* at 1-10.

## SUMMARY OF THE ARGUMENT

Design patents present unique issues across nearly all aspects of a patent case, from conception of the design through damages awarded for its infringement. As such, this Court and Congress have implemented a unique set of frameworks for design cases, including claim construction, infringement, indefiniteness, and damages. For decades, obviousness has followed suit with the *Rosen-Durling* framework. Courts, litigants, and the Patent Office have applied that framework without meaningful challenge or interruption since its inception, including for the fifteen years since *KSR*. There is no persuasive reason to change course now.

For its part, LKQ, joined by certain amici, bemoans the purported rigidity of the *Rosen-Durling* framework and argues that it was overruled by *KSR*. LKQ is wrong on both points. *KSR* did not expressly overrule *Rosen-Durling*, as everyone agrees, nor did it otherwise abrogate it. Rather, *KSR* spoke only to a particular kind of rigidity, one that unduly restricts a factfinder's ability to use common sense. But as this Court has made clear—in decisions like *MRC*, *Campbell I*, *Titan Tire*, and others—the *Rosen-Durling* framework freely allows common sense and consideration of the knowledge of skilled artisans. LKQ's argument to the contrary is not persuasive, and the Court should reject it.

The Court should also reject LKQ's argument because it largely ignores important principles of *stare decisis* and other practical considerations that are

particularly strong in this case. The *Rosen-Durling* framework provides a considered approach that courts and innovators alike have relied on without interruption for decades. LKQ's suggestion that the Court should disregard decades of considered precedent and revert to a rudderless free-for-all will increase confusion, disrupt settled expectations, and leave lower courts and factfinders without the necessary guidelines to properly conduct the obviousness analysis. To the extent the Court is inclined to make any change to the *Rosen-Durling* framework, which GM does not believe is necessary, it should do so through clarification of the standard, such as incorporation of concepts from existing caselaw, not through abrogation.

## ARGUMENT

## I.    DESIGN PRESENTS UNIQUE ISSUES THAT REQUIRE A TAILORED OBVIOUSNESS FRAMEWORK

In nearly all respects—from conceptualization of a design through the damages awarded for its infringement—design patents present unique issues. Like it has done in other contexts, *see infra* Section III.A.2, this Court has approached design patent obviousness with a legal framework tailored to those unique issues. This is not a "lower patent validity bar," as LKQ wrongly argues (at 56); it is a recognition that the nature of the art properly informs the obviousness question.

To begin, the process and outcome in design invention differs significantly from utility invention. In the case of utility invention, the problem is generally

13

known and the solution has a defined endpoint: a disease to cure, a battery life to extend, or a method for disease detection to improve. Not only that, but utility patents typically present that problem and endpoint in the specification and claims, explaining to the public what the problem was and how the inventor purported to solve it. Not so in design. Design patents have no written description or written claims to define their scope; the invention is defined by the overall impression the drawings convey. The difficulty of converting this impression to words is one courts have grappled with often, leading this Court to caution against even attempting to verbally describe that impression. *See Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679-80 (2008) (en banc) ("[C]ourts should not treat the process of claim construction as requiring a detailed verbal description of the claimed design, as would typically be true in the case of utility patents."); *see also Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010) (questioning how "a court could effectively construe design claims, where necessary, in a way other than by describing the features shown in the drawings").

Judge Lourie correctly articulated this in his additional views to the panel decision, stating that unlike utility patents, design patents "relate to considerations such as the overall appearance, visual impressions, artistry, and style of ornamental subject matter." *Lourie, J. Additional Views* at 3. Design experts have echoed this sentiment, stating that "any 'problem' that a designer addresses via aesthetics is

14

necessarily ill-defined, elusive, and subjective." Janice M. Mueller & Daniel H. Brean, *Overcoming the "Impossible Issue" of Nonobviousness in Design Patents*, 99 KY. L.J. 419, 439 (2011); *id.* at 511 ("Design, insofar as the aesthetic appearance is concerned, is an artistic endeavor that is not generally perceived as or likened to technical problem solving."); *see also* 1 Donald S. Chisum, *Chisum on Patents* § 23.03[6] (2023) ("With a design, the problem—how to make an article that is more ornamental and attractive to the eye—is normative in character and thus more open-ended. Not surprisingly, the courts openly admit that any assessment of the obviousness of the solution is necessarily subjective." (citation omitted)). Indeed, Professor Sarah Burstein has characterized the "designer's problem" as "a fairly open-ended one, with many possible—and few obvious—solutions." Sarah Burstein, *Visual Invention*, 16 LEWIS & CLARK L. REV. 169, 175 (2012).

This open-ended nature of design places a unique and complex strain on factfinders. *Egyptian Goddess* recognized this when fashioning a design infringement framework, stating that "it can be difficult to answer the question whether one thing is like another without being given a frame of reference." 543 F.3d at 676-77; *see also In re Nalbandian*, 661 F.2d 1214, 1216 (C.C.P.A. 1981) ("In the field of design the analysis is not so easy." (quoting *In re Laverne*, 356 F.2d 1003, 1006 (C.C.P.A. 1966))). This Court has similarly developed

frameworks for design patent novelty, indefiniteness, and enablement that differ from utility and take into account the unique nature of design. *See In re Maatita*, 900 F.3d 1369, 1375-79 (Fed. Cir. 2018) (discussing § 112 definiteness and enablement requirements for design patents); *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239-41 (Fed. Cir. 2009) (discussing the "ordinary observer" standard for novelty).

Design patent obviousness has (and should continue to) followed suit. Like other questions in design cases, the visual nature of design creates a more abstract obviousness analysis, leaving more room for the factfinder to utilize hindsight. *See Durling*, 101 F.3d at 103 (stating that a judge's explanation of a decision in design cases is "more complicated because it involves an additional level of abstraction not required when comprehending the matter claimed in a utility patent"); *In re Jennings*, 182 F.2d 207, 208 (C.C.P.A. 1950) (critiquing the Patent Office for "selecting features taken from five different patents"). The seemingly (and sometimes purposefully) simple nature of a design—as opposed to, say, semiconductors or pharmaceuticals—invites factfinders to indulge their own arrogance, using the patent as a roadmap to reconstruct the design. *See* Mueller & Brean, 99 KY. L.J. at 442 ("Paradoxically, the more simple a design for a new product, the more likely that it will be viewed as a minor improvement or 'obvious variation' over prior art."). This is only made worse by the fact that the objective

16

guardrails used in utility cases—like "obvious to try," "reasonable expectation of success," "long-felt need," and "unexpected results"—are either inapplicable or ill-fitting in design cases. *See Lourie, J. Additional Views* at 3 ("[T]he considerations involved in determining obviousness are different in design patents."); *see also In re Glavas*, 230 F.2d 447, 450 (C.C.P.A. 1956) ("The principle of nonanalogous arts . . . cannot be applied to design cases in exactly the same manner as to mechanical cases."). The unique nature of design patents compels a tailored framework for obviousness, and that is precisely what the *Rosen-Durling* framework provides.

## II.    THE *ROSEN-DURLING* FRAMEWORK PRESENTS A PROPER FRAMEWORK FOR ADDRESSING DESIGN PATENT OBVIOUSNESS

The *Rosen-Durling* framework provides factfinders with the guidance necessary to properly evaluate design patent obviousness. As this Court has stated, it is an application of the *Graham* factors to the specific context of design patents:

> Invalidity based on obviousness of a patented design is determined on factual criteria similar to those that have been developed as analytical tools for reviewing the validity of a utility patent under § 103, that is, on application of the *Graham* factors.

