**Appeal No. 2021-2348**

# United States Court of Appeals
*for the*
# Federal Circuit

LKQ CORPORATION, KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,
*Appellants*,

*v.*

GM GLOBAL TECHNOLOGY OPERATIONS LLC,
*Appellee.*

Appeal From The United States Patent And Trademark Office,
Patent Trial And Appeal Board In IPR2020-00534

## BRIEF FOR HYUNDAI MOTOR COMPANY AND KIA CORPORATION AS *AMICI CURIAE* ON REHEARING *EN BANC* IN SUPPORT OF APPELLEE

D. James Pak
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
djamespak@quinnemanuel.com

William B. Adams
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
williamadams@quinnemanuel.com

*Counsel for Amici Curiae Hyundai Motor Company and Kia Corporation*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2021-2348

**Short Case Caption** LKQ Corp. et al v. GM Global Technology Operations LLC

**Filing Party/Entity** Hyundai Motor Company and Kia Corporation

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/26/2023

Signature: /s/ William Adams

Name: William Adams

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Hyundai Motor Company | | |
| Kia Corporation | | Hyundai Motor Company |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 3

ARGUMENT ........ 4

I. THE INTERESTS OF THE AFTERMARKET AUTO PARTS INDUSTRY SHOULD NOT DICTATE THE INVALIDITY STANDARD FOR ALL OF DESIGN PATENT LAW ........ 4

II. THE ESTABLISHED LAW OF DESIGN PATENT OBVIOUSNESS SHOULD REMAIN ........ 11

CONCLUSION ........ 18

CERTIFICATE OF COMPLIANCE ........ 19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Automotive Body Parts Ass'n v. Ford Global Technologies, LLC*,
930 F.3d 1314 (Fed. Cir. 2019) ....................................3

*In the Matter of Certain Replacement Automotive Lamps*,
Inv. No. 337-TA-1291 (U.S. International Trade Commission) ....................2, 8

*In the Matter of Certain Replacement Automotive Lamps II*,
Inv. No. 337-TA-1292 (U.S. International Trade Commission) ..............2, 6, 7, 8

*Dobson v. Dornan*,
118 U.S. 10 (1886) ....................................12

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008) ....................................12

*In re Hubbell*,
709 F.3d 1140 (Fed Cir. 2013) ....................................16

*LKQ Corp. et al. v. Hyundai Motor America, Inc. et al.*,
1:21-cv-03167 (N.D. Ill.) ....................................1

*LKQ Corp. et al. v. Kia America Inc., et al.*,
1:21-cv-03166 (N.D. Ill.) ....................................1

*Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*,
739 F.3d 694 (Fed. Cir. 2014) ....................................14, 15

## Statutes and Constitutions

35 U.S.C. § 289 ....................................13

Patent Act of 1887 ....................................13

U.S. Const. art. I, § 8 ....................................12

## Other Authorities

LKQ Corporation's Form 10-K for Fiscal Year 2022 (Feb. 23, 2023) ....................9

H.R. Rep. No. 1966, 49th Cong. 1st Sess. (Apr. 27, 1886) ............................... 13, 14

MPEP § 804 ............................................................................................................ 16

MPEP § 1504.03 ...................................................................................................... 15

S. Rep. No. 206, 49th Cong. 1st Sess. (Mar. 9, 1886) ............................................ 13

## **STATEMENT OF INTEREST OF *AMICI CURIAE*[1]**

*Amici Curiae* Hyundai Motor Company and Kia Corporation ("Hyundai and Kia") are automobile manufacturers based in Seoul, Korea. They design, manufacture, market, and sell various lines of popular and award-winning vehicles. They are also the owners of design rights, including U.S. design patents, that protect the new and ornamental designs of their innovative vehicles and components.

Their respective subsidiaries, Hyundai Motor America, Inc. and Kia America, Inc., are the exclusive distributors of Hyundai- and Kia-brand automobiles, parts, and accessories in the United States. Both are based in Southern California.

