21-2348

*United States Court of Appeals*
*for the Federal Circuit*

LKQ CORPORATION, KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,
*Appellant,*

v.

GM GLOBAL TECHNOLOGY OPERATIONS LLC,
*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in IPR2020-00534
(JJ. Scott A. Daniels, Grace K. Obermann, and Christopher G. Paulraj)

**CORRECTED BRIEF OF AMICUS CURIAE INDUSTRIAL DESIGNERS SOCIETY OF AMERICA IN SUPPORT OF APPELLEE AND AFFIRMANCE**

Robert S. Katz
Sonia Mary Okolie
BANNER & WITCOFF, LTD.
1100 13th Street, NW, Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000

Erik S. Maurer
BANNER & WITCOFF, LTD.
71 S. Wacker Drive, Suite 3600
Chicago, IL 60606
Telephone: (312) 463-5000

*Attorneys for Amicus Curiae*
*Industrial Designers Society of America*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 21-2348

**Short Case Caption** LKQ Corporation, et al. v. GM Global Technology Operations LLC

**Filing Party/Entity** Industrial Designers Society of America

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/27/2023

Signature: /s/ Erik Maurer

Name: Erik Maurer

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| Industrial Designers Society of America | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☐ No ☑ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ v

INTEREST OF THE AMICUS CURIAE ........ 1

STATEMENT OF AUTHORSHIP AND FUNDING ........ 2

ARGUMENT ........ 3

I. INDUSTRIAL DESIGN IS IMPORTANT TO THE ECONOMY AND SHOULD BE PROTECTED AS CONGRESS INTENDED ........ 3

II. DESIGN PATENTS ARE LEGALLY AND PRACTICALLY DIFFERENT FROM UTILITY PATENTS ........ 6

III. THE *ROSEN-DURLING* FRAMEWORK PROVIDES ESSENTIAL CLARITY TO OBVIOUSNESS FOR DESIGN PATENTS ........ 8

IV. REVERSAL WOULD UNDERMINE THE DESIGN PATENT SYSTEM AND FAIR TRADE ........ 13

V. CONCLUSION ........ 16

# TABLE OF AUTHORITIES

**CASES**

*Campbell Soup Co. v. Gamon Plus, Inc.*,
939 F.3d 1335 (Fed. Cir. 2019) ....................10

*Durling v. Spectrum Furniture Co.*,
101 F.3d 100 (Fed. Cir. 1996) ....................9

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ....................7

*In re* Borden,
90 F.3d 1570 (Fed. Cir. 1996) ....................9

*In re Harvey*,
12 F.3d 1061 (Fed. Cir. 1993) ....................12

*In re Jennings*,
182 F.2d 207 (CCPA 1950) ....................9

*In re Rosen*,
673 F.2d 388 (CCPA 1982) .................... 8, 11, 12

*KSR Int'l v. Teleflex Inc.*,
550 U.S. 398 (2007) ....................7

LKQ Corp. v. GM Glob. Tech. Operations LLC,
71 F.4th 1383 (Fed. Cir. 2023) ....................1

**STATUTES**

35 U.S.C. § 101 ....................6

35 U.S.C. § 171 ....................6

**OTHER AUTHORITIES**

Bonnie Nichols, *Valuing the Art of Industrial Design*, Nat'l Endowment for the Arts Report #56 (Aug. 2013), https://www.arts.gov/sites/default/files/Valuing-Industrial-Design.pdf. ....................3

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

Del Coates, *Watches Tell More than Time: Product Design, Information, and the Quest for Elegance* 32 (2003) ....................4

Dieter Rams, *Dieter Rams on Good Design as a Key Business Advantage*, Fast Co. (May 9, 2012), http://www.fastcompany.com/1669725/dieter-rams-on-good-design-as-a-key-business-advantage ....................4

*Focus on the Illicit Trafficking of Counterfeit Goods and Transnational Organized Crime*, United Nations Off. on Drugs & Crime, (2014), https://www.unodc.org/documents/counterfeit/FocusSheet/Counterfeit_focussheet_EN_HIRES.pdf....................14

