**No. 2021-2348**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LKQ CORPORATION, KEYSTONE AUTOMOTIVE INDUSTRIES, INC.,

*Appellants*,

*v.*

GM GLOBAL TECHNOLOGY OPERATIONS LLC,

*Appellee.*

On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in IPR2020-00534

## CORRECTED BRIEF FOR *AMICUS CURIAE* APPLE INC. IN SUPPORT OF APPELLEE GM GLOBAL TECHNOLOGY OPERATIONS LLC

MARK C. FLEMING
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

BENJAMIN S. FERNANDEZ
WILMER CUTLER PICKERING
HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
(720) 274-3135

TRACY-GENE G. DURKIN
STERNE KESSLER
GOLDSTEIN & FOX PLLC
1101 K Street N.W.,
10th Floor
Washington, DC 20005
(202) 371-2600

MARK D. SELWYN
S. DENNIS WANG
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

LAURA E. POWELL
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 663-6000

*Attorneys for Amicus Curiae Apple Inc.*

October 27, 2023

## CERTIFICATE OF INTEREST

Counsel for Amicus Curiae Apple Inc. certifies the following:

**1. Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Apple Inc.

**2. Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

**3. Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

None.

**5. Related Cases**. Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☒ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). Please do not duplicate information. This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: October 27, 2023

/s/ Mark D. Selwyn

MARK D. SELWYN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ....................................................................i

TABLE OF AUTHORITIES ....................................................................iv

INTEREST OF *AMICUS CURIAE* ....................................................................1

SUMMARY OF THE ARGUMENT ....................................................................3

ARGUMENT ....................................................................5

I. THE *ROSEN-DURLING* FRAMEWORK ADDRESSES THE SPECIAL NATURE OF DESIGN PATENTS ....................................................................5

II. THE *ROSEN-DURLING* FRAMEWORK IS FULLY CONSISTENT WITH LONG-STANDING SUPREME COURT PRECEDENT ....................................................................11

III. THE GOVERNMENT'S PROPOSED MODIFICATIONS UNNECESSARILY DEVIATE FROM WELL-SETTLED LAW ....................................................................16

IV. THE *ROSEN-DURLING* FRAMEWORK PROVIDES PREDICTABILITY AND CONSISTENCY TO THE EVALUATION OF DESIGN PATENT OBVIOUSNESS WHILE PROMOTING DESIGN INNOVATION AND PROTECTION ....................................................................26

CONCLUSION ....................................................................29

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Airbus S.A.S. v. Firepass Corp.*,
941 F.3d 1374 (Fed. Cir. 2019) ....................15

*Campbell Soup Co. v. Gamon Plus, Inc.*,
10 F.4th 1268 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1129 (2022) ....................*passim*

*Campbell Soup Co. v. Gamon Plus, Inc.*,
939 F.3d 1335 (Fed. Cir. 2019) ....................12, 19

*Corephotonics, Ltd. v. Apple Inc.*, No. 22-1340,
__ F.4th __, 2023 WL 6798899 (Fed. Cir. Oct. 16, 2023) ....................15

*Durling v. Spectrum Furniture Co.*,
101 F.3d 100 (Fed. Cir. 1996) ....................*passim*

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
543 F.3d 665 (Fed. Cir. 2008) (*en banc*) ....................23, 24

*Gorham Manufacturing Co. v. White*,
81 U.S. (14 Wall.) 511 (1871) ....................27

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ....................3, 11, 17

*In re Blum*,
374 F.2d 904 (C.C.P.A. 1967) ....................5

*In re Glavas*,
230 F.2d 447 (C.C.P.A. 1956) ....................6

*In re Harvey*,
12 F.3d 1061 (Fed. Cir. 1993) ....................6

*In re Jennings*,
182 F.2d 207 (C.C.P.A. 1950) ....................11

*In re Oetiker*,
977 F.2d 1443 (Fed. Cir. 1992) ....................................................................15

*In re Rosen*,
673 F.2d 388 (C.C.P.A. 1982) ..................................................................*passim*

*In re Slovish*,
769 F.2d 738 (Fed. Cir. 1985) ......................................................................15

*Kimble v. Marvel Entertainment, LLC*,
576 U.S. 446 (2015)..........................................................................................26

*KSR International Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................................................................................*passim*

*MRC Innovations, Inc. v. Hunter Manufacturing, LLP*,
747 F.3d 1326 (Fed. Cir. 2014) ...........................................................13, 14

*Patterson v. McLean Credit Union*,
491 U.S. 164 (1989)..........................................................................................26

*Samsung Electronics Co. v. Apple Inc.*,
580 U.S. 53 (2016)............................................................................................27

*Smith v. Whitman Saddle Co.*,
148 U.S. 674 (1893)....................................................................................20, 21