*Hupp v. Siroflex of Am., Inc.*, 122 F.3d 1456, 1462 (Fed. Cir. 1997); *see also Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir. 2021) (hereinafter, "*Campbell II*") (design patent "obviousness inquiry requires consideration of the four *Graham* factors"). This design-specific application of

*Graham* provides the necessary guardrails to foster and protect design innovation.

Below GM provides a brief historical overview of the framework, which further

illustrates its purpose and meaning.

> **A.    The *Rosen* Primary Reference Requirement Provides an**
> **Appropriate Starting Point for Design Patent Obviousness.**

As Judge Lourie observed in his additional views to the underlying panel

decision, the obviousness analysis must start somewhere:

> In any obviousness analysis, the question is whether the claimed
> invention was obvious, but obvious over *what*.  One has to start from
> somewhere.

*Lourie, J. Additional Views* at 4.  The *Rosen* case itself epitomizes the need for this

starting point and illustrates why a "primary reference" requirement is necessary to

evaluate designs "as a whole."  *See Rosen*, 673 F.2d at 390-91.

*Rosen* was about whether the design for a contemporary coffee table was

obvious over multiple other furniture designs.  *Id.* at 389.  These designs are shown

below:

| Rosen's Design |
|:---:|
|  |
| Application No. 875,918 |
| **Prior Art Designs** |

| | |
|:---:|:---:|
|  |  |
| Hysten<br>(Des. 239,487) | Rosen Desk<br>(Des. 240,185) |
|  |  |
| Klein<br>(Des. 183,617) | Mudde<br>(Des. 234,068) |

The Rosen Desk was "the basic reference." *Id.* The Hysten table disclosed a transparent circular top; Mudde disclosed three equidistant legs supporting a circular table; and Klein showed that V-shaped legs receiving and supporting a flat top were known in the art. Reviewing this evidence, the examiner found that it would have been obvious to select the legs of the Rosen Desk in combination with various aspects of the prior art furniture to arrive at Rosen's design. *Id.* at 390. The Board affirmed. *Id.*

On appeal, the *Rosen* court found that the obviousness decision—based on a four-reference combination disclosing a hodgepodge of individual design elements—was improperly driven by hindsight. *See id.* at 390-91. The court agreed that an ordinary designer would have been aware of and considered the different elements from the four references, but found this awareness was not sufficient to find obviousness. After all, the ultimate question is not whether elements exist in the prior art and ***could be combined***; the question is "whether the various elements selected by the PTO from each of the[] references would have made ***the overall appearance of the claimed design*** obvious." *Id.* at 390 (emphasis added). In other words, the question the PTO and Board should have asked was "whether appellant's table design from the standpoint of its ***appearance as a whole*** would have been obvious to one of ordinary skill in designing tables or other closely related contemporary furniture." *Id.* (emphasis added).

To answer that relevant (and more difficult) question, the *Rosen* court aptly recognized that the analysis needs to begin with "a something in existence." *Id.* at

20

391.  And, to keep the analytical focus on the design as a whole, that "something in existence" should have "design characteristics" that are "basically the same as the claimed design."  *Id.*  The *Rosen* primary reference requirement provides this important starting point.

The *Rosen* case was not decided in a vacuum; it built on earlier cases that similarly emphasized the need for a starting point.  In *Jennings*, for example, the court observed that "[i]n considering patentability of a proposed design the appearance of the design must be viewed as a whole" and then compared against "something in existence" rather than with "something that might be brought into existence by selecting individual features from prior art and combining them." 182 F.2d at 208.  The court emphasized that the need for a primary reference—a something in existence—was especially apparent in situations where reaching the claimed design "would require modification of every individual feature" of a prior art reference.  *Id.*

Fifteen years after *Rosen*, this Court reiterated the need for a primary reference in *Durling*.  The facts of *Durling* are again illustrative of this need.  In that case, the district court found that Durling's design patent for a sectional sofa was obvious over a prior art sectional, the Schweiger (both reproduced below). *Durling*, 101 F.3d at 102.

| **Durling's Design** |
| :---: |
|  |
| U.S. Pat. No. D339,243 |
| **Prior Art Design** |
|  |
| The Schweiger |

Applying *Rosen*'s reasoning, this Court rejected the district court's conclusion and found that the Schweiger was not an adequate starting point for the obviousness inquiry. *Id.* at 104. While the district court found the Schweiger reflected the same ***design concept*** as the claimed design—a sectional sofa with

integrated tables—this Court said the correct inquiry is whether the ***overall visual impression*** of the two designs is the same, and found they were not.  *Id.*  For example, the Schweiger had three sofa sections arranged in a rounded right angle, while Durling's design had two sections with an integrated center coffee table forming a true right angle.  *Id.*  And while the Schweiger's front rails curved horizontally around the end tables, Durling's rails swept upwardly to provide support for the end tables.  *Id.*  Based on those substantial design differences, the Court held it was "readily apparent that the Schweiger model does not create the same visual impression as does Durling's claimed design."  *Id.*  And because there was no adequate starting point from which to evaluate potential modifications from secondary references, the Court concluded the claimed design was not obvious.  The *Durling* case thus further illustrates the need to ground the obviousness inquiry in something in existence that is basically the same as the claimed design.

### B.     The "So Related" Step Ensures There Is an Articulable Design-Based Reason to Modify the Primary Reference.

The "so related" step similarly guards against hindsight by requiring a patent challenger to identify some articulable reason why an ordinary designer would modify the primary reference in view of another design.  The "so related" step comes from *Glavas*, where the court considered the "propriety of combining references in design cases."  230 F.2d at 449.  In doing so, the court made two findings that are critical to carrying through any design-patent obviousness analysis.

First, the court reasoned that conceptual guidelines from utility cases like "nonanalogous art" "cannot be applied to design cases in exactly the same manner as to mechanical cases" due to the differences between utility and design. *Id.* at 450. Instead, the court held that factfinders must look to the specific nature of the design and find a design motivation for making any modification. For example, "if the problem is merely one of giving an attractive appearance to a surface, it is immaterial whether the surface in question is that of a wall paper, an oven door, or a piece of crockery." *Id.* But "when the proposed combination of references involves material modifications of the basic form of one article in view of another, the nature of the articles involved is a definite factor in determining whether the proposed change involves invention." *Id.* In other words, the *Glavas* court, as in *Rosen*, recognized that design patents are different from utility patents and require frameworks relevant to the unique issues they present.

Second, the court emphasized that it is not enough that the features of a claimed design simply exist somewhere in the world; there must be reason to assemble them:

> Obviously, almost every new design is made up of elements which, individually, are old somewhere in the prior art, but the fact that the individual elements of a design are old, does not prove want of invention in assembling them.

*Id.* The ultimate question, according to *Glavas*, is thus whether the designs "are so related that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Id.*

Importantly, *Glavas* does not preclude consideration of common sense or require that features missing from the primary reference necessarily be present in a secondary reference—nor has this Court interpreted it as such. *See MRC Innovations, Inc. v. Hunter Mfg., LLP*, 747 F.3d 1326, 1334-35 (Fed. Cir. 2014). Rather, its statement requiring that references be "so related," when read in context, is simply a recognition that the visual appearance of the references is paramount, not whether they are analogous in a "mechanical sense." *See Glavas*, 230 F.2d at 450. In other words, the mandate of *Glavas* and the role of the "so-related" step is to ensure that the factfinder identifies a design motivation, based in the aesthetic appearance of the references, when determining whether combination is proper.