Hyundai and Kia are currently engaged in litigation involving their design patents in the U.S. District Court for the Northern District of Illinois.[2] The cases were initiated by LKQ Corporation ("LKQ") and Keystone Automotive Industries, Inc. ("Keystone"), the Plaintiffs-Appellants here. Without authorization from Hyundai or Kia, LKQ and Keystone have marketed and sold various third-party aftermarket headlamps and taillamps that are intended to replace original Hyundai

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici curiae* states that no counsel for any party authored this brief in whole or in part, and no party or counsel for a party made any monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made any monetary contribution that was intended to fund the brief's preparation or submission.

[2] *LKQ Corp. et al. v. Hyundai Motor America, Inc. et al.,* 1:21-cv-03167 (N.D. Ill.); *LKQ Corp. et al. v. Kia America Inc., et al.*, 1:21-cv-03166 (N.D. Ill.).

and Kia parts. LKQ and Keystone have sought declaratory judgments of non-infringement and invalidity of over 40 design patents owned by Hyundai and Kia.

These cases are parallel to two investigations that have been conducted in the International Trade Commission ("ITC") involving almost all of the same design patents.[3] After the final evidentiary hearings in those ITC investigations, Administrative Law Judges found that LKQ and Keystone had infringed 38 out of 41 of Hyundai and Kia's design patents.

Hyundai and Kia have an interest in the continued and predictable application of design patent law, including the current *Rosen-Durling* obviousness framework, to protect the considerable resources they have expended in developing new vehicles. Consumers in the United States have benefited in remarkable ways from a design patent system that incentivizes innovative companies like Hyundai and Kia to devote their businesses to creating new designs for consumer products, with confidence that they can rely on predictable and logical frameworks for assessing infringement and validity when those design patent rights are threatened by companies that copy their products and designs without permission.

---

[3] *In the Matter of Certain Replacement Automotive Lamps*, Inv. No. 337-TA-1291; *In the Matter of Certain Replacement Automotive Lamps II*, Inv. No. 337-TA-1292.

## INTRODUCTION

This appeal is not an isolated design patent case involving auto parts, but is part of a larger, deliberate campaign by an aftermarket parts industry that is openly hostile to auto manufacturers' design patent rights. In *Automotive Body Parts Ass'n v. Ford Global Technologies, LLC*, 930 F.3d 1314 (Fed. Cir. 2019), for example, then-appellant, now-*amicus* Automotive Body Parts Association ("ABPA"), of which LKQ and Keystone are members, pressed novel theories related to patent exhaustion and aesthetic functionality to, as this Court put it, "invite us to rewrite established law to permit ABPA to evade Ford Global Technologies, LLC's [design] patent rights." *Id.* at 1316. This Court rightly "decline[d] ABPA's invitation." *Id.*

Once again, the aftermarket auto parts industry, supported by insurance companies that profit alongside them, seeks a sea change in design patent law that would allow it to evade design patent rights with impunity. LKQ, Keystone, and their *amici* are simply not interested in advancing innovation in the auto parts sector, nor are they concerned about their ability to compete by creating new and innovative designs. Instead, they profit by directly copying the products of others, even where those products are covered by design patents. Because infringement is a foregone conclusion due to the copying, these companies must rely on the invalidity standard to avoid liability. This Court again should decline their invitation to disturb design patent law and retain the current design patent obviousness test, which for decades

has been rightly rooted in a visual analysis catered to the unique characteristics of design patent claims and rights.

## ARGUMENT

### I. THE INTERESTS OF THE AFTERMARKET AUTO PARTS INDUSTRY SHOULD NOT DICTATE THE INVALIDITY STANDARD FOR ALL OF DESIGN PATENT LAW

This appeal does not concern a general problem plaguing the world of design patents as a whole; rather, it involves an idiosyncratic debate within a single industry—the aftermarket auto parts industry—that is better left to policymakers than to the courts.[4] Indeed, two key features of the aftermarket parts industry are antithetical to the U.S. design patent system, making this case a particularly inappropriate one in which to alter longstanding precedent.