*Intellectual Property Crimes: Are Proceeds from Counterfeited Goods Funding Terrorism?*: *Hearing Before the H. Comm. on International Relations,* 108th Cong. 31-35 (2003) (statement of Ronald K. Noble, Secretary General, INTERPOL) ....................14

Sarah Burstein, *Guest Post: "Design Patent Exceptionalism" Isn't*, Patently-O (July 6, 2023), https://patentlyo.com/patent/2023/07/design-patent-exceptionalism.html ..........7

*Save Money on Auto Repair Transportation Act ("SMART Act"),* H.R. 1707, 118th Cong. (2023) ....................15

*Statistical Items Concerning Design Filed for Information Exchange Among the Five Offices of* ID5, Indus. Design 5 Forum (Sept. 2023), http://id-five.org/wp-content/uploads/2023/10/ID5stats2022_forUsers.pdf........4

Stephen Bayley, *In Good Shape: Style in Industrial Products 1900 to 1960* 73–74 (1979)....................8

*Supporting Innovation, Creativity & Enterprise: Charting a Path Ahead (U.S. Joint Strategic Plan on Intellectual Property FY 2017-2019*) 32-44 (2016)....................13

Thom Tillis*, Tillis, Coons, Cassidy & Hirono Introduce Bipartisan Legislation to Seize Counterfeit Products and Protect American Consumers and Businesses* (Dec. 5, 2019), https://www.tillis.senate.gov/2019/12/tillis-coons-cassidy-hirono-

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

introduce-bipartisan-legislation-to-seize-counterfeit-products-and-protect-american-consumers-and-businesses ....................................................14

U.S. Bureau of Lab. Stat., Industrial Designers Summary (Sept. 6, 2023), https://www.bls.gov/ooh/arts-and-design/industrial-designers.htm.....................4

U.S. *Intellectual Property Rights Seizure Statistics*: *Fiscal Year 2021,* U.S. Customs and Border Prot. (Sept. 29, 2022), https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf.........................................................................15

## INTEREST OF THE AMICUS CURIAE

The Industrial Designers Society of America ("IDSA") is one of the oldest and largest membership organizations for industrial designers. *See Our Story*, IDSA, https://www.idsa.org/about-idsa/our-story. IDSA is a non-profit association dedicated to improving knowledge of industrial design and representing the profession to businesses, the government, and the public at large. IDSA has thousands of members across the United States and worldwide in Student Chapters, Professional Chapters, and Special Interest Sections. *See About IDSA*, IDSA, https://www.idsa.org/about-idsa/. IDSA also sponsors the International Design Excellence Awards® (IDEA) annually, one of the most prestigious and competitive industrial design competitions in the world.

IDSA has a primary interest in the outcome of this matter based on its longstanding commitment to design rights issues. IDSA's specific interest in this case is to ensure that the design patent obviousness analysis continues to be conducted in a way that fairly and adequately protects design innovation. IDSA has no personal stake in any of the parties to this litigation or the specific results of this case. IDSA respectfully submits this brief for the benefit of the Court and in specific support of affirming the longstanding framework of obviousness confirmed by the Federal Circuit's prior holding in this case. *LKQ Corp. v. GM Glob. Tech. Operations LLC*, 71 F.4th 1383 (Fed. Cir. 2023).

## STATEMENT OF AUTHORSHIP AND FUNDING

Pursuant to Federal Rules of Appellate Procedure 29(a)(4)(E), amicus curiae Industrial Designers Society of America states that only it and its counsel authored this brief, and no part of this brief was authored by counsel to a party. No party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amicus curiae and its counsel made such a monetary contribution to its preparation or submission.

## ARGUMENT

### I. INDUSTRIAL DESIGN IS IMPORTANT TO THE ECONOMY AND SHOULD BE PROTECTED AS CONGRESS INTENDED

Industrial design touches every aspect of most people's day. From the toothbrush pulled from the cabinet at daybreak, through the kitchen equipment used to prepare lunch, to the reading glasses and bedside table lamp in the evening—and most every product encountered between—it was someone's job to consider and design for the human factors and aesthetic desirability of the things we use in our lives.