## STATUTES

35 U.S.C. § 103 ......................................................................................3, 23, 26

## OTHER AUTHORITIES

Cosm Chair, Herman Miller,
https://www.hermanmiller.com/products/seating/office-chairs/cosm-chairs/ (last visited Oct. 25, 2023) ................................................10

*Disbursement of Wages, Cuneiform Tablet No. 13*, Library of Congress (2039 B.C.),
https://www.loc.gov/resource/amedscd.2020741382_cf0013/?sp=1&r=-1.898,-0.248,4.795,1.798,0 (last visited Oct. 25, 2023) ............................25

Dyson Purifier Cool Gen1, Dyson, https://www.dyson.com/air-treatment/air-purifiers/purifier-cool-gen1-tp10/white#, last visited Oct. 25, 2023 ........ 9

*Helios on His Chariot*, Museum of Fine Arts, Budapest, https://www.mfab.hu/artworks/176769/ (last visited Oct. 25, 2023) ........ 18, 23

Macias, Amanda, *7 Facts About Coca-Cola's Iconic Bottle, On Its 100th Birthday*, Business Insider (Nov. 16, 2015, 1:09 PM), https://www.businessinsider.com/facts-about-coca-colas-iconic-bottle ........ 8

Mossberg, Walter S. & Katherine Boehret, *Testing Out the iPhone*, Wall Street Journal, June 27, 2007 ........ 6

Taylor, Eric, *Sixth Panel: Torch, Crown with Rays and Ribbons, Whip from The Mithraeum of Felicissimus*, Ostia Antica, https://www.ostia-antica.org/regio5/9/9-1.htm (last visited Oct. 25, 2023) ........ 23

U.S. Intellectual Property and Counterfeit Goods—Landscape Review of Existing/Emerging Research, Federal Research Division, February 2020, https://www.uspto.gov/sites/default/files/documents/USPTO-Counterfeit.pdf (last visited Oct. 25, 2023) ........ 28

U.S. Design Patent No. D11,023 (1879) (Statue of Liberty) ........ 17, 18, 23

U.S. Design Patent No. D48,160 (1915) (Coca-Cola Bottle) ........ 8

U.S. Design Patent No. D593,087 (2009) (Original 2007 iPhone) ........ 7

U.S. Design Patent No. D598,532 S1 (2009) (Dyson Fan) ........ 9

U.S. Design Patent No. D874,860 (2020) (Herman Miller Cosm Chair) ........ 10

Wikipedia, iPhone (1st generation), https://en.wikipedia.org/wiki/IPhone_(1st_generation) (last visited Oct. 25, 2023) ........ 7

## INTEREST OF *AMICUS CURIAE*[1]

Design is a foundational principle at Apple. Since its founding in 1976, Apple has committed to design innovation, developing products that consistently elicit surprise, delight, and recognition for their reimagination and reinvention of the look and feel of consumer electronics. Shortly after founding, Apple launched its Industrial Design Group to bring design in-house and to drive design innovation. Apple's early products reflected its design-centric approach. In 1984, Apple released Macintosh, whose distinctive appearance broke the mold of traditional personal computer design. Design has remained part of Apple's DNA ever since, as reflected by products such as iMac, iPod, iPhone, iPad, Apple Watch, and recently-announced Apple Vision Pro.

Apple's successes are due in significant part to its uncompromising commitment to design. Rather than make design secondary to technological and/or manufacturing practicality, Apple puts design at the forefront with significant investment in design innovation and technological advancement supporting design implementation. Apple also champions innovation in the design community through many programs that support independent developers and small and

[1] This brief is filed pursuant to the Court's order dated June 30, 2023. No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus* and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.

midsized enterprises (SMEs). Every year, Apple presents Apple Design Awards honoring developers for innovative application and game design.

To protect its substantial investments in design, Apple has developed a robust patent portfolio that includes more than four thousand active U.S. design patents. Design patents are critical for Apple to protect its brand identity by preventing competitors from copying its designs and counterfeiters from flooding the market with copycat products. And in developing and defending its designs, Apple has relied on the robust, balanced, and predictable framework for evaluating obviousness in design patents set forth in this Court's *Rosen-Durling* jurisprudence. *See Durling v. Spectrum Furniture Co.*, 101 F.3d 100 (Fed. Cir. 1996); *In re Rosen*, 673 F.2d 388 (C.C.P.A. 1982).

The *Rosen-Durling* framework properly addresses the substantial risk of hindsight bias that would arise if a design patent challenger could show obviousness by piecing together multiple disparate designs that are merely similar in concept. *Rosen* and *Durling* are also consistent with *KSR* and long-standing Supreme Court obviousness precedent. Thus, there is no reason for the Court to abandon the *Rosen-Durling* framework. Although other *amici*, including the government (Dkt. 120), suggest clarifications to *Rosen-Durling*, the proposed modifications would remove important safeguards against hindsight that are built into the existing test as applied by this Court. The Court should retain those

safeguards and maintain a predictable patent landscape for U.S. design innovators by reaffirming *Rosen-Durling*.