## III.   THE COURT SHOULD MAINTAIN THE *ROSEN-DURLING* FRAMEWORK FOR DESIGN PATENT OBVIOUSNESS

As is clear from its historical origins, the *Rosen-Durling* framework provides the necessary guardrails for design patent obviousness. Importantly, it also provides the flexibility *KSR* requires. Because *KSR* does not overrule or otherwise abrogate the *Rosen-Durling* framework, this Court should reject LKQ's invitation to upend the carefully tailored framework that has been in successful operation for decades.

### A.    The *Rosen-Durling* Framework Is Consistent with *KSR* and Its Teachings.

LKQ and its supporting amici are simply wrong that *KSR* overruled or abrogated the *Rosen-Durling* framework. *KSR* did no such thing. While *KSR* prohibits rigidity that denies recourse to common sense, it does not prohibit all rules or frameworks. Indeed, this Court has endorsed non-statutory frameworks in a variety of contexts both before and after *KSR*. *Rosen-Durling* is one of those frameworks: it provides the necessary guidance to factfinders for evaluating design obviousness while providing sufficient flexibility.

### 1.    *KSR* did not explicitly or implicitly overrule *Rosen* or *Durling*.

It is undisputed that *KSR* did not explicitly overrule *Rosen* or *Durling*. Indeed, it could not have done so because *KSR* did not involve or discuss design patents at all, much less reference the design patent framework espoused in *Rosen* and *Durling*. As Judge Lourie aptly recognized, the Supreme Court "cannot reasonably be held to have overruled a precedent of one of [this Court's] predecessor courts involving a type of patent it never mentioned." *Lourie, J. Additional Views* at 4.[3]

---

[3] The Corrected Brief of *Amicus Curiae* American Intellectual Property Law Association in Support of Neither Party is consistent with GM's position, as it clearly and thoughtfully explains why *KSR* does not overrule or abrogate the relevant design patent tests. *See* Dkt. 136 at 4-6 (hereinafter, "AIPLA Amicus Brief").

*KSR* did not implicitly overrule *Rosen* or *Durling* either. The facts and procedural history of *KSR* are instructive on this point. In *KSR*, the Supreme Court addressed this Court's longstanding requirement in the utility patent context that the prior art must provide a "teaching, suggestion, or motivation" to combine references and find claims obvious. *KSR*, 550 U.S. at 418-22. The district court held the claims obvious, finding a motivation to combine the prior art references based "largely on the nature of the problem to be solved" by the patent. *Teleflex, Inc. v. KSR Int'l Co.*, 119 F. App'x 282, 287 (Fed. Cir. 2005) (non-precedential), *rev'd*, 550 U.S. 398.

This Court reversed, concluding that the district court "applied an incomplete teaching-suggestion-motivation test." *Id.* at 288. Specifically, this Court held that the nature of the problem to be solved could not satisfy the teaching-suggestion-motivation test unless the "prior art references address[ed] the precise problem that the patentee was trying to solve." *Id.* But the Supreme Court reversed, concluding that this Court had "analyzed the issue in a narrow, rigid manner inconsistent with § 103 and our precedents." *KSR*, 550 U.S. at 428. In other words, the Supreme Court found fault specifically in the way this Court **applied** the teaching-suggestion-motivation test in the particular case before it, not with the application of obviousness frameworks as a general matter.

27

Further, *KSR* did not involve a design patent or touch on any obviousness test for design patents.  That is not surprising, given the teaching-suggestion-motivation test was historically only applied to utility inventions, not design patents.  As Judge Lourie recognized, "[s]urely [the Supreme Court] did not intend to speak to obviousness of designs, and what was said about a test long applied to utility inventions was not indicated to apply to design patents."  *Lourie, J. Additional Views* at 3-4.  That is particularly true given that design patents had their own longstanding framework for assessing obviousness—the *Rosen-Durling* framework—which was not once mentioned or discussed by the Supreme Court in *KSR*.[4]

Given *KSR*'s focus on utility patents, it is also unsurprising that "in the more than fifteen years since *KSR* was decided, this Court has decided over fifty design patent appeals. . . [and] has continually applied *Rosen* and *Durling* just as it had in the decades preceding."  *Panel Opinion* at 13; *see also*, *e.g.*, *Campbell II*, 10 F.4th at 1275-76 (Moore, J.) (applying the *Rosen-Durling* framework); *Spigen Korea Co. v. Ultraproof, Inc.*, 955 F.3d 1379, 1383-85 (Fed. Cir. 2020) (Reyna, J.) (same); *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1329-32 (Fed. Cir. 2012)

---

[4] LKQ's listed cases (at 14) all specifically relate to the teaching-suggestion-motivation test addressed by the Supreme Court in *KSR*.  None support the proposition that the Court's *KSR* analysis abrogated other obviousness frameworks.

(Bryson, J.) (same).  This uninterrupted application of the *Rosen-Durling*

framework, with no substantive mention of *KSR* or objection from the parties that

litigated these matters, indicates that *KSR* does not speak to design patent

obviousness at all—explicitly or implicitly.

## 2. *KSR* did not prohibit the use of frameworks, like *Rosen-Durling*, in analyzing obviousness.

In light of the above, the only way LKQ can argue *KSR* overrules or

abrogates the design tests is by overreading the Supreme Court's ruling.

Specifically, LKQ says (at 10) the "Supreme Court in *KSR* held that obviousness

cannot be limited by rigid rules but must instead be based on a flexible and

expansive inquiry," and incorrectly concludes from that holding that *KSR* prohibits

***any*** rules surrounding the obviousness framework.  Not so.  As the AIPLA Amicus

Brief correctly explains, the Supreme Court in *KSR* "indicated that rules and

structured analytical frameworks are not problematic *per se* but rather only become

problematic when they 'deny factfinders recourse to common sense.'"  AIPLA

Amicus Brief at 5 (quoting *KSR*, 550 U.S. at 421).

That is why this Court, even after *KSR*, has endorsed many non-statutory

frameworks to guide the obviousness analysis and avoid the traps of hindsight.

*See*, *e.g.*, *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011) (reiterating post-*KSR*

the requirement that a reference can only be considered prior art if it is analogous

to the claimed invention); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,

567 F.3d 1314, 1326 (Fed. Cir. 2009) (reiterating post-*KSR* that an invention is not obvious where the prior art teaches away from the claimed invention).  Indeed, even *KSR* did not eliminate the teaching-suggestion-motivation framework, explaining "[t]here is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis."  *KSR*, 550 U.S. at 418-19.  The problem in *KSR* was with the Federal Circuit's "***application*** of the TSM test."  *Id.* at 419 (emphasis added).

Similarly, in the context of new chemical compounds, post-*KSR*, the lead-compound test requires a "known compound" as a starting point, and a reason to modify that compound in order establish prima facie obviousness.  *See Takeda Chem. Indus. Ltd. v. Alphapharm Pty.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007) (holding that "in cases involving new chemical compounds, it remains necessary [after *KSR*] to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound"); *Eisai Co. v. Dr. Reddy's Lab'ys, Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) ("Teva cannot create a genuine issue of material fact on obviousness through the unsupported assertion that compounds other than lansoprazole might have served as lead compounds.").

The lead compound analysis is particularly instructive because of its similarities to the *Rosen-Durling* framework.  Like the *Rosen-Durling* framework, the lead compound analysis also consists of two steps, with the first step focused on identifying a starting point (here a prior art compound instead of a *Rosen*

reference) and the second step focused on how a skilled artisan would modify that compound or reference:

> Proof of obviousness based on structural similarity requires clear and convincing evidence that a medicinal chemist of ordinary skill would have been motivated **[step 1]** to select and then **[step 2]** to modify a prior art compound (*e.g.*, a lead compound) to arrive at a claimed compound with a reasonable expectation that the new compound would have similar or improved properties compared with the old.