*First*, participants in the aftermarket parts industry profit in large part because they can avoid the substantial costs of undertaking original design work by instead copying the designs of original equipment manufacturers like GM, Hyundai, and Kia. In doing so, companies like LKQ and Keystone can profit from parts sales without ever having spent a dime on design, research, development, marketing,

---

[4] As various *amici* supporting LKQ and Keystone have acknowledged, they are active in legislative and public policy realms, which has led, so far unsuccessfully, to proposed legislation relating to design patents for auto parts. *See, e.g.*, Brief of *Amici Curiae* American Property Casualty Insurance Association, National Association of Mutual Insurance Companies, and Certified Automotive Parts Association, ECF 101, at 1-2; Brief (Corrected) of *Amicus Curiae* Taiwan Auto Body Parts Association, ECF 129, at 13-14 & nn. 7-9.

testing, or any of the other numerous activities needed to bring new and desirable vehicles to market. As explained more below, LKQ and Keystone do this by working with other companies, including other members of the ABPA, that freely admit to buying original equipment manufacturer ("OEM") parts, running optical scans on them, and then creating replicas of them that are exported around the world. Companies like LKQ, Keystone, and other aftermarket auto parts suppliers purchase these knockoffs and sell them to consumers in the United States as replacements for authentic OEM parts.

Hyundai and Kia's current litigation against LKQ and Keystone regarding their rampant infringement of Hyundai and Kia's design patents for headlamp and taillamp assemblies is instructive. In the Initial Determination in the ITC investigation related to Hyundai's design patents, for example, Chief Administrative Law Judge Cheney described the evidence of how TYC Corporation, a Taiwan-based manufacturer of many of LKQ and Keystone's aftermarket headlamps and taillamps and an ABPA member, copies Hyundai and Kia's parts:

> One of the first things that TYC does when designing and making a replacement lamp is to purchase the original equipment version, sometimes referred to as the 'OE' or 'OEM' (short for original equipment manufacturer) product. After receiving the OE lamp, TYC then performs a 'CCD' scan of the OE lamp. A CCD scan is a form of an optical scan that very accurately recreates a digital image of the object being scanned. After scanning the OE product, TYC then uses that scan as a reference when recreating the replacement part. TYC advertises the resulting replacement parts as having no differences from the original equipment:




*In the Matter of Certain Replacement Automotive Lamps II*, Inv. No. 337-TA-1292, Public Initial Determination, EDIS Doc. No. 789302, at 122 (I.T.C. Jan. 24, 2023) (citations omitted).

ALJ Cheney went on to find that any suggestion that TYC may have copied only "some aspects" of the Hyundai products, but not "all the ornamental features of those domestic industry products," was "not persuasive because the pictures of the representative accused products are virtually identical to the pictures of the alleged representative domestic industry products":

| Asserted Patent | Representative Accused Product | Alleged Representative Domestic Industry Product |
|---|---|---|
| '478 Patent |  |  |
| '8835 Patent |  |  |
| '836 Patent |  |  |
| '583 |  |  |

*Id.* at 123-24 (showing these four pairs and the remaining sets of comparisons).

Going through a full infringement analysis that compared the overall visual impression of each asserted design patent with the overall appearance of each corresponding accused product, ALJ Cheney found infringement of all 21 of

Hyundai's asserted design patents by LKQ and Keystone's products. *Id.* at 131-254.[5]

The *amici* supporting LKQ and Keystone admit that this is their business model and that they knowingly choose to infringe the design patents of OEMs. For example, the Taiwan Auto Body Parts Association ("TABPA") explains that its members desire to make each part "similar in appearance to the original damaged part it is replacing" and that TABPA members are thereby "forced to make a decision as to providing parts which are subject to the plethora of design patents obtained by the OEM's." Brief (Corrected) of *Amicus Curiae* Taiwan Auto Body Parts Association, ECF 129, at 1. Other *amici* are not so transparent, but their support for LKQ and Keystone likewise reflects that they cannot profit from copying OEM designs unless this Court adopts a new invalidity standard that makes it impossible for auto manufacturers to obtain design patent rights on replacement parts. *See, e.g.*, Brief of *Amicus Curiae* Eagle Eyes Traffic Industrial Co., Ltd., ECF 126, at 5-6; Brief of *Amici Curiae* American Property Casualty Insurance Association et al., ECF 101, at 5-6.