Industrial designers design all types of products across every product category imaginable. *See IDEA Categories*, IDSA, https://www.idsa.org/awards-recognitions/idea/idea-categories/. These designers leverage their creativity, aesthetic and engineering skills, and business knowledge to produce the best and most appealing designs and, in turn, create products whose appearances drive consumer demand.

Industrial design serves an important function by making products more visually appealing, more interesting, and more relevant to consumers. *See* Bonnie Nichols, *Valuing the Art of Industrial Design*, Nat'l Endowment for the Arts (Aug. 2013), https://www.arts.gov/sites/default/files/Valuing-Industrial-Design.pdf. It is undeniable that product design is a major driving factor in product demand and marketability: "[I]n the face of increasing competition, design is often the *only*

product differentiation that is truly discernable to the buyer." Dieter Rams, *Dieter Rams on Good Design as a Key Business Advantage*, Fast Co. (May 9, 2012), http://www.fastcompany.com/1669725/dieter-rams-on-good-design-as-a-key-business-advantage (emphasis added). Moreover, consumers are typically willing to pay a premium for products that are aesthetically pleasing. *See*, Del Coates, *Watches Tell More than Time: Product Design, Information, and the Quest for Elegance* 32 (2003).

The United States is a major leader in industrial design. There are over 32,000 industrial designers currently working in the U.S. and the field is expected to continue to grow. *Industrial Designers,* U.S. Bureau of Lab. Stat., https://www.bls.gov/ooh/arts-and-design/industrial-designers.htm (Sept. 6, 2023). Design patents protect the ornamental design of an article of manufacture and they are, therefore, essential tools in an industrial designer's ability to guard against copyists and knockoffs. In 2022, approximately 55,000 design patent applications were filed with the U.S. Patent and Trademark Office. *Statistical Items Concerning Design Filed for Information Exchange Among the Five Offices of* ID5, Indus. Design 5 Forum, http://id-five.org/wp-content/uploads/2023/10/ID5stats2022_forUsers.pdf (Sept. 2023). These applications reflect design contributions from large and small entities, and

independent inventors. Design patents are the main tool to prevent third parties from duplicating and knocking-off new and creative designs.

Design patentees in the United States face a crossroads: the need for design rights is increasing but the enforceability of these rights is declining. Infringers are knocking-off products quicker and quicker, while the pendency to obtain design rights from the U.S. Patent and Trademark Office ("USPTO") keeps increasing. Infringers have a plethora of e-commerce platforms through which to sell their knockoffs and, if caught, they seemingly disappear only to reappear under a new name. At the same time, judicial decisions interpreting the Patent Act have generally weakened design patent rights. It is getting harder and harder for a designer to exclude copies of innovative product designs from the marketplace.

The elimination of the *Rosen-Durling* framework in an obviousness analysis would jeopardize the design rights of design patentees by making design rights unduly susceptible to challenge and less certain. Given the existence of a wholly separate statutory right designated by Congress for design patents and the tremendous growth of the industrial design field, it is evident that this Court should uphold the existing *Rosen-Durling* framework. Industrial design is important to this nation's economy and should be adequately protected as Congress intended so that companies will invest in hiring industrial designers and creating new designs that consumers demand.

## II. DESIGN PATENTS ARE LEGALLY AND PRACTICALLY DIFFERENT FROM UTILITY PATENTS

Design and utility patents are inherently different from one another. Design patents arise from 35 U.S.C. § 171 that provides protection to one who "invents any new, original, and ornamental design for an article of manufacture." On the other hand, utility patents flow from 35 U.S.C. § 101 that provides protection to "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." In sum, design patents protect the appearance of products while utility patents protect how they work.