**SUMMARY OF THE ARGUMENT**

Consistent with long-standing Supreme Court and Federal Circuit precedent, the *Rosen-Durling* framework recognizes the special nature of design patents, while providing a flexible approach to determining whether a design would have been obvious under 35 U.S.C. § 103. As such, there is no reason to abandon the *Rosen-Durling* framework, on which design-focused industries have relied for decades. Apple offers the following additional arguments in support of Appellee GM Global Technology Operations LLC ("GM").

1. *Rosen-Durling* addresses the special nature of design patents, which renders them more susceptible to hindsight bias during an obviousness analysis. This Court's jurisprudence incorporates key safeguards to prevent such hindsight bias, and properly focuses the analysis on the visual impression of the design as a whole.

2. *Rosen-Durling* is consistent with the Supreme Court's decisions in *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966), and *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 428 (2007). As this Court has explained, *Rosen-Durling*'s two-step framework addresses the first three *Graham* factors upheld in *KSR*. *See Campbell Soup Co. v. Gamon Plus, Inc.*, 10 F.4th 1268, 1275 (Fed. Cir.

2021) (*Campbell II*), *cert. denied*, 142 S. Ct. 1129 (2022). Further, *Rosen* and *Durling* do not impose a rigid rule; they allow for a flexible analysis of the first three *Graham* factors, consideration of multiple prior art references, and reliance on the common sense of the designer of ordinary skill. Moreover, *Rosen* and *Durling* resemble other obviousness doctrines that this Court has correctly continued to apply flexibly post-*KSR*, including the test for determining whether a reference is "analogous art" to be considered for purposes of the utility patent obviousness inquiry.

3. Modifying the *Rosen*-*Durling* framework as proposed by the government would remove critical safeguards that prevent hindsight bias in the context of design patents. *See* Brief for the United States as Amicus Curiae on Rehearing En Banc In Support of Neither Party (Dkt. 120) ("Gov. Br."). *Rosen* and *Durling* already provide for a flexible and balanced approach to assess design patent obviousness in a manner that is consistent with *KSR*.

4. The *Rosen*-*Durling* framework has provided predictability and consistency to the evaluation of design patent obviousness for decades, and a substantive change in the law would harm design expectations. Design innovators rely on clear design patent rules to obtain patent protection and to use design patents to remove counterfeit and copycat products from the marketplace. This Court should reaffirm the *Rosen*-*Durling* framework as the appropriate framework.

# ARGUMENT

## I. THE *ROSEN-DURLING* FRAMEWORK ADDRESSES THE SPECIAL NATURE OF DESIGN PATENTS

Design patents, by their nature, present unique issues when analyzing obviousness not typically present for utility patents. For example, claimed designs are inherently unitary. There are "no portions of a design which are 'immaterial' or 'not important.' A design is a unitary thing and all of its portions are material in that they contribute to the appearance which constitutes the design." *In re Blum*, 374 F.2d 904, 907 (C.C.P.A. 1967). The Court's *Rosen-Durling* framework therefore properly focuses the obviousness analysis on the visual characteristics of the design ***as a whole***. It does so, for example, by first ensuring that there is a primary reference already in existence with "basically the same" ***overall visual impression*** as the claimed design. *Durling*, 101 F.3d at 103; *Rosen*, 673 F.2d at 390-391. Only then does a court consider whether it would have been obvious to an ordinary designer to modify the primary reference in a way that would produce the claimed design. *Campbell II*, 10 F.4th at 1275. The primary reference requirement ensures that the claimed design is considered as a whole when determining the scope and content of the prior art and comparing that prior art to the claimed design.

Unlike utility patents, which can often be described by their constituent parts, a design is viewed by its ***overall*** visual impression—i.e., the visual

impression that one senses by viewing the complete design. Further, while utility patent subject matter often involves complex technology or science, a design patent is limited to its "ornamental design" and its "visual appearance." *In re Harvey*, 12 F.3d 1061, 1064 (Fed. Cir. 1993) (citing *In re Glavas*, 230 F.2d 447, 450 (C.C.P.A. 1956)). This renders designs more susceptible to hindsight reconstruction from known shapes and objects—an improper exercise given a design's inherently unitary nature. In other words, once a design is known, it can be tempting to characterize the design as a mere combination of existing shapes and objects.

The hindsight reconstruction problem is particularly pronounced with regard to minimalist designs. Some of the most innovative product designs are minimalistic and "simple" in concept, but create unique overall visual impressions. Apple's iconic products, such as iPhone, iPad, Mac, and Apple Watch, have received industry acclaim for their surprising and striking—yet minimalistic—visual appearances. Consider, for example, the original iPhone's design, which, at its introduction, *The Wall Street Journal* summed up as "simply beautiful."[2]

[2] Mossberg & Boehret, *Testing Out the iPhone*, Wall Street Journal, June 27, 2007, at 3.