*Daiichi Sankyo Co. v. Matrix Lab'ys, Ltd.*, 619 F.3d 1346, 1352 (Fed. Cir. 2010).

Also like the "basically the same" analysis for the *Rosen* reference, the lead compound cases require at step 1 a reasoned showing as to why a skilled artisan would select a proposed lead compound over others.  The lead compound analysis "requires the challenger to demonstrate by clear and convincing evidence that one of ordinary skill in the art ***would have had a reason to select a proposed lead compound*** or compounds over other compounds in the prior art."  *Daiichi Sankyo*, 619 F.3d at 1354 (emphasis added).  Indeed, this Court has made clear that, on the first step, "[a]bsent a reason or motivation based on such prior art evidence, mere structural similarity between a prior art compound and the claimed compound does not inform the lead compound selection."  *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1292 (Fed. Cir. 2012).

So too at step 2, the challenger must provide sufficient analysis to carry its burden: "the accused infringer must identify some reason that would have led a chemist to modify a known compound in a particular manner."  *Altana Pharma AG v. Teva Pharms. USA, Inc.*, 566 F.3d 999, 1007 (Fed. Cir. 2009); *see also id.* (noting that "[t]his standard is consistent with the legal principles announced in the

Supreme Court's decision in *KSR*"). That is consistent with *Rosen-Durling*'s "so related" inquiry, which also requires "some reason" for combining two designs.

Notably, this Court first endorsed the lead compound analysis ***after* *KSR*** issued and many cases have since confirmed that the two-step framework is entirely consistent with *KSR*'s teachings. *See*, *e.g.*, *Takeda Chem. Indus., Ltd.*, 492 F.3d at 1359; *Eisai Co.*, 533 F.3d at 1359 ("[P]ost-*KSR*, a prima facie case of obviousness for a chemical compound still, in general, begins with the ***reasoned identification*** of a lead compound." (emphasis added)).

Simply put, this Court's endorsement and application of the two-step lead-compound framework after *KSR* (among other frameworks) demonstrates that such frameworks are entirely appropriate and consistent with *KSR*'s teachings. The key is simply that any such framework provides sufficient flexibility, which, as discussed below, the *Rosen-Durling* framework does.

### B. The *Rosen-Durling* Framework Provides Flexibility Consistent with the Instruction of *KSR*.

Contrary to LKQ's complaints of rigidity, the *Rosen-Durling* test provides a workable framework for flexibly assessing obviousness.

*Rosen*'s primary reference requirement, for example, asks a relatively open-ended question: whether a factfinder can determine "almost instinctively" that a skilled artisan would believe "two designs create basically the same visual impression." *Durling*, 101 F.3d at 103. This requirement is not unduly rigid, but merely asks for "an adequate starting point, a basic reference which embodies similar design concepts." *Rosen*, 673 F.2d at 391. Critically, the "basically the

same" requirement does not mean "near-identical," as LKQ argues without citation (at 17), or even "substantially the same" (the standard for anticipation and infringement). *See Int'l Seaway Trading*, 589 F.3d at 1239. Rather, it looks for whether the reference has "substantial differences" or differences that would require "major modifications." *Campbell II*, 10 F.4th at 1275 (quoting *Spigen Korea Co.*, 955 F.3d at 1383). The requisite degree of similarity will vary, depending on the type of design and the level of skill in the art; there is no percentage threshold for "basically the same." Further, contrary to LKQ's assertion (at 2, 19), nothing in *Rosen* precludes a factfinder from considering the full scope of the relevant prior art during the analysis; it requires finding a proper starting point within that prior art, but the analysis takes place with the knowledge of the full scope of the prior art. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1381 (Fed. Cir. 2009) (considering, among other things, three prior art references and finding that "[t]he trial court would have been entitled to consider any one of these references to be a primary reference").

Similarly, while LKQ claims (at 19) that the *Rosen-Durling* framework precludes considering the knowledge of a skilled artisan, that is plainly not true. Indeed, when reversing a finding of non-obviousness in *Campbell I*, this Court recognized that a factfinder ***must*** rely on common sense and the level of skill in the art when looking for a primary reference. *Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1340-41 (Fed. Cir. 2019) (hereinafter, "*Campbell I*"). In that case, the Court rejected the Board's factfinding that the design of a gravity feed

dispenser—the Linz dispenser (shown below)—was not a proper primary reference in the obviousness analysis because it lacked a soup can. *Id.*

| Challenged Claim | Prior Art Design |
|:---:|:---:|
|  | |
| U.S. Pat. No. D612,646 | Linz<br>(U.S. Pat. No. D405,622) |

The Court explained it was undisputed that the claimed design and the Linz design were for can dispensing. *Id.* The only dispute was about the dimensions of the can to be used with the system. *Id.* at 1341. Considering the record, the Court held, "the ever-so-slight differences in design, in light of the overall similarities, do not properly lead to the result that Linz is not a single reference that creates basically the same visual impression as the claimed designs." *Id.* (quotation marks omitted). A skilled artisan could use common sense and background knowledge to envision a can, so this Court found substantial evidence did not support the Board's finding that Linz was not a proper primary reference. *Id.*

Other post-*KSR* decisions have similarly illustrated *Rosen*'s flexibility.  For example, in *Golden Eye Media USA, Inc. v. Evo Lifestyle Products Ltd.*, this Court found that despite numerous differences between the primary reference and the claimed design, the two designs "created 'basically the same' visual impression." No. 2021-2096, 2022 WL 2232517, at *4 (Fed. Cir. 2022) (non-precedential) (affirming obviousness "[d]espite [the primary reference] having a different handle design and location, horizontal rods that differ in length and design, and a less rectangular shape [than the patented design]").

The *MRC* case is yet another example of this Court's consistent pattern of finding *Rosen* references, all while allowing for the consideration of common sense and creativity when conducting the analysis.  *MRC*, 747 F.3d 1326.  There, the Court found the primary reference—an "Eagles Pet Jersey"—was "basically the same" as the claimed design, despite the presence of three visual differences, which the district court had described as "major differences":

> (1) The patented design has a V-neck collar where the Eagles jersey has a round neck; (2) the patented design contains an interlock fabric panel on the side portion of the design rather than mesh; and (3) the patented design contains additional ornamental surge stitching on the rear portion of the jersey.

*Id.* at 1331-32.  Despite these differences, this Court found the prior art "basically the same" because "both designs contain the same overall shape, similar fabric, and ornamental surge stitching."  *Id.* at 1332-33.  Moreover, and contrary to LKQ's

35

misplaced argument that no daylight exists between anticipation and obviousness, the Court made clear that "basically the same" does not mean "the same": "if the designs were identical, no obviousness analysis would be required." *Id.* at 1333.

The "so-related" analysis for combining prior art references also has flexibility. *MRC* is again instructive. There, the Court explained "it is the mere similarity in appearance that itself provides the suggestion that one should apply certain features to another design." *Id*. at 1334. Secondary references, the Court elaborated, are generally "closely akin" to the claimed design. *Id.* (quoting *Borden*, 90 F.3d at 1575). For example, in *MRC*, the secondary references were pet sports jerseys, "not furniture, or drapes, or dresses." *Id.* The Court rejected MRC's contention that more of an explanation for combining features was required; where the references were of the same type they met the "so related" standard. *Id.* The Court further held that the addition of an ornamental aspect missing from the art (extended ornamental surge stitching) would have been obvious despite no literal disclosure in any of the references. *Id*. at 1335 & n.6 (noting that additional stitching "merely followed the visual lines created by the seams of the V2 jersey; in other words, it served only to highlight a design feature that had already existed in the V2 prior art jersey").