---

[5] The ALJ in the investigation related to Kia's design patents likewise found infringement of 17 out of 20 Kia design patents by LKQ and Keystone's products, with the 3 non-infringement findings being close calls. *In the Matter of Certain Replacement Automotive Lamps*, Inv. No. 337-TA-1291, Public Initial Determination, EDIS Doc. No. 790224, at 43-275 (I.T.C. Jan. 24, 2023).

LKQ and Keystone's motives are also clear from public statements they were required to make regarding risks to their business. In LKQ's most recent 2023 annual 10-K report, for example, LKQ candidly states on behalf of itself and Keystone that "[t]o the extent OEMs and other manufacturers obtain design patents or trademarks and are successful in asserting claims of infringement of these patents or trademarks against us, we could be restricted or prohibited from selling certain aftermarket products, which could have an adverse effect on our business." LKQ Corporation's Form 10-K for Fiscal Year 2022 (Feb. 23, 2023) at 17, *available at* https://investor.lkqcorp.com/financials/sec-filings/default.aspx. LKQ admitted this was so because design patents interfere with LKQ and Keystone's ability to "sell aftermarket parts that *replicate* the patented parts." *Id.* (emphasis added); *see id.* ("To the extent OEMs are successful in defending their patents or trademarks, we could be restricted or prohibited from selling the corresponding aftermarket products, which could have an adverse effect on our business.") (emphasis added).

*Second*, another problematic feature of the aftermarket industry is that it profits from a relationship with auto insurance companies (the other main set of *amici* supporting LKQ and Keystone here) that encourage the use of these knockoff products instead of authorized OEM parts. As various *amici* acknowledge, the insurance companies pay out less on a policy, and therefore profit more, if a repair shop uses a knockoff part instead of an authentic part to fix an insured car. *See* Brief

of *Amicus Curiae* Auto Care Association, ECF 111, at 3; Brief of *Amici Curiae* American Property Casualty Insurance Association et al., ECF 101, at 5-6.

The insurance companies claim that this is better for consumers, but the same argument would justify their replacing an insured Rolex watch or Gucci handbag with a knockoff version, thereby saving them money and supposedly enabling them to lower their premiums. Moreover, even though lower prices can benefit consumers in some situations, that is not always the case, particularly where those lower prices are achieved by companies avoiding the very real costs of such things as design, research, development, and marketing by simply copying other companies' patented products. If this lower-price argument were sound, it would support the protection of unauthorized knockoff products in every industry.

The aftermarket parts companies and the insurance companies have even teamed up to support an organization called the Certified Automotive Parts Association ("CAPA"), another *amicus* supporting LKQ and Keystone here. *See* Brief of *Amici Curiae* American Property Casualty Insurance Association et al., ECF 101, at 2-3. Through this certification organization, knockoff aftermarket parts are "certified" as acceptable replacements for authentic parts. *Id.* Ostensibly an independent, non-profit certifying body, CAPA has a Board of Directors and Technical Committee that are in fact a collection of representatives from the aftermarket and insurance industries, including employees of LKQ, Keystone, and a

host of auto insurance companies. *See* Board of Directors, https://www.capacertified.org/BoardOfDirectors; Technical Committee, https://www.capacertified.org/TechnicalCommittee.

For these reasons, this Court should decline to overhaul the design patent obviousness test for the sake of one self-interested set of industry participants.

## II. THE ESTABLISHED LAW OF DESIGN PATENT OBVIOUSNESS SHOULD REMAIN

GM has ably explained and defended the current legal framework for assessing design patent obviousness using the *Rosen-Durling* framework, and Hyundai and Kia join in support of those arguments without repeating them here. This section aims to address in further detail just a few of the arguments that LKQ, Keystone, and their *amici* have advanced in favor of changing the obviousness framework from one guided by visual similarity to one in which ancillary issues and verbal arguments can swamp an otherwise straightforward, fair, and replicable analysis.