In the market, design patents cause third party products to compete without a copied appearance. Importantly, it is usually simple to avoid infringing a design patent: competitors simply need to not substantially copy the appearance of another's product. Indeed, we have not found a single Federal Circuit design patent case affirming infringement where the infringer was not aware of the asserted design patent or the patent's commercial embodiment. It is well understood that utility patent rights are entirely different in this practical effect and, there, "innocent infringement" is common. Thus, design and utility patents have rightly been treated differently in the courts because they address different concerns and have different practical implications.

In view of the fundamental differences between design and utility patents, the USPTO and the courts have adapted distinct legal tests and frameworks to address

each right, despite the fact that these rights share many of the same statutory provisions. While design patents and utility patents may appear to offer parallel courses of protection, the paths significantly diverge and "[g]eneral principles may be transferrable but the actual tests are not." Sarah Burstein, *Guest Post: "Design Patent Exceptionalism" Isn't*, Patently-O (July 6, 2023), https://patentlyo.com/patent/2023/07/design-patent-exceptionalism.html.

The Supreme Court first established a three-part obviousness test for utility patents in 1966, holding that "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). Further, this analysis requires that "the combination of familiar elements according to known methods [renders an invention obvious] when it does no more than yield predictable results." *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). Although the Supreme Court rejected the more "rigid" obviousness test and opted for an "expansive and flexible approach" in *KSR*, this ruling was born of utility patents and is not so "expansive and flexible" as to extend to design patents. The principles in question for utility patent obviousness are not applicable or even necessarily transferrable to design patent obviousness.

For example, the consideration of available options that may be combined to solve a technological problem and result in a particular utility is irrelevant to the

scope of a claim that is premised entirely on the appearance of an article. Designers are not nearly as limited by the quantity of available alternative choices as utility patent inventors. Product design is driven by aesthetics, and the countless individual aesthetic choices available to a designer could result in myriad final designs having distinctive appearances. *See* Stephen Bayley, *In Good Shape: Style in Industrial Products 1900 to 1960* 73–74 (1979) ("To any design problem there are many possible solutions; there is no one perfect solution, and sometimes, as in the design of a flower vase, there are hundreds or even thousands of shapes which would do the job."). Utility patent inventions, on the other hand, are largely driven by function and finding a useful solution to a problem.

Therefore, distinct frameworks for evaluating obviousness in utility and design patent cases is not only logical but necessary because the concept-based principles for evaluating utility patent obviousness find no parallels in the realm of design patents.

## III. THE *ROSEN-DURLING* FRAMEWORK PROVIDES ESSENTIAL CLARITY TO OBVIOUSNESS FOR DESIGN PATENTS

The *Rosen-Durling* framework is used to determine whether a design patent claim would have been obvious at the time the design was created. First, according to *Rosen-Durling,* there should be an existing primary reference having design characteristics that are "basically the same" as the claimed design. *In re Rosen*, 673 F.2d 388, 391 (CCPA 1982). Then, one or more secondary references may

potentially be used to modify the primary reference if they are "so related that the appearance of some ornamental features in one would suggest the application of those features to the other." *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (quoting *In re Borden*, 90 F.3d 1570, 1575 (Fed. Cir. 1996)). Thus, the analysis hinges on determining whether a designer of ordinary skill in the art would have modified the primary reference to create a design that has the same overall appearance as the claimed design.

Rather than focusing on individual characteristics of the claimed design (e.g., a straight line, a curve, a spline), the framework requires an evaluation of the overall appearance of the claimed design. Further, the *Rosen-Durling* framework helps guard against combining design elements to recreate the claimed design through hindsight. This approach predated *Rosen-Durling* when the U.S. Court of Customs and Patent Appeals established that the obviousness of a design begins "with something in existence – not with something that might be brought into existence by selecting features from prior art and combining them," particularly where combining them would require modification of every individual feature. *In re Jennings*, 182 F.2d 207, 208 (CCPA 1950). *Rosen-Durling* then logically permitted modification of a design when there is some *actual* reason for doing so based on similarities in overall appearance.