FIG. 3



U.S. Design Patent No. D593,087 (2009) (Original 2007 iPhone);

https://en.wikipedia.org/wiki/IPhone_(1st_generation) (last visited Oct. 25, 2023).

Other popular product designs exhibit similarly minimalistic qualities.  For example:

FIG. 1.





U.S. Design Patent No. D48,160 (1915) (Coca-Cola Bottle); Macias, *7 Facts About Coca-Cola's Iconic Bottle, On Its 100th Birthday*, Business Insider (Nov. 16, 2015, 1:09 PM), https://www.businessinsider.com/facts-about-coca-colas-iconic-bottle.



FIG. 1



U.S. Design Patent No. D598,532 S1 (2009) (Dyson Fan); Dyson Purifier Cool Gen1, Dyson, https://www.dyson.com/air-treatment/air-purifiers/purifier-cool-gen1-tp10/white#, last visited Oct. 25, 2023.



FIG. 1



U.S. Design Patent No. D874,860 (2020); Cosm Chair, Herman Miller, https://www.hermanmiller.com/products/seating/office-chairs/cosm-chairs/ (last visited Oct. 25, 2023). Although one could try to break these now-existing designs down into disparate elements, doing so would ignore the specific design innovation required to achieve the designs for these specific consumer products.

The *Rosen-Durling* framework is tailored to address these unique aspects of design. It considers the unitary nature of a design by emphasizing that when analyzing obviousness, "it is the overall appearance, the visual effect as a whole of the design, which must be taken into consideration." *Rosen*, 673 F.2d at 390. This Court explained that, unless the design's visual characteristics are considered as a

whole, a court runs the risk of holding an innovative design obvious even where the prior art contains no actual preexisting design that resembles the patented design, simply because "individual features from prior art" could be combined in a way that "would require modification of every individual feature[.]" *Id.* at 391 (quoting *In re Jennings*, 182 F.2d 207, 208 (C.C.P.A. 1950)). The *Rosen-Durling* framework does not arbitrarily impose rigid restrictions, but instead reflects the unique, unitary nature of design patents and promotes continued design innovation.

## II. THE *ROSEN-DURLING* FRAMEWORK IS FULLY CONSISTENT WITH LONG-STANDING SUPREME COURT PRECEDENT

The *Rosen-Durling* framework provides the proper obviousness framework for assessing design patents under the Supreme Court's *Graham* factors, which were upheld in *KSR*. *Graham*, 383 U.S. at 17-18; *KSR*, 550 U.S. at 407 ("[T]he [*Graham*] factors continue to define the inquiry that controls."); *see Campbell II,* 10 F.4th at 1275 ("In the design patent context, we address the first three *Graham* factors by determining whether a designer of ordinary skill would have combined teachings of the prior art to create 'the same overall visual appearance as the claimed design.'" (quoting *Durling*, 101 F.3d at 103)). In applying the *Rosen-Durling* framework, courts address the first three *Graham* factors—i.e., the scope and content of the prior art, the differences between the claims and the prior art, and the level of ordinary skill in the art, *Graham*, 383 U.S. at 1, 17-18—while

recognizing the unique nature of design patents, which are unitary and protect ornamental appearance. *Campbell II*, 10 F.4th at 1275.

Unlike the rigid rule that the Supreme Court found problematic in *KSR*, this Court has applied the *Rosen-Durling* framework flexibly and has not hesitated to use that framework to invalidate design patents as obvious over prior art designs where appropriate. For example, the first step of *Rosen-Durling* (the "basically the same" prong) ensures that the primary reference and the claimed design cannot have "substantial differences in the[ir] overall visual appearance" or differences that would require "major modifications." *Campbell II*, 10 F.4th at 1273. In *Campbell I*, this Court held that a prior art reference lacking express disclosure of a claimed cylindrical object still satisfied the "basically the same" prong of the *Rosen-Durling* framework, allowing for consideration of common sense when evaluating a claimed design. *See Campbell Soup Co. v. Gamon Plus, Inc.*, 939 F.3d 1335, 1335 (Fed. Cir. 2019) (*Campbell I*); *see Durling*, 101 F.3d at 103 ("[T]he ultimate inquiry under section 103 is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved."). This is plainly different from the rigid application of the teaching-suggestion-motivation test that the Supreme Court rejected in *KSR* for denying "recourse to common sense." *KSR*, 550 U.S. at 421 ("Rigid preventative rules that

deny factfinders recourse to common sense, however, are neither necessary under our case law nor consistent with it.”).