*MRC* thus makes clear that the *Rosen-Durling* framework does ***not*** preclude consideration of the knowledge of a skilled artisan; instead, it ***requires*** such consideration and allows a factfinder to find designs obvious based on that knowledge, even if the specific features are not literally disclosed in the primary or

36

secondary references.  *See also Nalbandian*, 661 F.2d at 1217 (relying on "common knowledge in the art" when finding modifications obvious).  That is the epitome of flexibility.

### C.    The *Whitman Saddle* Case Poses No Additional Problem to the *Rosen-Durling* Framework.

The *Rosen-Durling* framework is also consistent with the approach the Supreme Court employed in *Smith v. Whitman Saddle Co.*, 148 U.S. 674 (1893).  The *Whitman Saddle* Court considered a design patent covering a saddle design that combined the design of the front portion (pommel) of the prior art Granger saddle and the rear portion (cantle) of the prior art Jenifer-McClellan saddle.  *Id.* at 680.  These images are shown below.

| **Challenged Claim** |
|:---:|
|  |
| Des. 10,844 |



| **Prior Art Designs[5]** |
|---|

| Granger Saddle | Jenifer-McClellan Saddle |

The Court, considering the evidence of saddle design generally, explained that the combination or substitution of these features was "customary." *Id.* at 681. The Court thus said it could not agree that the claimed design was patentable over the prior art. *Id.*

LKQ's claim that *Whitman Saddle* undercuts the *Rosen-Durling* framework is wrong, as it requires at least two unsupported assumptions. It first requires LKQ's assumption (at 24) that Granger was not similar enough to the claimed design to be "basically the same." But the Court never made such a finding. Instead, the Court treated Granger as a primary reference, explaining that "[t]he saddle design described in the specification differs from the Granger saddle in the substitution of the Jenifer cantle for the low, broad cantle of the Granger tree." *Id.* at 680. Though the Supreme Court was not operating under the modern articulation of the *Rosen-Durling* framework—the formalization of the framework

---

[5] The briefs submitted to the Supreme Court in *Whitman Saddle* are available at SAppx001-071. Images of the Granger and Jenifer McClellan saddles appear on SAppx033.

was decades away—the Court was plainly treating Granger as a starting point akin to what would be done in a *Rosen-Durling* analysis.  Second, LKQ's argument relatedly assumes that *Rosen* requires a certain percentage-level of similarity between a design and a primary reference, and that the Granger saddle could not meet that standard.  This too is wrong.  The degree of similarity required for a primary reference is flexible, and will vary depending on the art.  Indeed, LKQ's chart of prior art in various industries (at 49-50) proves as much.  Even accepting LKQ's argument that it is meaningful to compare the obviousness analysis as applied to a baby's onesie to the analysis as applied to a revolutionary product like the iPad, LKQ's demonstrative illustrates flexibility in assessing similarity depending on the nature of the art, not rigidity or arbitrariness.

Problems akin to *Whitman Saddle* have, in fact, arisen in recent years and led to a similar result under the *Rosen-Durling* framework.  The *Jore* case is illustrative.  *See Jore Corp. v. Kouvato, Inc.*, 117 F. App'x 761 (Fed. Cir. 2005) (non-precedential).  In that case, the Court addressed a jury verdict finding nonobviousness of a design patent for a drill bit.  The Kouvato patent claimed a collared, hexagonal shaft, while the closest identified prior art—the Triumph bit—had a non-collared, cylindrical shaft.  *Id.* at 763.  A second reference—the '157 Patent—disclosed a collared hexagonal shaft, as shown below.  *Id.* at 764.



| Kouvato's Design |
|:---:|
| D419,575 |
| **Prior Art Designs** |
| Triumph Bit |
| U.S. Pat. No. 4,818,157 |

In reversing the district court's denial of a motion for judgment of invalidity notwithstanding the verdict, this Court explained that it would have been obvious to combine the Triumph bit with the collared, hexagonal shaft of the '157 Patent. *Id.* at 762-66. In doing so, the Court properly framed the issue in terms of a

primary reference and a secondary reference in accordance with the *Rosen-Durling* framework, *id.* at 762-763, even though the problem is plainly one of a front portion of one reference being combined with the rear portion of another.  And, like *Whitman Saddle*, the Court employed a flexible analysis and considered the teachings of the art and the skill of an ordinary designer to find the claim obvious. *Id.* at 764-65.

\* \* \*

The *Rosen-Durling* framework fully conforms with the law of obviousness as set out by statute and by the Supreme Court.  It is an application of *Graham*.  It allows for resort to common sense as evidenced by *Campbell I*.  And it accounts for the supposed "50/50" problem of *Whitman Saddle* as shown by *Jore*.  It is thus a legally valid, workable solution to the unique considerations design patents face.

It is also not the free pass for design patents that LKQ says it is.  While LKQ tries to support its rigidity grievances (at 26-31) by comparing grant rates and invalidity determinations of design and utility patents, its comparison falls flat. First, its arguments ignore the differences between design and utility patents, particularly the narrow scope of design patents.  And in any event, LKQ provides no persuasive reason why this Court should seek to impose parity between obviousness findings in utility and design cases.  Second, LKQ concedes (at 42-43 & nn. 6-8), that **sixty percent** of post-*KSR* design patent obviousness appeals applying the *Rosen-Durling* framework have ended in invalidity.  Even in the other forty percent of published post-*KSR* cases, the Court never once held a

design patent *valid* or affirmed such a finding.[6]  Considering all post-*Durling*

opinions of this Court ending in a final judgment on the obviousness question, the

number of patents found invalid for obviousness jumps to ***nearly seventy percent***,

with the most recent judgment of nonobviousness occurring in 2002.[7]  The fact that

a substantial majority of this Court's design patent obviousness decisions end in

---

[6] LKQ contends (at 43-44) that this Court found nonobviousness in three cases by reversing district court decisions.  That is not true.  In *Apple*, the Court reversed the district court's determination that Samsung had raised a substantial question of invalidity for purposes of the preliminary injunction analysis.  678 F.3d at 1330-33.  The *Apple* case, however, did not resolve any ultimate question of validity and did not reverse a district court finding of obviousness.  In *High Point Design LLC v. Buyers Direct, Inc.*, the Court vacated and remanded the district court's obviousness determination due to application of the wrong legal standard and failure to explain the decision.  730 F.3d 1301, 1312-14 (Fed. Cir. 2013).  The Court's remand allowed the district court to revisit the obviousness question. *Id.* at 1314-15.  Similarly, in *Spigen*, the Court reversed the district court's summary judgment of obviousness due to a factual question for the jury and remanded for further proceedings.  955 F.3d at 1383-86.  Rounding out the forty percent, in *Campbell I* the Court reversed the Board's factual finding that Linz was not a proper primary reference and remanded for further proceedings.  939 F.3d at 1340-41.