GM and the United States as *amicus curiae* are absolutely correct that the obviousness test must remain focused on a visual analysis. Brief of Appellee GM, ECF 166, at 13-17; Brief for the United States as *Amicus Curiae*, ECF 120, at 20, 30-31. This has long been the bedrock of design patent law: "As the Supreme Court has recognized, a design is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the

illustration.'" *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008) (quoting *Dobson v. Dornan*, 118 U.S. 10, 14 (1886)). Thus, in the infringement context, the prior art is not merely described in words or analyzed piecemeal, but properly placed side-by-side with the overall appearances of the asserted design and accused product to create a visual frame of reference for comparison. *Id.* at 676-77. The same should continue in the obviousness context.

LKQ, Keystone, and their *amici* wrongly argue that the current obviousness test is broken because it allows the design patent field to be filled with too many patents. But having many past design inventions in a field is not in itself a reason to invalidate large volumes of new design patents in that field, particularly for products such as automobiles and clothing where despite a substantial number of historical references, talented designers are constantly coming up with new designs and trends to suit consumers' ever-changing tastes. Using a loose obviousness test would be detrimental to the ongoing work of designers who provide new vehicles, clothing, footwear, furniture, jewelry, and more despite centuries of prior designs.

Allowing copiers like LKQ and Keystone to mine the prior art for bits and pieces of references after the fact also would not "promote the Progress of Science and useful Arts," U.S. Const. art. I, § 8, but would stifle it by undermining the very benefit that designers work so hard to achieve, namely pushing design ahead despite so much having already been done. Where fields are crowded with art, the work of

the designer is even *more* important, not less. Invalidating designs as supposedly obvious simply because a collection of elements can be found in the historical record has no connection with the real-world work done by designers, who are continually creating a steady stream of new *overall* designs, and it would undermine the substantial benefits that such design work provides to consumers and the economy.

The existing obviousness framework has long worked, and LKQ and Keystone provide no persuasive basis to change it to vastly reduce the number of design patents that are issued. Indeed, the current design patent statute, 35 U.S.C. § 289—with its provision for disgorgement of the infringer's entire profits—is almost entirely a product of the Patent Act of 1887. In passing that statute, Congress recognized that "[p]roperty in original designs (which are defined as works of art applied to articles of manufacture intended for sale and use) is a property of great and increasing value, intimately related to material progress in the industrial arts." S. Rep. No. 206, 49th Cong. 1st Sess. (Mar. 9, 1886) at 1; *accord* H.R. Rep. No. 1966, 49th Cong. 1st Sess. (Apr. 27, 1886) at 1. "So far as *consumers* are concerned, the effect of design patent laws that are respected is to give them more beautiful [products] for the same money, and even for less money, with a tendency to encourage the purchase of articles of standard qualities as opposed to shoddy imitations, which is a true economy in individuals and so in masses." H.R. Rep. No. 1966 at 2 (emphasis in original). "[I]t is just that the entire profit on the article should

be recoverable and by the patentee, for it is the *design that sells the article*, and so that makes it possible to realize any profit at all …." *Id.* at 3 (emphasis added).

LKQ, Keystone, and their *amici* are also wrong to cite statistics of high design patent acceptance rates at the U.S. Patent Office as supposed proof that the obviousness framework is somehow broken there. Design patents, by their very nature, should have a different acceptance rate than utility patents because they can have only one claim. *See, e.g.*, *Pacific Coast Marine Windshields Ltd. v. Malibu Boats, LLC*, 739 F.3d 694, 698, 703 (Fed. Cir. 2014). Thus, unlike an inventor of a utility patent who can imbed a number of variations on the same invention into a single application using multiple claims, a design patent inventor must seek separate design patents to do the same thing. *Id.* This can often be done in families of design patents that build off the same base image with different parts of the product drawn in solid or dashed lines, thereby claiming different portions of the same underlying image, but doing so in separate patents. For example, just a few weeks ago, Nike was issued a host of design patents on incremental changes in the design of a shoe. Below are representative images from just six of these new patents:[6]

[6] D1,001,465; D1,001,466; D1,001,468; D1,001,469; D1,001,470; and D1,001,472.