An argument that the *Rosen-Durling* framework is a “rigid bright-line test” is inaccurate. To the contrary, it is and has been a logical and reasonable framework for evaluating obviousness and avoiding the hindsight cherry-picking of prior art elements to arrive at the claimed design.

This Court demonstrated the flexibility of this framework in *Campbell Soup Co. v. Gamon Plus, Inc.* In *Campbell Soup*, the Court found that a can dispenser disclosed in the prior art (the “Linz” reference) was basically the same as the claimed design (U.S. Patent No. D612,646), even though Linz did not depict a cylindrical can as did the claimed design. *Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1340-41 (Fed. Cir. 2019). The Court did not rigidly apply the *Rosen* test, instead it noted that the Linz reference disclosed a *can* dispenser, even though a can was not shown in the drawings, because it was rational to infer a can existed. *Id.*

| **Linz Reference** | **U.S. Patent No. D612,646** |
|---|---|
|  |  |

Importantly, the reasonableness of the *Rosen-Durling* framework is highlighted in the Rosen case itself. In *Rosen*, an examiner rejected Rosen's design patent claim to a table as being obvious by combining four different references that were not basically the same as the claimed design (and also not basically the same as one another). *In re Rosen,* 673 F.2d at 389-90. The Patent and Trademark Board of Appeals sustained this rejection. *Id.* at 390. An illustration showing Rosen's claimed design (left) and the designs of the cited references (right) appears below:

| ***Rosen* Claimed Design** | **References Cited and Combined by Examiner** |
|---|---|
| D268,555 | D240,185 |
|  |  |
| | D183,617 |
| |  |
| | D234,068 |
| |  |
| | D239,487 |
| |  |

The U.S. Court of Customs and Patent Appeals reversed and clarified the now well-known framework that requires an existing primary reference which has design characteristics that are "basically the same" as the claimed design. *Id*. This framework helps guard against using hindsight to assemble unrelated references that do not have basically the same appearance as the claimed design and/or one another.

This framework makes sense when one considers that industrial design is a creative endeavor. Design patents focus on appearances, not concepts. *In re Harvey*, 12 F.3d 1061, 1064 (Fed. Cir. 1993). One would never say that a book is not new or would have been obvious because all its words are found in a dictionary. One would never say that a portrait or sculpture is not new or would have been obvious because it has the same number of facial features as other portraits or sculptures. Similarly, it would be illogical to have an obviousness test for designs where one could parse lines and curves and features from assorted prior art references–none of which have an appearance that is basically the same as the claimed design–to piece together the claimed design after its original creation.

The *Rosen-Durling* framework has provided clarity and flexibility to design patent obviousness analysis for more than 25-years. There is no reason to disrupt it now.

## IV. REVERSAL WOULD UNDERMINE THE DESIGN PATENT SYSTEM AND FAIR TRADE

As explained above, industrial design is a significant driving factor behind consumer demand for products. Independent designers and small entities, in particular, rely on the design patent system to protect their designs and stop knockoff products from unfairly competing in the market.

Changes to the obviousness analysis would have disastrous effects on these parties. As we saw before the *Rosen-Durling* framework, design rights would become harder to obtain and harder to enforce because basic design elements (e.g., a straight line, a curve, a spline) can be found in virtually any prior art reference and combined simply because they are common design elements. This would, in turn, likely impact the future of product innovation by diminishing the value of industrial design and disincentivizing industrial designers to innovate.