This Court has also flexibly applied the second step of *Rosen-Durling*, which analyzes whether the secondary references are so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other. *Rosen*, 673 F.2d at 391. For example, in *MRC Innovations, Inc. v. Hunter Mfg., LLP*, this Court relied on the skill of an ordinary designer in the art to conclude that certain claimed ornamental features not present in any of the secondary references would have been “de minimis” and an “insubstantial change that would have been obvious to a skilled designer.” 747 F.3d 1326, 1355 (Fed. Cir. 2014). The Court noted that “on numerous occasions we have invalidated design patents despite the inclusion of ornamental features that were entirely absent from prior art designs” by finding that the features would have been de minimis to an ordinary designer in the art. *Id.* (collecting cases).

Further, while *KSR* explained that the obviousness analysis should consider “common sense,” *KSR* noted that it still “can be important to identify a reason that would have prompted a person of ordinary skill in the art to combine the elements as the new invention does.” *KSR*, 550 U.S. at 401. Consistent with *KSR*, the *Rosen-Durling* framework considers whether the secondary references “are so

related [to the primary reference] that the appearance of certain ornamental features in one would ***suggest the application of those features to the other***." *Rosen*, 673 F.2d at 391 (emphasis added).

The *Rosen* opinion itself applied a flexible approach to the obviousness inquiry consistent with *KSR*. *Rosen* considered a broad scope of prior art furniture designs that "would reasonably fall within the scope of the knowledge of the designer of ordinary skill" and "realm of knowledge." *Rosen*, 673 F.2d at 390. The Court also noted that the analysis considers whether "features might ***reasonably*** be interchanged with or added from those in other pertinent references to achieve [the claimed] design." *Id.* at 391 (emphasis added). *Rosen*'s analysis thus reflects an "expansive and flexible approach" described in *KSR*. *KSR*, 550 U.S. at 415.

The mere fact that the *Rosen-Durling* framework involves a structured two-step inquiry does not mean it is invalid under *KSR*. *KSR* does not prohibit a structured framework that sets forth criteria for evaluating obviousness. This Court has continued to apply a structured approach to the four-factor *Graham* test in other contexts. For example, when analyzing secondary considerations, the Court requires that the patentee carry the "burden of production to demonstrate a nexus between the claimed design and the secondary considerations." *MRC Innovations*, 747 F.3d at 1336. In a similar vein, *Rosen-Durling* requires the patent

challenger to carry the burden of identifying a primary reference before proceeding to the second step of the framework.

Indeed, the *Rosen-Durling* framework resembles other obviousness-related inquiries that continue to apply after *KSR*. For instance, the "analogous art" doctrine sets forth a prerequisite test for utility patent obviousness that must be satisfied for a reference even to qualify as prior art: "A reference qualifies as prior art for an obviousness determination only when it is analogous to the claimed invention." *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1379 (Fed. Cir. 2019); *see also Corephotonics, Ltd. v. Apple Inc.*, No. 22-1340, __ F.4th __, 2023 WL 6798899, at *7 (Fed. Cir. Oct. 16, 2023) ("Art that is 'too remote' from the patents being attacked cannot be treated as prior art." (citing *In re Slovish*, 769 F.2d 738, 741 (Fed. Cir. 1985))); *id.* ("The combination of elements from non-analogous sources, in a manner that reconstructs the applicant's invention only with the benefit of hindsight, is insufficient … [for] obviousness." (quoting *In re Oetiker*, 977 F.2d 1443, 1447 (Fed. Cir. 1992))). Like *Rosen's* primary reference requirement, in the utility patent context, if no analogous art is identified, the obviousness inquiry will not proceed. *Airbus*, 941 F.3d at 1379 (reference can be used for obviousness "***only*** when it is analogous" (emphasis added)).

Like the analogous art doctrine, *Rosen-Durling* also identifies ground rules for prior art references to be considered in an obviousness analysis: a primary

reference must have "basically the same" visual impression as the claimed design, and any secondary references must be "so related [in appearance to each other] that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Durling*, 101 F.3d at 103, 105; *Rosen*, 673 F.2d at 391. This is no different, whether in degree or kind, from the analogous-art requirement that this Court has continued to apply in determining the universe of potentially invalidating references for utility patents following *KSR*.

## III. THE GOVERNMENT'S PROPOSED MODIFICATIONS UNNECESSARILY DEVIATE FROM WELL-SETTLED LAW

In its *amicus* brief, the government seeks to clarify *Rosen-Durling*, but in doing so, proposes modifications that would shift the focus to individual aspects of a design or abstract concepts, rather than the overall visual impression of a design. The government suggests three modifications: (1) replacing the "basically the same visual impression" language with "***broadly*** have a similar overall visual effect"; (2) allowing the obviousness analysis to continue even without a single primary reference; and (3) jettisoning the "so related" requirement. Gov. Br. 26-29. The suggestion of changing "basically the same" to "broadly hav[ing] a similar overall visual effect" introduces significant risk of hindsight bias. Moreover, as explained below, each proposed modification would remove safeguards that *Rosen-Durling* recognized prevent hindsight bias in the context of evaluating design patents—a concern that the Supreme Court reaffirmed in *KSR* as a proper consideration under

Section 103. *KSR*, 500 U.S. at 421 ("A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." (citing *Graham*, 383 U.S. at 36)).