[7] Since November 1997, the Court has found or affirmed the obviousness of design patents in nine decisions. *See Campbell II*, 10 F.4th 1268; *MRC*, 747 F.3d 1326; *Golden Eye Media*, 2022 WL 2232517; *Sealy Tech., LLC v. SSB Mfg. Co.*, 825 F. App'x 801 (Fed. Cir. 2020) (non-precedential); *Sealy Tech., LLC v. SSB Mfg. Co.*, 825 F. App'x 795 (Fed. Cir. 2020) (non-precedential); *3form, Inc. v. Lumicor, Inc.*, 678 F. App'x 1002 (Fed. Cir. 2017) (non-precedential); *Jore*, 117 F. App'x 761; *In re Chung*, 243 F.3d 561 (Fed. Cir. 2000) (non-precedential); *Berry Sterling Corp. v. Pescor Plastics, Inc.*, 215 F.3d 1351 (Fed. Cir. 1999) (non-precedential).  It has found or affirmed nonobviousness in just four. *See Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277 (Fed. Cir. 2002); *In re Haruna*, 249 F.3d 1327 (Fed. Cir. 2001); *Hupp*, 122 F.3d at 1462; *OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396 (Fed. Cir. 1997).

invalidity shows that the *Rosen-Durling* framework is ***not*** the hallmark of an unfairly restrictive obviousness test. Instead, it strikes a careful—and correct— balance; a balance this Court should not disturb.

### D. Practical Considerations Support Maintaining the *Rosen-Durling* Framework.

#### 1. *Stare decisis* is particularly strong here.

Even apart from the ***legal*** logic that supports the *Rosen-Durling* framework, essentially all ***practical*** reasons point toward keeping that framework, and decidedly away from LKQ's rudderless approach. This Court explained the practical importance of maintaining long-standing precedent in *Lighting Ballast Control LLC v. Philips Electronics North America Corp.*:

> *Stare decisis* is of fundamental importance to the rule of law. The doctrine of stare decisis enhances predictability and efficiency in dispute resolution and legal proceedings, by enabling and fostering reliance on prior rulings. By providing stability of law that has been decided, *stare decisis* is the foundation of a nation governed by law. The Supreme Court has said: "we will not depart from the doctrine of stare decisis without some compelling justification."

744 F.3d 1272, 1281 (Fed. Cir. 2014) (en banc) (internal citations and quotations omitted); *see also Kimble v. Marvel Entm't LLC*, 576 U.S. 446, 455 (2015) ("The doctrine [of *stare decisis*] rests on the idea . . . that it is usually more important that the applicable rule of law be settled than that it be settled right." (quotation marks omitted)); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014) ("Before overturning a long-settled precedent, however, we require 'special justification,' not just an argument that the precedent was wrongly decided."). In

43

short, a legal framework that has been applied for decades—particularly one that defines critical property rights, like the *Rosen-Durling* framework—should be changed only in the most extreme of circumstances. *See Kimble*, 576 U.S. at 457 ("And we have often recognized that in just those contexts—cases involving property rights and contract rights—considerations favoring *stare decisis* are at their acme." (quotation marks omitted)).

As a result of this strong need for consistency, courts look to a number of factors in deciding whether any such "compelling justification" exists to overrule precedent. A good synopsis of those factors appears in Bryan Garner's treatise on judicial precedent, as summarized below:

| Reasons Against Overruling | Reasons for Overruling |
|---|---|
| The decision has stood unchallenged for many years | The decision is contrary to plain principles of law |
| The same or other courts have approved and followed the decision in many later decisions | The decision is isolated and hasn't been followed or acquiesced in |
| The decision has been universally accepted, acted on, and acquiesced in by courts, the legal profession, and the general public | A divided court's decision on a matter of great importance is now seriously doubted |
| The decision has become a rule of property | The decision has been met with general dissatisfaction, protest, or severe criticism |
| Reliance has been placed on the prior decision: contracts have been made, business transacted, and rights adjusted | No serious reliance interests have built up around the decision |

| in reliance on the decision for a long time or to a great extent | |
| --- | --- |
| The prior decision involved interpreting a statute | Although some private rights may be injured by overruling the decision, it was wrong in the first place, it produces general injustice, and less harm will result from overruling the decision than from allowing it to stand |

Bryan A. Garner et al., *The Law of Judicial Precedent* 396 & 404 (2016).

Addressed more generally, the *Rosen-Durling* framework hits the "don't overrule" side of every such consideration, because it has been:

- repeatedly adopted across all judges of this Court, and thus essentially all appellate judges with design patent purview, without criticism or controversy;

- accepted by the bar and public with almost no criticism from relevant stakeholders until LKQ's recent self-serving campaign to eliminate it;

- consistently accepted by Congress;

- relied on by stakeholders in building design patent portfolios;

- adopted as a central rule of property that directly affects the value of a government-granted property right; and

- a much better framework than the rudderless approach LKQ advocates.

Addressing each point:

**Full and Consistent Judicial Adoption**:  This Court has universally followed the *Rosen-Durling* framework.  Since Judges Markey, Rich, Baldwin, Miller, and Nies issued *Rosen* unanimously 40+ years ago, every judge on the

Court who has faced the issue (and at least 13 currently-serving judges) has authored or joined an opinion that applied the *Rosen-Durling* framework.[8]  LKQ has not identified a single panel opinion prior to this case criticizing or even undercutting the *Rosen-Durling* framework, whether before or after *KSR*—and we know of none.  Instead, the story of the *Rosen-Durling* framework is one of flexible but consistent application of the framework to the particular facts of each case.  And as mentioned above, that flexible application is highlighted by the fact that sixty percent of the cases reaching this Court post-*KSR* resulted in a judgment of invalidity.

**Full and Consistent Public Acceptance**:  The bar and public have been equally supportive of the *Rosen-Durling* framework.  Whether at the time *Rosen* issued, the time *Durling* issued, the time *KSR* issued, or any time since, initial innovators and secondary innovators (improvers) have comfortably applied the *Rosen-Durling* framework.  There has been no hue and cry from industry, and no meaningful challenge to the current framework.  Indeed, in perhaps the largest design patent dispute of all time—*Apple v. Samsung*—the defendant raised invalidity issues on appeal but did not question the *Rosen-Durling* framework.

---

[8] *E.g.*, *Campbell II*, 10 F.4th 1268 (Judges ***Moore***, ***Prost***, and ***Stoll***); *MRC*, 747 F.3d 1326 (Judges Rader, ***Prost***, and ***Chen***); *High Point Design*, 730 F.3d 1301 (Judges O'Malley, ***Schall***, and ***Wallach***); *Apple*, 678 F.3d 1314 (Judges ***Bryson***, ***Prost***, and O'Malley); *Titan Tire*, 566 F.3d 1372 (Judges ***Newman***, ***Plager***, and Gajarsa); *Durling*, 101 F.3d 100 (Judges ***Clevenger***, Skelton, and Rader); *Golden Eye*, 2022 WL 2232517 (Judges ***Lourie***, ***Schall***, and ***Reyna***); *Sealy Tech.*, 825 Fed. App'x 795 (Judges ***Prost***, ***Reyna***, and ***Hughes***); *3Form, Inc.*, 678 Fed. App'x 1002 (Judges ***Hughes***, ***Schall***, and ***Stoll***).

*See generally* Opening Brief for Defendants-Appellants, *Apple Inc. v. Samsung Elecs. Co.*, No. 2014-1335, 2014 WL 2586819 (Fed. Cir. May 23, 2014).

LKQ cites (at 26-30) academic commentary that has no ties to real-world commercial concerns, and statistics about grant rates and invalidation rates. Higher grant rates are necessarily tied to the narrow scope of design patent claims—as that narrow scope is the predicate on which the entire obviousness inquiry rides. *See Durling*, 101 F.3d at 103 (obviousness inquiry begins with "discern[ing] the correct visual impression created by the patented design as a whole," followed by comparison to the prior art); *see also MRC*, 747 F.3d at 1333 n.1 ("[D]esign patents have 'almost no scope' beyond the precise images shown in the drawings." (quoting *In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988))).