This practice leads to multiple design patents being issued from the same base invention, which tends to increase the overall acceptance rate, as inventors iterate off the same base design but must do so in different patent applications. That is not evidence that the obviousness test is broken but the result of an idiosyncrasy of design patent practice.

Indeed, the current obviousness test *is* at work in the Patent Office, even for design patents that are ultimately issued. For example, examiners commonly raise non-final rejections during examination, including based on obviousness. *See, e.g.*, Manual of Patent Examining Procedure ("MPEP") § 1504.03. Applicants can get around these non-final rejections but often must narrow the scope of their claim or make statements that could affect claim scope through prosecution history estoppel. *See Pacific Coast*, 739 F.3d at 702. Thus, even though the patent is not ultimately rejected, the obviousness test has done work on the claim scope.

The Patent Office's use of the doctrine of obviousness-type double patenting is another example of the current design patent obviousness test at work during Patent Office examinations. *See* MPEP § 804. That doctrine stops the otherwise unjustified timewise extension of a patent right by requiring the applicant to abandon an application or file a terminal disclaimer to limit the life of a patent that merely makes obvious changes to an earlier application by the same inventor. *See id.*; *In re Hubbell*, 709 F.3d 1140 (Fed Cir. 2013).

A design patent from Apple's portfolio illustrates both of these examples of the current obviousness test working properly in the background to limit patent scope and term length. The D618,678 patent, shown below, claims the front face of the initial iPhone:



*D618,678*

During prosecution, the examiner raised primary and secondary references using the *Rosen-Durling* framework and issued a non-final obviousness rejection on that basis. *See* File History for D618,678, Nov. 7, 2009 Non-Final Office Action. Those

references are below, showing that the *Rosen-Durling* framework captures not just "near-identical" references, as LKQ and Keystone have wrongly argued:




FIG.56




*Primary Reference* *Secondary Reference*

The examiner also issued an obviousness-type double patenting rejection in view of another Apple design patent application then pending for the design below, stating that while the claims were not identical, the change in color would have been an obvious modification (*see id.*):



*D617,677*

Apple overcame both obviousness rejections, but only by limiting the D'678 patent's scope and term. To overcome the *Rosen-Durling* references, Apple

described differences in the design of its patent application as compared to the prior art references. *See* File History for D618,678, Jan. 27, 2010 Response to Non-Final Office Action. And for the obviousness-type double patenting rejection, Apple filed a terminal disclaimer so the term of the D'678 patent would end at the same time as the other Apple patent. *Id.*

In sum, the current design patent obviousness test based on the *Rosen-Durling* framework protects the interests of consumers, inventors, and healthy competition. Overhauling that system so that copiers like LKQ and Keystone can benefit from infringing design patents with impunity is undesirable and unnecessary.

## CONCLUSION

The Court should reaffirm the *Rosen-Durling* framework for evaluating design patent obviousness. If, however, the Court is inclined to modify the standard in any way, it nevertheless should preserve the basic *Rosen-Durling* framework that is rooted in a visual analysis.

Dated: October 26, 2023

Respectfully submitted,

*/s/ William B. Adams*

D. James Pak
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000
djamespak@quinnemanuel.com

William B. Adams
QUINN EMANUEL URQUHART
& SULLIVAN , LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
williamadams@quinnemanuel.com

*Counsel for Amici Curiae Hyundai Motor Company and Kia Corporation*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this amicus brief complies with the type-face and volume limitations set forth in Federal Rules of Appellate Procedure 29(d) and 32(a)(7)(B) because the type face is Times New Roman, proportionally spaced, fourteen-point font, and the number of words in this brief is 3,615, according to the word count of Microsoft Word.

Dated: October 26, 2023

/s/ *William B. Adams*
William B. Adams