And a strong, predictable system for protecting industrial designs has much broader implications. Knockoff and counterfeit products undermine principles of fair trade in the global economy. *Supporting Innovation, Creativity & Enterprise: Charting a Path Ahead (U.S. Joint Strategic Plan on Intellectual Property FY 2017-2019*) 32-44 (2016). Via such products, consumers are commonly misled and exposed to low quality products that are unregulated and often unsafe. *Id*. Governments are also concerned because knockoffs and counterfeits are associated with labor exploitation, organized crime, the financing of criminal and terror

networks, drug trafficking, money laundering, and people smuggling *Id*; s*ee also, Focus on the Illicit Trafficking of Counterfeit Goods and Transnational Organized Crime*, United Nations Off. on Drugs & Crime, (2014), https://www.unodc.org/documents/counterfeit/FocusSheet/Counterfeit_focussheet_EN_HIRES.pdf; *Intellectual Property Crimes: Are Proceeds from Counterfeited Goods Funding Terrorism?*: *Hearing Before the H. Comm. on International Relations,* 108th Cong. 31-35 (2003) (statement of Ronald K. Noble, Secretary General, INTERPOL).

Importantly, design patent infringement can be intertwined with product counterfeiting. A current strategy of counterfeiters is to import knockoffs (i.e., products that copy another's industrial design but that do not bear counterfeit trademarks) into the United States separately from unauthorized labels bearing counterfeit marks, only to affix unauthorized labels and counterfeit marks to the knockoffs once the products are in the U.S., thereby circumventing customs inspections for counterfeits. *Tillis, Coons, Cassidy & Hirono Introduce Bipartisan Legislation to Seize Counterfeit Products and Protect American Consumers and Businesses*, Thom Tillis (Dec. 5, 2019), https://www.tillis.senate.gov/2019/12/tillis-coons-cassidy-hirono-introduce-bipartisan-legislation-to-seize-counterfeit-products-and-protect-american-consumers-and-businesses. Indeed, this practice is evidenced by the fact that labels bearing counterfeit marks—i.e., the labels

themselves, not labeled products—are one of the most seized counterfeit items in the U.S. *Intellectual Property Rights Seizure Statistics*: *Fiscal Year 2021,* U.S. Customs and Border Prot., https://www.cbp.gov/sites/default/files/assets/documents/2022-Sep/202994%20-%20FY%202021%20IPR%20Seizure%20Statistics%20BOOK.5%20-%20FINAL%20%28508%29.pdf (Sept. 29, 2022). Revising the *Rosen-Durling* framework will diminish the ability of companies targeted by counterfeiters to predictably enforce their industrial design rights, and likely contribute to the increase in the importation of knockoffs and resulting counterfeits.

Finally, it is notable that the fight over the *Rosen-Durling* framework in this Court is just one front in a broader effort to undermine design patent protections. Congress has been considering bills for over a decade that would create an exception to effectively limit the term of design patents directed to automobile parts. *See* H.R. 1707, 118th Cong. (2023). While legislative efforts to-date would only impact auto-part designs, an unwinding of the *Rosen-Durling* framework here would broadly weaken the U.S. design patent system across *all industries* and create uncertainty for *all design patentees*. The Court should reaffirm the vitality of the *Rosen-Durling* framework.

## V. CONCLUSION

The *Rosen-Durling* framework provides consistency, predictability, and flexibility to design patent obviousness analysis that has worked effectively for more than 25-years. Abandoning this framework for an obviousness test built for utility patents would have far-reaching negative consequences for industrial design, industrial designers, and fair trade. IDSA respectfully submits that *Rosen-Durling* should remain the rightful framework for evaluating design patent obviousness.

Respectfully submitted,

Dated: October 27, 2023

/s/ Erik Maurer

Robert S. Katz
Sonia Mary Okolie
BANNER & WITCOFF, LTD.
1100 13th Street, NW, Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000

Erik S. Maurer
BANNER & WITCOFF, LTD.
71 S. Wacker Drive, Suite 3600
Chicago, IL 60606
Telephone: (312) 463-5000

*Attorneys for Amicus Curiae Industrial Designers Society of America*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 21-2348

**Short Case Caption:** LKQ Corporation, et al. v. GM Global Technology Operations LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 2,954 words.
- ☐ the filing has been prepared using a monospaced typeface and includes __________ lines of text.
- ☐ the filing contains __________ pages / __________ words / __________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. __________).

Date: 10/27/2023

Signature: /s/ Erik Maurer

Name: Erik Maurer

Save for Filing