***First***, eliminating *Rosen-Durling*'s requirement to identify a primary reference with "basically the same visual characteristics," and instead allowing use of a primary reference that merely "broadly ha[s] a similar overall visual effect" (Gov. Br. 12), invites hindsight into the obviousness analysis. Doing so would allow a challenger to assert obviousness based on prior art that is merely ***conceptually*** similar to the claimed design or even an arbitrary subset of the claimed design, but does not disclose a similar overall visual impression. The challenger would undoubtedly use hindsight to seek a conclusion that it would have been obvious to modify the primary reference to look like the claimed design. In *Durling,* this Court properly rejected the defendant's attempt to use this approach. *See Durling*, 101 F.3d at 103-105 (holding that district court erred by focusing on the "general concept of a sectional sofa with integrated end tables" instead of the design's visual appearance as a whole).

Take, for example, a design patent from 1879 entitled "Liberty Enlightening the World," more commonly known as the Statue of Liberty. *See* U.S. Design Patent No. D11,023 (1879). Under the government's proposed rule, a patent challenger could rely on a prior art Greek sculpture of Helios to invalidate the

patent by arguing that it is a proper starting point because it "broadly ha[s] a similar overall visual effect" as the Statue of Liberty:

**Statue of Liberty**
D11,023



**Helios on His Chariot Sculpture**



*See* U.S. Design Patent No. D11,023 (1879) (Statue of Liberty); *Helios on His Chariot*, Museum of Fine Arts, Budapest, https://www.mfab.hu/artworks/176769/ (last visited Oct. 25, 2023). As shown above, the Helios sculpture is similar in ***concept*** to the Statue of Liberty (e.g., it depicts a human figure wearing robes and a multi-pointed crown), but it conveys a very different overall visual impression.

Under the current *Rosen-Durling* analysis, Helios would not be a proper starting point to invalidate the Statue of Liberty design because it does not have "basically the same" overall visual impression. Unlike the Statute of Liberty, Helios is in motion, the horses and chariot dominate the sculpture, and Helios' body posture and orientation are different from Lady Liberty's. But under the government's "broadly similar" test, which allows for many more differences between the primary reference and the claimed design, there is enhanced risk of relying on hindsight to diminish the differences between Helios and the claimed design to conclude that Helios is a proper starting reference.

When properly applied, the "basically the same" requirement is not rigid, contrary to the government's assertion. Gov. Br. 18-25. As the Court recognized in *Campbell I*, a factfinder can still find a proper primary reference, even if it lacks all the claimed design elements. *Campbell I*, 939 F.3d at 1340-1341 (holding that prior art showing a dispenser design was a proper primary reference, even though it did not expressly show the claimed can within the dispenser). *Rosen* itself referred to the primary-reference requirement as a "starting point," thus allowing—and, in fact, requiring—further analysis based on one or more secondary references if the starting point is "something in existence, the design characteristics of which are basically the same as the claimed design …." *Rosen*, 673 F.2d at 391. And, as explained above, the "basically the same" analysis allows consideration of the

ordinary designer's creativity and common sense, with which *KSR* was concerned. *See supra* Section II.

Further, while LKQ and certain *amici* contend that the "basically the same" test of *Rosen-Durling* conflicts with *Smith v. Whitman Saddle Co.*, 148 U.S. 674, 681 (1893), that is not the case. *See* Appellants Br. 24-25; Gov. Br. 21-26; Automotive Body Parts Association Br. 9. The design patent in *Whitman Saddle* was obvious under *Rosen-Durling*'s framework. *Whitman Saddle* involved a patented design that essentially combined the front half of one prior art saddle with the rear half of another prior art saddle. The Supreme Court highlighted evidence that "there were several hundred styles of saddles or saddletrees belonging to the prior art, and that it was customary for saddlers to vary the shape and appearance of saddletrees in numerous ways, according to the taste and fancy of the purchaser." 148 U.S. at 681. The Court determined that evidence showed both halves of the claimed saddle design were used on a variety of prior art saddles and that "the addition of a known cantle to a known saddle, in view of the fact that such use of the cantle was common," did not produce a patentable design. *Id.*