Yet LKQ says nothing about that plain cause for high validity rates, and instead, without citation or logic (at 26-28), attributes it wholly to the *Rosen-Durling* framework. Most important, LKQ cites nothing to show anything but full acceptance by the innovation community for the current design patent validity regime. And LKQ's amicus support, not surprisingly, comes primarily from entities who have no interest in innovation or patents (other than to invalidate them) because their business is to knock off innovation, not create it.

**Protecting Critical Property Rights**: The *Rosen-Durling* framework is also a core definition for property rights—*i.e.*, whether an innovator gets narrow rights or no rights at all—and is thus of particular importance to maintain. *See Kimble*, 576 U.S. at 457. The *Rosen-Durling* framework is a central rule of

47

validity; it affects every prosecution and every litigation and is therefore uncommonly pervasive in setting a patent right. It was also applied in the prosecution of every single unexpired patent, or nearly so, as design patents last just 15 years, and *Rosen-Durling* has been in place 40+ years.

Moreover, the innovation community has been told explicitly by the relevant agency that its design rights will be tested by the *Rosen-Durling* framework for all existing patents. *See* Manual of Patent Examining Procedure (MPEP) § 1504.03. And critically, the framework is binary—if an innovator falls on one side, they receive protection, and if they fall on the other, they get nothing for their investment of design effort and prosecution costs. In sum, this is an all-or-nothing property rule that the legal and administrative systems of the federal government have provided to innovators and competitors for decades. In such situations, *stare decisis* is in "superpowered form." *Kimble*, 576 U.S. at 457-59 (stating that *stare decisis* as at its most potent when it comes to property rights "because parties are especially likely to rely on such precedents when ordering their affairs").

**A Comparatively Better Approach**: LKQ's proposed approach—a free-for-all with no analytical framework to guide and constrain a factfinder—would be a step back regardless of one's feelings about the *Rosen-Durling* framework. LKQ posits a world where a jury is given no guidance beyond the *Graham* factors. Yet this Court has repeatedly seen the wisdom of setting legal obviousness requirements to guide and limit the jury that do not appear in *Graham*—*e.g.*, the requirement for a lead compound, the requirement for analogous art, and the

effects of teaching away.  These requirements all help to guide factfinders, and yet are flexible at the same time.  LKQ's position would have the effect of taking away these kinds of guideposts and would leave factfinders unduly rudderless in judging particular subsets of obviousness.

**Innovation Markets Working**: In their present form, design patents do what they should: provide narrow protection against knockoffs without interfering with design innovation.  The automotive industry shows this.  Specifically, many automotive innovators obtain design patents on their designs and release fresh-looking competitive vehicles every cycle.  They do not sue their competitors to block innovation.  Rather, the only recent conflicts have been with companies, like LKQ, that provide no design innovation at all, and simply want to copy innovator designs.  This case is about attempted free riding, not about any legitimate balancing between work of initial innovators and follow-on innovators.

In short, LKQ has identified no practical reasons to depart from the *Rosen-Durling* framework, and all practical considerations point toward maintaining consistency in the law.  For this additional reason, the Court should reject LKQ's effort to dismantle the current framework.

## 2.    Congress has repeatedly accepted the framework.

Even apart from *stare decisis*, the past four decades show Congress repeatedly accepting the *Rosen-Durling* framework and rejecting efforts—like those by LKQ—to narrow design rights.  ***First***, Section 103 has been repeatedly amended post-*Rosen* without a change in the long-accepted law—a "most

49

persuasive indication[] that the rule . . . has become part of the warp and woof of the legislation." *Francis v. S. Pac. Co.*, 333 U.S. 445, 450 (1948).  For example:

- in 1984, Section 103 was amended to exclude certain 102(f) and (g) art from consideration for obviousness (Patent Law Amendments Act of 1984, Pub. L. No. 98-622, § 1, 98 Stat. 3383, 3384 (1984));

- in 1995, it was amended to apply a special rule, in (b)(1), for certain "biotechnological process[es]" (Pub. L. No. 104-41, § 1, 109 Stat. 351, 351 (1995));

- in 1999, it received an exclusion of certain 102(e) art from consideration for obviousness (Domestic Publication of Foreign Filed Patent Applications Act of 1999, Pub. L. No. 106-113, § 4505, 113 Stat. 1501, 1501A-565 (1999));

- in 2004, 103(c) was amended for certain "collaborative efforts" (Cooperative Research and Technology Enhancement (CREATE) Act of 2004, Pub. L. No. 108-453, § 2, 118 Stat. 3596, 3596 (2004)); and

- in 2011, it was substantially rewritten to reflect the current first-to-file priority structure (Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3(c), 125 Stat. 284, 287 (2011)).

In each case, Congress saw fit to fix what it perceived to be broken in Section 103, and said nothing about the well-known, longstanding, and precedentially binding *Rosen-Durling* framework.  That is strong evidence that compels this Court to not change the law now.  *See*, *e.g.*, *Francis*, 333 U.S. at 450; *Girouard v. United States*, 328 U.S. 61, 76 (1946); *Missouri v. Ross*, 299 U.S. 72, 75 (1936); *United States v. Elgin, Joliet & E. Ry. Co.*, 298 U.S. 492, 500 (1936); *United States v. Ryan*, 284 U.S. 167, 175 (1931).

*Second*, other aspects of design patent law have received extensive Congressional attention, without Congress changing the obviousness framework for design patents.  For example, Congress dramatically overhauled the patent laws in 2011 with the passage of the Leahy–Smith America Invents Act but left the standard for design patent obviousness untouched.

*Third*, even Congresspeople who want to lessen design patent rights have not sought to change the *Rosen-Durling* framework.  For example, Representative Darrell Issa has been pressing for legislation focused on this very industry through proposed bills: the Save Money on Auto Repair Transportation (SMART) Act and its predecessor proposal the Promoting Automotive Repair, Trade, and Sales (PARTS) Act.  Those bills would have reduced the design patent term from 14 years to 2.5 years for auto parts but said nothing about the standard for design patent validity.  H.R. 1707, 118th Cong. (1st Sess. 2023) (SMART Act introduced by Rep. Issa in 2023); H.R. 3664, 117th Cong. (1st Sess. 2021) (SMART Act introduced by Rep. Issa in 2021); H.R. 1057, 114th Cong. (1st Sess. 2015) (PARTS Act introduced by Rep. Issa in 2015).  And critically, these bills did not pass or even gain any real traction—showing that Congress disagrees with LKQ that a problem exists for design patent protection in the auto industry.

Just as there is no legal reason to disturb the *Rosen-Durling* framework, there is no practical reason to do so either.  Indeed, all practical considerations support maintaining the framework that this Court has continually and consistently applied for decades and rejecting LKQ's rudderless approach.

## IV.   AT MOST, THIS COURT SHOULD CLARIFY *ROSEN-DURLING*, NOT ABANDON IT

For all the reasons discussed above, the *Rosen-Durling* framework provides a flexible solution to the complex problem of evaluating design patent obviousness.  If the Court is inclined to make a change, it should do so through elaboration rather than abrogation.  Elaborating on the existing framework— through consolidation of principles the Court has already articulated—will provide the benefit of clarity, without upsetting the reliance innovators have placed on the current system or throwing the design patent world into a rudderless framework, without the decades of valuable caselaw to guide stakeholders.

To begin, LKQ's suggestion that the Court simply abandon the *Rosen-Durling* framework is unworkable and unsupported.  LKQ argues (at 31) that the test for design patent obviousness should simply ask "what an ordinary designer would actually have found obvious."[9]  This vague and overly simplistic approach ignores a number of things.