None of this undermines the *Rosen-Durling* framework. In *Whitman Saddle*, the Supreme Court identified two references, the Granger and Jenifer saddles, that, when combined, would have resulted in the claimed design. The two saddles were so similar to the claimed design that either reference could have served as a

primary reference that was "basically the same" as the claimed design, with the other reference being "so related" to the first as to suggest combining the different feature from the second reference with the first. After finding one of the two saddles a primary reference, the trier of fact could "determine whether, using secondary references, an ordinary designer would have modified the primary reference to create a design that has the same overall visual appearance as the claimed design." *Campbell II*, 10 F.4th at 1275. While the Supreme Court did not expressly identify the Granger saddle using the term "primary reference," its analysis focused on "difference[s] compared with the Granger saddle," and was thus consistent with treating Granger as the primary reference that had "basically the same" visual appearance. *Whitman Saddle*, 148 U.S. at 682 (in summarizing its analysis, stating that "the design of the patent had two features of difference ***as compared with the Granger saddle***, one the cantle, the other the drop" (emphasis added)); *see also id.* at 680 (describing differences of claimed design from Granger saddle); *id.* (noting that accused saddle was "***substantially the Granger saddle*** with the Jenifer cantle" (emphasis added)). Thus, there is no analytical inconsistency between *Rosen-Durling* and *Whitman Saddle*.

***Second***, the Court should not adopt the government's suggestion that a design patent may be obvious even in the absence of an adequate primary reference. Gov. Br. 12, 23-26. Again, taking the design patent for the Statue of

Liberty as an example, under the government's proposed rule, without a starting reference, a patent challenger could take individual features from the Helios sculpture and combine them with individual features from a prior art mosaic to invalidate the design patent by piecing together the individual concepts in each of the prior art designs.



*See* U.S. Design Patent No. D11,023 (1879) (Statue of Liberty); *Helios on His Chariot*, Museum of Fine Arts, Budapest, https://www.mfab.hu/artworks/176769 (last visited Oct. 25, 2023); Taylor, *Sixth Panel: Torch, Crown with Rays and Ribbons, Whip from The Mithraeum of Felicissimus*, Ostia Antica, https://www.ostia-antica.org/regio5/9/9-1.htm (last visited Oct. 25, 2023). By allowing the continued applicability of additional prior art references even without a primary reference that is "basically the same" in overall visual impression as the claimed design, the government's proposed rule again invites hindsight, because a challenger could combine any number of known design concepts to form the claimed design. *See* Gov. Br. 25-29. In so doing, the government's test would shift the focus from the claimed design as a whole to its individual features, contrary to the statute's instruction that obviousness be considered with regard to "the claimed invention as a whole." 35 U.S.C. § 103.

The government's proposed test also conflicts with this Court's *en banc* holdings in the infringement context. In *Egyptian Goddess*, this Court addressed whether, for purposes of determining infringement of design patent, a claimed design's "points of novelty" should be identified for comparison with an accused design. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 671 (Fed. Cir. 2008) (en banc). This Court held that dissecting a design into one or more "points of novelty" would improperly shift the focus to a "single specified feature of the

claimed design, rather than on the proper inquiry, i.e., whether the accused design has appropriated the claimed design as a whole." *Id.* at 677. The government's proposed test would create a divide between how the same claimed design is understood for infringement on one hand and for invalidity on the other.

***Third***, the Court should not adopt the government's proposal to jettison the "so related" requirement—a proposal the government states is necessary "to allow the decisionmaker to take into account the ordinarily skilled designer's experience, creativity, and common sense, when considering combinations involving the base reference." Gov. Br. 12. As explained above, the *Rosen-Durling* framework already permits the decisionmaker to consider the ordinarily-skilled designer's common sense and creativity when determining whether the ornamental features of secondary references would suggest their application to the primary reference. *See supra* Section II. And the "so related" requirement is critical to prevent the use of hindsight in combining ornamental features from visually unrelated prior art, similar to the purpose of the analogous art doctrine for utility patents. *See id.*

In the Statue of Liberty example, one of the many differences between the Statue of Liberty and the Helios sculpture is that the latter is not holding a torch or a tablet. Without the "so related" requirement, a challenger could rely on designs wholly unrelated in appearance to the Helios sculpture to provide teachings of the

missing features that one would only combine with the benefit of having first seen the Statute of Liberty design.




As depicted above, the missing elements in the Helios sculpture in comparison to the Statue of Liberty can be found in an unrelated mosaic, which shows a torch, and an unrelated cuneiform tablet. *Disbursement of Wages, Cuneiform Tablet No. 13*, Library of Congress (2039 B.C.).[3] If the government's proposal to "jettison" the "so related" requirement were adopted, these disparate elements taken from three designs that are visually unrelated to each other could be

[3] https://www.loc.gov/resource/amedscd.2020741382_cf0013/?sp=1&r=-1.898,-0.248,4.795,1.798,0 (last visited Oct. 25, 2023).

used to recreate the Statue of Liberty based purely on hindsight—not on any suggestion of visual similarity in the works themselves.