---

[9] All the amici supporting LKQ urge similarly vague approaches that are unworkable for the same reasons.  *See*, *e.g.*, Brief of *Amicus Curiae* Eagle Eyes Traffic Industrial Co., Ltd., in Support of Appellants (Dkt. 126) at 18-20; Brief of Amici Curiae American Property Casualty Insurance Association, National Association of Mutual Insurance Companies, and Certified Automotive Parts Association in Support of Appellants En Banc Rehearing (Dkt. 101) at 10-11; Brief of *Amicus Curiae* Taiwan Auto Body Parts Association (Supporting Appellants) (Dkt. 129) at 14-15; En Banc Brief of Amicus Curiae Auto Care Association in Support of Appellants LKQ Corporation and Keystone Automotive Industries, Inc. (Dkt. 111) at 5; Brief of Amici Curiae Patent Law Professors, the Repair Association, Securepairs, iFixit, and US PIRG in Support of Appellants on En Banc Rehearing (Dkt. 139) at 12-21.

Most importantly, LKQ's proposed solution ignores the unique issues that design patents present; issues that have been widely recognized across the caselaw for decades. *See*, *e.g.*, *Egyptian Goddess*, 543 F.3d at 676-77 ("[I]t can be difficult to answer the question whether one thing is like another without being given a frame of reference"); *Durling*, 101 F.3d at 103 (stating that a judge's explanation of a decision in design cases is "more complicated because it involves an additional level of abstraction not required when comprehending the matter claimed in a utility patent"). This Court has recognized that the obviousness framework may differ depending on the nature of the art at issue; design should continue to follow suit.

LKQ's proposed approach would also unnecessarily jettison decades of caselaw, which articulated a considered and balanced approach to assessing the "impossible issue" of design patent obviousness. *See Nalbandian*, 661 F.2d at 1219 (Rich, J., concurring) (referring to "the impossible issue of obviousness in design patentability cases"). Indeed, those cases incorporate many of the principles that LKQ seeks to include in the obvious analysis—flexibility, common sense, and creativity of the skilled designer. *See*, *e.g.*, *MRC*, 747 F.3d at 1332-36; *Campbell I*, 939 F.3d at 1340-41; *Titan Tire*, 566 F.3d at 1380-85. LKQ's suggestion (at 36-37) that lower courts, juries, and the Patent Office will simply figure it out by looking to *Graham* and "expert testimony" does not reflect a thoughtful or workable approach to the issue; it reflects the desires of one party in

53

one industry seeking to advance its own agenda.  Abandoning decades of precedent and leaving the lower courts adrift is not the answer.

And finally, as stated above, LKQ's approach would upset the reliance that innovators have placed in the design patent system.  As a company that specializes in copying innovators, LKQ's reasons for this are clear enough, but the consequences of the Court's decision here are wide-ranging and warrant a more nuanced approach to any change to the standard.

LKQ's proposed approach is thus not the answer to any perceived issues with the *Rosen-Durling* framework.  And while GM continues to urge the Court to maintain the current framework, should this Court be inclined to make any change, there are several workable steps it could take.[10]

***First***, the Court could provide some additional explanation of what it means for a primary reference to be "basically the same."  As reflected in this Court's recent precedent, the requirement of a primary reference is not tantamount to an "almost identical" reference requirement or even a "substantially similar" requirement.  In *Campbell I*, for example, the Court reversed the Board's factual finding that the prior art can dispenser was not basically the same because it did

---

[10] These proposed steps would largely address the concerns expressed by the USPTO, namely that the *Rosen-Durling* framework properly guards against hindsight in the design context but has been ***applied*** too rigidly.  Brief for the United States as *Amicus Curiae* on Rehearing *En Banc* in Support of Neither Party (Dkt. 120) at 13-14, 18, 22-23.  The USPTO proposes additional modifications as well, but as the primary issue it identifies is application and not the framework itself, GM urges that clarification of the framework is sufficient.

not itself disclose a can. 939 F.3d at 1341. Though the can made up a significant part of the claimed design, considering undisputed evidence of the state of the art, the can-less reference was a suitable starting point. *Id.* at 1340-41. The Court's analysis in *MRC* similarly shows that "basically the same" does not require exact identity. The MRC dog jersey designs had meaningful differences: the shape of the neckline, the fabric used for the side panels of the garment, and the ornamental surge stitching. *MRC*, 747 F.3d at 1332. Despite these differences, this Court confirmed that the garments were similar enough to be basically the same, explaining: "That there are slight differences in the precise placement of the interlock fabric and the ornamental stitching does not defeat a claim of obviousness; if the designs were identical, no obviousness analysis would be required." *Id.* at 1333. *Campbell I* and *MRC* are just two among many cases that establish the "basically the same" requirement is not a rigid rule, but a flexible (albeit important) requirement for a close starting point.

*Second*, the Court can make clear that, contrary to LKQ's unsupported assertion (at 2), nothing in *Rosen* or its progeny precludes the factfinder from considering the full scope of the relevant prior art during the obviousness analysis. Indeed, a factfinder may consider the full scope of what the prior art teaches to a skilled designer, but simply must arrive at one or more (*see Titan Tire*, 566 F.3d at 1381) primary references in the first step of the obviousness framework.

*Third*, this Court could clarify that the "so related" inquiry is, consistent with *KSR* and *Glavas*, nothing more than a requirement that there be a design-

based motivation for an ordinary designer to combine two designs or otherwise modify the primary reference. The test ***does not*** require, as some have suggested, that the reason to combine be found in the reference itself. Nor does it prohibit routine design modification that would have been obvious to a skilled designer. *See MRC*, 747 F.3d at 1334-35. This Court could thus make clear that *Durling*'s second step is simply a recognition that there be an aesthetic or design-based reason for any proposed modification.

***Fourth***, the Court could emphasize the availability of common sense in the design patent obviousness inquiry. Consistent with *KSR* and this Court's post-*KSR* design patent obviousness precedent, common sense solutions—such as adding the can in *Campbell I* or the decorative stitching in *MRC*—are not foreclosed in the design patent obviousness analysis. While the Court has never said otherwise, to the extent clarification is necessary, it can make this point clear.

In summary, while GM believes the Court's decisions applying the *Rosen-Durling* framework make it unnecessary, to the extent the Court is inclined to make any changes, it should do so through these clarifications, rather than the abrogation that LKQ seeks.

## **CONCLUSION**

The *Rosen-Durling* framework strikes a careful balance that has worked well for decades. It provides the flexibility required by *KSR*, while demanding that the problem of design patent obviousness be analyzed through an appropriate lens. This Court should reaffirm the *Rosen-Durling* framework for evaluating design

patent obviousness.  Should the Court be inclined to modify the test in any way, it should do so through clarification, not abrogation.

Dated:  October 12, 2023

Respectfully submitted,

 */s/ Joseph A. Herriges*

Joseph A. Herriges
John A. Dragseth
Sarah E. Jack
FISH & RICHARDSON P.C.
60 South 6th Street, Suite 3200
Minneapolis, MN 55402
(612) 335-5070
herriges@fr.com; dragseth@fr.com;
jack@fr.com

Nitika Gupta Fiorella
FISH & RICHARDSON P.C.
222 Delaware Avenue, 17th Floor
Wilmington, DE 19801
(302) 652-5070
fiorella@fr.com

*Attorneys for Appellee GM Global Technology Operations LLC*

## **CERTIFICATE OF COMPLIANCE**

The foregoing document is submitted in accordance with the type-volume limitation of Fed. Cir. R. 32(b). The Brief contains 12,429 words, excluding the parts of the brief exempted by Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14 Point.


Dated:  October 12, 2023                    */s/ Joseph A. Herriges*
                                            Joseph A. Herriges