In sum, the *Rosen-Durling* framework should be preserved and not be altered in the manner suggested by the government, as its proposed modifications would invite hindsight bias at the expense of the Patent Act's intended protection of a design "as a whole." 35 U.S.C. § 103.

## IV. THE *ROSEN-DURLING* FRAMEWORK PROVIDES PREDICTABILITY AND CONSISTENCY TO THE EVALUATION OF DESIGN PATENT OBVIOUSNESS WHILE PROMOTING DESIGN INNOVATION AND PROTECTION

A final important consideration is the longevity of the *Rosen-Durling* framework, which has provided predictability to the evaluation of design patent obviousness for decades, and on which innovators in design-heavy industries have relied to protect their investments and brand value.

As the Supreme Court has repeatedly observed, *stare decisis* is of particular importance in interpretation of statutory schemes, as Congress can always amend the statute if it sees fit. *See Kimble v. Marvel Entm't, LLC*, 576 U.S. 446, 456 (2015) (explaining that "*stare decisis* carries enhanced force when a decision, … interprets a statute" and "unlike in a constitutional case, critics of our ruling can take their objections across the street, and Congress can correct any mistake it sees"); *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-173 (1989) ("Considerations of stare decisis have special force in the area of statutory

interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done."). Here, the *Rosen-Durling* framework has long endured without any criticism from Congress. Doing so would cause unnecessary uncertainty in a well-functioning area of the patent law.

The U.S. patent system provides incentives for innovations and public disclosures that contribute to further innovation. As the Supreme Court explained over a century ago, "the grant of patents for designs were plainly intended to give encouragement to the decorative arts[.]" *Gorham Mfg. Co. v. White*, 81 U.S. (14 Wall.) 511, 524 (1871). Design patents contain valuable aesthetic ornamental features of a commercial product that "may enlarge the demand for it, and may be a meritorious service to the public." *Id.* at 524-525; *see also Samsung Elecs. Co. v. Apple Inc.*, 580 U.S. 53, 55 (2016) ("The federal patent laws have long permitted those who invent designs for manufactured articles to patent their designs."). *Rosen-Durling*'s predictable framework for design patent validity allows innovators and businesses of all sizes to rely on patent protection to not only continue protecting existing products but to develop new products. It also incentivizes investment in related engineering advancements required to support and implement those designs, such as new tooling and infrastructure. On the other hand, removing or watering down the *Rosen-Durling* framework would make it

difficult for the USPTO and courts to apply rules in a consistent manner, leading to less predictable outcomes and increased litigation.

Such unpredictability, in turn, may further embolden copycats to create counterfeits and knockoffs of innovative designs, flooding the market with products that harm brand value. For example, the original iPhone design is as immediately recognizable to a consumer as the registered Apple logo such that they both contribute to Apple's brand identity. Indeed, it is so recognizable that infringers can (and do) sell knockoffs that appear to be iPhones, even without using "Apple" or the Apple logo on the product or as part of the knockoff listing on online marketplaces. Low-quality counterfeits and knockoffs threaten brand identity by creating subpar product experiences that can impact customer loyalty and consumer safety.[4]

In addition to iPhones, infringers sell counterfeit and knockoff power products, such as phone chargers, that copy Apple's patented designs and lead consumers to believe they are purchasing genuine Apple products. But those products often do not meet the quality or safety standards required by Apple,

[4] *See* U.S. Intellectual Property and Counterfeit Goods—Landscape Review of Existing/Emerging Research, Federal Research Division, February 2020 at 11, https://www.uspto.gov/sites/default/files/documents/USPTO-Counterfeit.pdf (last visited Oct. 25, 2023).

causing customers of those products to be faced with economic risk and potential physical harm from unsafe, low-quality products.

Without appropriate design patent protection for innovative product designs, Apple and other innovative companies across all industries and of all sizes would have limited IP tools available to them to stop knockoffs and counterfeiters that copy a product's designs. Strong and predictable design patent protection is critical to stopping these bad actors.

## CONCLUSION

For the foregoing reasons, this Court should affirm the *Rosen-Durling* framework for analyzing obviousness in the design patent context.

Respectfully submitted,

/s/ Mark D. Selwyn

MARK D. SELWYN
S. DENNIS WANG
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

TRACY-GENE G. DURKIN
STERNE KESSLER
GOLDSTEIN & FOX PLLC
1101 K Street N.W., 10th Floor
Washington, DC 20005
(202) 371-2600

MARK C. FLEMING
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

BENJAMIN S. FERNANDEZ
WILMER CUTLER PICKERING
HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
(720) 274-3135

LAURA E. POWELL
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue, N.W.
Washington, DC 20037
(202) 663-6000

*Attorneys for Amicus Curiae Apple Inc.*

October 27, 2023

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS**

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and includes 5,323 words.

2. The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Mark D. Selwyn
MARK D. SELWYN
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
(650) 858-6000

October 27, 2023